**2024-1102**

# United States Court of Appeals for the Federal Circuit

TRACKTIME, LLC,

*Plaintiff-Appellant,*

– v. –

AMAZON.COM SERVICES LLC, AUDIBLE, INC.,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Delaware in No. 1:18-cv-01518-MN (Hon. Maryellen Noreika, Judge)*

## APPELLANT'S OPENING BRIEF AND ADDENDUM

ROBERT GREENSPOON
WILLIAM W. FLACHSBART
DUNLAP BENNETT & LUDWIG PLLC
*Attorneys for Plaintiff-Appellant*
333 North Michigan Avenue, Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
wflachsbart@dbllawyers.com

DECEMBER 9, 2024

COUNSEL PRESS (800) 4-APPEAL • (624292)

9. A method for a multimedia seek sequence using a synchronization index and a mobile computing device comprising the steps:

displaying on a mobile computing device text from a synchronization index, wherein said synchronization index comprises respective times within multimedia corresponding to a word or range of words and wherein said text is displayed other than as a web page;

wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface;

receiving information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a word, or range of words, from said synchronization index, wherein said gesture is recognized by said touch-sensitive input interface;

performing a data lookup using said synchronization index, wherein said synchronization index is referenced to provide data for a time location t1 that corresponds to said word or range of words selected by the recognized gesture; and

seeking on said mobile computing device multimedia corresponding to said synchronization index, and if found, accessing multimedia at t1.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1102

**Short Case Caption** TrackTime, LLC v. Amazon.com Services LLC

**Filing Party/Entity** TrackTime, LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 11/01/2023

Signature: /s/Robert Greenspoon

Name: Robert Greenspoon

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| TrackTime, LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| See Attached. | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**4. Legal Representatives.** List all law firms, partners, and associates that (a)appeared for the entities in the originating court or agency or (b) are expected toappear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

**Dunlap Bennett & Ludwig PLLC:**

Mark Magas

Tracy Pearson

Rolando Diaz

Thomas Dunlap

**Devlin Law Firm:**

Timothy Devlin

**Nelson Bumgardner Conroy:**

Edward Reese Nelson III

Joseph Paul Oldaker

Timothy Edward Grochocinski

## TABLE OF CONTENTS


**Page**

TABLE OF AUTHORITIES ........................................................................ vii

STATEMENT OF RELATED CASES ........................................................1

JURISDICTIONAL STATEMENT ............................................................1

INTRODUCTORY STATEMENT ..............................................................2

STATEMENT OF THE ISSUES.................................................................5

STATEMENT OF THE CASE....................................................................5

A. Origins of the ’978 and ’638 Patents..................................................5

B. The ’978 and ’638 Patents Overcome Problems with Conventional Technologies.................................................................8

C. Amazon Releases Amazon Music “Tap to Jump” to Great Praise, and Patents it Much Later than TrackTime Did......................11

D. Amazon’s Failure to Elicit Evidence of Certain Prior Art Features, or that Any Prior Art Contained the ’638 Patent’s “Ordered Combination” ....................................................................11

E. The District Court’s Pre-Trial ’978 Patent Ruling, and Post-Trial ’638 Patent Rulings ....................................................................13

SUMMARY OF THE ARGUMENT ........................................................16

ARGUMENT ..............................................................................................17

I. The District Court Erred in Finding the ’978 Patent Claims Invalid as Indefinite Means-Plus-Function Claims.............................17

A. Standard of Review........................................................................17

B. The “Executable Program Code” Limitations Are Not Indefinite ........................................................................................18

C. The District Court Erred to Find Indefiniteness .......................22

II. The District Court Erred in Denying JMOL on the ’638 Patent ..................................................................................................25

A. Standard of Review........................................................................25

B. The Finding That Amazon Music Does Not Infringe Claim 9 of the '638 Patent Is Unsupported by Substantial Evidence ....25

C. Claim 9 Was Patent Eligible as a Matter of Law Under *Alice* Step 1, and Amazon Adduced No Evidence at Trial for Ineligibility Under Step 2 ....33

D. No Substantial Evidence Supported Anticipation or Obviousness of Claim 9 ....40

1. Toub Does Not Anticipate, and No Substantial Evidence Allowed a Contrary Finding ....41

2. LiveNote Does Not Anticipate, and No Substantial Evidence Allowed a Contrary Finding ....44

3. Master Does Not Anticipate or Render Obvious, Master is Not Prior Art, and No Substantial Evidence Allowed a Contrary Finding ....46

III. The District Court Alternatively Erred to Deny a New Trial on the '638 Patent ....52

A. Standard of Review ....52

B. The Inconsistent Verdict and Weight of the Evidence Compels a New Trial ....52

C. The District Court's Erroneous Exclusion of Amazon's Patent (Which Proves Unconventionality), and of TrackTime's Draft Patent Application (Which Proves TrackTime Antedates Master as Prior Art), Compels a New Trial ....56

CONCLUSION ....63

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Almirall LLC v. Taro Pharm. Indus. Ltd.*,
No. 1:17-CV-663-JFB-SRF, 2019 U.S. Dist. LEXIS 11539 (D. Del. Jan. 24, 2019)....57

*Amster Corp. v. Envirotech Corp.*,
730 F.2d 1476 (Fed. Cir. 1984)....29

*BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016).... 37, 38

*Berkheimer v. Hewlett-Packard Co.*,
881 F. 3d 1360 (Fed. Cir. 2018).... 39, 40

*Bilski v. Kappos*,
561 U.S. 593 (2010)....35

*Cordance Corp. v. Amazon.com, Inc.*,
658 F.3d 1330 (Fed. Cir. 2011)....25

*Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*,
880 F.3d 1356 (Fed. Cir. 2018).... 35, 37

*Data Engine Technologies LLC v. Google LLC*,
906 F.3d 999 (Fed. Cir. 2018).... 35, 36

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)....57

*Dyfan, LLC v. Target Corp.*,
28 F.4th 1360 (Fed. Cir. 2022).... *passim*

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016).... 34, 37

*Finjan LLC v. ESET, LLC*,
51 F.4th 1377 (Fed. Cir. 2022)....17

*Finjan, Inc. v. Blue Coat Sys.*,
879 F.3d 1299 (Fed. Cir. 2018)....36

*GN Netcom, Inc. v. Plantronics*,
930 F.3d 76 (3d Cir. 2019).... 56, 57, 61

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
91 F.3d 1580 (Fed. Cir. 1996) .......... 19

*Haskell v. Colebourne*,
671 F.2d 1362 (CCPA 1982) .......... 47, 58

*Intel Corp. v. Qualcomm Inc.*,
21 F.4th 801 (Fed. Cir. 2021) .......... 17

*Mahurkar v. C.R. Bard, Inc.*,
79 F.3d 1572 (Fed. Cir. 1996) .......... 41, 48

*McQueeney v. Wilmington Tr. Co.*,
779 F.2d 916 (3d Cir. 1985) .......... 61

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) .......... 36

*Mycogen Plant Science v. Monsanto Co.*,
243 F.3d 1316 (Fed. Cir. 2001) .......... 25, 29, 32

*PAR Pharma., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) .......... 51

*Parker v. Flook*,
437 U.S. 584 (1978) .......... 35

*Pediatrix Screening, Inc., v. TeleChem Int'l, Inc.*,
602 F.3d 541 (3d Cir. 2010) .......... 52, 56

*Thales Visionix Inc. v. U.S.*,
850 F.3d 1343 (Fed. Cir. 2017) .......... 34

*Titanium Metals Corp. of Am. v. Banner*,
778 F.2d 775 (Fed. Cir. 1985) .......... 40

*Uniloc USA, Inc. v. LG Electronics USA, Inc.*,
957 F.3d 1303 (Fed. Cir. 2020) .......... 36

*Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*,
308 F.3d 1167 (Fed. Cir. 2002) .......... 40, 41

*United States v. Fulton*,
837 F.3d 281 (3d Cir. 2016) .......... 56

*Vectura Ltd. v. GlaxoSmithKline LLC*,
981 F.3d 1030 (Fed. Cir. 2020) .......... 52

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017)....................................36

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015)....................................18, 19

*WSOU Investments LLC v. Google LLC*,
Nos. 22-1063, -1065, 2023 U.S. App. LEXIS 27763
(Fed. Cir. Oct. 19, 2023)....................................19, 22, 24

*Xpertuniverse, Inc. v. Cisco Sys., Inc.*,
No. 09-157-RGA, 2013 U.S. Dist. LEXIS 164935
(D. Del. Nov. 20, 2013)....................................52

*Zeroclick, LLC v. Apple Inc.*,
891 F.3d 1003 (Fed. Cir. 2018)....................................19, 20, 22, 24

**Statutes & Other Authorities:**

28 U.S.C. § 1295(a)(1)....................................2

28 U.S.C. § 1331....................................2

28 U.S.C. § 1338(a)....................................2

35 U.S.C. § 101....................................33

35 U.S.C. § 102(e)....................................46

35 U.S.C. § 102(g)....................................46

35 U.S.C. § 112.................................... *passim*

Fed. Cir. R. 47.5(a)(1)....................................1

Fed. Cir. R. 47.5(a)(2)....................................1

Fed. R. Evid. 401....................................56, 59

Fed. R. Evid. 402....................................56

*How can the Last Printed date in properties be before the Creation Date property in Word?*, MICROSOFT COMMUNITY (Jun. 9, 2020)....................................58

## STATEMENT OF RELATED CASES

Under Fed. Cir. R. 47.5(a)(1), no other appeal in or from the same proceeding was previously before this or any other appellate court.

Under Fed. Cir. R. 47.5(a)(2), Appellant is not aware of any case that is pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in the pending case.

## JURISDICTIONAL STATEMENT

This is an appeal in a patent infringement action in the United States District Court for the District of Delaware ("district court") filed by Plaintiff-Appellant TrackTime, LLC ("TrackTime") against Defendant-Appellees Amazon.com Services LLC and Audible, Inc. (collectively, "Amazon"). (Appx270-333). TrackTime appeals the district court's opinion (Appx3-30), order (Appx31), and final judgment (Appx32-33) dated September 26, 2024, denying TrackTime's post-trial motion for judgment as a matter of law and for a new trial, regarding U.S. Patent No. 8,856,638 (the "'638 Patent"). TrackTime appeals the district court's judgment following jury verdict (Appx1-2) dated September 27, 2024, and all interlocutory orders supporting it. TrackTime also appeals the district court's pre-trial order (Appx44-58) finding asserted claims of U.S. Patent No. 8,862,978 (the "'978 Patent") invalid for indefiniteness. TrackTime timely filed an Amended Notice of

Appeal on October 3, 2024, within thirty days of entry of final judgment. (Appx6711-6712).

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has jurisdiction over this appeal under 28 U.S.C. § 1295(a)(1).

## INTRODUCTORY STATEMENT

This appeal involves TrackTime's patented technology for making it easier and faster to navigate within multimedia files on touchscreen mobile media players. Conventional media players, such as CD players, relied on physical buttons that enabled users to skip forward or backward through audio content in small, fixed time increments. Early computerized media players copied those conventional navigation features, and added "scrub bar" navigation options. That prior-art technology, however, was slow and cumbersome. TrackTime's '638 and '978 Patents changed that paradigm with a new approach to navigating multimedia content. The claimed invention presents users with a textual transcript of the multimedia content, and enables them to finger-tap on particular words to jump to the corresponding time position in the multimedia file. Using the patented technology, users easily skim through long multimedia files and "tap to jump" exactly where they want to go.

Amazon implemented TrackTime's patented technology in its Amazon Music product. Amazon's internal documents called "tap to jump" a "wow feature," "surprisingly addictive," and "innovative." (Appx6390-6391). Indeed, Amazon ***filed***

***its own patent*** on tap-to-jump. Amazon's patent lauded the feature as "overcom[ing]" the "deficiencies in conventional approaches" to navigating content on portable media players. (Appx9122).

The district court dismissed TrackTime's claims for Amazon's infringement of the '978 Patent. The district court interpreted the phrases "executable program code configured to facilitate annotation of a portion of [a] synchronization index" in claim 1, and "executable program code configured to synchronously play said associated multimedia with said synchronization index" in claim 2 as means-plus-function claims under 35 U.S.C. § 112, ¶6. And, insisting that the specification identified no corresponding structure for the term "executable program code," the district court ruled those claims were indefinite. That ruling was erroneous and must be reversed. This Court's precedent makes clear that terms such as "executable program code" do not trigger means-plus-function treatment. Regardless, even if the claims ***were*** means-plus-function claims, the specification recites sufficient structure to inform a skilled artisan of the scope of the claims with "reasonable certainty."

The district court's judgments of no-infringement and invalidity as to the '638 Patent must also be reversed. The district court erred in denying TrackTime's renewed motion for JMOL that Amazon Music infringed claim 9 of the '638 Patent. At trial, TrackTime's expert testified that Amazon Music practiced each limitation of claim 9. Amazon's expert hardly disputed that testimony. Instead, he raised non-

infringement arguments that were legally irrelevant. Amazon's expert insisted that Amazon Music does not practice a claimed "performing" step (limitation 9[d]), because the accused product adds an additional intermediate step to the process. But it is black letter law that infringement cannot be defeated by adding steps. Amazon's expert also contended that Amazon Music does not "seek" to a location (limitation 9[e]) in a multimedia file, despite using a "seek" function to do this in software. No reasonable jury could find non-infringement on that basis, either.

The district court's invalidity rulings fare no better. The district court deemed the '638 Patent directed to an abstract idea. But the claims are directed to a concrete improvement to portable multimedia player user interfaces. They recite a navigation feature that enables users to see a transcript of the multimedia file and use the words on the device's touchscreen as a special actuator to navigate within the file. The district court's determinations on anticipation and obviousness were also in error. Two prior-art references that Amazon contended anticipated the '638 Patent claims do not feature a touchscreen or mobile device as the claims require. A third and final prior art reference is not prior art at all—it post-dates what the USPTO found to be the priority date of the '638 Patent, and does not disclose the claimed invention anyway. The district court erred in denying TrackTime's motion for JMOL that the '638 Patent was not invalid, and at minimum should have granted a new trial based on prejudicial and wrong evidentiary rulings, if not the clear weight of the evidence.

## STATEMENT OF THE ISSUES

1. Whether claim language about "executable program code" configured to perform a conventional operation renders the asserted '978 Patent claims indefinite.

2. Whether substantial evidence supported the jury's verdict that Amazon Music lacks the only contested steps of claim 9 of the '638 Patent ("performing" and "seeking").

3. Whether the '638 Patent claims are directed to an abstract idea, and if so, whether substantial evidence supported the jury's verdict that its "ordered combination" was well-known, routine, and conventional.

4. Whether substantial evidence supported the jury's verdict on anticipation by three references (Toub, LiveNote, Master), obviousness by Master, and prior art status by Master in view of TrackTime's antedating evidence.

5. Whether the clear weight of the evidence, an inconsistency in the verdict, and/or evidentiary errors in excluding Amazon patent activities and TrackTime's pre-Master draft patent application merited the grant of a new trial.

## STATEMENT OF THE CASE

### A. Origins of the '978 and '638 Patents

The origins of the patents-in-suit demonstrate that the inventor set about to solve technological problems in conventional industry practice. And he succeeded.

The solution brought useful ideas into vastly different areas, from digital evidence presentations, to fun and interactive music listening experiences.

In 2008, inventor Curt Evans co-owned a litigation trial support company called Digital Evidence Group. (Appx5622, Appx5683). Mr. Evans noticed that in-court video deposition playback had limited functionality and was difficult to set up, requiring software running on a full version of Microsoft Windows and a large desktop computer. (Appx5624-5627). He set about to devise a comprehensive multimedia review platform to address these problems that could take advantage of the newly emerging touchscreen smartphones and reduce the amount of multimedia transmitted. (Appx5627-5628). On July 11, 2008, as he was reading a paper on closed captioning, which was non-interactive and laden with shortcomings, he sketched a version of his idea on that paper:



(Appx5628-5632, Appx8239). Already by then, as the sketch shows, Mr. Evans had incorporated the idea of "tap to jump"—*i.e.*, using an on-screen transcript to scroll and play back a multimedia excerpt that corresponds to specific tapped words. (Appx5630-5631).

Mr. Evans engaged software developers, led by Tom Rzonca, to assist in his multi-year commercial software effort. (Appx5687-5688, Appx5711-5712). One concept document used during the 2008-2010 development mocked up a deposition transcript adjacent to its video on an Apple iPhone, indicating "Drag/flick=scrolls pages" and "Double tap on line of testimony=begins playing video at correct location by referencing timecode in synchronized transcript." (Appx5687-5689, Appx8174-8195, *see esp.* Appx8191). At the time Mr. Evans filed the initial provisional application covering these ideas on January 3, 2011, commercial product development was still continuing under Mr. Rzonca's leadership. (Appx5711-5715, Appx7735).

Leading up to that provisional filing, Mr. Evans initially engaged the services of patent agent Steve Maynard. (Appx5632, Appx5761-5762). Mr. Evans briefed Mr. Maynard on the complete concept of the invention. (Appx5632, Appx5682-5683, Appx5687-5690). While Mr. Maynard was working on an early version of a draft patent application, Messrs. Maynard and Evans decided that Mr. Maynard would not be the best person to complete the effort because Mr. Maynard was newly hired to

become a USPTO employee-examiner. (Appx5760-5762, Appx7740). Eventually Mr. Evans retained Fish & Richardson to do so. (Appx5699). By November 23, 2010, Mr. Evans, coincidently a patent attorney himself, had completed a draft of the provisional patent application and delivered it on CD to the Fish firm. (Appx5618, Appx5695-5697). Thereafter, the Fish firm worked diligently to apply certain minor revisions and get the application on file by January 3, 2011, including billing Mr. Evans about $9,500 for the December 2010 work. (Appx5699-5700). The November 23, 2010 draft contained the same technology disclosure as the January 3, 2011 formal filing, which in turn contained the same technology disclosure as the specifications of the later-filed ’978 and ’638 Patents. (Appx3935-3936, Appx6744-6784, Appx6786-6796, Appx6919-6922).

## B. The ’978 and ’638 Patents Overcome Problems with Conventional Technologies

As embodied in the ’638 Patent’s figures and the infringing Amazon Music app, the tap to jump experience looks like this:

| ’638 Patent Figure and Text | Amazon Music’s Tap to Jump |
|---|---|
| <br><br>FIG. 35<br>“As the song plays on the mobile computing device, lyrics display in a synchronous, smoothly scrolling teleprompter type fashion. Each line of lyrics is, preferably, linked to a specific time within the song. A predetermined gesture (e.g., a swipe, a double-tap, a triple-tap, or similar, or movement of the line of lyrics to a static position indicator to indicate a desired playback location) jumps the song to that time of elapsed duration.”<br><br>(Appx6973, Appx7002; *see also* Appx6999 (“a tap”)). | <br><br>Q. And upon the tapping music would play from a different time period corresponding to the place in the lyrics that you tapped?<br><br>A. Correct.<br><br>(Appx3897, Appx6813 (objection omitted)). |

(Appx6724-6725). This uniquely interactive experience solved several technological problems in industry practice. First, the ’638 Patent spends several columns detailing inferior ways that prior art trial presentation software platforms worked. (Appx6983-

Appx6988). Along the way, the ’638 Patent background also derided conventional karaoke forms for not delivering sufficient entertainment value. (Appx6987-6988). Likewise, this background section critiqued closed captioning in its conventional form for being non-interactive. (Appx6988, explaining that closed-captioning and karaoke use a “synchronization index-type format” and were “characterized by passive non-interactivity” with “no opportunity to use the words in any fashion other than to read them,” a sharp “contrast” from use “in the present disclosure” of the ’638 Patent).

Claim 9 of the ’638 Patent exemplifies how Mr. Evans solved such problems. It sets forth a method that uses a synchronization index on a mobile device for multimedia navigation. Such an index contains time codes corresponding to lines of text from a transcript (such as song lyrics or deposition testimony). The mobile device that contains such an index now receives information corresponding to a touch gesture placed on a word or group of words from that synchronization index. That is the “tap.” In response, the device performs a timecode lookup. The result of that lookup causes the device to seek the multimedia that corresponds to those words and navigate accordingly (*i.e.*, to the place in the song corresponding to where the user tapped the words). That is the “jump.” The result is “tap to jump.”

### C. Amazon Releases Amazon Music "Tap to Jump" to Great Praise, and Patents it Much Later than TrackTime Did

Amazon called its development of "tap to jump" a "wow feature" (Appx8101), "surprisingly addictive" (Appx8118) and "innovative" (Appx8091) in its internal documents. (Appx6390-6391). Customers used it 28.7 billion times, almost 9 million times a day. (Appx6361-6362). For its 2014 release, Jeff Bezos specifically demonstrated it to a crowd of impressed onlookers. (Appx5808). Amazon filed and received its own patent for Amazon Music tap to jump. (Appx9106-9130). Though filed too late in view of TrackTime's much earlier filing, the Amazon patent shows Amazon boasting that its tap to jump feature overcame problems with conventional technologies, like a "scrub bar." Amazon's '658 patent states that using an index with timestamped lines of lyrics to navigate the media "***overcome[s]*** one or more of the above-referenced and other deficiencies in ***conventional approaches*** to presenting media content via a computing device." (Appx9122, with emphasis).

### D. Amazon's Failure to Elicit Evidence of Certain Prior Art Features, or that Any Prior Art Contained the '638 Patent's "Ordered Combination"

At trial, TrackTime's expert Dr. Edwin Hernandez demonstrated how Amazon Music tap to jump contains each and every limitation of claim 9. (Appx5554, Appx5558-5563). To attempt its claim 9 infringement rebuttal, Amazon pointed only to two limitations: "performing" (element 9[d]) and "seeking" (element 9[e]).

(Appx6083-6084, Appx6188). Amazon's expert contended that "performing" was absent supposedly because an intervening and additional data structure (called LyricLine in Amazon's source code) is populated with the information from the JSON file that contains the timestamps associated with specific lines of lyrics for a song, whereupon LyricLine facilitates the actual timecode lookup. (Appx6185-6186). Amazon's expert contended that "seeking" was absent supposedly because music is not accessed "if found" (despite the fact that music undisputedly plays after a tap navigates to a certain place in the multimedia). (Appx6187-6188).

Amazon was less troubled by such level of detail in its analysis on prior art anticipation. At trial, Amazon urged that U.S. Patent App. No. 2007/0027844A1 (Appx8513-8528, "Toub") anticipated, even though it disclosed mouse clicks on a screen (not gestures on a touchscreen) using a large desktop computer (not a mobile device) (Appx6379-6382), and even though the reference never discloses any software routines. (Appx6318). Amazon urged that a commercial LiveNote system (Appx8611-8659, Appx8697-8742, Appx8745-9105) anticipated, despite no evidence of its use of a mobile device to collect touch gestures to navigate playback position. (Appx6377-6378). And Amazon urged that a patent by SoundHound (Appx8474-8488, U.S. Patent No. 8,433,431, invented by Aaron Master) that post-dated all of TrackTime's filing dates anticipated and rendered obvious, on the strength of its initial December 2, 2010 provisional application filing. (Appx8489-

8512, the ’123 Master provisional application). As discussed later, Master is not prior art, and Master’s provisional application contains gaps in its disclosure about how it performs media navigation that Amazon’s expert filled with his own speculation that happened to resemble TrackTime’s patent claim language.

Finally, to support its *Alice* Step 2 burden, Amazon presented its expert opinion that argued from “logic” (not prior art) that the “ordered combination” of TrackTime’s patent claims was well-known, routine, and conventional. (Appx6173-6175).

### E. The District Court’s Pre-Trial ’978 Patent Ruling, and Post-Trial ’638 Patent Rulings

The district court determined that the “executable program code” term in claims 1 and 2 of the ’978 Patent were means-plus-function terms and that they were indefinite under § 112 ¶ 6 during claim construction proceedings. (Appx44, Appx51-58). First, the district court identified that the relevant “question” was “whether program code provides sufficient structure to overcome the presumption that § 112 ¶ 6 does not apply.” (Appx52). The district court rejected TrackTime’s arguments and found that § 112 ¶ 6 applies to “executable program code.” Misbelieving that certain “executable program code” limitations invoked means-plus-function claiming, the district court professed an inability to locate any corresponding structure in the specification that performed the claimed functions. The district court did not address any of the testimony provided by TrackTime’s expert, Dr. Agrawala,

which explained why a skilled artisan would understand "executable program code" to have a well-known structure.

Second, having found "executable program code" to be a means-plus-function term, the district court then determined that the term was indefinite. For the use of the term in claim 1, the district court concluded that "[n]one of the cited sections [in the specification offered by TrackTime] discloses an algorithm or procedure that explains how the 'executable program code' accomplishes the annotation function." (Appx57). For claim 2, the district court similarly found that TrackTime "does not cite, and the Court cannot find, any portion of the specification that discloses an algorithm or procedure by which multimedia and a synchronization index are synchronously played." (Appx58). Thus, the district court held all asserted '978 Patent claims invalid for indefiniteness.

On the '638 Patent, the jury sided mostly with Amazon. The jury rejected Amazon's assertion that the '638 Patent failed the written description requirement and did not find the claims obvious in light of Toub and LiveNote. However, the jury found that Amazon Music did not infringe claim 9, that all three references anticipate (with Master also rendering claim 9 obvious), and that the "ordered combination" of claims 1 and 9 was well-known, routine, and conventional. (Appx5383). (Other issues were tried that are not part of this appeal, including claim 1 infringement, and including infringement by an Audible technology called Immersion Reading).

When the adverse verdict came in, TrackTime renewed its motion for judgment as a matter of law that Amazon Music infringes claim 9. TrackTime also renewed its other JMOL arguments that pointed out gaps in the prior art, Amazon's inability to present any patent ineligibility proof, and that TrackTime had undisputably antedated the Master provisional application. TrackTime also raised various grounds for a new trial, including erroneous exclusion of Amazon factual statements in its patenting activities and Mr. Evans' pre-Master draft patent application. (Appx6631-6658).

Nearly one year after briefing ended, the district court denied TrackTime's motions for judgment and a new trial. (Appx3-30). The district court held that various pieces of evidence supplied "substantial evidence" on the grounds that TrackTime had raised (to be refuted later in this brief). It also held that the special verdict was not inconsistent as between Amazon Music noninfringement and Toub anticipation, based on TrackTime supposedly failing to show that the relevant features were identical (to be refuted later in this brief). Finally, the district court denied TrackTime's new trial arguments for various reasons, including contending it had not erred to exclude from trial Amazon's own patenting activity evidence, nor TrackTime's November 23, 2010 draft patent application. This appeal followed.

## SUMMARY OF THE ARGUMENT

On the ’978 Patent, this Court’s precedents confirm that claim language directed to “executable program code” configured to perform an operation, particularly one that is conventional, is definite. That claim language calls out a class of structures and, therefore, is not a means-plus-function term. The claims containing the “executable program code” language are not indefinite, regardless of the extent to which the specification identifies a “corresponding structure” for such code.

On the ’638 Patent, the trial verdict was unsound on multiple grounds and this Court should reverse the denial of JMOL and/or a new trial as follows.

First, evidence at trial only supported that Amazon Music’s tap to jump feature contains the disputed limitations of claim 9 (“performing” and “seeking”), especially in view of the jury locating those limitations in Toub.

Second, the ’638 Patent claims are directed to a concrete technology that uses touch gestures on words on a mobile device’s screen to navigate the playback position of multimedia to a new place corresponding to those words. Thus, they are not directed to the abstract idea of “using an index to synchronize text and multimedia.” But even if that abstract idea ruling were correct, no evidence at trial supported that the ordered combination of how that idea was implemented in the asserted patent claims was well-known, routine, and conventional. Amazon’s argument from “logic” ignored that the named “abstract idea” leads equally to

inferior karaoke and closed captioning deployments, foreclosing any preemption or patenting of a fundamental "building block."

Third, no evidence at trial supported anticipation by Toub, LiveNote or Master, nor obviousness by Master, nor that TrackTime failed to antedate Master through its prior invention.

Finally and at minimum, the district court should have granted a new trial based on the clear weight of the evidence, inconsistencies in the verdict, and prejudicial evidentiary errors in excluding Amazon's patenting activities (for showing patent eligibility / unconventionality) and TrackTime's pre-Master draft patent application (for antedating Master).

## ARGUMENT

### I. The District Court Erred in Finding the '978 Patent Claims Invalid as Indefinite Means-Plus-Function Claims

#### A. Standard of Review

"Claim construction is ultimately a question of law" that this Court reviews de novo. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 808 (Fed. Cir. 2021). A district court's underlying findings about extrinsic evidence are reviewed for clear error. *Id.* This Court also reviews a district court's determination of indefiniteness *de novo*. *Finjan LLC v. ESET, LLC*, 51 F.4th 1377, 1382 (Fed. Cir. 2022).

### B. The "Executable Program Code" Limitations Are Not Indefinite

For putative means-plus-function claims, the indefiniteness analysis proceeds in two steps. "The first step is to determine whether a claim limitation is drafted in means-plus-function format, which requires [the Court] to construe the limitation to determine whether it connotes sufficiently definite structure to a person of ordinary skill in the art." *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022). If "the limitation is in means-plus-function format," the Court will "perform the second step of determining 'what structure, if any, disclosed in the specification corresponds to the claimed function.'" *Id.* (quoting *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351 (Fed. Cir. 2015)). Applying that analysis here shows that the '978 Patent claims are not means-plus-function claims, and are not indefinite.

1. At the first step, the Court determines whether the claim limitations are drafted in means-plus-function format. Where, as here, claims do not use "the term 'means'" or similar "nonce words," courts "presume that [the] claim limitation is not drafted in means-plus-function format." *Dyfan*, 28 F.4th at 1365 (citing *Williamson*, 792 F.3d at 1348). To rebut that presumption, the party challenging the claims must show that skilled artisans would not understand "the words of the claim ... to have a sufficiently definite meaning as the name for structure.'" *Id.* (quoting *Williamson*, 792 F.3d at 1348). "What is important is . . . that the term, as the name

for structure, has a reasonably well understood meaning in the art." *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996).

Here, claim 1 of the '978 Patent requires "executable program code configured to facilitate annotation of a portion of said synchronization index." (Appx222). Claim 2 of the '978 Patent requires "executable program code configured to synchronously play said associated multimedia with said synchronization index." (Appx222). Neither limitation uses the term "means," or any similar "nonce words" such as "module." *Williamson*, 792 F.3d at 1350. Thus, there is a presumption that the claims are not in means-plus-function format. *Id.*

The phrase "executable program code" is not a nonce word tantamount to the word "means." This Court's "precedent" makes clear that "claim limitations like … 'computer program code,' when combined with a description of what the code is intended to accomplish, convey definite structure to the ordinary skilled artisan." *WSOU Investments LLC v. Google LLC*, Nos. 22-1063, -1065, 2023 U.S. App. LEXIS 27763, at *12-13 (Fed. Cir. Oct. 19, 2023) (nonprecedential) (citing *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1006-07 (Fed. Cir. 2018); *Dyfan*, 28 F.4th at 1368). Thus, in *WSOU*, this Court held that claims reciting the term "computer program code … configured" to perform certain steps, such as "detect[ing] that an application is being started," were not means-plus-function claims. 2023 U.S. App. LEXIS, at *1-2, *13. Similarly, in *Zeroclick*, this Court held

that the district court had "legally erred by not giving effect to the unrebutted presumption against the application of §112, ¶6," by treating the terms "'program' and 'user interface code'" as "nonce words." *Zeroclick*, 891 F.3d at 1008. And in *Dyfan*, this Court held that the term "code" did not trigger means-plus-function treatment, because the claims used that word "in combination with the recitation of the code or application's operation." *Dyfan*, 28 F.4th at 1368-69.

Applying that precedent here confirms that the challenged claims are not means-plus-function claims. The claims recite "executable program code" that is "configured" to perform specific operations. Claim 1 requires code "configured to facilitate annotation of a portion of said synchronization index," while claim 2 requires code "configured to synchronously play said associated multimedia with said synchronization index." (Appx222). TrackTime's expert, Dr. Agrawala, testified that skilled artisans would have understood the claim limitations, read as a whole, to refer to "well-understood" code for performing those operations. (Appx1635-1639, Appx1641-1644). Accordingly, use of the term "executable program code" did not render the claims means-plus-function claims.

Indeed, *Dyfan* is indistinguishable. There, this Court examined whether limitations including the use of "code" and "application" were means-plus-function terms subject to § 112 ¶ 6. Part of the problem was that the court below "erred by ignoring key evidence—unrebutted deposition testimony from Target's own expert,

Dr. Goldberg—regarding how a person of ordinary skill would have understood the 'code'/'application' limitations." *Dyfan*, 28 F.4th at 1367. Likewise, the district court here erred by ignoring Dr. Agrawala's testimony about the well-known structure behind "executable program code."

2. Even if "executable program code" was a means-plus-function term subject to § 112 ¶ 6, TrackTime's expert testified that the specification provides the structure for the "executable program code" to perform the annotation function in claim 1 and the synchronization function in claim 1. (Appx1639-1640, Appx1644-1645). This Court "often look[s] to extrinsic evidence when determining whether a disputed limitation would have connoted structure to a person of ordinary skill." *Dyfan*, 28 F.4th at 1366. For claim 1, Dr. Agrawala pointed out that Figures 6 and 16 from the specification provide the structure that "facilitate[s] annotation of a portion of said synchronization index" in claim 1. He testified that Figure 6 describes "annotation and edit logic 6-12" that provides the structure for "executable program code" in claim 1. (Appx1639). Further, he opined that Figure 16 and the "corresponding descriptions" in the specification identified an interface that also provides the structure for the "executable program code." (Appx1639).

For claim 2, Dr. Agrawala cited Figures 7, 8, 16, 18, and 20-31 as providing the structure that "synchronously play[s] said associated multimedia with said

synchronization index." (Appx1644). He also identified the "video, display, and playlist logic 6-13" as providing the relevant structure. (Appx1644).

### C. The District Court Erred to Find Indefiniteness

Under *Dyfan* and similar cases (such as *WSOU* and *Zeroclick*), claim language calling out "executable program code configured to" perform a function is not subject to means-plus-function treatment, especially when evidence of record shows that off-the-shelf or well-known code performed that precise function. *Dyfan*, 28 F.4th at 1367-69. There is thus no justification for searching the specification for a "corresponding structure," and no indefiniteness is possible whatever that search reveals. *Id.* This alone merits reversal.

The district court erred in ignoring the testimony of TrackTime's expert, Dr. Agrawala. TrackTime's expert explained (without contradiction) that "executable program code configured to facilitate annotation of a portion of said synchronization index" (claim 1) and "executable code configured to synchronously play said associated multimedia with said synchronization index" (claim 2) were each well-known structures in the art, and thus the claims are not subject to § 112 ¶ 6 and are definite. (Appx1635-1639, Appx1641-1644, describing LiveNote and other applications having such code for annotation). Under this Court's caselaw, claim language requiring code that executes to perform a named function "do[es] not recite 'purely functional language.'" *Id.* at 1368. It instead "would have connoted structure

to a person of ordinary skill." *Id.* In short, "code"-style claim language "in combination with the recitation of the code or application's operation would have connoted structure to persons of ordinary skill." *Id.* at 1369. Such style of claim avoids means-plus-function treatment.

Here, in its pre-*Dyfan* decision, the district court mistakenly placed a far higher burden on a patent applicant to avoid means-plus-function treatment than the law requires. The district court misbelieved that a patent specification must explicitly and overtly identify conventional technologies that might contain the "executable code" to avoid the indefiniteness problem. The district court criticized TrackTime's argument that applications like LiveNote, SyncPlayer, Microsoft Synchronized Accessible Media Exchange, RealLegal Binder and Summation had such code, based on TrackTime not "show[ing] that the ***'978 Patent indicates*** to a person of skill in the art that the 'executable program code' refers to these software applications." (Appx53, emphasis added). In other words, the district court added a requirement for the inventor to name a linkage in the patent specification between executable code functions in the claims and specific pre-existing applications having such code. Thus, to the district court, indefiniteness arose because the "***patent does not state*** that these prior art software applications contain the claimed executable program code." (Appx54, emphasis added).

This was error. Nothing in *Dyfan* (or other cases such as *WSOU* or *Zeroclick*) required such a named linkage. A person of skill in the art can recognize "executable code" as a class of structures whether or not the patent specification spoon-feeds this fact. If a claim recites executable code that performs an operation, it avoids means-plus-function treatment when it is simply recognized to name a "class" of structures. *Dyfan*, 28 F.4th at 1367-69.

Since the district court legally erred to hold "executable code" limitations in the '978 Patent subject to means-plus-function treatment, it legally erred to find indefiniteness arising from noncompliance with the requirements of such claims. "Executable program code" that performs a named operation does not signal means treatment under *Dyfan* and related precedents. This is especially so here, where TrackTime supplied unrebutted evidence that such "annotation" and "synchronous play" code operations were conventional in the art within identified software applications. And, even if subject to means-plus-function treatment, the district court erred to overlook Dr. Agrawala's testimony describing the fully-supportive "corresponding structures." Under *de novo* review, this Court should therefore reverse because the claims of the '978 patent are not indefinite as a matter of law.

## II. The District Court Erred in Denying JMOL on the '638 Patent

### A. Standard of Review

This Court reviews a district court's denial of JMOL under the law of the regional circuit, here the Third Circuit. *Cordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1333 (Fed. Cir. 2011). The Third Circuit reviews a district court's denial of JMOL *de novo*. *Id.* "JMOL is proper when after viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find for the nonmovant." *Id.* (cleaned up). To overcome JMOL, there must be a "***legally sufficient*** evidentiary basis for a reasonable jury to find for" the non-movant "on [the] issue." *Mycogen Plant Science v. Monsanto Co.*, 243 F.3d 1316, 1324 (Fed. Cir. 2001) (affirming district court's grant of JMOL of infringement) (emphasis added). Thus, JMOL must be granted if the jury's verdict is "premised on incorrect legal standards." *Id.*

### B. The Finding That Amazon Music Does Not Infringe Claim 9 of the '638 Patent Is Unsupported by Substantial Evidence

There was no dispute that Amazon Music includes a "tap to jump" feature that functions like the claimed invention. (Appx5812-5814, Appx6109). A consumer listening to a song may scroll through lyrics, tap a finger at the place on a screen containing a desired line, and thereby move playback to that place in the song (or podcast, in the case of podcast transcripts):

| | |
|---|---|
|  |  |
| Appx7017 (screenshot as tap gesture initiated) | Appx7018 (screenshot post-tap to jump) |

TrackTime's expert, Dr. Hernandez, testified at trial that Amazon Music's "tap to jump" feature satisfies each limitation of claim 9. (Appx5554, Appx5558-5563). Amazon's expert did not dispute the majority of the limitations. He disputed only two: limitation 9[d]'s requirement of "performing a data lookup using [a] synchronization index," and limitation 9[e]'s "seeking" requirement. (Appx6188). Amazon's expert's non-infringement arguments, however, were ***legally insufficient*** to support the jury's verdict of non-infringement.

1. At trial, TrackTime's expert addressed each limitation of claim 9, and explained how Amazon Music practiced that limitation. (Appx5558-5563). In

particular, Dr. Hernandez identified a particular "JSON file" (*i.e.*, a data file) containing the song lyrics as the "synchronization index" recited in the preamble and limitations 9[a] & 9[c]-[e]. (Appx5558-5559). Amazon's expert did not dispute Dr. Hernandez's testimony with respect to limitations 9[a]-[c]. He disputed only whether Amazon Music practiced limitation 9[d]'s requirement of "performing a data lookup" and limitation 9[e]'s requirement of "seeking." (Appx6188).

**Performing a Data Lookup**. Limitation 9[d] requires "performing a data lookup using [a] synchronization index" when the user taps on lyrics. Amazon's expert did not dispute that code in Amazon Music performed a lookup. Amazon Music calls a "function" "whenever a user clicks on … lyrics … on the screen that's being played." (Appx6093). That function, Amazon's expert admitted, performs a data "lookup." (Appx6094). According to Amazon's expert, however, that did not meet the claims because the data lookup is performed on a LyricLine object rather than directly on the JSON file that TrackTime's expert identified as the claimed "synchronization index." (Appx6093-6094).

But Amazon's expert conceded Amazon Music "***use[s] the data from within the JSON file*** that Dr. Hernandez talked about" in order to "populate the lyrics line

object" used in the data lookup.[1] (Appx6095 (emphasis added)). Thus, the accused products satisfy the literal language of limitation 9[d]: Amazon Music "perform[s] a data lookup ***using*** [a] synchronization index." The JSON file that TrackTime identified as the claimed synchronization index undisputedly is "used" to generate the LyricLine objects for the data-lookup function. Amazon's expert nowhere explained how parsing the lyrics JSON file to generate in-memory objects for the data lookup function does not constitute "using" the JSON file for the data lookup, as limitation 9[d] requires. TrackTime's Dr. Hernandez explained that, to the contrary, skilled artisans would understand the LyricLine objects to be simply parsed, in-memory representations of the JSON file. (Appx5559).

Amazon's non-infringement theory rests on the legally erroneous premise that adding an extra step to the claims—parsing the claimed synchronization index into an in-memory format to facilitate data lookup—can overcome infringement. Black-letter law says the opposite—addition of extra steps does not negate infringement.

---

[1] Amazon had no similar qualms in conceding limitation 9[c], which requires a "gesture performed on a portion of said viewing screen corresponding to a word, or range of words, ***from said synchronization index***." (Appx6188, Appx7015, emphasis added). The words are "from said synchronization index" the same way the timestamps for the data lookup come from "using said synchronization index" for reference.

*Amster Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984). Amazon's expert's testimony regarding limitation 9[d], therefore, was not "legally sufficient" to support the jury's finding of non-infringement. *Mycogen*, 243 F.3d at 1324. Thus, JMOL in TrackTime's favor was required.

**Seeking**. Limitation 9[e] requires "seeking on said mobile computing device multimedia content corresponding to said synchronization index, and if found, accessing multimedia at" a specified time. In other words, the claims require seeking to the corresponding audio when the user taps on particular lyrics. Amazon's expert did not deny that "Amazon['s] code" contains a function named "seek" that performs a "seek" operation by "jump[ing] to a position within" an "audio file that's already open" and being played. (Appx6097-6098). But according to Amazon's expert, "the claims" first require "looking for a file" and then, "if you find it," "jump[ing] to … a position within that file." (Appx6097).

But limitation 9[e], by its plain terms, does not require any such file search. Limitation 9[e] recites "seeking on said mobile computing device multimedia ***corresponding to*** said synchronization index, and if found, accessing multimedia at [a particular time]." Putting aside the dispute about exactly what constitutes the claimed "synchronization index"—the JSON file or the LyricLine objects—there was no dispute that Amazon Music uses an index corresponding to the audio file currently being played. (Appx6093-6094). When the user taps on lyrics, the system

performs a lookup on that index to identify the corresponding time position in the audio file. (Appx6093-6094). Then, as Amazon's expert admitted, the system jumps to that time position. (Appx6093-6094). That satisfies the plain language of limitation 9[e]. The system "seek[s] … multimedia corresponding to said synchronization index," because it accesses an audio file (the multimedia) that corresponds to the lyrics index for that audio file. Then, "if [such multimedia is] found," the system "access[es] multimedia at [the specified time]."

Amazon could not properly establish non-infringement by simply pointing to the fact that the "multimedia corresponding to said synchronization index" will always be "found"—because in Amazon Music the synchronization index is always associated with the file being played. That does not change the fact that Amazon's system meets the literal language of the claims.

2. The jury's finding that claim 9 is not infringed also is inconsistent with its finding that claim 9 is anticipated by the prior art. Here, the parties agreed that the Toub prior art satisfied the "performing" and "seeking" limitations of claim 9. (Appx6138, Appx6379-6382). (TrackTime asserted different reasons why Toub does not anticipate.) Toub has its own version of a file that, like Amazon's, contains time stamps. (Appx8521, "transcription index file"). Though it uses a different overall process requiring a text-search and text-search-result "snippets," Toub discloses using that file to jump (after a mouse click) to a new place in media. (Appx6379).

Notably, Toub does not describe what data structures or code routines might cause that jump. (Appx6318).

| | |
|---|---|
| <br>Playing Device<br>Fig. 1C |  |
| (Appx8516, Toub's Fig. 1C showing a display screen and search result text, clickable to cause a jump using a mouse). | (Appx8515, Toub's Fig. 1B transcription index file). |

When it came time to read claim 9 onto Toub, Amazon's expert applied that claim more broadly and leniently than he did for infringement. He admitted that Toub has "performing" just by using a "transcription index file." (Appx6136-6137). Under this reasoning, Amazon Music has "performing" because it uses a lyrics JSON file. He also admitted that Toub has "seeking" because a synchronization index "is on [a] device and [the device is] able to display it," notwithstanding the way any piece of media is ultimately "found" (Appx6138). The same is true of the lyrics from the JSON file in Amazon Music. The LyricsLine object is just the JSON file loaded into memory. (Appx6095-6096). Since Toub and Amazon Music were identical with

respect to how they might read on "performing" and "seeking," the jury's non-reexaminable findings about Toub independently compel JMOL of infringement.

3. The district court's reasons for granting JMOL cannot be sustained. The district court faulted TrackTime for not addressing "each claim limitation" in its motion for JMOL. (Appx10). But, as explained above, TrackTime's expert showed that Amazon Music practiced each claim limitation, and Amazon's expert disputed only two claim limitations: 9[d] & [e]. TrackTime's JMOL motion thus explained that "Amazon only contested whether Amazon Music infringes the final two elements of claim 9 for 'performing' and 'seeking.'" (Appx6638 (citing Appx6188)). A patentee's JMOL motion need not address "additional limitations present in the claims" but which are not "dispute[d]" in order to establish entitlement to JMOL. *Mycogen*, 243 F.3d at 1335. The district court erred in denying JMOL merely because TrackTime's motion did not address undisputed limitations.

The district court also rejected TrackTime's argument that the jury's verdict of non-infringement was inconsistent with its verdict of anticipation, by allegedly failing to explain Amazon Music and Toub were the same or analogous with respect to the "performing" and "seeking" limitations. (Appx21). But TrackTime's JMOL motion explained exactly that, and cited to relevant testimony. (Appx6638-6639). And, as explained above, Amazon Music and Toub are identical in the relevant respects because Amazon's JSON file holds line-by-line timestamps, while Toub's

"transcription index file" also holds line-by-line timestamps, and each such file is "used" for a jump. Similarly, Toub's movement to a new playback position (albeit via text search-result "snippets") matches identically Amazon Music's observable movement to a new playback position.

Therefore, this Court should reverse the denial of JMOL of Amazon Music's infringement of claim 9. When you tap, it jumps. (Appx6109, Amazon's software expert admitting this to the jury). The district court erred by refusing to grant JMOL.

### C. Claim 9 Was Patent Eligible as a Matter of Law Under *Alice* Step 1, and Amazon Adduced No Evidence at Trial for Ineligibility Under Step 2

The district court's determination that claim 9 is directed to ineligible subject matter under 35 U.S.C. §101 must also be reversed. Early in the case, the district court ruled that the claims of the '638 Patent were directed to the abstract idea of "using an index to synchronize text and multimedia" at Step 1 of *Alice*, but submitted to the jury the question of whether the claim recited a patent-eligible inventive concept under *Alice* Step 2. The claim, however, is directed to an improvement to media-player technology, not an abstract idea. The claimed tap-to-jump feature enables users to navigate within audio files in a novel way, by selecting words on a touchscreen to navigate to a corresponding multimedia location. (Appx6983). Moreover, even if the claim was directed to an abstract idea, Amazon failed to

present clear-and-convincing evidence that the claim contained no inventive concept that rendered it patent-eligible at Step 2 of *Alice*.

1. At Step 1 of *Alice*, this Court must "articulate what the claims are directed to." *Thales Visionix Inc. v. U.S.*, 850 F.3d 1343, 1347 (Fed. Cir. 2017). In doing so, the Court must consider the claims "as a whole." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016). Here, the claims are directed to a new way of navigating within multimedia files on a mobile media player. Conventional media players, such as a CD player, relied on physical buttons to skip forward and backward within a multimedia file in fixed increments. Even on computer media players, scrub bars were difficult to use, required mouse or track pad actuation, and could not guarantee playback movement to precise word ranges. The claimed invention, by contrast, is a technological improvement to user interfaces and playback navigation that permitted using a touch on a portion of a mobile device touchscreen corresponding to a word or range of words as an actuator to change playback position of multimedia. The claims thus recite "displaying . . . text" from the multimedia file; "receiving information" from a "touch-sensitive input interface gesture performed on" a "word, or range of words" on the device's "screen," "performing a data lookup" to identify the "time location t1 that corresponds to [the] word or range of words selected" by the user, and "seeking" to that time location. (Appx7015).

That is not an abstract idea, any more than a "seek" button on a CD player is an abstract idea. It is not a "formula or algorithm," a "mental process," *Parker v. Flook*, 437 U.S. 584, 587 (1978), or a "long prevalent" economic practice, *Bilski v. Kappos*, 561 U.S. 593, 611 (2010). Instead, the claim is directed to a feature of a physical device that allows users to control the operation of the device by physically touching the screen in specified ways.

Claim 9 is "directed to an improved user interface for" mobile media players, similar to the claims in *Core Wireless Licensing S.A.R.L. v. LG Electronics, Inc.*, 880 F.3d 1356, 1362 (Fed. Cir. 2018) and *Data Engine Technologies LLC v. Google LLC*, 906 F.3d 999, 1009 (Fed. Cir. 2018). The claimed feature solves a "technological problem" in prior-art mobile multimedia players. *Data Engine*, 906 F.3d at 1008. The specification explains that navigating multimedia files on prior-art players was "complex" and "problematic." (Appx6988). Thus, there was a need for technology to "simplify navigation of multimedia" content on mobile multimedia players. (Appx6988). Similar to the summary window in *Core Wireless*, the claimed invention solves the problem of the prior art using a "specific" interface—an interface that displays a transcript on a touchscreen and enables users to touch a word or range of words on the screen to jump to the corresponding location. 880 F.3d 1356. Claim 9 also recites a "specific … implementation" of that interface, using a

synchronization index to map between words on the screen and time locations in the multimedia file. *Data Engine*, 906 F.3d at 1009.

Claim 9 is also an improvement to technology. As this Court made clear in *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1315 (Fed. Cir. 2016), an "improve[ment to] an existing technological process" is itself a technological invention, not an abstract idea. Claim 9's tap-to-jump feature was an improvement on prior-art methods of navigating multimedia files, such as physical buttons on tape and CD players, or scrub bars on old-style computer screen media players. The inventor criticized prior technological navigation and display modes as inferior, in view of the new technology he brought to fruition. (Appx6983-6988). Mr. Evans' aim was coverage for an exceptionally concrete application—using the words on the touchscreen of a mobile device as a special actuator to move the playback position to a new place in multimedia corresponding to those words. That is a technological improvement to existing computing devices—which makes using the device faster and easier—not an abstract idea. *McRO*, 837 F.3d at 1315; *see also Uniloc USA, Inc. v. LG Electronics USA, Inc.*, 957 F.3d 1303, 1305 (Fed. Cir. 2020); *see also Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1258 (Fed. Cir. 2017) (noting that it is "appropriate to consider the technological improvement embodied in the claims at step one . . . ."); *Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018).

The district court determined that claim 9 was abstract at Step 1 because it improperly "oversimpli[fied]" the claim, in a way that was "untethered" from the language of the claim and overlooked the limitation that supplied the "invention's benefits." *Enfish*, 822 F.3d at 1367. The district court characterized claim 9 as being directed to "using an index to synchronize text and multimedia." (Appx39). The district court completely misapprehended the invention. It focused only on one aspect of how the invention is implemented (using a synchronization index) while overlooking what the claimed feature actually is—a user interface for navigating multimedia files. This Court rejected a similar argument in *Core Wireless*, where it explained that the claimed application summary window could not be reduced to an abstract idea by recharacterizing it as being directed to the "idea of summarizing information." 880 F.3d at 1362. Likewise here, the claimed tap-to-jump feature—an improved user interface for mobile devices—cannot be rendered abstract by recharacterizing it as being directed to the idea of indexing information.

2. With the Step 1 error so clear, this Court should reverse the ineligibility determination without review of the jury verdict on Step 2. However, that jury verdict is unsound even if the district court's Step 1 ruling stands. The Federal Circuit in Step 2 asks whether the claims at issue offer an "inventive concept" that "transforms the abstract idea into a patent-eligible invention." *BASCOM Glob. Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349 (Fed. Cir. 2016). The

"inventive concept" may be found in the "ordered combination" of claim limitations. *Id.* The evidence did not permit a reasonable jury to find that Amazon had proven that the '638 Patent's "ordered combination" was well-known, routine, and conventional at the time of the invention. Amazon's burden was "clear and convincing" evidence, but it failed to elicit any such evidence at all.

Audible's CTO, Guy Story, gave the point away, without objection from Amazon:

> Q. In that 2008 to 2010 time frame, you were unaware of any conventional or well understood techniques of using gestures on words as an actuator to change play back position; correct?
>
> A. I am not 100 percent sure what the word actuator means, but I think that's, I would say yes, I was not aware.
>
> Q. And at the time of your deposition in this case, you could not name any product on the market in 2008 to 2010 that was a mobile audio player with a screen that would take gestures on to words of the screen to jump to a different play back position in an Audiobook, correct?
>
> A. That's correct.

(Appx5878-5879). Amazon never asked Mr. Story to name any candidate "ordered combination" technologies that existed in 2008-2010 to rehabilitate his answers.

Amazon's expert came up equally short. On direct, he named no prior art (much less a quantity) that were (or disclosed) mobile devices that used touch gestures onto words on a screen to move playback position. (Appx6173-6175). He used hindsight. He framed his testimony with an "if" statement that assumed into

existence a key piece of the ordered combination. (Appx6173, "you need to have a combination of all these elements ***if*** you want to be able to display and tap and move the video or audio," emphasis added). But "to be able to display and tap and move" was core to TrackTime's invention, and not the district court's expression of the so-called "abstract idea." And Amazon's expert's attempt to point to "Sanction II" failed, because he admitted the differences: it used a desktop computer (not a mobile device), and used a click of a mouse (not a tap on a screen) (Appx6174-6175). Trying to use one reference to show an "ordered combination" was routine is never sufficient. *Berkheimer v. Hewlett-Packard Co.*, 881 F. 3d 1360, 1369 (Fed. Cir. 2018) (the "mere fact" that a piece of prior art discloses something does not suffice).

The district court's JMOL ruling defended the verdict on unsound grounds. First, it pointed to evidence that individual limitations, and "each of the component parts," were conventional. (Appx11). This, though, only begs the question whether the "ordered combination" of such component parts as recited in the patent claim was conventional. Second, the district court excused Amazon's expert's argument-from-inference (*i.e.*, his use of the word "if" noted above) as a mere "colloquial" use of the word. (Appx12). The district court assumed that a challenger meets its burden of proof under *Alice* Step 2 by merely showing that the "order was fixed by the abstract idea." (Appx12). But this misstates the law, since a challenger must show the "ordered combination" to have been "well-known, routine, and conventional,"

not "logical ***or*** well-known, routine, and conventional." *Berkheimer*, 881 F.3d at 1367-68. Tellingly, Amazon and the district court did not even apply "logic" correctly. As noted, by "logic," the stated "abstract idea" of "using an index to synchronize text and multimedia" equally leads to closed captioning and karaoke—technologies far removed from the media navigation claims of this case.

Trial elicited no evidence that anyone other than Curt Evans came up with the ordered combination of claim 1 and 9 of the '638 Patent apart from any "abstract idea" named by the district court. Even if there were no error in the *Alice* Step 1 conclusion, the district court should have granted JMOL on *Alice* Step 2.

### D. No Substantial Evidence Supported Anticipation or Obviousness of Claim 9

The standard for anticipation is demanding. The challenger to the patent must show, by clear-and-convincing evidence, that a prior-art "reference discloses ***exactly what is claimed***," with no "differences between the disclosure and the claim." *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 780 (Fed. Cir. 1985). Thus, "to succeed on its anticipation defense, [Amazon] was required to prove by clear and convincing evidence that every limitation of [TrackTime's] asserted claims was contained, either expressly or inherently, in a single prior art reference." *Union Carbide Chemicals & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1188 (Fed. Cir. 2002). "In other words, [Amazon] bore the burden of demonstrating that there were no differences between [TrackTime's] claimed invention" and Amazon's

prior art references. *Id.* at 1188-89. But here there are clear differences between the claims of the ’638 Patent and each of Amazon’s prior art references. Claim 9 requires “receiving information” corresponding to a “touch-sensitive input interface gesture performed on” the device’s “screen,” but neither Toub nor LiveNote disclose a touchscreen or receiving input from touch gestures. Claim 9 requires implementation on a mobile device, but neither Toub nor LiveNote disclose media navigation on such items. Thus, no reasonable jury could find that those references anticipate the claims.

Master, meanwhile, does not even qualify as prior art because Amazon failed to offer anything that would “persuade the trier of fact by clear and convincing evidence that [Master] was published [nor invented] prior to [the ’638 Patent’s] invention date.” *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996). And, regardless, it does not render the claims obvious.

#### 1. Toub Does Not Anticipate, and No Substantial Evidence Allowed a Contrary Finding

Toub is missing the following limitations from claim 9:

- 9[pre], 9[a], 9[b], and 9[c] – Toub has no “mobile computing device.” (Appx6379).
- 9[a] – Toub has no “displaying on a mobile computing device text from a synchronization index.” (Appx6379).

- 9[c] – Toub has no "receiving information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a word, or range of words." (Appx6381-6382).

The evidence indisputably showed that Toub only discloses mouse clicks and a full desktop computer providing its functionality. (Appx8516). Toub therefore cannot anticipate. No substantial evidence supported that Toub disclosed information from any "touch" gesture on the words of a screen, as required by claims 1 and 9. And Toub disclosed his device was a big desktop computer (Appx6323-6324, Appx6379, discussing Fig. 1C), not a mobile device.

Toub does not have the word "touchscreen." Amazon's expert grudgingly admitted that Toub discloses "something to the effect of touch sensitive device or touch sensitive input." (Appx6324). But according to the unimpeached testimony of Dr. Hernandez, this single disclosure of "touch-input device" in ¶ [0033] (the actual phrasing the expert struggled to remember) was "the old fashioned way of doing business" that only referred to a "track pad," which was "another form of a mouse that was used at the time of Toub." (Appx6380-6382). Toub's disclosure used only the next sentence (***not*** the sentence containing the words "touch-input device") to name "output" structures, such as "screen displays." (Appx6381, describing ¶ [0033]; Appx8522). Likewise, according to the unimpeached testimony of Dr.

Hernandez, Toub's sole reference to "mobile telephones" and "pocket computers" was in a boilerplate list of alternative configurations for achieving the "principles" of Toub, without detail that a person skilled in the art could use—failing to enable Toub's "snippet" click-feature on a mobile device using touch gestures on words. (Appx6380).

Finally, according to the undisputed testimony of Dr. Hernandez, even Toub's display of mouse-clickable "snippets" could not read on the "text from a synchronization index" of claim 9, based on what a person of skill in the art would have discerned from the '638 Patent prosecution history. (Appx6398-6399). Such a person would not have just read the claims (which mention "portion" language—as pointed out to Dr. Hernandez). (Appx6398-6399). Such a person would perceive at Appx7706-7711, that Mr. Evans distinguished the Byers prior art on grounds that a synchronization index must contribute a "substantial majority" of a transcript's text to qualify under claims 1 or 9—the same way Toub's text-search-result "snippets" are distinct from claims 1 or 9. The prosecution history indicates that "entering a search query . . . cannot be done as a first step" (Appx7711), and that a "substantial majority" of a "synchronization index" is required for "displaying . . . text from a synchronization index" and cannot occur as a result of a text-query. (Appx7707).

The district court's JMOL ruling elided these distinctions, and incompletely quoted the reference. The JMOL ruling first stated that Amazon's expert "testified

about this capability," but only pointed to his testimony about the touch input device that Toub discusses separately from a screen—*i.e.*, a track pad, which is not the touchscreen required by the claims. (Appx17-18). The JMOL ruling then stated that Toub discloses that "the 'invention [is] operational with . . . mobile telephones," but avoids what Toub actually says: only that "principles of the invention are operational" with mobile telephones, without any further discussion of which specific "principles" Toub meant, or how to assemble any "principles" in an enabling way. (Appx18, Appx8522). And finally, the JMOL ruling ignored that the "snippets" of Toub (per Dr. Hernandez's uncontradicted testimony) do not qualify as the claim's "displaying . . . text from a synchronization index," for reasons just stated based on the Byers prosecution disclaimer. This Court should reverse and grant JMOL for TrackTime that Toub does not anticipate.

#### 2. LiveNote Does Not Anticipate, and No Substantial Evidence Allowed a Contrary Finding

LiveNote is missing the following limitations from claim 9:

- 9[pre], 9[a], 9[b], and 9[c] – LiveNote has no "mobile computing device." (Appx6377-6378).
- 9[c] – LiveNote has no "receiving information indicating a user's selected mobile computing device touch-sensitive input interface

gesture performed on a portion of said viewing screen corresponding to a word, or range of words." (Appx6377-6378).

- 9[d] – LiveNote has no "performing a data lookup using said synchronization index." (Appx6377-6378).

The evidence showed that LiveNote only discloses a tablet PC for one purpose—text annotations in a transcript using a pen-stylus, not to navigate multimedia and not using human touch gestures. (Appx6319-6320; Appx8906). No substantial evidence supported that LiveNote disclosed information from any "touch" gesture on the words of a screen, as required by claims 1 and 9. Even its pen-stylus did not navigate anything.

LiveNote also indisputably used a big desktop computer, with MS Windows, for its playback operations, not a mobile device. The evidence only showed that LiveNote's playback functionality highlighted by Amazon was on a non-mobile device—a full scale desktop PC. And even there, the evidence showed merely placing a cursor using a mouse in a transcript window—nothing about human touch gestures, or processing information from such touch gestures, and particularly not on a mobile device. (Appx6321-6322; *see also* Appx6377-6378). The jury lacked substantial evidence to find that LiveNote anticipated.

The district court's JMOL ruling ignored these distinctions. It merely quoted Amazon's expert's observation that a tablet PC could be used with LiveNote, without

acknowledging that tablet PC functionality was limited to non-navigation purposes—annotating a note using a stylus. (Appx18-19). That expert never interacted with the LiveNote software and only considered user documentation. (Appx6317). Even his quoted testimony that "you can tap on the tablet" and "you could use your finger" (Appx6145-6146) does not change the fact that such actions did not move any playback, nor constitute navigation of any kind. Nor did the JMOL ruling even confront the problem that LiveNote's only navigation was on a big desktop computer (not a mobile device). This Court should reverse and grant JMOL for TrackTime that LiveNote does not anticipate.

#### 3. Master Does Not Anticipate or Render Obvious, Master is Not Prior Art, and No Substantial Evidence Allowed a Contrary Finding

If prior art at all, the Master patent indisputably does not anticipate or render obvious claims 1 or 9.

At the outset, Amazon's expert agreed that the law only permits Amazon to point to the subject matter of the Master ***provisional*** application to make out its Master-invalidity case. (Appx6314-6315). That document contains too little content, and what it does disclose differs substantially from Curt Evans' invention of claims 1 and 9.

1. First, TrackTime antedated the Master document, rendering it not prior art. Under the pre-AIA statutory subsections 35 U.S.C. §§ 102(e) & (g), TrackTime

presented overwhelming evidence that the ’638 Patent has an invention date prior to the December 2, 2010, filing date of the Master ’123 provisional application. (Appx6641). This included: (1) USPTO prosecution evidence, with a finding by the USPTO that the ’638 Patent was entitled to an invention date before August 15, 2008 (*see* Appx7647), plus record-evidence of diligence within the declarations of Curt Evans, Steve Maynard, and Tom Rzonca (Appx7718-7742); (2) direct trial testimony from Mr. Evans and Mr. Maynard (Appx5616-5633, Appx5681-5756; Appx5757-5769); and (3) sketch and various email exhibits, such as Appx8174-8195, Appx8239-8295. Mr. Evans presented unrebutted testimony that he delivered his draft patent application to the Fish & Richardson law firm on Nov. 23, 2010. (Appx5695). The attorneys at Fish & Richardson only made minor edits before filing the application. This draft patent application fully supported eventual claim 9. (Appx3935-3936; Appx6744-6784). This draft was unquestionably the complete invention, and it needs no further corroboration. *Haskell v. Colebourne*, 671 F.2d 1362, 1365-66 (CCPA 1982). Amazon made no factual attack or cross-examination on Mr. Evans’ high activity seeking to reduce to practice after conception, but argued only that there was no conception until January 3, 2011.

Mr. Evans also offered unrebutted testimony that he worked with the Fish & Richardson law firm during that 33-day critical period between December 2, 2010 and January 3, 2011 to get his provisional patent application filed on January 3, 2011,

and that the firm billed $9,500 for that work in that time period. (Appx5700). Mr. Evans testified his work with the software developers continued, which Tom Rzonca corroborated in unrebutted manner, by declaration almost contemporaneously signed on February 8, 2011. (Appx7735, "[F]rom at least June 2009 to the present, my software development team and I have worked continuously and diligently to reduce the software to practice in functioning computer code, which is specified in US Provisional Patent Application 61/429,399.").

Additionally, Amazon elicited no evidence or testimony that could reasonably support an invention date by Master before his December 2, 2010, provisional. Amazon's sole evidence that existed prior to December 2, 2010, was a September 2009 email chain among SoundHound employees in Appx8421-8424, that had nothing to do with the claimed invention of the '638 Patent. This is not enough to meet Amazon's clear and convincing burden to establish earlier conception by Master. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996).

The district court's JMOL ruling oversimplified TrackTime's evidence as "partisan" and weighable against Mr. Evans by the jury. (Appx15). However, the allowed evidence only supported that the '638 Patent is entitled to an invention date before Master. Mr. Evans testified to that effect, without impeachment. (Appx5618, Appx5682-5700). Documents such as the USPTO findings and evidence, delivery of the November 23, 2010 draft patent application to the Fish & Richardson firm,

the sketch, the slide deck (Appx5687-5689, Appx8174-8195, *see esp.* Appx8191) and the emails, while conception evidence in their own right, at minimum corroborated such testimony. In short, no testimony or document at trial questioned the historical fact that Mr. Evans conceived his invention before Master's December 2, 2010 provisional date, and acted diligently over the next 33 days. There was nothing for a jury to "weigh." No reasonable jury could have found Master to be prior art. This conclusion would have been even stronger if Evans' excluded November 23, 2010, draft application was admitted (discussed in the new-trial section of this brief).

2. Alternatively, the Master provisional only discloses the LRC file (which Amazon pointed to as the "synchronization index") in the server. (Appx6315). While Amazon's expert mentioned that text appears in a figure under an arrow of "Timing Data +" and "Lyrics Data +," it is undisputed that these pieces of text do not disclose the LRC file traveling <u>***to***</u> any mobile device. (Appx6316, answering equivocally "not precisely no" to whether the "LRC file stays at the server"). This is important for appreciating Master's failure to disclose the "performing a [timecode/data] lookup" on a mobile device using the LRC file—thus, its failure to anticipate or render obvious.

The only Master provisional wording remotely on point is the words that after a double-tap, "in response the audio and scrub bar will move to that portion of the

song." (Appx8506). As Dr. Hernandez pointed out, there is a vacuum of disclosure of what happens internally to cause such a "move." Dr. Hernandez noted without impeachment why the Master provisional at most disclosed a mathematical algorithm but not an index lookup, even giving the benefit of the doubt an index is at the phone. (Appx6383). Amazon's expert confirmed that he saw no source code to resolve the gap, and that Master never testified whether a process at the phone versus a process at the server causes such movement because "he said both are possible." (Appx6316-6317).

Finally, Amazon's expert's single sentence urging obviousness was too conclusory to meet Amazon's clear and convincing burden. His complete obviousness testimony was:

> [M]y understanding is TrackTime requires that you actually have . . . the synchronization index on the device, which is one of the things I pointed to. That is disclosed as well by the Master patent, and to the extent it's not disclosed, that would have been obvious to a person of ordinary skill to move it, and it would make perfect sense because it would allow things to happen faster if it was on the device.

(Appx6167). Apart from being noninformative about ***perceptions*** and ***understandings*** of persons of skill in the art ***in 2008-2010*** (as opposed to his own in 2023), this was nonresponsive. He offered no opinion why a person of ordinary skill in the art might have (or would have) changed the nondisclosed manner of "moving" the audio and scrub bar into one involving that of claims 1 or 9 of "performing a [timecode/data] lookup" on anything (such as the already-extant LRC file at

Master's server). And, no reasonable jury could have discounted the strong and undisputed objective nonobviousness facts (including how Amazon called the claimed feature a "wow feature" and "surprisingly addictive" and "innovative" in its internal documents). (Appx6390-6391). The jury therefore also lacked substantial evidence for its sole obviousness conclusion.

The district court's JMOL ruling merely quoted Amazon's expert testimony about what "could be done on a mobile device." (Appx16). But possibilities and probabilities are not probative for anticipation, which instead asks what the reference discloses to occur on the mobile device. *See PAR Pharma., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1195-96 (Fed. Cir. 2014). The evidence at trial remained uncontroverted that Master did not disclose the LRC file existing on a mobile device, nor a timecode lookup on that LRC file to navigate (as opposed to a math calculation). To the extent Amazon departed from the reference to allege those features might exist, it engaged in rewriting the prior art—not evidencing what a person of skill in the art would know it to disclose. But in fact, Amazon's expert testimony at its fullest extent never asserted that a timecode lookup occurred in Master's mobile device on any mobile device-resident LRC file—since instead, the "tap" or "double tap" was "sent to the remote server." (Appx6160-6161). Thus, if Master is even prior art, this Court should reverse and grant JMOL for TrackTime that Master does not anticipate or render obvious TrackTime's patent.

## III. The District Court Alternatively Erred to Deny a New Trial on the '638 Patent

### A. Standard of Review

This Court reviews a district court's denial of a motion a new trial under the law of the regional circuit, here the Third Circuit. *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1035 (Fed. Cir. 2020). The Third Circuit reviews a district court's denial of a motion for a new trial under an abuse of discretion standard. *Id.*

### B. The Inconsistent Verdict and Weight of the Evidence Compels a New Trial

Factually inconsistent verdicts are a long-recognized ground for granting a new trial. *Xpertuniverse, Inc. v. Cisco Sys., Inc.*, No. 09-157-RGA, 2013 U.S. Dist. LEXIS 164935, *5 (D. Del. Nov. 20, 2013). So has when a verdict goes against the clear weight of the evidence and a new trial is needed to prevent a miscarriage of justice. *Pediatrix Screening, Inc., v. TeleChem Int'l, Inc.*, 602 F.3d 541, 546 (3d Cir. 2010).

The jury's Toub anticipation findings include implied findings that Toub exactly discloses claim 9's "performing a data lookup" and "seeking" steps—non-reexaminable findings by the jury under the Seventh Amendment since both sides agree the jury had substantial evidence as far as that went. Amazon simultaneously, but inconsistently, contended these steps were absent in the Amazon Music tap-to-

jump feature. (Appx6188, "Claim elements 9D [*i.e.*, 'performing'] and 9E [*i.e.*, 'seeking'] are not satisfied in my view.").

Both cannot be true. In particular, Amazon's expert testimony why Toub disclosed the "performing" step was "the transcription index file which associates time codes written at the bottom to skip video position to corresponding selected caption, the select the caption text and you use a time code to look up a time within the video, that's exactly what's described and required by element 1E." (Appx6136-6137, discussing "performing" in claim 1, emphasis added; *see also* Appx6138, explaining that presence in claim 1 proved limitation's presence in claim 9). This position that it was enough to "use a time code to look up a time within the video" was (properly) agnostic about whether, to perform a data/timecode lookup "using" the synchronization index possessing that timecode, it happened "on" the file containing that index, versus on a data structure populated from that index. That Amazon Music's JSON file (the synchronization index) fills the LyricLine data structure, and lookup occurred on ***this*** data structure but not the original file, grounded Amazon's noninfringement expert opinion. (Appx6185-6186). These were inconsistent jury-adopted positions.

Such inconsistency and confusion became more apparent when it came to the "seeking" step. There, Amazon's expert stated his Toub mapping relied on TrackTime's view of Amazon Music infringement, which he "applied" for "the

purpose of the [Toub] patent." (Appx6138). All that he required here was to find in Toub "if it [*i.e.*, the multimedia] is on device and they are able to display it, you have satisfied this limitation." (Appx6138). Since "that particular video is on the device and it did display at the right time, therefore that limitation is met under TrackTime's view of what it takes to meet this limitation." (Appx6138). The same was equally true about Amazon Music.

The district court rejected this reasoning without significant discussion. (Appx21). The district court stated that TrackTime's argument "seeks to elide any distinctions between Amazon Music and Toub in terms of the evidence presented at trial," (Appx21), but that was plainly wrong and an abuse of discretion. Amazon Music and Toub both used a timecode/text-line linked synchronization index, and both "jumped" upon actuation of that text (albeit in Toub, using a mouse click on a "snippet" on a big desktop computer-connected screen). This was enough for Amazon's expert and the jury to find Toub contained claim 9's "performing" and "seeking," but inconsistently they both demanded more before Amazon Music could infringe.

The clear weight of the evidence also supported infringement and validity, separately warranting a new trial. The district court offered no reasoning for denying a new trial, other than stating its denial was "substantially for the same reasons that the Court declined to upset the jury's verdict in Plaintiff's motion for judgment as a

matter of law." (Appx19). But the clear weight of the evidence went against the verdict, as follows:

Claim 9 Amazon Music Infringement: Lookups are performed "using" the Amazon JSON file (which contains timecodes and lyric lines), and once there is a "tap," there is a "jump" managed by the "seek" function in software. (Appx6095, Appx6097).

Subject Matter Eligibility: Amazon named no prior art reference containing the "ordered combination" involving touch gestures on words on a mobile device screen to move media playback to a corresponding location. (Appx6173-6175).

Toub Non-Anticipation: Toub's "touch-input device" was not a touchscreen (but instead a track pad), and Toub's boilerplate statement that unspecified "principles" of the present invention may apply to mobile devices had no substance. (Appx6380-6382).

LiveNote Non-Anticipation: Using a pen stylus on a tablet PC only caused annotations (not media playback navigation or movement), and when media playback movement did occur, this required use of a mouse (not a touch input) on a large PC (not a mobile device). (Appx6321-6322, Appx6377-6378).

Master Non-Anticipation and Non-Obviousness: Mr. Evans antedated Master's December 2, 2010 date (Appx6641); and Master's provisional application was silent about performing timecode lookups, a gaping hole in the reference's

disclosure, with Amazon's expert admitting that the "tap" indication got sent to a remote server for processing (Appx6160, Appx6316).

### C. The District Court's Erroneous Exclusion of Amazon's Patent (Which Proves Unconventionality), and of TrackTime's Draft Patent Application (Which Proves TrackTime Antedates Master as Prior Art), Compels a New Trial

Finally, two erroneous and prejudicial evidentiary exclusions also warrant a new trial.

A new trial is warranted when a court erroneously admitted or excluded evidence that "could have shaped" a jury's verdict. *See, e.g.*, *GN Netcom, Inc. v. Plantronics*, 930 F.3d 76, 89 (3d Cir. 2019); *Pediatrix Screening*, 602 F.3d at 546 n.9. Evidence is relevant and admissible when it has "any tendency to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence." Fed. R. Evid. 401, 402. Relevant evidence may be excluded under Rule 403 only "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." However, "the Federal Rules . . . suggest a generally liberal approach to" admissibility. *United States v. Fulton*, 837 F.3d 281, 314 (3d Cir. 2016) (internal quotation omitted). The Third Circuit holds "a strong presumption that relevant evidence should be admitted," which "requires weighing the maximum reasonable probative force for the offered

evidence against the likely prejudicial impact of the evidence." *GN Netcom*, 930 F.3d at 85 (citation omitted).

1. The district court erred by excluding from evidence PTX 381 (Appx9131-9178), Plaintiff's November 23, 2010, draft patent application. (Appx6302-6303). Despite consistency with all other evidence under the "rule of reason," the Court found the metadata for this native Microsoft Word file unreliable because its "Created" date is listed as occurring after its "Last Printed" date. (Appx5517-5519). The Court rejected TrackTime's offer to *voir dire* its expert, Dr. Hernandez, to explain the issue on grounds that he did not rehabilitate the seeming metadata inconsistency in his opening expert report. (Appx6303). However, the metadata issue only arose at trial (never during expert discovery), and should have been, at most, a proper subject for cross-examination. It did not justify exclusion. *See Almirall LLC v. Taro Pharm. Indus. Ltd.*, No. 1:17-CV-663-JFB-SRF, 2019 U.S. Dist. LEXIS 11539, at *15 (D. Del. Jan. 24, 2019), quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993) ("Vigorous cross-examination [is one of] the traditional and appropriate means of attacking shaky but admissible evidence.").

Unrebutted testimony shows that Mr. Evans delivered multiple drafts of his patent application to his attorneys, including a final draft to the Fish & Richardson law firm on November 23, 2010, consistent with the native file's name "patent application 112210_v023.doc" and metadata, "Last Modified 11/23/2010 10:10

AM." (Appx3935, Appx5695-5700). The attorneys at Fish & Richardson only made minor edits before filing the application. A draft patent application conveyed to an attorney and filed with minor edits is evidence of conception. *Haskell*, 671 F.2d at 1365-66. Dr. Hernandez within his expert report also mapped the content of PTX 381 (Appx9131-9178) to each claim element of the '638 Patent, and would have so testified. (Appx3935-3936, citing Appx6744-6784). The November 23, 2010 draft contained the same technology disclosure as the January 3, 2011 provisional, which in turn contained the same technology disclosure as the '638 Patent. (Appx6919-6922, citing Appx6744-6784 and Appx6786-6796).

The discrepancy between the "Created" and "Last Printed" dates is a red herring. It does not render the November 23, 2010, "Last Modified Date" unreliable. This is a common issue with Microsoft Word.[2] Dr. Hernandez was a former Technical Program Manager at Microsoft. (Appx5522). He would have credibly

---

[2] *How can the Last Printed date in properties be before the Creation Date property in Word?*, MICROSOFT COMMUNITY (Jun. 9, 2020), https://answers.microsoft.com/en-us/msoffice/forum/all/how-can-he-last-printed-date-in-properties-be/d104c634-2274-46e1-a450-318856106054 (last visited December 6, 2024).

confirmed that the "Last Modified Date" metadata was reliable. The issue also first arose at trial.

The draft application should have been admitted. It was relevant under Rule 401, as it would have proved conception by Mr. Evans, under the "rule of reason," before the date of the Master provisional. (Appx6302-6303). The draft application's proof of earlier conception was also relevant to the jury's consideration of whether "a reason existed *at the time of the invention* to combine the elements of the prior art" when analyzing obviousness and what was "well-understood, routine, and conventional *at the time of the invention*" under *Alice* Step 2. (Appx5348, Appx5355) (emphasis added). Any possible prejudice from the "Created" and "Last Printed" dates did not substantially outweigh the probative value of this evidence, as Dr. Hernandez would have explained the issue subject to cross-examination.

The district court abused its discretion to deny a new trial on this ground, first for asserting that the document with metadata "had not been produced in discovery." (Appx22-23). That was untrue, since TrackTime did produce the unaltered native WORD file in discovery, evidenced by Amazon's expert reports disclosing "detail[ed], page-by-page" analysis of the draft (Appx3227), and discussing it coming from a single production number (TRACKTIME-000158887) containing multiple pages. (Appx3336). The district court also called the document "undated" (Appx22), despite its filename containing a date indication one day prior to the

November 23, 2010 date, as well as being dated in metadata. (Appx3935). Finally, the district court critiqued TrackTime's expert and inventor as not being able to "offer a conclusively clarifying opinion" (Appx23), but overlooked TrackTime's express offer to *voir dire* the metadata issue with the expert to confirm the reliability of the November 23, 2010 date, either in or outside the presence of the jury. (Appx6303). In combination with all of the other evidence consistent with Mr. Evans' pre-December 2, 2010 conception, the district court lacked any proper ground for excluding this important evidence. Finally, the district court suggested that TrackTime could have called Mr. Evans to testify on the document (Appx24), but to do so would have violated the district court's very exclusion of that document from evidence.

2. The district court also erred by excluding testimony regarding Amazon's factual statements made in its own patenting activities. (Appx9106-9130). This testimony would have helped prove the '638 Patent's inventive concept. (Appx5126). However, the district court did not "weigh the maximum reasonable probative force" against "the likely prejudice," as the Third Circuit has stated is required in consideration of the liberal approach to evidence that the Federal Rules prescribe. Instead, the district court summarily stated that the evidence was "tangential" and not "relevant." (Appx5127).

The validity of the ’638 Patent was a dispositive issue, and thus material to the case. TrackTime presented unrebutted testimony from Dr. Hernandez that the same inventive concept is present in both the ’638 Patent and Amazon’s ’658 patent. (Appx4947-4948). This makes Amazon’s factual statements in its patenting activities relevant. That makes it more likely that the “ordered combination” of the ’638 Patent was likewise not well-known, routine, and conventional, and therefore, valid.

The district court excluded evidence regarding Amazon’s patenting activities because of potential jury confusion. (Appx5127). However, this kind of potential risk could have been mitigated by jury instructions. *See GN Netcom,* 930 F.3d at 87. Further, the district court did not explain how that prejudice would have been unfair. *See id*. at 88; *McQueeney v. Wilmington Tr. Co.*, 779 F.2d 916, 923 n.8 (3d Cir. 1985) (“[A]bsen[t] . . . a showing of particularized danger of unfair prejudice, the evidence must be admitted”).

Amazon’s ’658 patent states that using an index with timestamped lines of lyrics to navigate the media “***overcome[s]*** one or more of the above-referenced and other deficiencies in ***conventional approaches*** to presenting media content via a computing device.” (Appx9122, with emphasis). These factual statements are inconsistent with Amazon’s arguments to the district court and the jury. They also

independently prove that TrackTime's '638 Patent passed muster under *Alice* Step 2 as an inventive concept beyond a conventional "scrub bar."

In its new trial decision, the district court stated that there was "minimal probative value" to the Amazon '658 patent, with a risk of prejudice, confusion and wasting time. (Appx24-25). Yet it failed to explain how this can be true. The issue was simple, and would have been straightforward to present: Amazon in its own (late) patent seeking to cover the same territory told the USPTO that its invention was unconventional. No jury could have been confused about that, nor its undermining of Amazon's patent eligibility attack. By excluding this evidence, the district court abused its discretion, separately meriting reversal of the new trial decision.

## CONCLUSION

For the reasons above, this Court should vacate the invalidity judgment against the ’978 Patent, reverse the JMOL order to hold claim 9 of the ’638 Patent infringed while holding claims 1 and 9 not invalid, otherwise reverse and/or vacate erroneous rulings on appeal, and remand for further proceedings consistent with its opinion (*e.g.*, a new damages trial).

Respectfully submitted,

/s/ Robert Greenspoon

ROBERT GREENSPOON
WILLIAM W. FLACHSBART
DUNLAP BENNETT & LUDWIG PLLC
*Attorneys for Plaintiff-Appellant*
333 North Michigan Avenue, Suite 2700
Chicago, Illinois 60601
(312) 551-9500
rgreenspoon@dbllawyers.com
wflachsbart@dbllawyers.com

# ADDENDUM

# TABLE OF CONTENTS
# ADDENDUM


| Docket No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 314 | Judgment Following Jury Verdict | 09/27/2023 | Appx1 |
| 330 | Memorandum Opinion | 09/26/2024 | Appx3 |
| 331 | Order on Judgments as a Matter of Law | 09/26/2024 | Appx31 |
| 332 | Final Judgment | 09/26/2024 | Appx32 |
| 28 | Memorandum Order on Motion to Dismiss | 06/19/2019 | Appx34 |
| 89 | Memorandum Order on Claim Construction | 07/07/2021 | Appx44 |
| | ’638 Patent | | Appx59 |
| | ’978 Patent | | Appx142 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| TRACKTIME, LLC,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM SERVICES LLC and AUDIBLE, INC.,<br><br>Defendants. | C.A. No. 18-1518-MN |

**JUDGMENT FOLLOWING JURY VERDICT**

This 27th day of September 2023, the Court having held a jury trial and the jury having rendered a unanimous verdict on September 19, 2023 (*see* D.I. 309), pursuant to Rule 58(b) of the Federal Rules of Civil Procedure, IT IS HEREBY ORDERED that:

1. Judgment is entered in favor of Defendants Amazon.com Services LLC and Audible, Inc. (collectively, "Defendants") and against TrackTime, LLC ("Plaintiff") that Defendants do not infringe claims 1 and 9 of U.S. Patent No. 8,856,638 ("the '638 Patent");

2. Judgment is entered in favor of Defendants and against Plaintiff that claims 1 and 9 of the '638 Patent are invalid as anticipated;

3. Judgment is entered in favor of Defendants and against Plaintiff that claims 1 and 9 of the '638 Patent are invalid as obvious;

4. Judgment is entered in favor of Defendants and against Plaintiff that claims 1 and 9 of the '638 Patent are patent ineligible under 35 U.S.C. § 101;

IT IS FURTHER ORDERED that this Judgment shall have the effect of denying as moot all other motions made by the parties pursuant to Rule 50(a) of the Federal Rules of Civil Procedure.

IT IS STILL FURTHER ORDERED that the deadline for any party to move for costs and attorneys' fees (including under 35 U.S.C. § 285) is extended to within fourteen (14) days after the time for appeal has expired or within fourteen (14) days after issuance of the mandate from the appellate court, whichever is later, and no party shall file any such motion before that time.

Maryellen Noreika
The Honorable Maryellen Noreika
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRACKTIME, LLC,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM SERVICES LLC and AUDIBLE, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 18-1518 (MN) |

**MEMORANDUM OPINION**

Tracy L. Pearson, DUNLAP BENNETT & LUDWIG, Wilmington, DE, Thomas M. Dunlap, DUNLAP BENNETT & LUDWIG, Vienna, VA, Robert Greenspoon, William Flachsbart, Mark Magas, DUNLAP BENNETT & LUDWIG, Chicago, IL – Attorneys for Plaintiff

Steven J. Balick, Andrew C. Mayo, ASHBY & GEDDES, Wilmington, DE; J. David Hadden, Saina S. Shamilov, Ravi R. Ranganath, S.J. Hahn, FENWICK & WEST LLP, Mountain View, CA; Todd R. Gregorian, Min Wu, Christopher S. Lavin, FENWICK & WEST LLP, San Francisco, CA, Melanie L. Mayer, Jeffrey A. Ware, Jonathan T. McMichael, FENWICK & WEST LLP, Seattle, WA – Attorneys for Defendants

September 26, 2024
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE:**

The Court presided over a five-day jury trial in this patent case from September 13 to 19, 2023. (*See* D.I. 317, 318, 319, 320 & 321 ("Tr.")). At the end of the trial, the jury returned a verdict in favor of Defendants Amazon.com Services LLC ("Amazon") and Audible, Inc. ("Audible") (together, "Defendants") and against Plaintiff TrackTime, LLC ("Plaintiff" or "TrackTime"). The jury found that Defendants' accused products do not directly infringe the asserted claims, that all asserted claims are invalid as anticipated and obvious, and that the ordered combination of elements in the asserted claims were well-understood, routine, and conventional at the time of the invention. The jury rejected Defendants' argument that the asserted claims are invalid for lack of written description.

Pending before the Court are Plaintiff's motion for judgment as a matter of law or for a new trial (D.I. 323) and Defendants' motion for judgment as a matter of law or for alternative relief as to certain claims dropped by Plaintiff prior to trial (D.I. 316). For the reasons set forth below, the Court will DENY Plaintiff's motion and GRANT Defendants' request for alternative relief.

## I. BACKGROUND

This case concerns U.S. Patent No. 8,856,638 ("the '638 patent" or "the Patent-in-Suit"), invented by Curt Evans and owned by TrackTime. The '638 patent relates to methods and systems for remote control multimedia seeking – in other words, technology that allows a user to navigate forward, backward, or within the playback timeline of a multimedia file.

Plaintiff filed this action on October 1, 2018, asserting that two of Defendants' applications, Amazon Music X-Ray Lyrics ("Amazon Music") and Kindle's Audible Immersion

Reading ("Immersion Reading") (together, "the Accused Products"), infringe claims 1 and 9 of the '638 patent (collectively, "the Asserted Claims").[1] (*See* D.I. 1).

From September 13 to 19, 2023, the Court presided over a jury trial. (*See* D.I. 293, 296, 297 & Tr.). The jury found that Plaintiff failed to prove, by a preponderance of the evidence, that the Accused Products infringe the Asserted Claims. (D.I. 309 at 1). The jury also found that Defendants had proven, by clear and convincing evidence, that the Asserted Claims are invalid as anticipated and obvious, (*id.* at 3-4), based on three references of prior art: U.S. Patent No. 8,433,431, invented by Dr. Aaron Master and owned by Soundhound, Inc. ("Master"); U.S. Patent Application No. 2007/0027844A1, invented by Stephen Toub and owned by Microsoft Corporation ("Toub"); and LiveNote Technologies Ltd.'s LiveNote Application Suite ("LiveNote"). (*See* DTX0055; DTX0057; DTX0142). Furthermore, the jury found that the ordered combination of elements in the Asserted Claims were well-understood, routine, and conventional at the time of the invention. (D.I. 309 at 5).[2]

On September 27, 2023, the Court entered judgment on the jury verdict under Rule 58(b) of the Federal Rules of Civil Procedure. (D.I. 314). On October 9, 2023, Defendants filed their motion for judgment as a matter of law as to the dropped claims (D.I. 316) and on October 25, 2023, Plaintiff filed its motion for judgment as a matter of law, with an alternative request for a new trial (D.I. 323). Briefing on those motions was completed on October 30 and November 14, 2023, respectively. (D.I. 322, 325, 327, & 328).

---

[1] Plaintiff's dropping of other claims of the '638 patent prior to the start of trial is the subject of Defendants' JMOL and addressed *infra* at Section III.C. (*See* Tr. at 77:14-78:22). In addition, Plaintiff initially alleged infringement of another patent, U.S. Patent No. 8,862,978 ("the '978 Patent"). (D.I. 1, 35). Prior to trial, the Court ruled that the asserted claims of the '978 Patent are invalid as indefinite under 35 U.S.C. § 112. (D.I. 89 at 8-15).

[2] The jury also found that the Asserted Claims are not invalid for lack of adequate written description. (D.I. 309 at 2). Neither party challenges that finding here.

## II. LEGAL STANDARDS

### A. Judgment as a Matter of Law

Judgment as a matter of law may be entered against a non-moving party if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue." Fed. R. Civ. P. 50(a)(1). A motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 373 (3d Cir. 2016) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)). Entry of judgment as a matter of law is a remedy to be invoked "sparingly." *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 383 (3d Cir. 2004).

Following a jury trial, a renewed motion for judgment as a matter of law under Rule 50(b) may be granted only if the movant demonstrates "that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied by the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (citation and alteration omitted). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support the finding under review. *Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 407 (Fed. Cir. 2018).

In determining whether substantial evidence supports the jury verdict, the Court may not make credibility determinations, weigh the evidence, or substitute its own conclusions for those of the jury where the record evidence supports multiple inferences. *See Avaya*, 838 F.3d at 373; *Lightning Lube*, 4 F.3d at 1166. Moreover, in the Third Circuit, when the movant bears the burden of proof on an issue, judgment as a matter of law is appropriate only if "there is insufficient

evidence for permitting any different finding." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976) (citations omitted).

**B. Motion for a New Trial**

"[A]fter a jury trial," the Court may grant a new trial "to any party" on "all or some of the issues" for "any reason for which a new trial has heretofore been granted" in federal court actions at law. Fed. R. Civ. P. 59(a)(1)(A). Common grounds for a new trial are: "(1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence exists that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent." *Ateliers de la Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 775 (D. Del. 2015).

Whether to grant a new trial is a question committed to the Court's discretion. *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980). Unlike the standard for judgment as a matter of law, on a motion for a new trial, "the Court need not view the evidence in the light most favorable to the verdict winner." *Ateliers*, 85 F. Supp. 3d at 776. "Nevertheless, new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

**C. Voluntary Dismissal**

Under Rule 41(a)(2) of the Federal Rules of Civil Procedure, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). Dismissals under Rule 41(a)(2) are without prejudice unless the Court finds

otherwise, *id.*, and the Third Circuit has set a "liberal policy" in favor of voluntary dismissals. *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 863 (3d Cir. 1990). Nevertheless, that policy must be counterbalanced with any potential prejudice that the defendant might suffer. *Id.* "Factors a court should consider when determining whether dismissal will substantially prejudice a defendant include: (1) the potential duplicative expense of a second litigation; (2) the expenses already incurred by the defendant; (3) how far the current litigation has progressed; and (4) whether the plaintiff was diligent in seeking dismissal." *Ferring Pharms. Inc. v. Novel Labs., Inc.*, No. 17-894 (RGA), 2018 WL 5085516, at *1 (D. Del. Oct. 18, 2018). If an analysis of those factors shows that the defendant will "suffer legal prejudice as the result of the dismissal, a dismissal with prejudice may be warranted." *Bioverativ Inc. v. CSL Behring LLC*, No. 17-914 (RGA), 2021 WL 3471688, at *1 (D. Del. Aug. 6, 2021).

## III. DISCUSSION

In its motion, Plaintiff asserts that the Court should set aside the jury's findings as to patent infringement, invalidity, and eligibility. Alternatively, in requesting a new trial, Plaintiff argues that the weight of the evidence does not support the jury's verdict, the jury's anticipation and non-infringement findings are inconsistent, the Court erred in certain evidentiary rulings, and that Defendants' counsel engaged in misconduct that confused the jury. Defendant has moved for judgment as a matter of law on the claims Plaintiff dropped before trial, and, in the alternative, argues that they should be dismissed with prejudice. The Court addresses the motions in turn.

### A. Plaintiff's Motion for Judgment as a Matter of Law

Plaintiff challenges certain of the jury's findings on patent infringement, eligibility, and invalidity. Specifically, Plaintiff contends that (1) Amazon Music infringes claim 9,[3] (2) both Asserted Claims are patent eligible because the ordered combination was not routine, conventional or well-understood, and (3) neither of the Asserted Claims is anticipated or obvious.

#### 1. Infringement

"Infringement is a question of fact that [is] review[ed] for substantial evidence when tried to a jury." *Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1291 (Fed. Cir. 2023). "A factual finding is supported by substantial evidence if a reasonable jury could have found in favor of the prevailing party in light of the evidence presented at trial." *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1335 (Fed. Cir. 2019).

Plaintiff argues that the only reasonable finding for the jury was that Amazon Music infringes claim 9 of the '638 patent. (D.I. 323 at 3). Specifically, Plaintiff says that the jury should have accepted its arguments that Amazon Music infringed the "seeking" and "performing" limitations based on testimony from Defendants' own experts, Dr. Dan Schoenfeld and Dr. Henry Houh. (*Id.*).[4] According to Plaintiff, during Amazon's invalidity case, Schonfeld and Houh each testified that the '638 patent's claims were anticipated by prior art called Toub, because Toub practices the "seeking" and "performing" functions of the claimed invention. (*Id.*). Plaintiff goes on to reason by analogy that, because the jury accepted that the Patent-in-Suit was anticipated by

---

3 Plaintiff does not dispute the jury's other findings of non-infringement in Question 1 of the Verdict Form, which pertain to claim 1 for Amazon Music and claims 1 and 9 for Immersion Reading. (D.I. 309 at 1).

4 To the extent Plaintiff argues that Defendants' experts testified inconsistently as to invalidity and infringement, Plaintiff did not cross examine Dr. Schonfeld or Dr. Houh (or anyone else) about this purported inconsistency at trial, and Plaintiff never drew the distinction for the jury in its closing (or elsewhere). (*Cf.* Tr. at 809:21-817:3).

Toub (D.I. 309 at 3) and Toub practiced the "seeking" and "performing" limitations, then Amazon Music also practices the "seeking" and "performing" limitations, "[b]ecause the same definition must be used for infringement as validity" (D.I. 323 at 3).

Plaintiff's argument comes up short for several reasons. First, Plaintiff fails to complete its syllogism – it is missing a necessary premise that Toub and Amazon Music were proven at trial to be the same (or even analogous) with respect to the "seeking" and "performing" limitations. Without that link, it does not follow that Amazon Music does *anything* simply because Toub does it, let alone "seeking" and "performing" as specified. To that point, Defendants identify several portions of expert testimony that the jury could have used to find that Amazon Music does not practice either function. (*See, e.g.*, Tr. at 716:16-719:24 ("[T]herefore, those [claim] limitations, 1E and 9D are not satisfied for the [X-ray Lyrics] Amazon Music application.")).

Another flaw in Plaintiff's argument is that, as Plaintiff acknowledges in its papers (D.I. 328 at 1), it bore the burden of proving infringement of each claim limitation at trial. *See E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1073 (Fed. Cir. 2019). Plaintiff does not explain why other evidence offered at trial, including testimony of Defendants' experts about infringement, cannot support the jury's finding of non-infringement. *See Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 969 (Fed. Cir. 2022). What is missing from Plaintiff's argument is any contention that what the jury did hear constituted "insufficient evidence for permitting *any different finding* other than that of infringement." *Express Mobile, Inc. v. GoDaddy.com, LLC*, 680 F. Supp. 3d 517, 527 (D. Del. 2023) (quotation marks omitted) ("[I]n this case there *were* alternative bases upon which a reasonable jury could find noninfringement.").

Accordingly, the jury's finding of non-infringement is supported by substantial evidence and will not be overturned.

**2. Eligibility**

Plaintiff next argues that, as a matter of law, no reasonable jury could find that "the ordered combination of elements in [claims 1 and 9] of the '638 patent was well understood, routine, and conventional as of the time of the invention." (D.I. 309 at 5). In support of that position, Plaintiff contends that testimony from Audible's Chief Technology Officer, Mr. Story ("the CTO"), and Defendants' expert, Dr. Schonfeld, fatally undermined the conventionality finding. (D.I. 323 at 4-5). Neither argument warrants displacing the jury's verdict.

First, Mr. Story acknowledged that he was "unaware of any conventional or well understood techniques of using gestures on words as an actuator" and "could not name any product on the market" between 2008 to 2010 with the ordered claim elements. (Tr. at 446:20-447:6). But those two statements, offered by one fact witness about his own personal awareness, were just two of the many pieces of evidence adduced on conventionality at trial. Indeed, they were the only two substantive statements Plaintiff elicited during its two-minute examination of Mr. Story. In addition to that testimony, the jury heard from Plaintiff's inventor, Mr. Evans, Plaintiff's expert, Dr. Hernandez, and Defendants' expert, Dr. Schonfeld. Dr. Hernandez agreed that "tapping on a touch interface to select something, that was well-known and conventional since Apple introduced the iPhone in 2007." (Tr. at 885:5-12). Dr. Schonfeld testified that the invention was "well-known, routine and conventional" because each of the component parts had already been invented and the abstract idea of the combination necessitated its ordering. (*Id.* at 699:16-706:20). Those opinions were corroborated by Mr. Evans on cross examination, when he conceded that he did not invent any of the component claim elements, and, instead, that the "invention is in the whole claim," comprising "all those pieces together." (Tr. at 294:12-18). A reasonable jury could well consider all of that evidence and conclude that the combination of the claim elements was

conventional, notwithstanding Mr. Story's inability to name a product that practiced them all together.

Second, Plaintiff attacks Dr. Schonfeld's opinion about the ordered combination of elements as "hindsight" by parsing certain phrasing Dr. Schonfeld used. (D.I. 323 at 5). In response to the question, "is there anything unconventional or not well-known about the ordering of these steps?" Dr. Schoenfeld replied, "Not in my opinion, . . . you need to have a combination of all these elements if you want to be able to display and tap and move the video or audio." (Tr. at 704:11-18). Plaintiff apparently contends that Dr. Schonfeld's colloquial use of the word "if" in that sentence transformed the opinion into "circular logic" that impermissibly "assumed into existence a key piece of the ordered combination." (D.I. 323 at 5).

Such a reading is grammatically unfounded, and, in fact, directly foreclosed by the remainder of Dr. Schonfeld's testimony. Dr. Schonfeld followed the challenged statement by sequentially walking through the claim elements, explaining how their order was fixed by the abstract idea. (*Id.* at 704:19-706:20). This led him to opine that the combination is conventional because there is only one functional way to sequence the relevant claim elements – "the order is the only logical order that can be." (Tr. at 704:17-18).[5] That opinion is not contradicted by the statement Plaintiff challenges, "you need to have a combination of all these elements ***if*** you want to be able to display and tap and move the video or audio," (*id.* at 704:15-17 (emphasis added)), because Dr. Schonfeld continued to address the "display," "tap," and moving "gesture" functions in his analysis, (*id.* at 705:2-706:1). Altogether, this constituted evidence that a reasonable juror

[5] *See also* Tr. at 705:11-12 ("[T]he ordered combination is predetermined, you cannot do it in any other logical order."); *id.* at 705:24-706:1 ("So there cannot be anything but one logical order, it is predetermined, you cannot order it in any other way.").

could have fairly considered in rendering the determination that the combination of claim elements was conventional.

### 3. **Invalidity**

At trial, Defendants argued that the Asserted Claims of the ’638 patent are invalid on anticipation and obviousness grounds, based on three prior art references: (1) Soundhound’s Master Patent; (2) Microsoft’s Toub Patent Application; and (3) LiveNote. The jury agreed that the Asserted Claims are anticipated by all three references and rendered obvious by Master. (D.I. 309 at 3-4). Plaintiff challenges those findings. The Court finds that substantial evidence supports the jury’s verdict on each theory of invalidity.

“A patent is invalid for anticipation under 35 U.S.C. § 102 if a single prior art reference discloses each and every limitation of the claimed invention.” *Purdue Pharma L.P. v. Epic Pharma, LLC*, 811 F.3d 1345, 1351 (Fed. Cir. 2016). A claimed invention is anticipated when it “was known to or used by others in this country before the date of the patentee’s invention” and was “accessible to the public.” *UCB, Inc. v. Watson Labs. Inc.*, 927 F.3d 1272, 1289 (Fed. Cir. 2019) (citations omitted). “Dissemination and public accessibility are the keys to the legal determination whether a prior art reference was published.” *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1364 (Fed. Cir. 2014) (quotation marks, alteration, and citation omitted). “Anticipation is a factual question, and a jury verdict regarding anticipation is reviewed after trial for substantial evidence.” *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1350 (Fed. Cir. 2019) (citation omitted).

“Obviousness is a question of law based on underlying findings of fact.” *Game & Tech. Co. v. Activision Blizzard Inc.*, 926 F.3d 1370, 1379 (Fed. Cir. 2019) (quotation marks and citation omitted). Specifically, a jury’s “verdict of obviousness must be supported by facts of (1) the scope

and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) any objective indicia such as commercial success or long-felt need." *Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 582 F.3d 1288, 1294 (Fed. Cir. 2009). "What a reference teaches and whether a person of ordinary skill in the art would have been motivated to combine the teachings of separate references are questions of fact." *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1353 (Fed. Cir. 2012). "Where, as here, the jury made no explicit factual findings regarding obviousness, [the Court] must determine whether the implicit findings necessary to support the verdict are supported by substantial evidence." *Fresenius*, 582 F.3d at 1294.

The jury found that each of the Master, Toub, and Live Note prior art references discloses all the limitations of the Asserted Claims. (D.I. 309 at 3). Plaintiff challenges that finding as unreasonable. (D.I. 323 at 6-10). Defendant also offered the same three prior art references as a basis for obviousness, and the jury found that Master rendered the Asserted Claims obvious. (D.I. 309 at 4). Plaintiff challenges that determination, too. The Court addresses both findings and holds that substantial evidence supports the jury's verdict.

**a. <u>Master</u>**

<u>Prior Art.</u> As a threshold issue, Plaintiff argues that no reasonable jury could have found that Master is prior art because the '638 patent predates it. (D.I. 323 at 6; D.I. 328 at 3-4). The Master provisional application was filed on December 2, 2010. (DTX0055). According to Plaintiff, it adduced evidence at trial that the '638 patent's claimed invention date went back before that by more than two years, as early as August of 2008. (D.I. 323 at 6). To support that claim, Plaintiff points to prosecution documents submitted to the U.S. Patent and Trademark Office ("the

USPTO"), trial testimony from its inventor and patent prosecution attorney, and email and sketch exhibits introduced at trial. (*Id.*).

Defendants respond that the '638 patent's earliest priority date is January 3, 2011, when the provisional application was filed. (*See* PTX473). They argue this fact is bolstered by trial evidence, including, for example, expert testimony from Dr. Schonfeld that Plaintiff's inventor's early sketch work did not constitute legal conception because it was not "complete and operative" and did not disclose all of the required claim limitations. (Tr. 658:12-660:25 ("You have to show that you not only have the general idea, but there is support for each and every one of the elements of the limitations that we went through in the claim, and that's clearly missing.")). Moreover, Defendants argue, none of Plaintiff's witnesses refuted that testimony or otherwise mapped the conception documents onto the Asserted Claims. (D.I. 327 at 8).

The Court agrees with Defendants that there was substantial evidence upon which the jury could find that Master constituted prior art. The bulk of the evidence Plaintiff identifies in support of its priority argument comes from partisan witness declarations submitted by its inventor, Mr. Evans, and prosecution attorney, Mr. Maynard, to the USPTO in 2014 – six years after the claimed dated of invention. Judging the weight of that evidence is a "credibility determination" that belongs uniquely to the jury. *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1168 (Fed. Cir. 2015). Here, the jury was free to ascribe little value to the uncorroborated, self-serving declarations and testimony from Mr. Evans and Mr. Maynard, particularly when counterbalanced by the expert testimony and documents supplied by Defendants. *Id.*; *Apator Miitors ApS v. Kamstrup A/S*, 887 F.3d 1293, 1296-97 (Fed. Cir. 2018). In other words, "the jury had substantial evidence on which to base a conclusion that the [challenged] work was prior art to the [plaintiff's] patent." *Syngenta Seeds, Inc. v. Monsanto Co.*, 404 F. Supp. 2d 594, 603 (D. Del. 2005), *aff'd*,

231 F. App'x 954 (Fed. Cir. 2007); *Ingenico Inc. v. IOENGINE, LLC*, No. 18-826 (WCB), 2022 WL 20814960, at *3 (D. Del. Dec. 9, 2022).

Anticipation. Plaintiff next asserts that, even if Master constitutes prior art, it still does not anticipate the '638 patent because Master does not disclose every limitation of the Asserted Claims. (D.I. 323 at 9-10). For one, says Plaintiff, the LRC file that serves as Master's synchronization index "stays at the server" and does not travel to a mobile device, thereby undermining the "performing a data lookup" claim limitation. (*Id.*). Defendants counter that Dr. Schonfeld testified otherwise, explaining, among other things, that "the LRC files, the synchronization time, and finally the fact that it could be done on a mobile device . . . are all disclosed in the [Master] provisional application." (Tr. at 688:17-22). For the same reason, Defendants assert, Dr. Schonfeld directly refuted Dr. Hernandez's expert testimony that Master discloses a "mathematical complex system" rather than a "lookup." (D.I. 327 at 11-12). "It was ultimately up to the jury, [here], to weigh the credibility of the parties' opposing theories and evidence." *Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1378 (Fed. Cir. 2003). The Court finds that this "classic example of competing experts" constitutes "substantial evidence" before the jury. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003).

Obviousness. Finally, Plaintiff contends that the jury could not have reasonably found that Master rendered the '638 patent obvious. (D.I. 323 at 9-10). The lone basis for this contention is that Dr. Schonfeld's testimony on the obviousness of the synchronization index was purportedly too cursory to carry Defendant's burden of proof. (*Id.* at 10; Tr. at 698:6-16). Plaintiff, however, takes that statement in isolation, ignoring the rest of Dr. Schonfeld's testimony about Master. Plaintiff also fails to address Dr. Schonfeld's testimony that Plaintiff did not put on any evidence of secondary indicia of non-obviousness, such as commercial success, industry praise, or long-felt

and unmet need. (Tr. at 698:25-699:15). For its own part, Plaintiff points to no such evidence that the jury overlooked. *In re Huang*, 100 F.3d 135, 139 (Fed. Cir. 1996) ("Once a *prima facie* case of obviousness has been established, the burden shifts to the applicant to come forward with evidence of nonobviousness to overcome the *prima facie* case."). And Plaintiff also fails to address other relevant evidence that the jury could have considered in making its obviousness determination. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 426 (2007) ("[The patentee] has shown no secondary factors to dislodge the determination that [the claim] is obvious."). For example, Dr. Schonfeld also testified that the claimed invention constituted a combination of already-existing features and functions, rather than novel components invented by Mr. Evans. *See id.* at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."); (Tr. at 704:11-706:1 ("the elements, their combination and their order are already part of [prior art]")).

Accordingly, the Court finds that the jury's determination that Master anticipated and rendered obvious the '638 patent was based on substantial evidence.

**b. <u>Toub</u>**

Next, Plaintiff argues that the Toub prior art could not have anticipated the '638 patent because (1) Toub's navigation function is based on mouse clicks, rather than the touch screen functionality required by TrackTime, and (2) Toub works only on desktop devices, while TrackTime is for mobile devices. (D.I. 323 at 7-8). Plaintiff says that its expert, Dr. Hernandez, testified to these discrepancies while Dr. Schonfeld's testimony, on the other hand, was not sufficient to establish these anticipating functions. (*Id.*).

First, with respect to touch-screen navigation, Toub explicitly discloses that "[t]he computing system may also have . . . a touch-input device." (DTX0057.0010). Dr. Schonfeld

testified about this capability, noting that "you can do this tap-to-jump . . . with a touching of the device and screen displayed." (Tr. at 663:11-18; *id.* at 666:2-6). Second, Defendants produced testimony and documentary evidence on mobile capability, including Toub, which discloses that the "invention [is] operational with . . . mobile telephones, pocket computers, personal computers, . . . minicomputers, . . . and distributed computing environments that include any of the above systems or devices." (DTX0057.0010; Tr. at 663:21-664:3 (discussing capability on a "mobile telephone or a tablet")). Plaintiff put on competing testimony from Dr. Hernandez, who attempted to contextualize Toub's parameters as outmoded. (Tr. at 874:5-7). But the Court finds that Defendants supplied enough proof – substantial evidence – that the jury could reasonably find that Toub had mobile and touch-screen capabilities. *Pannu*, 155 F.3d at 1348. Accordingly, there is no basis to set aside the jury's findings pertaining to Toub.

**c. <u>LiveNote</u>**

As with Toub, Plaintiff argues that LiveNote could not have anticipated TrackTime, because, like Toub, LiveNote was not designed for touchscreen navigation on a mobile device. (D.I. 323 at 8-9). Rather, according to Plaintiff, LiveNote could only perform on a "full scale desktop" by "using a mouse," and was made only for "text annotations in a transcript using a pen-stylus." (*Id.*). Accordingly, Plaintiff argues that Defendants failed to meet their burden of proving that LiveNote disclosed claims 1 and 9 of the '638 patent. (*Id.*).

Yet Defendants at trial furnished LiveNote documents and testimony from Dr. Schonfeld that directly contradict Plaintiff's position. For instance, Dr. Schonfeld testified that "you can also use [LiveNote] with something called a tablet PC" – a mobile device – and went on to opine that the LiveNote patent "makes clear that you can tap on the tablet and . . . you could use your finger

if you wanted to." (Tr. at 676:21-677:2; DTX0336). This substantial evidence provides a basis for the jury to have reasonably concluded that LiveNote anticipated the claimed invention.

Based on the foregoing, the Court finds that each of these sources of prior art provides substantial evidence of anticipation supporting the jury's verdict.

### B. Plaintiff's Motion in the Alternative for a New Trial

In the alternative, Plaintiff moves for a new trial. Of the four principal grounds for evaluating a new trial request, Plaintiff argues that three of them merit granting the motion here. Specifically, Plaintiff contends that the jury's verdict: (1) constitutes a miscarriage of justice because it is against the clear weight of the evidence; (2) was facially and internally inconsistent; and (3) was unfairly influenced by improper conduct by counsel and erroneous evidentiary rulings by the Court. *See Ateliers*, 85 F. Supp. 3d at 775. The Court addresses each assertion in turn.

#### 1. Clear Weight of the Evidence

Plaintiff first contends that the jury's verdict was against the great weight of the evidence for the same reasons set forth in its motion for judgment as a matter of law. (D.I. 323 at 11). "Although the standard for granting a new trial is less rigorous than the standard for granting judgment as a matter of law – in that the court need not view the evidence in the light most favorable to the verdict winner – a new trial should only be granted where 'a miscarriage of justice would result if the verdict were to stand,' the verdict 'cries out to be overturned,' or the verdict 'shocks the conscience.'" *Ateliers*, 85 F. Supp. 3d at 776 (quoting *Williamson*, 926 F.2d at 1353 (alteration omitted)). The Court finds that the jury's verdict does no such thing, substantially for the same reasons that the Court declined to upset the jury's verdict in Plaintiff's motion for judgment as a matter of law. *See Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1311 (Fed. Cir. 2005). Plaintiff's request for a new trial on these same grounds is therefore denied.

Plaintiff also challenges the jury's finding that the Accused Products did not infringe the Asserted Claims as against the weight of the evidence, on the basis that Defendants impermissibly engaged in new, "untimely claim construction" of certain limitations. (D.I. 323 at 11-12). Plaintiff argues that Defendants tainted the verdict by pressing the "untimely claim construction that remote server interactions are supposedly required but not practiced (via the 'receiving . . . information indicating a . . . gesture' step and the 'delivering' step)." (*Id.*).

Notably, the only citation Plaintiff provides for its assertion is a few sentences of Defendants' opening statement. (*Id.* (citing Tr. at 114-15)). There is no reference to any testimony or other evidence Defendants purportedly offered in connection with the new claim construction. Plaintiff did not object to that statement when it was made, and the jury was instructed that statements by counsel are not evidence. (Tr. at 64:6-9). Accordingly, Plaintiff cannot retry this case on that basis. *See, e.g.*, *Murray v. Fairbanks Morse*, 610 F.2d 149, 152 (3d Cir. 1979) ("Counsel's failure to object precludes him from seeking a new trial on the grounds of the impropriety of opposing counsel's closing remarks."); *Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 401 (3d Cir. 2016); Fed. R. Civ. P. 103(a).

Even if Plaintiff had timely objected, the plain language of claim 1 of the '638 patent forecloses Plaintiff's argument. Claim 1 discloses "receiving, from the mobile computing device, information indicating a user's . . . gesture." (JTX001.00082). "[T]he 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005). Here, the interpretation Plaintiff says Defendants used is just such "ordinary meaning." *Id.* That is fatal to Plaintiff's argument.

On both of the prior points, Plaintiff asserts that testimony from its expert, Dr. Hernandez, was "compelling" and "ably showed" its case. (D.I. 323 at 12). If it was, it was for the jury to

decide. *See, e.g.*, *MobileMedia*, 780 F.3d at 1168. And given that the jury was presented with countervailing testimony from two of Defendants' experts, the Court does not see that the "clear weight of the evidence" requires the Court to interpose its judgment in that credibility call. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1362 (Fed. Cir. 2012) ("Because of this conflicting expert testimony, the jury was free to make credibility determinations and believe the witness it considers more trustworthy." (internal quotation marks omitted)); *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 89 (3d Cir. 1960).

**2. Facially Inconsistent Verdict**

Plaintiff next asserts that the jury's finding that Amazon Music did not infringe the Asserted Claims is facially inconsistent with its finding that Toub anticipated the '638 patent. This position largely reiterates Plaintiff's previous argument for judgment as a matter of law. *See supra* at Section III.A.1 ("Infringement"). Plaintiff once again claims that "Dr. Schonfeld made clear admissions on the 'performing' and 'seeking' functions in the context of invalidity that are fundamentally inconsistent with Amazon's non-infringement contentions." (D.I. 328 at 8). Accordingly, argues Plaintiff, the jury could not reasonably find that Amazon Music did not infringe the "performing" and "seeking" elements of claims 1 and 9 while also finding that Toub anticipated the Patent-in-Suit because it disclosed both of those claim elements. (*Id.*).

As already discussed, Plaintiff's argument is flawed insofar as it seeks to elide any distinctions between Amazon Music and Toub in terms of the evidence presented at trial. *See supra* at Section III.A.1 ("Infringement"). Therefore, for those same reasons, the Court finds that the jury did not render an inconsistent verdict.[6]

---

[6] Moreover, the jury found that the Asserted Claims of the '638 patent are also anticipated by two other references, LiveNote and Master, neither of which Plaintiff challenges as "facially inconsistent." Accordingly, even if the Court were to accept Plaintiff's argument

### 3. The Court's Evidentiary Rulings

"Unless justice requires otherwise, no error in admitting or excluding evidence . . . is ground for granting a new trial." Fed. R. Civ. P. 61. A new trial is warranted only when an erroneous evidentiary ruling results in manifest injustice. *See Lind*, 278 F.2d at 88-89. Plaintiff asserts that the Court made three erroneous evidentiary rulings that unfairly impacted the outcome of the trial. First, the Court improperly excluded Plaintiff's inventor's draft patent application, which would have had a material bearing on the prior art analysis. (D.I. 323 at 14-15). Second, the Court improperly excluded Defendants' patenting activities for the purpose of proving inventive concept. (*Id.* at 16-17). And third, the Court improperly admitted prejudicial prior art testimony from Defendants. (*Id.* at 17).

#### a. Plaintiff's Draft Patent Application

On the fourth day of trial, Plaintiff sought to introduce a Microsoft Word document, authored by Plaintiff's inventor, Mr. Evans, that purported to be a draft patent application for the claimed invention ("the Draft Application"). (PTX 381). Although the Draft Application was undated, Plaintiff maintained that it was from November 23, 2010 – 10 days before the Master priority date. (*See* Tr. at 791:10-17). This assertion was based on the document's metadata. (*Id.*). But, upon inspection, the metadata was confusing and unreliable. The Draft Application's "Last Printed" date of October 22, 2010 implausibly predated the "Created" date of November 22, 2010, Plaintiff had not produced the metadata during discovery, and Dr. Hernandez did not discuss these reliability issues in his expert report. (*Id.* at 791:23-793:23). In other words, Plaintiff sought to

---

about Toub, it would not change the ultimate verdict that the Asserted Claims are invalid as anticipated, because "the evidence with respect to at least one of the prior art references was sufficient to prove anticipation of the asserted claims." *Northpoint Tech.*, 413 F.3d at 1312.

introduce the Draft Application as an uncorroborated, undated document with metadata that had not been produced in discovery and for which neither Plaintiff's expert nor its fact witness could offer a conclusively clarifying opinion. (Tr. at 794:20-795:7).

The Court excluded the Draft Application on all of those grounds, reasoning that it would be confusing to the jury. (*Id.*). "It is well established, [now], that when a party seeks to prove conception through an inventor's testimony the party must proffer evidence, in addition to the inventor's own statements and documents, corroborating the inventor's testimony." *Apator*, 887 F.3d at 1295 (quotations and alteration omitted). Here, however, Plaintiff did not put on independent evidence sufficient to corroborate the testimony of Mr. Evans. The Draft Application could not suffice, because "issues with the timestamp prevent[ed] it from satisfying the clear and convincing standard necessary to prove prior invention." *Kenexa Brassring, Inc. v. Taleo Corp.*, 751 F. Supp. 2d 735, 761 (D. Del. 2010). Even if the date were reliable, the Draft Application would not qualify as "independent" because it was created by Mr. Evans himself, and there were no third parties to swear to it. *Apator*, 887 F.3d at 1296-97 ("The evidence proffered by [inventor] is stuck in a catch-22 of corroboration. . . . it would be strange indeed to say that an inventor, who filed the [document] that needs corroborating, can by his own testimony provide that corroboration." (some alterations and ellipses omitted)).

Moreover, the exclusion did not unduly prejudice Plaintiff, because it put on other evidence that Mr. Evans' conception of the invention predated the Master patent, including prosecution documents, declarations, and direct testimony from Mr. Evans and Mr. Maynard – the same evidence that Plaintiff contends is so substantial that no reasonable jury could have ignored it. (*See supra*, Section III.A.3.a). That evidence, like the Draft Application, "originated with the inventor[]" and was not independently corroborated. *Kolcraft Enters., Inc. v. Graco Children's*

*Prod., Inc.*, 927 F.3d 1320, 1324 (Fed. Cir. 2019). As a result, the jury apparently disregarded its credibility. There is no reason to think that the jury would have treated the undated, conflicting Draft Application any differently, even if it had been admitted into evidence. *Id.* (finding that "inventor deposition testimony [and] the Inventor Declaration" did not constitute "evidence in the record independently corroborating the inventors' alleged conception"). And, finally, Plaintiff could have called Mr. Evans to testify that he created the Draft Application on November 23, 2010, without introducing the document itself. But Plaintiff declined to do so. The Court's evidentiary ruling does not merit a new trial.[7]

**b. <u>Defendants' Patenting Activities</u>**

Plaintiff next contends that the Court should have admitted statements made by Defendants in the course of prosecuting one of their own patents not at issue in this case ("the Amazon Patent"). (D.I. 323 at 16). According to Plaintiff, the claimed invention of the Amazon Patent shared similar features to the claimed invention of the '638 patent, so Defendants' prior statements that the Amazon Patent was not conventional foreclose Defendants from arguing that the '638 patent was conventional. But, as evidenced by the parties' grappling on the motions *in limine*, that proposition was in direct dispute. (D.I. 283 at 33:1-42:10). This led the Court to rule that it "didn't think Amazon's patents were relevant," and that bringing in Amazon Patent prosecution evidence would "risk serious jury confusion" and undue prejudice. (*Id.* at 42:2-10).

The Court routinely rejects the invitation to admit the prosecution history of patents "not related to any patent in th[e] case" for this very reason, even where a party contends such evidence is "directly contrary to [a party's] litigation positions." *Solvay, S.A. v. Honeywell Int'l Inc.*, 886

---

[7] In addition, as previously noted, even accepting Plaintiff's argument does not change the outcome of the verdict because the jury found the Asserted Claims invalid based on two other prior art references. *See supra* n.6.

F. Supp. 2d 396, 410 (D. Del. 2012) (excluding prosecution history of patent not-in-suit), *aff'd*, 742 F.3d 998 (Fed. Cir. 2014). This is because "the marginal relevance of the evidence is far outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury and wasting the limited time of the parties explaining the satellite patent prosecutions." *Id.* Here, Plaintiff sought to litigate the complex matter of the Amazon Patent's relevance as a single point in support of its rebuttal case on the conventionality of the '638 patent – an element on which Defendants bore the burden of proof. The minimal probative value of such impeachment material is plainly outweighed by the risk of prejudice, confusion, and wasting time. Fed. R. Evid. 403. Accordingly, Plaintiff's inability to introduce the Amazon Patent's prosecution history does not warrant a new trial.

**c. <u>The Master Demonstrative and Audible Prior Art Testimony</u>**

The third and final challenge Plaintiff makes to the Court's evidentiary rulings is that, over objections from Plaintiff, the Court (1) permitted Defendants to play a demonstrative video from the inventor of the Master prior art (DDX006) and (2) admitted testimony from Audible's CTO, Mr. Story, about the development of Immersion Reading (D.I. 323 at 17). According to Plaintiff, this was improper evidence of prior art, which confused the jury and prejudiced Plaintiff. (*Id.*).

With respect to the Master video, Plaintiff assented to the presentation under the condition that there be curative instructions explaining to the jury that video was only a demonstrative and did not itself constitute prior art. (*See* Tr. at 500:6-501:20). Those instructions were delivered as discussed. Directly before playing the video, Defendants' counsel stated on the record to the inventor of Master, "we're going to show this video to the jury that is not prior art in this case." (Tr. at 584:16-17). Later, on cross of Dr. Schonfeld, Plaintiff's counsel repeated that "the Sound Hound video placed up on this viewing screen . . . Amazon's counsel[] told the jury that is not

prior art." (Tr. at 805:8-14). Dr Schonfeld immediately concurred on the record: "That is not prior art, I agree." (*Id.*). Given these clarifying explanations to the jury, made by both parties, including from Defendants' counsel and their expert, Plaintiff did not suffer prejudice from the demonstrative.[8]

Equally unavailing is Plaintiff's contention that Mr. Story's testimony about the development of Immersion Reading prejudicially impacted Plaintiff because it "elicit[ed] backdoor evidence of prior art." (D.I. 323 at 17). During the portion of testimony that Plaintiff contends is problematic, Mr. Story discussed Apple iBooks, Kindle eBooks, and Soundhound LiveLyrics. (Tr. at 454:2-465:14). But none of those references were offered as prior art or served as the subject of the jury's verdict. Instead, the jury rendered its verdict of invalidity based on three different references: Master, Toub, and LiveNote. (D.I. 309 at 3-4). Mr. Story's testimony, then, offered nothing on the relevant prior art references in this case, and, therefore, did not prejudice Plaintiff.

**4. <u>Alleged Attorney Misconduct</u>**

Plaintiff's last effort to obtain a new trial is an assertion that Defendants' counsel engaged in three types of conduct meant to mislead and confuse the jury. Plaintiff says that Defendants improperly "pursued a narrative" theme that Plaintiff's inventor was a "failure," "made multiple distortions of prior art which confused the jury," and, lastly, "inflamed" the jury with "attacks" on and "disparag[ing]" remarks about Plaintiff's litigation funding and borrowing agreements. (D.I 323 at 18-20). Plaintiff characterizes these assertions as "unfounded," "misleading," and "confusing." (*Id.* at 20).

---

[8] Moreover, the jury was instructed that demonstratives are not evidence. (Tr. at 64:10-13).

To win a new trial on this basis, "the party seeking a new trial must demonstrate that the attorney's conduct constitutes misconduct, and not merely aggressive advocacy, and that the misconduct is prejudicial in the sense of affecting a substantial right in the context of the entire trial record." *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 260 (D. Del. 2001). The conduct at issue "must be so grievous as to have rendered the trial unfair." *Genzyme Corp. v. Atrium Med. Corp.*, 315 F. Supp. 2d 552, 584 (D. Del. 2004) (quotation marks omitted).

The essence of Plaintiff's protests about Defendants' counsel's statements is that they were "irrelevant," "confusing," and "inflammatory." (D.I. 323 at 20). Those criticisms, however, are the stuff that evidentiary objections are made of, not attorney misconduct.[9] *See Bd. of Regents v. Bos. Sci. Corp.*, No. 18-392 (GBW), 2024 WL 2848471, at *15 (D. Del. June 5, 2024). With respect to the statements that Plaintiff contends "improperly appealed to bias and emotion[,] [t]he Court is not convinced that those statements were misconduct as opposed to aggressive advocacy." *Id.* By contrast, Plaintiff does not assert that Defendants' counsel defied a prior Court order, *cf. Masimo Corp. v. Philips Elec. N. Am. Corp.*, No. 09-80 (LPS), 2015 WL 2379485, at *13 (D. Del. May 18, 2015) ("[T]he Court first concludes that there was 'attorney misconduct' in the sense that there were multiple violations of the Court's orders."), or "misrepresent[ed] the facts and law relevant to the jury's consideration of [the] issues." *Genzyme*, 315 F. Supp. 2d at 588. That type of "grievous" behavior is the hallmark of "attorney misconduct" in this context. *Id.* at 584.

Finally, Plaintiff fails to identify any "substantial right" that was offended or problem that would have tainted "the entire trial record." *Lucent*, 168 F. Supp. 2d at 260; *Bd. of Regents*, 2024

---

9 That Plaintiff failed to preserve a trial objection for any of these bases is by itself grounds to deny Plaintiff's motion, because "a party who fails to object to errors at trial waives the right to complain about them following trial." *Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir. 1998); *Stemtech*, 834 F.3d at 401 (denying new trial because "objections needed to be raised when the allegedly objectionable exhibits were offered at trial, and [movant] failed to lodge a contemporaneous objection"); *Murray*, 610 F.2d at 152; Fed. R. Evid. 103(a).

WL 2848471, at *15 ("[N]one of the statements were prejudicial in the sense of affecting a substantial right in the context of the entire record."); *Stambler v. RSA Sec., Inc.*, 123 F. App'x 982, 985 (Fed. Cir. 2005) (rejecting plaintiff's contention that "false theme" and "message" warranted new patent trial); Fed. R. Civ. P. 61. Accordingly, the Court denies Plaintiff's request for a new trial.

### C. Defendants' Motion for Judgment as a Matter of Law

In the proposed pretrial order, Plaintiff identified infringement of "claims 1-20 of the '638 patent" as issues for trial. (D.I. 278 ¶ 1). Plaintiff did not narrow its case at the pretrial conference or before the Court adopted and entered Plaintiff's proposal as part of the final pretrial order. (*See* D.I. 283; D.I. 293 ¶ 1). The morning of the trial, moments before the jury took their seats, the parties informed the Court that Plaintiff was withdrawing claims 2-8 and 10-20 of the Patent-in-Suit ("the withdrawn claims") and choosing to proceed with only the Asserted Claims (claims 1 and 9). (*See* D.I. 295; Tr. at 77:14-78:23). This decision was seemingly made in response to the Court's suggestion at the pretrial conference that the parties attempt to focus and narrow the issues for trial.[10] (D.I. 283 at 37:15-25; *id.* at 45:16-46:21).

---

10 The Court imposed no limits. This District maintains a heavy docket of patent cases, where both plaintiffs and defendants regularly and strategically carry numerous claims and defenses deep into litigation before winnowing them. *See, e.g.*, *Bial-Portela & Ca. S.A. v. Alkem Labs. Ltd.*, No. 18-304 (CFC), 2022 WL 13944612, at *2 (D. Del. Oct. 24, 2022). "In [such] cases, plaintiffs routinely assert at the outset significantly more patent claims than they ever could realistically assert at trial. As trial approaches, plaintiffs reduce their asserted claims to a manageable number and defendants reduce their invalidity defenses." *Id.*; *Shure Inc. v. ClearOne, Inc.*, No. 19-1343 (RGA), 2022 WL 1718950, at *1 (D. Del. May 27, 2022) ("In the normal course of litigation, parties narrow claims and defenses as trial approaches."). This is a simple matter of practicality: there are limits to the volume of what a jury or court can feasibly hear in a single time-delimited trial. *See Alkem Labs.*, 2022 WL 13944612, at *2 ("The finite resources of this Court and the parties make this narrowing process necessary."). Here, Plaintiff asserted 20 claims through the eve of trial but ultimately elected to proceed with just two, acknowledging that it "voluntarily decided that these are the two [claims] we want to focus on." (Tr. at 797:1-4).

Defendants now move for judgment as a matter of law as to the withdrawn claims, or, in the alternative, request that the Court deem those claims dismissed with prejudice. (D.I. 316 at 1). Plaintiff responds that Defendants' motion should be denied and the claims dismissed without prejudice, on the basis that the pretrial withdrawal of Plaintiff's claims effectively constituted a request for voluntary dismissal under Rule 41(a)(2).[11] (D.I. 322 at 3-4).

The circumstances of Plaintiff's withdrawal here warrant dismissal with prejudice. After nearly five years of litigation, Plaintiff dropped the withdrawn claims, quite literally, minutes before trial, *Bio-Rad*, No. 15-152 (RGA), at 1 ("[W]hen claims or counterclaims are dropped on the eve of trial, they are dropped with prejudice."), when the "claims were poised for a final disposition," *Shure*, 2022 WL 1718950, at *1, and without explanation, *Bioverativ*, 2021 WL 3471688, at *3 (dismissing with prejudice where plaintiff "offer[ed] no explanation as to why it decided to withdraw the [claims on the] Patent only once the case was ready for trial"). Defendants incurred great expense in getting to that point; they litigated three rounds of complaints, a motion to dismiss, the claim construction phase, summary judgment, and years of fact and expert

[11] It is an open question in this District as to whether Rule 15 (withdrawal) or Rule 41 (dismissal) is the proper lens to view belated requests to drop a claim. *See, e.g.*, *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1353 (Fed. Cir. 2012) (noting, without deciding, that "withdrawal of the claims [is] akin to either a Federal Rule of Civil Procedure 15 amendment to the complaint, or a Rule 41(a) voluntary dismissal of claims without prejudice" (internal citations omitted)); *Shure*, 2022 WL 1718950, at *1 (calling Rules 15 and 41 "alternative[s]" in this context); *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, No. 15-152 (RGA), D.I. 561 at 2-3 (D. Del. July 9, 2019). Because the parties' briefing principally addresses Rule 41, the Court evaluates the dispute under that rubric, without deciding which Rule controls in this context. *See Bioverativ*, 2021 WL 3471688, at *3 ("Because [the Court] find[s] that a dismissal with prejudice is warranted under Rule 41, [it] will not address [plaintiff's] alternative arguments under Rule 15."). In any event, the Court retains "extensive discretion" under both Rules and so would reach the same conclusion under a Rule 15 analysis, because the prejudice calculus remains the same. *Shure*, 2022 WL 1718950, at *1; *Alkem Labs.*, 2022 WL 13944612, at *2; *Nilssen v. Motorola, Inc.*, 203 F.3d 782, 784 (Fed. Cir. 2000) ("In many instances the procedure for, and effect of, an amendment will be the same as a voluntary dismissal because of the similarities between the governing rules.") (citation omitted)).

discovery. *See, e.g.*, *id.* (dismissing with prejudice under Rule 41 where "[t]he parties ha[d] litigated th[e] case for over three years, through discovery and dispositive motions, and the case [wa]s ready for trial"); *Ferring Pharms.*, 2018 WL 5085516, at *1 ("A plaintiff ordinarily will not be permitted to dismiss an action without prejudice under Rule 41(a)(2) after the defendant has been put to considerable expense in preparing for trial." (citation omitted)).

After all of that time and effort, Plaintiff failed to bring its case on the dropped claims before the jury at a five-day trial. Dismissal without prejudice would allow Plaintiff a second bite at the apple, for up to 18 claims on the very same patent, perhaps even in a different forum. This is the very picture of prejudice. *See, e.g.*, *Shure*, 2022 WL 1718950, at *1 ("Allowing [plaintiff] to file a new lawsuit tomorrow asserting these very claims would lead to excessive, duplicative expenses."); *Alkem Labs.*, 2022 WL 13944612, at *2 ("If [the court] were to dismiss [plaintiff's] withdrawn claims as moot and without prejudice, then [plaintiff] (and any future plaintiff) would receive a green light to engage in 'essentially endless litigation.'" (citation omitted)). "The interests of finality outweigh Plaintiff['s] interests in seeking to be able to assert the claims again." *Bio-Rad*, No. 15-152 (RGA), at 4. Accordingly, the Court grants Defendants' motion and dismisses the withdrawn claims with prejudice.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, the alternative relief requested in Defendants' renewed motion for judgment as a matter of law (D.I. 316) is GRANTED, and Plaintiff's renewed motion for judgment as a matter of law or for a new trial (D.I. 323) is DENIED.

An appropriate Order will follow.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRACKTIME, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1518 (MN) |
| | ) | |
| AMAZON.COM SERVICES LLC and AUDIBLE, INC., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

At Wilmington this 26th day of September 2024:

For the reasons set forth in the Memorandum Opinion issued this date, IT IS HEREBY ORDERED that:

1. Plaintiff's renewed motion for judgment as a matter of law or, in the alternative, for a new trial (D.I. 323) is DENIED.

2. The alternative relief requested in Defendants' renewed motion for judgment as a matter of law (D.I. 316) is GRANTED.

3. Plaintiff's claims 2-8 and 10-20 of the '638 patent are DISMISSED WITH PREJUDICE.

Maryellen Noreika
The Honorable Maryellen Noreika
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRACKTIME, LLC,<br><br>Plaintiff,<br><br>v.<br><br>AMAZON.COM SERVICES LLC and AUDIBLE, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 18-1518 (MN) |

**FINAL JUDGMENT**

At Wilmington this 26th day of September 2024, pursuant to Rule 54 of the Federal Rules of Civil Procedure and the Memorandum Opinion and Order entered by the Court on this date (D.I. 330, 331),

IT IS HEREBY ORDERED that:

1. Judgment is entered in favor of Defendants Amazon.com Services LLC and Audible, Inc. (collectively, "Defendants") and against TrackTime, LLC ("Plaintiff") that Defendants do not infringe claims 1 and 9 of U.S. Patent No. 8,856,638 ("the '638 Patent");

2. Judgment is entered in favor of Defendants and against Plaintiff that claims 1 and 9 of the '638 Patent are invalid as anticipated;

3. Judgment is entered in favor of Defendants and against Plaintiff that claims 1 and 9 of the '638 Patent are invalid as obvious;

4. Judgment is entered in favor of Defendants and against Plaintiff that claims 1 and 9 of the '638 Patent are patent ineligible under 35 U.S.C. § 101;

IT FURTHER ORDERED that the deadline for any party to move for costs and attorneys' fees (including under 35 U.S.C. § 285) is extended to within fourteen (14) days after the time for

appeal has expired or within fourteen (14) days after issuance of the mandate from the appellate court, whichever is later, and no party shall file any such motion before that time.

Maryellen Noreika

The Honorable Maryellen Noreika
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRACKTIME, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1518 (MN) |
| | ) | |
| AMAZON.COM, INC., AMAZON.COM LLC, AMZN MOBILE LLC, AMAZON WEB SERVICES, INC., AMAZON DIGITAL SERVICES LLC, and AUDIBLE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER**

At Wilmington this 19th day of June 2019:

As announced at the hearing on June 14, 2019, IT IS HEREBY ORDERED that Defendants' Motion to Dismiss (D.I. 14) is GRANTED as to claims 1-20 of U.S. Patent No. 8,856,638 ("the '638 Patent") and claims 1-10 of U.S. Patent No. 8,862,978 ("the '978 Patent").

Defendants' motion to dismiss was fully briefed as of December 21, 2018 (*see* D.I. 15, 17, 18, 19), and the Court received further submissions regarding which Supreme Court or Federal Circuit case each party contends is analogous to the claims at issue in Defendants' motion (*see* D.I. 23, 24; *see also* D.I. 22). The Court carefully reviewed all submissions in connection with Defendants' motion, heard oral argument (*see* D.I. 27) and applied the following legal standard in reaching its decision:

## I. LEGAL STANDARDS

### A. Motion to Dismiss for Failure to State a Claim

In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept all well-pleaded factual allegations in the complaint as true and view them in the light

most favorable to the plaintiff. *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010); *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 232-33 (3d Cir. 2008). "[A] court need not 'accept as true allegations that contradict matters properly subject to judicial notice or by exhibit,' such as the claims and the patent specification." *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (quoting *Anderson v. Kimberly-Clark Corp.*, 570 F. App'x 927, 931 (Fed. Cir. 2014)). Dismissal under Rule 12(b)(6) is only appropriate if a complaint does not contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "[P]atent eligibility can be determined at the Rule 12(b)(6) stage . . . when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

B. Patent-Eligible Subject Matter

Section 101 of the Patent Act provides that anyone who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may obtain a patent. 35 U.S.C. § 101. The Supreme Court has long recognized three exceptions to the broad categories of subject matter eligible for patenting under § 101: laws of nature, physical phenomena, and abstract ideas. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 134 S. Ct. 2347, 2354 (2014). These "are 'the basic tools of scientific and technological work' that lie beyond the domain of patent protection." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 77-78 (2012)); *see also Alice*, 134 S. Ct. at 2354. A claim to any one of these three categories is directed to ineligible subject matter under § 101. "[W]hether

a claim recites patent eligible subject matter is a question of law which may contain underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

Courts follow a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355; *see also Mayo*, 566 U.S. at 77-78. First, at step one, the Court determines whether the claims are directed to one of the three patent-ineligible concepts. *Alice*, 134 S. Ct. at 2355. If the claims are not directed to a patent-ineligible concept, "the claims satisfy § 101 and [the Court] need not proceed to the second step." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018). If, however, the Court finds that the claims at issue are directed a patent-ineligible concept, the Court must then, at step two, search for an "inventive concept" – *i.e.*, "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice*, 134 S. Ct. at 2355 (alteration in original) (quoting *Mayo*, 566 U.S. at 72-73).

1. Step One of the *Alice* Framework

At step one of *Alice*, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015); *see also Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (step one looks at the "focus of the claimed advance over the prior art" to determine if the claim's "character as a whole" is to ineligible subject matter). In performing step one of *Alice*, the Court should be careful not to oversimplify the claims or the claimed invention because, at some level, all inventions are based upon or touch on abstract ideas, natural phenomena, or laws of nature. *Alice*, 134 S. Ct. at 2354; *see also McRO, Inc. v.*

*Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016). "At step one, therefore, it is not enough to merely identify a patent-ineligible concept underlying the claim; [courts] must determine whether that patent-ineligible concept is what the claim is 'directed to.'" *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1050 (Fed. Cir. 2016).

2. Step Two of the *Alice* Framework

At step two of *Alice*, in searching for an inventive concept, the Court looks at the claim elements and their combination to determine if they transform the ineligible concept into something "significantly more." *Alice*, 134 S. Ct. at 2355; *see also McRO*, 837 F.3d at 1312. This second step is satisfied when the claim elements "involve more than performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Berkheimer*, 881 F.3d at 1367 (citation and internal quotation marks omitted); *see also Mayo*, 566 U.S. at 73. "The inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art. . . . [A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016). Whether claim elements or their combination are well-understood, routine, or conventional to a person of ordinary skill in the art is a question of fact. *Berkheimer*, 881 F.3d at 1368.

At both steps of the *Alice* framework, courts often find it useful "to compare the claims at issue with claims that have been considered in the now considerably large body of decisions applying § 101." *TMI Sols. LLC v. Bath & Body Works Direct, Inc.*, C.A. No. 17-965-LPS-CJB, 2018 WL 4660370, at *5 (D. Del. Sept. 28, 2018) (citing *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1294 (Fed. Cir. 2016)); *see also Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016).

## II. THE COURT'S RULING

The ruling to grant Defendants' motion to dismiss (D.I. 14) under Federal Rule of Civil Procedure 12(b)(6) was announced from the bench at the conclusion of the hearing as follows:

> . . . I'm prepared to rule on the pending motions. I will not be issuing written opinions, but I will issue an order that states my ruling.
>
> I want to emphasize before I get into the rulings that while I'm not issuing a written opinion, we have followed a full process for making the decisions that I'm about to state.
>
> There was full briefing on each of the pending motions. There were additional submissions regarding what each party viewed as the most analogous case and there has been extensive oral argument here today. All of the submissions and the arguments have been carefully considered.
>
> Now, as to my rulings, as an initial matter, I am not going to read into the record my understanding of Section 101 law. I have a legal standard that I've included in earlier opinions, including somewhat recently in *Kroy IP Holdings v. Groupon*, Civil Action No. 17-1405. I incorporate that law and adopt it to my ruling today, and I will also set it out in the order that I now will issue.
>
> First as to *TrackTime v. Amazon*, Civil Action No. 18-1518. There are two patents at issue here, United States Patent No. 8,856,638 and 8,862,978, which share the same specification.
>
> The patents generally relate to methods for using a mobile device to synchronize transcript text and multimedia to allow for display of selected multimedia or for index annotation.
>
> Defendants have moved pursuant to Rule 12(b)(6) to dismiss, arguing that the asserted claims which include all of the claims 1 through 20 of the '638 patent and claims 1 through 10 of the '978 patent are directed to patent ineligible subject matter. After reviewing the entire record, hearing argument and applying the law as I understand it, I agree with defendants.
>
> The asserted claims of the two patents are directed to patent ineligible subject matter, and I will grant defendants' motion to dismiss. I understand that that motion is not directed at claims 11 through 17 of the '978 patent and I am not today addressing those claims.

Defendants treat claim 1 of the '638 patent as representative of that patent and similarly treat claim 1 of the '978 patent as illustrative of the asserted claims of that patent.

In its papers, plaintiff argued that defendants have not met the burden of showing the representativeness, but did not articulate any reason for why the claims should not be treated as representative.

Here today, the discussion focused on claim 1 of the '638 patent. Plaintiff asserted that that claim is not representative of the claims of the '978 patent, pointing to elements of the '978 patent, referring to steps relating to facilitating an annotation of the synchronization index.

The test for whether a claim is representative as I understand it is whether the representative claim and the others are substantially similar and linked to the same abstract idea. As discussed below, I have reviewed all of the asserted claims and find that claim 1 of the '638 patent is representative of the asserted claims.

As to step one of *Alice*, defendants assert that claim 1 of the '638 patent is directed to the abstract idea of indexing video files. In its papers, TrackTime argued that the claim is instead directed to a new user interface and a, quote, "specific improvement in user interfaces for mobile devices."

Today, TrackTime added that the claim is directed to using a synchronization index to navigate between text and multimedia on a mobile device. The claim, however, does not claim or describe any improvement to the mobile device technology, or to technology for indexing video or to technology for creating a synchronization index that would make it more applicable to a mobile device. It does not capture an improved mobile device or user interface or any particular structure or means for such improvement. It recites generic steps for performing synchronization on a mobile device. It is directed to the abstract idea of using an index to synchronize text and multimedia. Thus, unlike *Enfish*, *Core Wireless* and *Data Engine*, the claim is not to a specific improvement in the capability or functioning of computers or technology. Instead, when considered as a whole, the claim uses generic computing devices to synchronize text with multimedia like audio or video, but now on a mobile device.

I am mindful that when looking at the claims as a whole, I must consider the purported advance or advances over the prior art.

Here, TrackTime asserts that the shortcomings of the prior art included the lack of transcript management utility for smoothly scrolling synchronized text in media for use on a mobile device, and that is also referenced in the '638 patent at column 1, lines 58 through 62. TrackTime asserts that the claimed invention is an improved user interface that is directed at that problem. TrackTime's argument, however, is essentially an argument that what was admittedly done on computers, use of an index to synchronize and navigate between text and multimedia, is now more easily done on mobile devices. But TrackTime does not claim how that is accomplished or any improvement in technology to allow it, and as another Court in this district has held, "data reformatting for a mobile device, even if captured in the claims, is an abstract idea." And that's *Valmont Industries v. Lindsay Corp.*, No. 15-42-LPS, 2018 WL 5962469 at *8.

The Court finds that all of the asserted claims from both patents are substantially similar and linked to the same abstract idea claimed in claim 1 of the '638 patent. Recitation of executable program code configured to facilitate the annotation of the synchronization index and communicating that annotation in claim 1 of the '978 patent does not change that conclusion, because there is no indication in the specification that the executable program code used is anything more than generic computer software.

Similarly, the dependent claims of both the '638 and the '978 patents simply add generic computer functions, for example, seeking a multimedia file or caching, or they include generic hardware or well-known mobile operating systems.

Moving to step two of *Alice*, defendants argue that there is no inventive concept supplied by the claims because the claim limitations are functional in nature and implemented on generic computer technology. For example, on a mobile computing device using a synchronization index, the touch sensitive input interface, and displaying synchronization indexed on a screen.

TrackTime, on the other hand, asserts that the claims as a whole are novel, which the Federal Circuit has noted in *SAP* and other cases is not the test for patent eligibility. TrackTime also appears to assert that the ordered combination of the claim elements results in an improved user interface for a mobile device. That is, that it improves the functioning of mobile computing devices by enhancing the user's experience and allowing improved multimedia seeking and retrieval.

I find, however, that the claim elements both specifically, both separately and looking at their ordered combination as *Alice* instructs me that I must do, do not supply the requisite inventive concept because they are simply well-known generic computer components functioning in a conventional way and their ordered combination is the only logical order that there can be, and the parties here do not dispute that.

So, for example, the mobile computing device described is a generic computer and the specification, column 18, lines 3 through 29, says that it may be one of many well-known commercial devices.

The synchronization index is an electronic file of many possible formats including a spreadsheet or Microsoft Access database, and may include transcript text and timing values. That's in the '638 patent, column 17, lines 4 through 27.

The executable software code is pretty much any software, that's in the specification at '638 patent at column 20, lines 39 to 42. And the remaining elements are functional limitations of computers performing steps within their ordinary capacity.

And so basically we're taking abstract, an abstract idea and having generic technology applied to it which was the case in the *Alice* and *Mayo* lines of cases. Although TrackTime asserts that there are factual issues as to whether the claims recite more than generic computer components performing generic functions, it does not identify any particular limitations that were not conventional or well known, et cetera.

Furthermore, although TrackTime points to allegations in its complaint, regarding shortcomings in the prior art and how the patents resolved or overcame those shortcomings. Those allegations consist largely of conclusory assertions parroting the language of *Berkheimer* or referring to an accused product.

With respect to the allegations about Amazon products and patents, while I understand that Amazon may have sought patent protection on its products or represented that some aspect of the accused products was novel, the patent eligibility of Amazon's claims is not before me.

Moreover that Amazon may assert that some aspect of its product is innovative does not bear on the eligibility of the claims before me, the ones that Amazon is accused of infringing.

Finally, I will address the cases the parties have submitted as being most analogous. TrackTime cites to *Data Engine Technologies v. Google*, 906 F.3d 999 Federal Circuit 2018. That case involved claims directed to systems and methods of using notebook tabs to assist in navigating complex three-dimensional spreadsheets. I disagree that it is analogous to the claims here. In *Data Engine* the Federal Circuit found that the claims were directed to improving functionality of complicated electronic spreadsheets by using a notebook tabbed interface, a specific structure that was more user friendly and allowed for faster and more convenient navigation of the spreadsheet and thereby avoided the problems of prior art. Those problems included that users had to search for and implement complex commands in order to get to where they wanted to be.

In contrast, the claims here are taking something that was done before by hand, for example an attorney matching up a transcript with a video, or something that was done by larger computers and claiming that process now done on mobile devices, but without any improvement in the functioning of the mobile devices or any recitation in the claims of how any purported improvement is achieved.

Defendants on the other hand cite *Intellectual Ventures v. Erie Indemnity*, 850 F.3d 1315 Federal Circuit 2017. That case involved claims directed to methods and apparatuses for locating information in a computer database using an index. In that case, the Federal Circuit agreed that the claims were directed to the abstract idea of creating an index and using it to search for and retrieve data which was a type of activity long known and performed before computers. And it was simply directed to collecting, classifying and filtering data without any specific method of doing so.

The Federal Circuit found that using XML tags to do searching did not save the claims from being an abstract idea because the claims were not focused on how the tags modified the database to improve its functionality and XML tags did not supply inventive content because they were well-known as admitted in the specification.

Here the Court agrees that the claims at issue in *Erie* and particularly claim 19 are analogous to the claims here. At step 1, the claims of the ’638 and ’978 patents are directed to methods of using a synchronization index for searching for multimedia based on texts associated with that multimedia, and then retrieving it or allowing for user annotation of the index just like using XML tags in

searching for and retrieving data in *Erie*. Similarly as to step 2 the claims are analogous because many of the limitations are conventional, for example, different commercial mobile devices, synchronization index can be a generic spreadsheet or a Microsoft access database. And many of the limitations are simply routine computer functions such as sending and receiving information to execute the database search.

So as I said, I am granting the motion to dismiss. I understand that there are additional claims of one of the patents that have not been asserted, and I am not addressing those patents, those claims as they are not before me.[1]

Maryellen Noreika

The Honorable Maryellen Noreika
United States District Judge

1 At the conclusion of the hearing, Plaintiff requested leave to file an amended complaint to include additional allegations regarding step 2 of *Alice*, and Defendants opposed that request on the grounds of futility. As clarified in the oral order issued after the hearing, the Court has given Plaintiff permission to file a motion for leave to amend its complaint and which attaches its proposed amended complaint. (*See* D.I. 26).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TRACKTIME, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 18-1518 (MN) |
| | ) | |
| AMAZON.COM, INC., AMAZON.COM LLC, AMZN MOBILE LLC, AMAZON WEB SERVICES, INC., AMAZON DIGITAL SERVICES LLC, and AUDIBLE, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER**

At Wilmington this 7th day of July 2021:

As announced at the hearing on February 12, 2021, IT IS HEREBY ORDERED that the disputed claim term of U.S. Patent Nos. 8,856,638 ("the '638 Patent") and 8,862,978 ("the '978 Patent") is construed as follows:

1. "multimedia" includes media that consists of only one type of media ('638 Patent, claims 1–7, 9–12, 14–16, 18, & 19; '978 Patent, claims 1–7).

In addition, for the reasons set forth below:

1. "executable program code configured to facilitate annotation of a portion of said synchronization index" is a means-plus-function term subject to 35 U.S.C § 112 ¶ 6 and is indefinite ('978 Patent, claim 1).

2. "executable program code configured to synchronously play said associated multimedia with said synchronization index" is a means-plus-function term subject to 35 U.S.C § 112 ¶ 6 and is indefinite ('978 Patent, claim 2).

The parties briefed the issues. (*See* D.I. 71). The Court carefully reviewed all submissions in connection with the parties' contentions regarding the disputed claim terms, heard oral argument (*see* D.I. 79), and applied the following legal standards in reaching its decision.

# I. LEGAL STANDARD

## A. Claim Construction

"[T]he ultimate question of the proper construction of the patent [is] a question of law," although subsidiary fact-finding is sometimes necessary. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015). "[T]he words of a claim are generally given their ordinary and customary meaning [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted). Although "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Id.* at 1314. "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted).

The patent specification "is always highly relevant to the claim construction analysis . . . [as] it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. "Even when the specification describes only a single embodiment, [however,] the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (internal quotation marks omitted) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence, . . . consists of the complete record of the proceedings before the PTO [(Patent and Trademark Office)] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

In some cases, courts "will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 574 U.S. at 331. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, although extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318–19. Where the intrinsic record unambiguously describes the scope

of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

B. Indefiniteness

Section 112 of the Patent Act requires a patent applicant to "particularly point[] out and distinctly claim[] the subject matter" regarded as the applicant's invention. 35 U.S.C. § 112 ¶ 2. "The primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *All Dental Prodx, LLC v. Advantage Dental Prods., Inc.*, 309 F.3d 774, 779–80 (Fed. Cir. 2002) (citing *Warner-Jenkinson Co. v. Hilton-Davis Chem. Co.*, 520 U.S. 17, 28–29 (1997)). Put another way, "[a] patent holder should know what he owns, and the public should know what he does not." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002).

A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). Definiteness is a question of law, but the Court must sometimes render factual findings based on extrinsic evidence to resolve the ultimate issue of definiteness. *See, e.g.*, *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1376 (Fed. Cir. 2017); *see also Teva*, 574 U.S. at 333. "Any fact critical to a holding on indefiniteness . . . must be proven by the challenger by clear and convincing evidence." *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003); *see also Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008).

## II. THE COURT'S RULING

The Court's rulings regarding the disputed claim terms of the '638 and '978 Patents were announced from the bench at the conclusion of the hearing. The Court's rulings are as follows:

> At issue are three disputed claim terms in two patents.[1] I am prepared to rule on one of those disputes, the first of those disputes. I will not be issuing a written opinion, but I will issue an order stating my ruling. In that order or later, I will construe the remaining two terms. I want to emphasize before I announce my decisions that although I am not issuing a written opinion, we have followed a full and thorough process before making the decisions I am about to state. I have reviewed the patents in dispute and the evidence submitted by the parties, including portions of the prosecution history, various sources of definitions, and declarations of experts submitted for each side. There was full briefing on each of the disputed terms. There has been argument here today. All of that has been carefully considered.
>
> Now as to my rulings. As an initial matter, I am not going to read into the record my understanding of claim construction law generally. I have a legal standard section that I have included in earlier opinions, including recently in *Best Medical International v. Varian Medical Systems, Inc.*, C.A. No. 18-1599. I incorporate that law and adopt it into my ruling today and will also set it out in the order that I issue.
>
> Defendants offered, through their expert witness Dr. Schonfeld, that "a person of ordinary skill in the art at the time of the alleged invention would have had a bachelor's degree in Computer Science or in Electrical and Computer Engineering and at least two years of experience in media systems such as text, image, graphics, audio, and video systems."[2] Plaintiff's expert, Dr. Agrawala, had no objection to Dr. Schonfeld's proposed level of skill and the level of ordinary skill in the art does not appear to be relevant to the disputes before me today.

---

1 The '638 Patent and the '978 Patent are continuations of the same patent application and share a specification. (D.I. 35 ¶¶ 16, 19, 25 n.1).

2 (D.I. 71-8 ¶ 20).

Now the disputed terms:

The first term is "multimedia."[3] Plaintiff proposes the construction, "audio, video, music, songs, video books, audio books, movies, television shows, radio recordings, voicemail, podcasts, audio of an oral argument, streaming media, and other media recordings." In its briefing, Plaintiff clarifies that its proposed construction "cover[s] media that consists of only one type of media (*e.g.*, audio files)." Defendants propose the construction, "more than one type of media."[4]

I am going to adopt Plaintiff's construction, that "multimedia" includes media that consists of only one type of media. The patent specification indicates that multimedia can be audio only. For example, at column 31, lines 41–42, the specification recites "multimedia formats, including in variant playlists, including *audio*, H.264, MPEG4, M4V type media files . . . ." At column 40, lines 13–32, the specification discloses, "a hierarchical seek order may be employed by the mobile computing device to retrieve multimedia" and provides an example of retrieving a song. And at column 44, line 34, the specification states, "the multimedia may be a voicemail."[5]

The patent specification also supports that "multimedia" includes audiovisual media, consistent with Plaintiff's construction. For example, at column 41, lines 37–40, the patent discloses that "multimedia may be a film, movie, motion picture, theatrical release, musical, music video, movie preview or trailer, or other

---

3 This term is in claims 1–7, 9–12, 14–16, 18, and 19 of the '638 Patent and claims 1–7 of the '978 Patent.

4 The parties do not define "media," but do not appear to dispute its meaning. I have tried to use "media" consistently with the parties' use.

5 Plaintiff cites several other portions of the specification that ostensibly show that multimedia can be audio only. (D.I. 71 at 2–3). Some examples discuss embodiments related to multimedia, for example "*multimedia content*, such as audio and/or video clips." *See, e.g.*, '638 Patent at 9:13–15 (emphasis added). Plaintiff's other citations to the patent specification do not clarify what portion of the embodiment corresponds to "multimedia." *See, e.g.*, *id.* at 50:25–43 ("Other uses for a *synchronization index and associated multimedia* operating on a mobile computing device are legion, and may include . . ." (emphasis added)). For avoidance of doubt, in construing "multimedia," I rely on Plaintiff's citations to the intrinsic evidence that clearly refer to "multimedia."

video generally consumed for entertainment or used for documentary purposes."[6]

Defendants argue that their proposed construction is supported by the definition of "multimedia" found in multiple dictionaries specific to the fields of electronics, computers, and telecommunications.[7] The Federal Circuit has cautioned against "elevating the dictionary" and other extrinsic evidence "to such prominence [because] it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."[8] I will heed that caution and decline to adopt the dictionary definition of "multimedia."

Defendants also argue that intrinsic evidence supports their construction of "multimedia" as "more than one type of media." For example, claim 1 of the '978 Patent recites both "respective times . . . corresponding to when a word or range of words is *audible in the multimedia*" and a "viewing screen . . . able to *display multimedia*," suggesting that the claimed multimedia has both audio and visual components. Defendants also note that at column 1, lines 23–35, the specification discloses that "multimedia may comprise a combination of text, audio, images, animation, video, or interactive content." This intrinsic evidence, however, is also consistent with Plaintiff's construction, which includes media of multiple types. Defendants do not explain why the cited portions of the patent

---

6 Plaintiff also asserts that its proposed construction of "multimedia" is consistent with its meaning in a prior art patent and one of Defendants' own patents. (D.I. 71 at 3). These other patents are extrinsic evidence and are less reliable than the patents-in-suit to clarify the meaning of "multimedia." *See Phillips*, 415 F.3d at 1318; *Tex. Dig. Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1211 (Fed. Cir. 2002) (declining to consider during claim construction a patent that had the same inventor as the patents-in-suit). I do not rely on these patents when construing "multimedia." Plaintiff also notes that the Court referenced "multimedia like audio or video" in a previous order ruling on a motion to dismiss. (D.I. 71 at 3 (citing D.I. 28 at 6)). That order did not set out to formally construe "multimedia," and I do not base my construction on that statement.

7 *See* D.I. 71-3 at 4 ("Multimedia . . . involves two or more simultaneous media types to communicate information."); D.I. 71-4 at 4 ("Multimedia combines multiple forms of media in the communication of information between users and machines."); D.I. 71-5 at 4 (defining "multimedia" as "[a] computer-based method of presenting information by using more than one medium of communication, such as text, graphics, and sound, and emphasizing interactivity"); D.I. 71-6 at 4 ("Multimedia is the combination of multiple forms of media in the communication of information."); D.I. 71-7 at 4 (defining "multimedia" as "[t]he combination of sounds, graphics, animation, and video.").

8 *Phillips*, 415 F.3d at 1321.

> require "multimedia" in general to be "more than one type of media," at the exclusion of other disclosed embodiments wherein multimedia is, for example, only audio.[9] Moreover, to adopt Defendants' proposed construction would contravene the "strong presumption against a claim construction that excludes a disclosed embodiment," as noted by the Federal Circuit.[10]
>
> The second term is "executable program code configured to facilitate annotation of a portion of said synchronization index."[11]
>
> The third term is "executable program code configured to synchronously play said associated multimedia with said synchronization index."[12] For these two terms, Plaintiff asserts that no construction is necessary and Defendants assert that the terms are governed by Section 112, paragraph 6 and that the terms are indefinite. I need time to consider further the arguments made before me today and I am not prepared to construe these terms today.

As noted, the Court did not decide at the hearing whether the disputed terms "executable program code configured to facilitate annotation of a portion of said synchronization index" in claim 1 of the '978 Patent and "executable program code configured to synchronously play said associated multimedia with said synchronization index" in claim 2 of the '978 Patent are "means plus function" terms subject to § 112 ¶ 6, and if so, whether they are indefinite.

"Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes 35 U.S.C. § 112 ¶ 6, which states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital

---

9 To wit, Defendants argue that replacing "multimedia" with "audio" would lead to nonsensical claim language, such as "audio from the [audio]" (D.I. 71 at 4–5 (citing '638 Patent at claim 1)). Plaintiff, however, does not propose that "multimedia" mean "audio." Rather, Plaintiff argues that audio is an exemplary embodiment of multimedia consisting of a single type of media.

10 *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1220 (Fed. Cir. 2020) (quoting *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018)).

11 This term is in claim 1 of the '978 Patent.

12 This term is in claim 2 of the '978 Patent.

> of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015). As *Williamson* recognized, "[i]n enacting this provision, Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Id.* at 1347–48 (citing *Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1350 (Fed. Cir. 2003)).

When disputed claim terms do not use the word "means," there is a rebuttable presumption that § 112, ¶ 6 does not apply. *Id.* at 1348. To overcome that presumption, Defendants must demonstrate, by a preponderance of evidence, that the claim terms fail to "recite sufficiently definite structure or else recite[] function without reciting sufficient structure for performing that function." *Id.* at 1349 (citing *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)) (internal quotation marks omitted); *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016).

Here, the terms at issue do not use the word means. Thus, the question is whether program code provides sufficient structure to overcome the presumption that § 112 ¶ 6 does not apply. Defendants argue that "executable program code" is a generic black box without any definite structure. Defendants assert that the claims are "silent as to *how* [the executable program code] achieve[s]" the claimed functions. They also note that the claims recite "executable program code

*configured to*" perform functions, thereby implying that the limitation is more structurally specific than "executable program code," but they do not disclose what the necessary configuration is.[13]

Plaintiff argues that "executable program code" is not a generic black-box term, but rather a specific reference to conventional code existing at the time of invention that would have been familiar to a person of ordinary skill in the art. (D.I. 71 at 24–26). Plaintiff offers definitions of "executable program" and "program" found in industry-specific dictionaries. (D.I. 71-11 ¶¶ 38–40). The existence of these definitions, however, does not show that a person of skill would understand the terms, as they are used in the claims, to have a definite structure. For example, one definition of "executable program" offered by Plaintiff is "[a] program that is ready to run on a given computer." (*Id.* ¶ 38). This generic definition gives no indication that "executable program code" is a specific code with definite structure.

Next, Plaintiff asserts that the claimed "executable program code" refers to code in certain prior art software applications, such as LiveNote, SyncPlayer, Microsoft Synchronized Accessible Media Exchange, RealLegal Binder, and Summation.[14] (D.I. 71 at 24–25). Plaintiff, however, does not show that the '978 Patent indicates to a person of skill in the art that "executable program code" refers to these software applications. Indeed, the '978 Patent refers to LiveNote, RealLegal,

13 Plaintiff argues that Defendants have not met their burden to rebut the presumption that § 112 ¶ 6 does not apply. The presumption, however, is not a strong one. *Williamson*, 792 F.3d at 1349. Furthermore, to the extent Plaintiff's contention rests on the difficulty of showing the absence of disclosed structure, Defendants cannot be faulted for being unable to prove a negative.

14 Plaintiff contends that Defendants essentially conceded this point by including some of these prior art references in Defendants' invalidity contentions. This argument conflates the two different standards governing invalidity based on prior art and sufficient disclosure to avoid means-plus-function claiming. Defendants' contention that the "executable program code" limitation exists in the prior art does not mean that a person of skill in the art would know the claimed structure of "executable program code" simply from the claims and the written description.

and other software applications by name, but only to state that their respective file formats can be ingested by the invention's "file format and data parsing logic 6-8." ('978 Patent at 28:1–16, 43:1–12). The patent does not state that these prior art software applications contain the claimed executable program code.

Finally, Plaintiff argues that a person of skill in the art would derive sufficient structural meaning of "executable program code" from the intrinsic evidence. (D.I. 71 at 28–30). Plaintiff implies, without ever explaining, that a person of skill in the art would recognize that the disputed terms correspond to "annotation and edit logic 6-12" and "video, display, and playlist logic 6-13" in the '978 Patent specification. (*Id.* at 28–30, 41–42). Even if this were true, Plaintiff fails to show structure for the "executable program code." By itself, "logic" connotes no more definite structure than "executable program code" and thus does not remove the disputed terms from means-plus-function claiming. *See Egenera, Inc. v. Cisco Sys., Inc.*, 972 F.3d 1367, 1374–75 (Fed. Cir. 2020) ("As used, 'logic' is no more than a 'black box recitation of structure' that is simply a generic substitute for 'means.'" (quoting *Williamson*, 792 F.3d at 1350)).

Plaintiff's cited authority, *Zeroclick, LLC v. Apple Inc.*, does not compel a different conclusion. 891 F.3d 1003 (Fed. Cir. 2018). In *Zeroclick*, the disputed terms were, "program that can operate the movement of the pointer" and "user interface code being configured to detect . . . ." *Id.* at 1006–1007. First, the Federal Circuit found that the district court had erred in applying § 112 ¶ 6 when the challenger of the patents-in-suit had not presented any evidence to rebut the presumption that the disputed terms did not use means-plus-function claiming. *Id.* at 1007–1008. Here, Defendants have presented evidence that the disputed terms, despite omitting the word "means," are subject to § 112 ¶ 6. Second, the *Zeroclick* court found that the disputed terms did not use means-plus-function claiming because the patents-in-suit expressly disclosed that the terms

referred to existing programs. *Id.* at 1008–1009 (showing that the patents-in-suit recite: "the programming design for all graphical interfaces has been based with the mindset of using the movement of the mouse . . . [whereas] the invention claimed in the patent provides the design of the computer interface to the movement of the pointer" (quotation marks and emphasis omitted); "the concept of activating some element of a GUI without clicking is *known*" (emphasis added); "the *nearest prior art* described the typical embodiment of the *conventional* graphical user interface GUI and how it could be generated by a computer" (quotation marks omitted) (emphases added); "backward compatibility, enabling all *existing* GUI's [*sic*] . . . to automatically be changed to add or replace it with the Zeroclick methodology" (quotation marks omitted) (emphasis added)). By contrast, the '978 Patent does not indicate that "executable program code" refers to a specific existing code or disclose what that code is. Thus, the Court finds that the '978 Patent is silent as to the structure of "executable program code," and thus § 112 ¶ 6 applies.

Having made this determination, the Court must undertake a two-step inquiry to determine whether the terms are indefinite. *Williamson*, 792 F.3d at 1351. "The court must first identify the claimed function." *Id.* (citing *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012)). "Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Id.* "Structure disclosed in the specification qualifies as 'corresponding structure' if the intrinsic evidence clearly links or associates that structure to the function recited in the claim." *Id.* at 1352. If the specification does not disclose adequate corresponding structure, the claim is indefinite. *Id.*

Here, the function of "executable program code configured to facilitate annotation of a portion of said synchronization index" is "facilitat[ing] annotation of a portion of said synchronization index." For computer-implemented means-plus-function claims, courts search

for an algorithm or procedure to provide adequate structure to overcome an indefiniteness challenge. *See Personal Audio LLC v. Google, Inc.*, Civil Action No. 17-1751-CFC-CJB, 2020 WL 58631, at *8 (D. Del. Jan. 6, 2020) (citing *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008)). The required structure can be disclosed, for example, "as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011) (citation omitted). In the parties' joint claim construction chart, Plaintiff cites numerous and voluminous portions of the '978 Patent that it argues provide structure for the claimed function. (D.I. 62 at 3). Some portions simply repeat the function without providing corresponding structure.[15] Some portions describe applications and embodiments of the claimed annotation function.[16] For example, the written description discloses, "[T]he annotation and edit logic 6-12 may enable a user to add notes to a text transcript, lock editing of a text transcript, link a counter designation to a direct designation, merge designations, bulk import designations, maintain confidentiality for edits to a text transcript, flatten designations, and add/edit evidentiary ruling designations."[17] Some portions

---

[15] *See, e.g.*, '978 Patent at Abstract, 3:54–4:5, 4:55–60, 13:6–22.

[16] *See, e.g.*, *id.* at 11:15–26 ("Other actions may also be provided . . . including annotation of text"), 13:6–22 (describing annotation on tablet computer), 13:37–52 (describing a viewing screen with an annotation icon), 21:45–22:9 (describing annotation using colors), 22:64–23:17 (describing annotation for case management), 24:8–15 (describing annotation using colors and graphics), 29:39–47 (describing "annotation and edit logic" as applied to case management), 30:43–60 (disclosing "function controllers" for "annotating and editing capability"), 31:51–32:3 (describing annotation for case management on iPad), 34:66–35:23 (describing annotation as designating deposition transcript), 38:13–52 (describing real-time implementation), 47:39–51 ("functional, inter-related, interactive product with annotation capacity"), 49:6–51 (describing annotating parts of a song and sharing annotations).

[17] *Id.* at 16:8–15.

describe the annotation function in terms of other black-box words that lack structure.[18] None of the cited sections, however, discloses an algorithm or procedure that explains how the "executable program code" accomplishes the annotation function. Thus, the term "executable program code configured to facilitate annotation of a portion of said synchronization index" is an indefinite means-plus-function claim term. *See Arendi S.A.R.L. v. LG Elecs., Inc.*, No. 12-1595-LPS, 2019 WL 3891150, at *12 (D. Del. Aug. 19, 2019) (finding that "program instructions for performing" certain steps was indefinite means-plus-function term because the only corresponding structure, "computer readable medium program including instructions," was itself a generic black box).

Turning to "executable program code configured to synchronously play said associated multimedia with said synchronization index," the Court also finds that the '978 Patent does not disclose sufficient corresponding structure for the function, "synchronously play[ing] said associated multimedia with said synchronization index." In the joint claim construction chart, Plaintiff cites several portions of the written description that it claims provide definite structure for this limitation. (D.I. 62 at 4). These sections, again, only describe applications and implementations of the "synchronous play" function.[19] For example, the written description states that "[t]he video, display, and playlist logic 6-13 may control synchronous text/video using a

---

18 *See, e.g.*, *id.* at 12:3–15 (describing a viewing screen layout with "computer source code"), 15:17–38 (describing exemplary system including software with various types of "logic"), 25:60–26:5 ("the software examines the synchronization index to compute the time difference"), 27:18–43 (describing web application coded with Ruby on Rails and comprising various types of "logic").

19 *See, e.g.*, *id.* at 11:39–50 ("a mobile computing device . . . may be employed to . . . synchronously display text and multimedia"), 12:3–15 (describing viewing screen layout including "computer source code (*e.g.*, code written in Xcode or other suitable programming language) . . . compiled for mobile computing devices"), 32:38–34:43 (describing implementation on mobile computing device software for transcript management), 39:3–41:21 (describing application to music), 41:23–43:51 (describing application to movies and motion pictures).

synchronization index. The video, display, and playlist logic 6-13 may perform video clip sequencing, jump to location features, runtime calculation, display of font/appearance, display and control of a scrub bar, timestamp editing, header/exhibits formatting, and variable speed playback control."[20] Plaintiff does not cite, and the Court cannot find, any portion of the specification that discloses an algorithm or procedure by which multimedia and a synchronization index are synchronously played. Thus, the term "executable program code configured to synchronously play said associated multimedia with said synchronization index" is indefinite.

Maryellen Noreika
The Honorable Maryellen Noreika
United States District Judge

20 *Id.* at 16:16–22.

US008856638B2

(12) **United States Patent**
**Evans**

(10) **Patent No.: US 8,856,638 B2**
(45) **Date of Patent: Oct. 7, 2014**

(54) **METHODS AND SYSTEM FOR REMOTE CONTROL FOR MULTIMEDIA SEEKING**

(71) Applicant: **Curt Evans**, Springfield, VA (US)

(72) Inventor: **Curt Evans**, Springfield, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/099,292**

(22) Filed: **Dec. 6, 2013**

(65) **Prior Publication Data**

US 2014/0089799 A1 Mar. 27, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/851,813, filed on Mar. 27, 2013, which is a continuation-in-part of application No. 13/342,865, filed on Jan. 3, 2012.

(60) Provisional application No. 61/429,399, filed on Jan. 3, 2011.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 17/20*** | (2006.01) |
| ***H04L 29/06*** | (2006.01) |
| ***H04N 5/765*** | (2006.01) |
| ***G06K 19/06*** | (2006.01) |
| ***H04N 21/414*** | (2011.01) |
| ***G06F 3/0484*** | (2013.01) |
| ***H04N 21/472*** | (2011.01) |
| ***A63F 13/30*** | (2014.01) |
| ***H04N 9/82*** | (2006.01) |
| ***H04N 21/4402*** | (2011.01) |
| ***G06F 17/30*** | (2006.01) |
| ***H04N 21/482*** | (2011.01) |
| ***G06F 3/0488*** | (2013.01) |
| ***H04N 21/433*** | (2011.01) |

(52) **U.S. Cl.**

CPC .............. ***A63F 13/12*** (2013.01); ***H04L 65/403*** (2013.01); ***H04N 5/765*** (2013.01); ***G06K 19/06009*** (2013.01); ***H04N 21/41407*** (2013.01); ***G06F 3/0484*** (2013.01); ***H04N 21/47217*** (2013.01); ***H04N 9/8233*** (2013.01); ***H04N 21/440236*** (2013.01); ***G06F 17/30017*** (2013.01); ***H04N 21/4828*** (2013.01); ***G06F 3/0488*** (2013.01); ***H04N 21/4334*** (2013.01)

USPC .......................................................... **715/206**

(58) **Field of Classification Search**

CPC .................................................... G06F 17/218

USPC .......................................................... 715/206

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,835,667 A * 11/1998 Wactlar et al. ................ 386/241
6,484,156 B1 * 11/2002 Gupta et al. .................. 707/802

(Continued)

FOREIGN PATENT DOCUMENTS

JP 2007074176 A 3/2007

OTHER PUBLICATIONS

Myers, Brad A., Juan P. Casares, Scott Stevens, Laura Dabbish, Dan Yocum, and Albert Corbett. "A multi-view intelligent editor for digital video libraries." In Proceedings of the 1st ACM/IEEE-CS joint conference on Digital libraries, pp. 106-115. ACM, 2001.*

(Continued)

*Primary Examiner* — Frank D Mills

(57) **ABSTRACT**

The invention relates to multimedia seek sequence using a synchronization index and a mobile computing device. A mobile computing device displays text from a synchronization index. The synchronization index comprises respective times within multimedia corresponding to a word or range of words. A user may perform a gesture performed on a portion of screen of the mobile computing device corresponding to a word, or a range of words, from the synchronization index. The mobile computing device performs a timecode lookup, using the synchronization index, and in response to the gesture performed to select a word or range of words, the timecode lookup functions to associate a time within multimedia to the selected word or range of words. Multimedia is then delivered beginning at that time, or the user is provided instructions for the delivery of multimedia, to a receiving device. The multimedia delivered corresponds to the word or range of words selected by the gesture of the user.

**20 Claims, 47 Drawing Sheets**
**(39 of 47 Drawing Sheet(s) Filed in Color)**



(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | | |
|---|---|---|---|---|
| 6,938,029 | B1 * | 8/2005 | Tien | 1/1 |
| 7,647,555 | B1 | 1/2010 | Wilcox et al. | |
| 7,786,999 | B1 | 8/2010 | Reid | |
| 7,956,847 | B2 | 6/2011 | Christie | |
| 7,962,942 | B1 * | 6/2011 | Craner | 725/88 |
| 8,055,247 | B1 | 11/2011 | Gailloux et al. | |
| 8,169,916 | B1 * | 5/2012 | Pai et al. | 370/238 |
| 8,438,602 | B2 * | 5/2013 | Rao | 725/89 |
| 2002/0038374 | A1 | 3/2002 | Gupta et al. | |
| 2002/0069218 | A1 * | 6/2002 | Sull et al. | 707/501.1 |
| 2003/0078973 | A1 * | 4/2003 | Przekop et al. | 709/204 |
| 2006/0122984 | A1 * | 6/2006 | Byers et al. | 707/3 |
| 2007/0038612 | A1 * | 2/2007 | Sull et al. | 707/3 |
| 2007/0044010 | A1 * | 2/2007 | Sull et al. | 715/500.1 |
| 2007/0130498 | A1 | 6/2007 | Hannuksela et al. | |
| 2007/0154169 | A1 | 7/2007 | Cordray et al. | |
| 2007/0204238 | A1 | 8/2007 | Hua et al. | |
| 2007/0297757 | A1 | 12/2007 | Kauffman et al. | |
| 2008/0084400 | A1 | 4/2008 | Rosenberg | |
| 2008/0119705 | A1 * | 5/2008 | Patel et al. | 600/347 |
| 2008/0184121 | A1 * | 7/2008 | Kulas | 715/723 |
| 2008/0319744 | A1 * | 12/2008 | Goldberg | 704/235 |
| 2009/0019487 | A1 * | 1/2009 | Kulas | 725/41 |
| 2009/0094520 | A1 * | 4/2009 | Kulas | 715/723 |
| 2009/0141988 | A1 * | 6/2009 | Kovtun et al. | 382/225 |
| 2009/0319482 | A1 * | 12/2009 | Norlander et al. | 707/3 |
| 2009/0327856 | A1 * | 12/2009 | Mouilleseaux et al. | 715/230 |
| 2010/0005485 | A1 * | 1/2010 | Tian et al. | 725/32 |
| 2010/0027966 | A1 * | 2/2010 | Harrang et al. | 386/69 |
| 2010/0042642 | A1 * | 2/2010 | Shahraray et al. | 707/102 |
| 2010/0088614 | A1 * | 4/2010 | Barbieri et al. | 715/756 |
| 2010/0169786 | A1 * | 7/2010 | O'Brien et al. | 715/738 |
| 2010/0225808 | A1 * | 9/2010 | Mears | 348/468 |
| 2010/0293464 | A1 | 11/2010 | Harada et al. | |
| 2010/0313125 | A1 | 12/2010 | Fleizach et al. | |
| 2011/0047163 | A1 * | 2/2011 | Chechik et al. | 707/741 |
| 2011/0075990 | A1 * | 3/2011 | Eyer | 386/241 |
| 2011/0107369 | A1 * | 5/2011 | O'Brien et al. | 725/38 |
| 2011/0119588 | A1 * | 5/2011 | Siracusano, Jr. | 715/723 |
| 2011/0239155 | A1 | 9/2011 | Christie | |
| 2012/0036130 | A1 * | 2/2012 | Light et al. | 707/736 |
| 2012/0042246 | A1 | 2/2012 | Schwesinger et al. | |
| 2012/0102387 | A1 * | 4/2012 | Badoiu et al. | 715/230 |


OTHER PUBLICATIONS

Office Action for U.S. Appl. No. 13/342,921 dated Aug. 23, 2013.

* cited by examiner




Fig. 1




FIG. 2




FIG. 3


8:19 AM
<Deponent Name>
Deposition Video
In the Circuit Court of Maryland
for Montgomery County
Civil Action No. XXXXX
Plaintiff v. Defendant et al.
Deponent Name
ATTY 1: I am Atty1 and I represent Defendant 1.
ATTY 2: I'm Atty2 and I'm President of Defendant 1.
ATTY 3: Atty3 representing Defendant 2.
THE WITNESS: Your turn, sir.
ATTY 4: Atty4. I'm one of the attorneys for Plaintiff.
ATTY 5: Atty5. Attorney for Plaintiff.
ATTY 6: Atty6. Attorney for Plaintiff.
ATTY 7: Atty7. Counsel for Plaintiff.
EXAMINATION BY COUNSEL FOR PLAINTIFF | BY Atty4
Q. Would you state your full name and | address, please? |
A. Deponent Name and Address 1
Q. Is it Mr. Name?
Q. Mr. Name , have you had your | deposition taken before? |
Q. Have you ever had your deposition | taken before? |
A. Yes |
Q. In what case or what cases? |

FIG. 4


1
2
3
4
5
6
7
11
16
17
18
19
20
Media File 1
Media File 2
Media File 3
Media File 4
Media File N

FIG. 5


Client-Firm Content
HTTP Streaming Server
Host Server
Cloud Platform with Storage Service and Open-Source Extensibility
Web App
Tablet App

FIG. 6


Errata
Change by user "Deponent Doe, John" on 10-10-2009: "Yes" changed to "Yes, I believe so."
Transcript
Doe, John
Deposition Video
9:51:54AM
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your testimony,
14 Sir?
15 A: (Pause) Yes, I believe so.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
Video runtime: Total 00:03:31
Plaintiff: 00:02:50
Defendant 00:00:41
Altered text displays differently. Give user option to determine color/font for additions (and possibly strikethrough for deletions, or just delete the deleted).
on off
Plaintiff - Initial Designation
Defendant - Counter-Designation
= Objection by Defendant

Fig. 7


DESIGNATIONS MERGED
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your testimony,
14 Sir?
15 A: (Pause) Yes.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
Transcript
Doe, John
Deposition Video
9:51:54AM
MAR 31 2003

Fig. 8

If User 1 designated:

begin=anno
guid=b37b01c7483ca63129143bb88fabaf2f205ff62b
user=
datetime=2006 11 29 11 56 28
pos=117 13 130 16
issues=8
end=anno

And If User 2 designated:

begin=anno
guid=b37b01c7483ca63129143bb88fabaf2f205ff62b
user=
datetime=2006 11 29 11 56 28
pos=121 0 135 10
issues=8
end=anno

THE PROPER MERGE SHOULD BE:

begin=anno
guid=b37b01c7483ca63129143bb88fabaf2f205ff62b
user=
datetime=2006 11 29 11 56 28
pos=117 13 135 10
issues=8
end=anno

FIG. 9


You are adding these designations. Please assign one issue to each before the import begins.
79.3+80.18
88.1+89.5
98.1+99.2
101.1+109.5
1. damages
2. liability
3. Defendant counter
4
5
6
Current color
Add another issue.
Apply to all checked.

FIG. 10


User selects the work panes, e.g., if used for internal review, attorney may select "private" pane on left and "Master" for the middle pane. If utility is being used for "review for trial", the panes may be Plaintiff Master and Defendant Master (below), which become merged in "Case Master".
Transcript
Doe, John
Plaintiff's Work Pane (Locked and Final)
Defendant's Work Pane
Defendant's Objections
Sustain
Overrule
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your testimony,
14 Sir?
15 A: (Pause) Yes.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
Objection by Defendant.
FRE 403-Relevance.
Defendant makes specific reference to its Brief in Support of Summary Judgment at p. 9.
on
off
Plaintiff - Initial Designation
Defendant - Counter-Designation
= Objection by Defendant
Video runtime: Total 00:03:31
Plaintiff: 00:02:50
Defendant 00:00:41
Each of Defendant's designations should, by law, correspond to one or more of Plaintiff's designations. The purpose of D's counter-designations are for "completeness".
If P elects to delete a designation, the corresponding D designation would be deleted as a consequence of their being linked. If any D designation retains a link, it stays.
Function: Require Defendant to link each designation to at least one Plaintiff designation, i.e. by dragging a "lasso". A D designation can correspond to more than one P designation.

Fig. 11A


Transcript
Doe, John
Plaintiff's Work Pane (Locked and Final)
Defendant's Work Pane
Counter-designation Linkages
Arrows indicate linkages
Designation 13.18+13.21 is linked to:
13.15+13.17
13.22+14.3
To Add/remove linkages:
User can lasso/drag from left-most pane;
User can type page:line range to add to list;
User can pick from a page:line list of all of P's designations;
User can use a loadfile.
If this "Counter-designations Linkages" pane is active, user can
1) Select his own designation (here the grey 13.18+13.21)
2) drag (lasso) P's designation of 13.15+13.17 into the right-most pane, which results in the linkage and text "13.15+13.17" to appear in right-most pane

Fig. 11B


Arrows indicate linkages. Dashed indicates one link is now severed. Link is removed from list.
Transcript
Doe, John
Plaintiff's Work Pane (Locked and Final)
Defendant's Work Pane
Counter-designation Linkages
Designation 13.18+13.21 is linked to:
13.15+13.17
13.22+14.3
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your test mony
14 Sir?
15 A: (Pause) Yes.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
"Removal from Final" = crosshatch
On mouse-over, a status balloon like this appears.
On 1-1-11, Plaintiff identified this as Final, in yellow.
On 1-2-11, Defendant linked 13.18+13.21, the solid red arrow.
On 1-3-11, Plaintiff removed 13.15+13.17 from being Final, and it is crosshatched as a result.

Fig. 11C


Q Thank you for that last answer.
Q Moving to the Smith article. Does the Smith article
have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I
said, "Okay" I meant that I had Exhibit 7 in front of me. Looking
at it now, it doesn't describe a turbo confabulator anywhere. In
fact, it describes the opposite of a turbo confabulator. Also, this
same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here
Exhibit 7.
Q Moving to some of the numbers we discussed. How
did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft
negotiated something similar for well over $50 million. We also
had offers at the time for licenses from Google, Netflix, and
Facebook. I talked with Mark Zuckerberg himself, and that's
Page 14
what he said. Fifty to seventy five, at least.
Q So these were conversations with Jobs and
Zuckerberg?
A Yes. And then each of their lawyers made their written
offers. It was clear they wanted to avoid the NTP v. Research
in Motion situation down the road. Just get the license out of
the way.
Q Do you have a Facebook account?
A I do now.
Q So do I. Think we should friend one another?
A Sir, there is nothing I'd like more. I bet you post
something witty every day.
Q So you said $50 million. And then you said
Zuckerberg told you as much as seventy-five. That's a big
range, so what do you consider the value?
A Well, the high end of that range. My understanding is
that the number would be something for the jury to decide.
They'd determine the reasonable royalty and calculate the final
number. I understand our damages expert will be
supplementing his final report this week. The reasonable
royalty is more than the $40 million conclusion of your expert,
Mr. Anderson.
Page 15
Court: Overruled
Objection by Defendant to 14.7+14.13
FRE 403 - Relevance
Court: No ruling
Objection by Defendant to 14.17+15.1
FRE 801 – Hearsay. <Sentences of
explanation can be placed here and still
be displayed neatly and substantially
adjacent to the designation at issue.
This is sample text. This text can cite the
location of a more complete briefing on
the issue if needed.>
KEY
Plaintiff's designation On Off
Defendant 1 designation On Off
Defendant 2 designation On Off
Non-designated text = displayed

Fig. 12


Moving to the Smith article. Does the Smith article
have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I
said, "Okay" I meant that I had Exhibit 7 in front of me. Looking
at it now, it doesn't describe a turbo confabulator anywhere. In
fact, it describes the opposite of a turbo confabulator. Also, this
same article has nothing to do with a flux capacitor.
Q Moving to some of the numbers we discussed. How
did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft
negotiated something similar for well over $50 million. We also
had offers at the time for licenses from Google, Netflix, and
Facebook. I talked with Mark Zuckerberg himself, and that's
Page 14
what he said. Fifty to seventy five, at least.
Click to collapse non-designated text
Q So you said $50 million. And then you said
Zuckerberg told you as much as seventy-five. That's a big
range, so what do you consider the value?
A Well, the high end of that range. My understanding is
that the number would be something for the jury to decide.
They'd determine the reasonable royalty and calculate the final
number. I understand our damages expert will be
supplementing his final report this week. The reasonable
royalty is more than the $40 million conclusion of your expert,
Mr. Anderson.
Page 15
Court: Overruled
Objection by Defendant to 14.7+14.13
FRE 403 - Relevance
Court: No ruling
Objection by Defendant to 14.17+15.1
FRE 801 – Hearsay. <Sentences of
explanation can be placed here and still
be displayed neatly and substantially
adjacent to the designation at issue.
This is sample text. This text can cite the
location of a more complete briefing on
the issue if needed.>
In printed output (as an option), these
long white gaps would be eliminated,
leaving only testimony designated by a
party.
Electronically, chevrons may allow a user
to expand/collapse these portions.
This transcript copy can be provided to
the Court or the Court's court reporter at
trial.
Dark line, or other graphic, to indicate
a range of lines has been omitted
KEY
Plaintiff's designation On Off
Defendant 1 designation On Off
Defendant 2 designation On Off
Non-designated text = NOT displayed

Fig. 13A


2 Moving to the Smith article. Does the Smith article
3 have any description of the turbo confabulator?
4 A Smith? You mean the one marked as Exhibit 7?
5 Q Yes.
6 A Okay, yes.
7 Q So it does describe the turbo confabulator.
8 Does it also describe the flux capacitor?
9 A No, I think you misunderstood what I said. When I
10 said, "Okay" I meant that I had Exhibit 7 in front of me. Looking
11 at it now, it doesn't describe a turbo confabulator anywhere. In
12 fact, it describes the opposite of a turbo confabulator. Also, this
13 same article has nothing to do with a flux capacitor.
17 Q Moving to some of the numbers we discussed. How
18 did you value your invention at $50 million.
19 A Steve Jobs told me it was worth $50 million. Microsoft
20 negotiated something similar for well over $50 million. We also
21 had offers at the time for licenses from Google, Netflix, and
22 Facebook. I talked with Mark Zuckerberg himself, and that's
Page 14
1 what he said. Fifty to seventy five, at least.
13 Q So you said $50 million. And then you said
14 Zuckerberg told you as much as seventy-five. That's a big
15 range, so what do you consider the value?
16 A Well, the high end of that range. My understanding is
17 that the number would be something for the jury to decide.
18 They'd determine the reasonable royalty and calculate the final
19 number. I understand our damages expert will be
20 supplementing his final report this week. The reasonable
21 royalty is more than the $40 million conclusion of your expert,
22 Mr. Anderson.
Page 15
Dark line, or other graphic, to indicate a range of lines has been omitted
Court: Overruled
Objection by Defendant to 14.7+14.13
FRE 403 - Relevance
Court: No ruling
Objection by Defendant to 14.17+15.1
FRE 801 – Hearsay. <Sentences of explanation can be placed here and still be displayed neatly and substantially adjacent to the designation at issue. This is sample text. This text can cite the location of a more complete briefing on the issue if needed.>
KEY
Plaintiff's designation On Off
Defendant 1 designation On Off
Defendant 2 designation On Off
Non-designated text = NOT displayed

Fig. 13B


Printed Page Output – Landscape Option
KEY
Plaintiff's designation On Off
Defendant 1 designation On Off
Defendant 2 designation On Off
Non-designated text = displayed
Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article
have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I
said, "Okay" I meant that I had Exhibit 7 in front of me. Looking
at it now, it doesn't describe a turbo confabulator anywhere. In
fact, it describes the opposite of a turbo confabulator. Also, this
same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here
Exhibit 7.
Q Moving to some of the numbers we discussed. How
did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft
negotiated something similar for well over $50 million. We also
had offers at the time for licenses from Google, Netflix, and
Facebook. I talked with Mark Zuckerberg himself, and that's
Page 14
Court: Overruled
Objection by Defendant to 14.7+14.13
FRE 403 - Relevance
Court: No ruling
Objection by Defendant to 14.17+15.1
FRE 801 – Hearsay. <Sentences of
explanation can be placed here and still
be displayed neatly and substantially
adjacent to the designation at issue.
This is sample text. This text can cite the
location of a more complete briefing on
the issue if needed.>

Fig. 14

Ability to print minuscript on 4 transcript pages per printed page, with issues highlighted, in 2 different configurations:




FIG. 15


Transcript
Doe, John
Deposition Video
9:51:54AM
MAR 31 2003
Show/hide certain issues
on off
Plaintiff Smith- Initial Designation
Defendant Lusk- Counter-Designation
= Objection by Defendant Lusk
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your testimony,
14 Sir?
15 A: (Pause) Yes.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
Video runtime: Total 00:03:31
Plaintiff: 00:02:50
Defendant 00:00:41
Objections
Sustain
Overrule
Objection by Defendant Lusk. FRE 403-Relevance. Defendant makes specific reference to its Brief in Support of Summary Judgment at p. 9.
Region to display objections. "Balloons" to expand/contract/accordion objections with a significantly long text description
Option: Allow Judge to rule upon objections within the application. "Sustain objection"=designation is prohibited from coming in to evidence.
"Overrule objection"=designation may still be offered into evidence.
For each, allow Judge a place to attach a comment, providing, if he wishes, a written description for reasons why the ruling was made. In this fashion, there is an opportunity to create a full, complete record for an appellate Court's review.
Calculates the would-be video run-time without creating the video clips.
Double click on any line of testimony causes video to begin playing at that location.
Chevrons to expand/collapse non-designated sections of testimony. Allows reader to read only those portions of the transcript that have been designated.

Fig. 16

```
<?xml version="1.0" encoding="UTF-8" ?>
- <DEPOSITION>
  - <PAGE pbk="T" T="0" n="1" a="1">
    - <LINE pbk="F" T="0" end_T="2816" n="1" p="1" a="1">
      <lnum>1</lnum>
        STATE OF MINNESOTA DISTRICT COURT
        </LINE>
    - <LINE pbk="F" T="0" end_T="2816" n="2" p="2" a="2">
      <lnum>2</lnum>
        COUNTY OF HENNEPIN THIRTY-EIGTH JUDICIAL DISTRICT
        </LINE>
    + <LINE pbk="F" T="0" end_T="2816" n="3" p="3" a="3">
    - <LINE pbk="F" T="244661" end_T="246826" n="15" p="15" a="190">
        <lnum>4</lnum>
      - <W pbk="F">
          <w>Word1</w>
          <t>244661</t>
          <end_t>245429</end_t>
        </W>
      - <W pbk="F">
          <w>And</w>
          <t>245429</t>
          <end_t>245748</end_t>
        </W>
      - <W pbk="F">
          <w>Word2</w>
          <t>246038</t>
          <end_t>246197</end_t>
        </W>
      </LINE>
    </PAGE>
  <MEDIA Name="demo4min.mpg" Duration="247838" TranStart="5:3" TranEnd="8:15" />
  <CONTINUING>0</CONTINUING>
  <DEPONENT_LAST>test</DEPONENT_LAST>
  <DEPONENT_FIRST>test</DEPONENT_FIRST>
  <DEPO_DATE>2005-12-14 00:00:00</DEPO_DATE>
  <CAPTION />
  <START_PAGE>1</START_PAGE>
  <PAGE_COUNT>8</PAGE_COUNT>
  <DIRECT_ATTORNEY>Attorney</DIRECT_ATTORNEY>
  <SHORT_CAPTION>test</SHORT_CAPTION>
  <LINES_PER_PAGE>25</LINES_PER_PAGE>
  </DEPOSITION>
```


FIG. 17


Linked Exhibit
Exhibit
Transcript
Doe, John
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your testimony,
14 Sir?
15 A: (Pause) Yes.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
Deposition Video
9:51:54AM
MAR 31 2003
Video runtime: Total 00:03:31
Plaintiff: 00:02:50
Defendant 00:00:41
on
off
Plaintiff - Initial Designation
Defendant - Counter-Designation

Fig. 18




FIG. 19


Movie Title
Movie Video
Char 2: <line from movie script synchronized with movie video>
Char 1: <line from movie script synchronized with movie video>
Char 3: <line from movie script synchronized with movie video>
Char 2: <line from movie script synchronized with movie video>
Char 1: <line from movie script synchronized with movie video>
Char 3: <line from movie script synchronized with movie video>
Char 2: <line from movie script synchronized with movie video>
Char 1: <line from movie script synchronized with movie video>
Char 3: <line from movie script synchronized with movie video>
Send to TV
Ad

FIG. 20


iPad
8:19 AM
Oral Argument in The Supreme Court
SUPREME COURT
OF THE UNITED STATES
Supreme Court of the United States
10-290. Microsoft Corp. v. i4i Ltd. Partnership
Date argued: 04-18-2011
THOMAS G. HUNGAR, ESQ., Washington, D.C.; on behalf of
Petitioner. SETH P. WAXMAN, ESQ., Washington, D.C.; on behalf of
00:00:00
-00:01:26
JUSTICE SCALIA: We'll hear argument now in
Case No. 10-290, Microsoft Corporation v. i4i Limited
Partnership.
Mr. Hungar, you may proceed.
ORAL ARGUMENT OF THOMAS G. HUNGAR
ON BEHALF OF THE PETITIONER
MR. HUNGAR: Thank you, Justice Scalia, and
may it please the Court:
The Federal Circuit's clear and convincing
evidence standard ensures the enforcement of invalid
patents, even though this Court recognized in KSR that
invalid patents stifle rather than promote the progress
of liberal arts. Under this Court's decisions Grogan
and Huddleston, the default preponderance standard
should govern in all cases because section 282 does not
specify a heightened standard of proof.
And as this Court suggested in KSR, it makes
no sense to have a heightened standard of proof when the
relevant prior art evidence was never even considered by
PTO. Under any view, it was error to require clear and
convincing proof of invalidity in this case.
JUSTICE GINSBURG: It would be hard to
argue, Mr. Hungar, that it makes no sense, but it made
sense to Cardozo and Judge Rich
MR. HUNGAR: Your Honor, Justice Cardozo was
not addressing a case in which the evidence at issue had
not been considered by the Patent Office. To the
ABA Sections, Divisions and Forums
• Expand your knowledge • Network with colleagues
• Take control of your professional advancement
Your ABA.
Your Success.
Join Today

FIG. 21


iPad
8:34 AM
On-Demand CLE
American Bar Association
Assessing IP Risks and Managing Litigation In a Changing Legal Environment
Faculty: Peter Chen
Recording Date: February 10, 2010
Running Time: 90 minutes
Credit Hours: 1.5
Topics: Intellectual Property Law
Pricing: $129.00 (Regular)
Is Copyright's First Sale Doctrine Dying?
Faculty: Joseph C. Gratz
Recording Date: April 28, 2010
Running Time: 90 minutes
Credit Hours: 1.5
Topics: Intellectual Property Law
Pricing: $119.00 (Regular)
Intellectual Property Law Issues In Construction
Faculty: Edward G. Benes
Recording Date: May 9, 2010
Running Time: 90 minutes
Credit Hours: 1.5
Topics: Intellectual Property Law
Pricing: $150.00 (Regular)
The State of Patent Damages Law
Faculty: Brendan Gardiner
Recording Date: April 1, 2010
Running Time: 120 minutes
Credit Hours: 1.5
Topics: Intellectual Property Law
Pricing: $175.00 (Regular)
Audio CLE
ABA
Patent Reform Act of 2009 / 2010: Effects on Small Businesses and Startups
Product Code: CET10PRSPOD
Faculty: David Boundy, David Postolski
Recording Date: September 24, 2010
Page Count: 41
Running Time: 59 minutes (00:07:34 viewed)
Credit Hours: 1
Ethics Hours: 0
Sponsoring Entities: ABA Center for CLE, Section of Intellectual Property Law, Young Lawyers Division
Topics: Intellectual Property Law
Pricing: $129.00 (Regular)
Welcome to the American Bar Association's On-Demand CLE program.
My name is David Boundy and I will be speaking about the Patent Reform Act of 2009 and 2010 and the effect of the reforms on small businesses and startups.
Now, as you know, a party which manufactures, imports, uses, sells, or offers for sale patented technology, during the term of the patent and within the country that issued the patent, is considered to infringe the patent.
The test varies from country to country, but in general it requires that the infringing party's product (or method, service, and so on) falls within one or more of the claims of the patent. The process employed involves "reading" a claim onto the technology of interest. If all of the claim's elements are found in the technology, the claim is said to "read on" the technology; if a single element from the claim is missing from the technology, the claim does not literally read on the technology and the technology does not infringe the patent with respect to that claim.
Typically, an expert witness will testify that all of a claim's elements may be found in the device (or system or method) that the patentee alleges to be infringing.
In the United States, an infringement may occur where the defendant has made, used, sold, offered to sell, or imported an infringing invention or its equivalent. One also commits indirect infringement if he actively and knowingly induces another

FIG. 22


iPad
8 19 AM
Anderson, Kevin May 10, 2011
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said, "Okay" I meant that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo confabulator anywhere. In fact, it describes the opposite of a turbo confabulator. Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something similar for well over $50 million. We also had offers at the time for licenses from Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's what he said. Fifty to seventy five, at least.
Q So these were conversations with Jobs and Zuckerberg?
A Yes. And then each of their lawyers made their written offers. It was clear they wanted to avoid the NTP v. Research in Motion situation down the road. Just get the license out of the way.
Q Do you have a Facebook account?
A I do now.
Q So do I. Think we should friend one another?
A Sir, there is nothing I'd like more. I bet you post something witty every day.
Q So you said $50 million. And then you said Zuckerberg told you as much as seventy-five. That's a big range, so what do you consider the value?
A Well, the high end of that range. My understanding is that the number would be

FIG. 23


iPad
8 34 AM
Anderson, Kevin May 10, 2011
Comments - Ping
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc
JUN 4 2008
Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have any description
of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No. I think you misunderstood what I said. When I said, "Okay" I meant
that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your
invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
similar for well over $50 million. We also had offers at the time for licenses from
Google, Netflix and Facebook. I talked with Mark Zuckerberg himself, and that's
I can't believe Defendants would have designated this.
It is so clear from the answer when you watch it that he's not saying that "Smith describes a turbo confabulator."
Are there any other instances like this? Let's put them all together and put them in the section of the Summary Judgment brief dealing with Defendant's playing fast and loose with the Court. I would like . . . more
Who do you want to do that?
Mary, why don't you take the lead on that since you're also doing the arguments relating to willful infringement
Okay, I'm on it. Thanks
BTW, these iPads are such a cool way to review transcripts. All of our trial teams need to use them. Saves so much time. I'm sending all transcripts to the client right now. He'll love it!

FIG. 24


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Errata
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
014.01 Q Thank you for that last answer.
02 Moving to the Smith article. Does the Smith article have any description
03 of the turbo confabulator?
04 A Smith? You mean the one marked as Exhibit 7?
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulator.
08 Does it also describe the flux capacitor?
09 A No, I think you misunderstood what I said. When I said, "Okay" I meant
10 that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
11 confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
12 Also, this same article has something nothing to do with a flux capacitor.
E
13 Q So neither is described?
14 A That's right. Neither is described in Smith. Here Exhibit 7.
15 Q Moving to some of the numbers we discussed. How did you value your
16 invention at $50 million.
17 A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
18 similar for well over $50 million. We also had offers at the time for licenses from
19 Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Page14, line 12.
"something" changed to
"nothing"
By Anderson, Kevin on
05-23-11.

FIG. 25


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Summary
Exhibit 1 of 10
014.01 Q Thank you for that last answer.
02 Moving to the Smith article. Does the Sr
03 of the turbo confabulator?
04 A Smith? You mean the one marked as E
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulat
08 Does it also describe the flux capacitor?
09 A No, I think you misunderstood what I sai
10 that I had Exhibit 7 in front of me. Looking at
11 confabulator anywhere. In fact, it describes t
12 Also, this same article has nothing to do with
13 Q So neither is described?
14 A That's right. Neither is described in Smi
15 Q Moving to some of the numbers we disc
16 invention at $50 million.
17 A Steve Jobs told me it was worth $50 mill
18 similar for well over $50 million. We also had
19 Google, Netflix, and Facebook. I talked with
United States Patent
Patent No.: US 6,714,091 B2
Date of Patent: Mar. 30, 2004
Page 1 of 13
Exit

FIG. 26


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Exhibits
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
JUN 4 2008
Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have any description
of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said, "Okay" I meant
that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your
invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
similar for well over $50 million. We also had offers at the time for licenses from
Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Anderson, Kevin
05-10-2011
Deposition Exhibit Set
Anderson Exhibit 1
Notice of Deposition
Anderson Exhibit 2
Notice of Investigation
Anderson Exhibit 3
Expert Report - Tom Smith
Anderson Exhibit 4
Index of Patents at issue
6,714,091
6,834,181
6,895,256
6,518,957
6,073,036
6,262,735
6,924,789
Anderson Exhibit 5
Testimony of Anderson, Kevin in Acme Corp. v. Intel, 04-01-06
Anderson Exhibit 6

FIG. 27


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Objections
Confidential Deposition Transcript
In re Certain Electronic Devices, Including
Mobile Phones, Portable Music Players,
and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have any description
of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No. I think you misunderstood what I said. When I said, "Okay" I meant
that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your
invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
similar for well over $50 million. We also had offers at the time for licenses from
Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Court: Overruled
Objection by Defendant to
14.7+14.13
FRE 803 - Relevance

FIG. 28


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Summary
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
JUN 4 2008
Plaintiff's Designations
5 clips 00:05.36
Defendant's Designations
17 clips 00:13.01
Total Clip Run Duration 00:18.37
Deposition length 06:42.10
Location - Page Line 014.15
Location - Time In 00:07.00
Location - Time Remaining 06:35.10
014.01 Q Thank you for that last answer.
02 Moving to the Smith article. Does the Smith article have any description
03 of the turbo confabulator?
04 A Smith? You mean the one marked as Exhibit 7?
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulator.
08 Does it also describe the flux capacitor?
09 A No, I think you misunderstood what I said. When I said, "Okay" I meant
10 that I had Exhibit 7 in front of me. Looking at it now it doesn't describe a turbo
11 confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
12 Also, this same article has nothing to do with a flux capacitor.
13 Q So neither is described?
14 A That's right. Neither is described in Smith. Here Exhibit 7.
15 Q Moving to some of the numbers we discussed. How did you value your
16 invention at $50 million.
17 A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
18 similar for well over $50 million. We also had offers at the time for licenses from
19 Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Plaintiff's Designation
014.07-014.12
00.00.33
E
Plaintiff's Designation
014.17-015.02
00.01.05

FIG. 29


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Summary
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
JUN 4 2008
Plaintiff's Designations
5 clips 00.05.36
Defendant's Designations
17 clips 00.13.01
Total Clip Run Duration 00.18.37
Deposition length 06.42.10
Location - Page Line 014.09
Location - Time In 00.07.00
Location - Time Remaining 06.35.10
Moving to the Smith article. Does the Smith article have any description
of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said, "Okay" I meant
that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
Also, this same article has nothing to do with a flux capacitor.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
similar for well over $50 million. We also had offers at the time for licenses from
Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
what he said. Fifty to seventy five, at least.
Q So these were conversations with Jobs and Zuckerberg?
A Yes. And then each of their lawyers made their written offers. It was clear they
wanted to avoid the NTP v. Research in Motion situation down the road. Just get
Plaintiff's Designation
014.07-014.12
00.00.33
E
Plaintiff's Designation
014.17-015.02
00.01.05

FIG. 30


iPad
8:34 AM
List
Anderson, Kevin May 10, 2011
Witnesses
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said, "Okay" I meant that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo confabulator anywhere. In fact, it describes the opposite of a turbo confabulator. Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something similar for well over $50 million. We also had offers at the time for licenses from Google, Netflix and Facebook. I talked with Mark Zuckerberg himself, and that's
Anderson, Kevin
05-10-2011
Taken by Bill Smith
Baker, Paul
05-13-2011
Taken by Jeff Risher
Campbell, Martha
05-14-2011
30(b)(6) designee of Defendant Nokia
Taken by Tom Smith
Mehra, Raj
03-01-2011
Taken by Jeff Risher
Singh, Sandeep
05-21-2011
Vol. 1 of 2
Taken by Tom Smith
Singh, Sandeep
05-22-2011
Vol. 2 of 2
Taken by Tom Smith
Waddams, Milton
02-10-2011

FIG. 31


iPad
8 19 AM
News
FoxNews - Fair & Balanced
FOX NEWS
Breaking Down
the Royal Wedding Vows
The first kiss - or two - delighted the throngs of crowds cheering the princess.
LONDON — Whether you're obsessed with all things Windsor or scoff at the idea of rising early to watch the pomp and circumstance of a fairytale wedding, you're probably aware that Britain's Prince William married his long-time love, Kate Middleton, on Friday. And while plenty of people are more interested in the gown, the over-the-top hats, and Kate's pouty junior bridesmaid, others are asking me for my professional opinion of the couple's first — and second — kiss as husband and wife.
VIDEO: William and Kate Exchanging Vows
As a sex therapist and co-founder of Good in Bed, I often stress the importance of small gestures like kissing, which can go a long way to strengthening your relationship in — and outside — of the bedroom.
So what do Wills and Kate's smooches say about the future of their marriage? In case you missed it, the couple kissed as they greeted the public on the balcony of Buckingham Palace. To say it was short and sweet is an understatement. Observers described it as ceremonial, familial, and passionless — if you blinked, you missed it. Maybe that's why William, in response to the cheering crowd, suggested they try again. And while the second kiss was a little more romantic, it didn't exactly evoke fireworks. In fact, Kate even pulled away at the end.
Does this mean the royal couple is doomed? Not so fast. Not everyone indulges in a long, romantic kiss on their wedding day, and the Brits are no exception.
"Kate's apparent standoffishness is forgivable," explained my Good in Bed colleague Anna Potter. "She's the first 'commoner' in centuries to marry this close to the throne, and she must have been insanely nervous to smooch her new husband in front of thousands and thousands of fans."
In fact, there's a reason why the couple didn't immediately seal their nuptials with a kiss. Not only are premarital PDAs verboten, but the Church of England prohibits kissing both during and after the ceremony at Westminster Abbey. When you consider that pressure — never mind

FIG. 32


iPad
8:34 AM
Edit
Radio Archives
Fusion of Entertainment and Enlightenment
June 2011
May 2011
April 2011
March 2011
February 2011
January 2011
December 2001
November 2010
October 2010
September 2010
August 2010
July 2010
June 2010
May 2010
April 2010
March 2010
Glenn Beck Radio Interview of Bil Bennett
Air Date: Wednesday, Nov 21, 2007
Other Interviews of Bill Bennett:
Friday, Nov. 23, 2007
THE GLENN BECK PROGRAM
GLENN: Now, Bill Bennett is on the phone with me and, Bill, I just wanted to tell you something I don't think I've ever told you. You changed my life and I don't – I am not exaggerating by that. You actually changed my life.
BENNETT: Really?
GLENN: I read the Book of Virtues when my kids were little and I was so taken by it, I read it myself without the kids. And in there is a letter from Thomas Jefferson to Peter Carr. You know that one?
BENNETT: Yeah, sure.
GLENN: And I am a recovering alcoholic and I had just sobered up and I had just decided that I was – I didn't really believe in anything that I hadn't been told. I didn't discover anything. Here I am 30 something years old. I didn't know any – I didn't know what truth was because I had never really searched for it. And I'm reading this in your book, "Book of Virtues" and the line is one of the only things that I had ever tried to memorize, it just made such an impact on me is above all things, when it comes to religion, fix reason firmly in her seat for if there be a God he must surely rather honest questions over blindfolded fear.
BENNETT: Yeah.

FIG. 33


iPad
8:19 AM
Kellogg School of Management
Kellogg
"Information Strategies for Competitive Advantage"
Professor Michael Mazzeo
Thursday, March 31, 2011
Contemporary organizations face an environment with seemingly unlimited information and limitless tools available to process and analyze data. Successful companies will be those that are able to harness information more effectively than their competitors. Professor Mazzeo will discuss how companies can best use the latest insights from the economics of
The school, originally founded in 1908 as Northwestern University's School of Commerce, a part-time evening program, was one of 16 founding members of the Association to Advance Collegiate Schools of Business, the organization that sets accreditation standards for business schools. As one of the organization's original members, the school later played a major role in helping to establish the Graduate Management Admission Test. In addition, faculty associated with the school have made contributions to fields such as marketing and decisions sciences. For instance, Walter Dill Scott, a pioneer in applied psychology, helped establish some of the earliest advertising and marketing courses in the first decade of the twentieth century. He went on to serve as president of Northwestern University from 1920-1939. More recently, Philip Kotler and Sidney J. Levy's groundbreaking 1969 Journal of Marketing article, "Broadening the Conception of Marketing," laid the foundations for a greatly expanded understanding of marketing. Similarly, Kotler's Marketing Management text has played a key role in deepening the field's scholarship.
In 1919, Ralph E. Heilman, a Northwestern graduate with a doctorate from Harvard, was appointed dean of the school. And in the next year, the school launched a graduate program leading toward the Master of Business Administration degree, drawing nearly 400 students in its first two years.
In 1951, Kellogg began offering executive education courses. The Institute for Management, a four-week summer program based in Evanston, expanded the following year to two sections. The program's success eventually led to it being expanded in Europe in 1965 with a similar program offered in Bürgenstock, Switzerland. In 1976, the school expanded its executive education offerings in Evanston, introducing a degree-granting program known as the Executive Management Program (EMP, today known as the Executive MBA Program). A watershed event in the school's history was the opening of the James L. Allen Center, home of the Kellogg executive education programs. The vision of dean Donald P. Jacobs (deanship 1975-2001, on faculty in Finance Department since 1957), the Allen Center enlisted the help of significant business figures in the Chicago-area, most notably James L. Allen, a Kellogg alumnus and cofounder of consultancy Booz Allen Hamilton. The Allen Center's cornerstone was laid in 1978 while the facility officially opened Oct. 31, 1979.

FIG. 34


iPad
8:34 AM
The Beatles
Abbey Road - 1969
Abbey Road is the eleventh studio album by the English rock band The Beatles. Though Let It Be was the last album released before The Beatles' dissolution in 1970, work on Abbey Road began in April 1969, making it the final album recorded by the band. Abbey Road was released on 26 September 1969 in the United Kingdom, and 1 October 1969 in the United States.
It was produced and orchestrated by George Martin for Apple Records. Geoff Emerick was engineer, Alan Parsons was assistant engineer, and Tony Banks was
Here come old flattop he come grooving up slowly
He got joo-joo eyeball he one holy roller
He got hair down to his knee
Got to be a joker he just do what he please
He wear no shoeshine he got toe-jam football
He got monkey finger he shoot coca-cola
He say "I know you, you know me"
One thing I can tell you is you got to be free
Come together right now over me
He bag production he got walrus gumboot
He got Ono sideboard he one spinal cracker
He got feet down below his knee
Hold you in his armchair you can feel his disease
Come together right now over me
He roller-coaster he got early warning
Let It Be
Rubber Soul
Beatles 65
Sgt. Pepper's Lonely Hearts Club Band
A Hard Day's Night

FIG. 35


iPad
8:19 AM
Bestsellers
Unbroken. NYT Bestsellers
The New York Times
UNBROKEN
A World War II Story of Survival, Resilience and Redemption
By Laura Hillenbrand
496 pp. Random House. $13.99
LAURA HILLENBRAND
UNBROKEN
00:00:00
00:01:26
Eight years ago, an old man told me a story that took my breath away. His name was Louie Zamperini, and from the day I first spoke to him, his almost incomprehensibly dramatic life was my obsession.
It was a horse--the subject of my first book, Seabiscuit: An American Legend—who led me to Louie. As I researched the Depression-era racehorse, I kept coming across stories about Louie, a 1930s track star who endured an amazing odyssey in World War II. I knew only a little about him then, but I couldn't shake him from my mind. After I finished Seabiscuit, I tracked Louie down, called him and asked about his life. For the next hour, he had me transfixed.
Growing up in California in the 1920s, Louie was a hellraiser, stealing everything edible that he could carry, staging elaborate pranks, getting in fistfights, and bedeviling the local police. But as a teenager, he emerged as one of the greatest runners America had ever seen, competing at the 1936 Berlin Olympics, where he put on a sensational performance, crossed paths with Hitler, and stole a German flag right off the Reich Chancellery. He was preparing for the 1940 Olympics, and closing in on the fabled four-minute mile, when World War II began. Louie joined the Army Air Corps, becoming a bombardier. Stationed on Oahu, he survived harrowing combat, including an epic air battle that ended when his plane crash-landed, some six hundred holes in its fuselage and half the crew seriously wounded.
On a May afternoon in 1943, Louie took off on a search mission for a lost plane. Somewhere over the Pacific, the engines on his bomber failed. The plane plummeted into the sea, leaving Louie and two other men stranded on a tiny raft. Drifting for weeks and thousands of miles, they endured starvation and desperate thirst, sharks that leapt aboard the raft, trying to drag them off, a machine-gun attack from a Japanese bomber, and a typhoon with waves some forty feet high. At last, they spotted an island. As they rowed toward it, unbeknownst to them, a Japanese military boat was lurking nearby. Louie's journey had only just begun.
That first conversation with Louie was a pivot point in my life. Fascinated by his experiences, and the mystery of how a man could overcome so much, I began a seven-year journey through his story. I found it in diaries, letters and unpublished memoirs; in the memories of his family and friends, fellow Olympians, former American airmen and Japanese veterans; in forgotten papers in archives as far-flung as Oslo and Canberra. Along the way, there were staggering surprises, and Louie's unlikely, inspiring story came alive for me. It is a tale of daring, defiance

FIG. 36


iPad
8:34 AM
Disney's Pirates of the Carribean On Stranger Tides
We're doomed
Sharks!
Worse than sharks, boy. Mermaids.
Interesting
We can do this Jack, the Fountain of Youth.
Mermaid waters. That be our path.
Push on. You can sleep when you're dead.
We are at a disadvantage.
Speak for yourself.
Last I heard, you were hell bent to find the Fountain of Youth
I'm just as bent as ever. Hellishly so.
Arrrrrgh.
PIRATES of the CARIBBEAN
ON STRANGER TIDES
ABOUT
VIDEOS
GALLERY
GAMES
ACTIVITIES
PRODUCTS
PARKS
PARTNERS
COMMUNITY
KEYS
Past Voyages
Join Jack's Crew

FIG. 37




FIG. 38

| Page, Line | Timestamp | 1 | 2 | 3 | 4 | 5 | 6 | 7 | ........ | X |
|---|---|---|---|---|---|---|---|---|---|---|
| $Page_0$, $Line_0$ | | | | | | | | | | |
| $Page_0$, $Line_1$ | | | | | | | | | | |
| $Page_0$, $Line_2$ | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| $Page_n$, $Line_n$ | | | | | | | | | | |

FIG. 39


Q Thank you for that last answer.
Q Moving to the Smith article. Does the Smith article have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Q Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said, "Okay" I meant that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo confabulator anywhere. In fact, it describes the opposite of a turbo confabulator. Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something similar for well over $50 million. We also had offers at the time for licenses from Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Page 14
what he said. Fifty to seventy five, at least.
Q So these were conversations with Jobs and Zuckerberg?
A Yes. And then each of their lawyers made their written offers. It was clear they wanted to avoid the NTP v. Research in Motion situation down the road. Just get the license out of the way.
Q Do you have a Facebook account?
A I do now.
Q So do I. Think we should friend one another?
A Sir, there is nothing I'd like more. I bet you post something witty every day.
Q So you said $50 million. And then you said Zuckerberg told you as much as seventy-five. That's a big range, so what do you consider the value?
A Well, the high end of that range. My understanding is that the number would be something for the jury to decide. They'd determine the reasonable royalty and calculate the final number. I understand our damages expert will be supplementing his final report this week. The reasonable royalty is more than the $40 million conclusion of your expert, Mr. Anderson.
Page 15
KEY
Plaintiff's designation On Off
Defendant 1 designation On Off
Defendant 2 designation On Off
Non-designated text = displayed
Fig. 40


Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have
any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said,
"Okay" I meant that I had Exhibit 7 in front of me. Looking at it now,
it doesn't describe a turbo confabulator anywhere. In fact, it
describes the opposite of a turbo confabulator. Also, this same
article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did
you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft
negotiated something similar for well over $50 million. We also had
offers at the time for licenses from Google, Netflix, and Facebook. I
talked with Mark Zuckerberg himself, and that's
Page 14
Show QR Code

FIG. 41


iPad
8:34 AM
Anderson, Kevin May 10, 2011
QR Code Reference
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant. Nokia Corp. and Nokia, Inc
Defendant's Designation
014.02+014.06
www.sampleURL.com/ClientControl=AttorneySmith9876 Transcript=ABC123-Anderson, StartPage=14; StartLine=2; EndPage=14 EndLine=6
014.01 Q Thank you for that last answer
02 Moving to the Smith article. Does the Smith article have any description
03 of the turbo confabulator?
04 A Smith? You mean the one marked as Exhibit 7?
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulator.
08 Does it also describe the flux capacitor?
09 A No, I think you misunderstood what I said. When I said, "Okay" I meant
10 that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
11 confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
12 Also, this same article has nothing to do with a flux capacitor.
13 Q So neither is described?
14 A That's right. Neither is described in Smith. Here Exhibit 7.
15 Q Moving to some of the numbers we discussed How did you value your
16 invention at $50 million.
17 A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
18 similar for well over $50 million. We also had offers at the time for licenses from
19 Google Netflix and Facebook I talked with Mark Zuckerberg himself and that's
Plaintiff's Designation
014.07+014.12
00 00 33

FIG. 42




FIG. 43


MobilePickup
KXDJ
58
Passport to Paradise
8:00 pm - 10:00 pm
Action and adventure await when a newly-wed couple escapes to an island paradise.
Paused
0:00
60:00
37:00
KCBC • 1000
12:30:03
Thu. 11/21
8:00 pm
8:30 pm
9:00 pm
KPQX 55
KPDT 56
KXDJ 58
KLSS 59
WKDS 61
Mr. Front Man
College Foot...
New Voyages
Passport to Paradise
Eleven Elements of the World
Papa Papagopas
Tracing the Past
Meeting...
REC
COX
A Time
B Theme
C Search

FIG. 44

# METHODS AND SYSTEM FOR REMOTE CONTROL FOR MULTIMEDIA SEEKING

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/851,813, entitled "Text-Synchronized Media Utilization and Manipulation Based on an Embedded Barcode," which is a continuation-in-part of U.S. patent application Ser. No. 13/342,865, entitled "Text-Synchronized Media Utilization and Manipulation," which claims priority to U.S. Provisional Patent Application Ser. No. 61/429,399, entitled "Text-Synchronized Media Utilization and Manipulation," which are all herein incorporated by reference in their entirety.

## BACKGROUND

Today, multimedia content can be recorded, displayed, and accessed on a wide variety of platforms including mobile computing devices, such as laptops, tablet computers, smart phones, etc. In general, multimedia may comprise a combination of text, audio, images, animation, video, or interactive content.

Unfortunately, it remains difficult to encode and synchronize text that is associated with a multimedia file. For example, the judicial system requires production and review of a substantial amount of information including audio and visual evidence, document production and review of written and electronically generated information, and testimony of various involved parties. Testimony is understood to be a process by which an attorney asks oral questions of a witness and the witness provides answers under oath. A word-for-word record of the questions asked and the answers given is called the testimony transcript. Testimony is normally taken and recorded during a deposition or a trial. During a trial or deposition, testimony is recorded by a court reporter using a special typewriter-like device normally referred to as a stenograph machine. The output of the stenograph machine is a long paper tape of printed phonetic characters capturing, in a form of short hand, the word-for-word record of the testimony. The court reporter uses the paper tape to create a text translation of the tape or text data. This text data is created using a typewriter or a word processor. The text data is referred to as a transcript of the testimony and is historically created "off-line" from the actual testimony.

During the discovery and research phase of litigation, the attorney will search through testimony for key statements made by a witness. The attorney uses software tools for searching and annotating the ASCII testimony or text data.

A shortcoming of some transcript management utilities is that they operate on a full version of Microsoft Windows operating system, which places large demands on processor speed and RAM memory. As a result, the full Microsoft Windows operating system is unsuitable for mobile computing devices, and they cannot run transcript management utilities. The result is that there has been no transcript management utility for display of smoothly scrolling, synchronized text and multimedia for use on a mobile computing device, where the user may perform a gesture on the text to cause the multimedia to jump to a desired location and begin playback.

## BRIEF DESCRIPTION OF THE DRAWINGS

The patent or application file contains at least one drawing executed in color. Copies of this patent or patent application publication with color drawing(s) will be provided by the Office upon request and payment of the necessary fee. Systems and methods which embody the various features of the invention will now be described with reference to the following drawings, in which:

FIG. **1** is a representation of the viewing screen layout of a mobile computing device, partitioned into several areas.

FIG. **2** illustrates an example of a movie being output using the viewing screen layout of a mobile computing device shown in FIG. **1**.

FIG. **3** illustrates another example representation of the viewing screen layout of a mobile computing device, partitioned into several areas.

FIG. **4** illustrates an example of a deposition video and transcript being output using the viewing screen layout of a mobile computing device shown in FIG. **3**.

FIG. **5** illustrates an example representation of the viewing screen layout of a mobile computing device, partitioned into several areas.

FIG. **6** is a schematic of elements of an example system.

FIG. **7** illustrates an example interface that may be used in handling errata sheet operations.

FIG. **8** illustrates an example of merging designations.

FIG. **9** illustrates example data structures that may be used in merging designations.

FIG. **10** illustrates an example interface for assigning issues to designations.

FIGS. **11**A-C illustrates an example interface where each party has its own work pane display of a transcript.

FIG. **12** illustrates an example printed page output in a portrait view.

FIGS. **13**A-B illustrates an example printed page output showing only designated portions of a transcript.

FIG. **14** illustrates an example printed page output in a landscape view.

FIG. **15** illustrates an example of a manuscript printing showing highlighted designations.

FIG. **16** illustrates an example interface for annotating evidentiary rulings on objections.

FIG. **17** illustrates an example format for a synchronization index.

FIG. **18** illustrates an example of a linked exhibit.

FIG. **19** illustrates exemplary graphical elements may be displayed to indicate other highlighted/designated portions of a text transcript.

FIG. **20** illustrates a display screen of a mobile device that can be divided into multiple sections.

FIG. **21** illustrates an exemplary screen shot of a mobile device for a transcript synchronized to a multimedia audio file.

FIG. **22** illustrates an exemplary screen shot of a mobile device playing multimedia content and a transcript for education material from an organization and a listing of other courses with multimedia content.

FIG. **23** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript.

FIG. **24** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript accompanied with a comments section on the display.

FIG. **25** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript accompanied with a section of the display for showing errata and a thumbnail of an attachment to the transcript.

FIG. **26** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a pop-up window showing a linked exhibit.

FIG. **27** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section for exhibits linked to the deposition.

FIG. **28** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section showing objections to portions of the testimony by the deponent.

FIG. **29** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a summary section on the display.

FIG. **30** illustrates an exemplary screen shot of a mobile device for a filtered deposition video and transcript with a summary section on the display.

FIG. **31** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section listing witnesses.

FIG. **32** illustrates an exemplary screen shot of a mobile device playing a news story having a video clip and corresponding text.

FIG. **33** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript and a section listing other files available to the user.

FIG. **34** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript from an educational institution.

FIG. **35** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript from a musical group and section listing other available content from the musical group.

FIG. **36** illustrates an exemplary screen shot of a mobile device playing multimedia content and a transcript for an audio book.

FIG. **37** illustrates an exemplary screen shot of a mobile device playing a movie and a transcript with a section for navigating through the movie's content.

FIG. **38** illustrates an exemplary layout of a display of a mobile device for brand tagging in multimedia content.

FIG. **39** illustrates an exemplary data structure for the synchronization index.

FIG. **40** illustrates an issue-coded transcript comprising barcode placed in the margin.

FIG. **41** illustrates a process flow chart for creating a barcode associated with a portion of a transcript and multimedia.

FIG. **42** illustrates a software user interface for displaying barcode associated with a portion of a transcript and multimedia.

FIG. **43** illustrates a multimedia display with barcode for retrieval of multimedia with a mobile computing device.

FIG. **44** illustrates a program guide with barcode for retrieval of multimedia with a mobile computing device.

## SUMMARY

In one embodiment, what is disclosed is a method for a multimedia seek sequence using a synchronization index and a mobile computing device. The method comprises providing, to a mobile computing device, information for displaying on the mobile computing device text from a synchronization index, wherein said synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia and respective times within multimedia corresponding to when a word or range of words is audible in the multimedia; wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface; displaying, after said providing step, at least a portion of said text from a synchronization index on said viewing screen; receiving, from the mobile computing device, information indicating a gesture performed on a portion of said viewing screen corresponding to a displayed word, or a range of words, from said synchronization index, wherein said gesture is recognized by said touch-sensitive input interface on the mobile computing device; performing a timecode lookup, using the synchronization index, and in response to the gesture performed to select a word or range of words, said timecode lookup functioning to associate a time, t1, within multimedia to the selected word or range of words; and delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device, wherein said multimedia corresponds to the word or range of words selected by the gesture.

In another embodiment, what is disclosed is a method for a multimedia seek sequence using a synchronization index and a mobile computing device. The method comprises the steps, displaying on a mobile computing device text from a synchronization index, wherein said synchronization index comprises respective times within multimedia corresponding to a word or range of words; wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface; receiving information indicating a gesture performed on a portion of said viewing screen corresponding to a word, or range of words, from said synchronization index, wherein said gesture is recognized by said touch-sensitive input interface; performing a data lookup using said synchronization index, wherein said synchronization index is referenced to provide data for a time location t1 that corresponds to said word or range of words selected by the recognized gesture; and seeking on said mobile computing device multimedia corresponding to said synchronization index, and if found, accessing multimedia at t1. In another embodiment, what is disclosed is a method for a multimedia seek sequence using a synchronization index and a mobile computing device. The method comprises providing a mobile computing device comprising a viewing screen and a touch-sensitive input interface; providing a synchronization index that comprises an electronic transcript that indicates text corresponding to audio from the multimedia and indicates respective times within multimedia corresponding to when a word or range of words is audible in the multimedia; providing a receiving device; displaying on said mobile computing device text from the synchronization index; receiving, by the mobile computing device, information indicating a gesture performed on a portion of said viewing screen corresponding to a word, or range of words, from said synchronization index; wherein said gesture is recognized by said touch-sensitive input interface; performing a timecode lookup using the synchronization index, wherein said synchronization index is referenced to provide data for a time location t1 that corresponds to said word or range of words; and seeking on said receiving device multimedia corresponding to said synchronization index, and, if found, accessing multimedia at t1.

## DETAILED DESCRIPTION

Techniques are described for deploying a synchronization index and associated media (e.g., multimedia), for manipulations to the synchronization index, for navigation between the synchronization index and associated media (e.g., multimedia), and for synchronous playback of media (e.g., multimedia) and associated text, preferably using a mobile computing device. For example, a system may use multimedia with a synchronized text transcription thereof, or a synchronization index, on a mobile computing device for viewing and manipulating the multimedia, using the synchronized text transcription. In this example, the mobile computing device

may be used to navigate the multimedia, annotate the text transcription, achieve synchronous play of the multimedia, and communicate to a computer other than the mobile computing device (e.g., a remote server) manipulations performed on the text or multimedia.

In one aspect, a system enables viewing and manipulating synchronized multimedia and text data stored on a remote server. The system may use multimedia with a synchronized text transcription thereof, or a synchronization index, on a mobile computing device for viewing and manipulating the multimedia, using the synchronized text transcription to navigate the multimedia and vice versa, optionally annotating the text transcription, and communicating to a computer other than the mobile computing device manipulations performed on the text or multimedia.

More generally, in some implementations, a system enables viewing and manipulating multimedia and text data. Specifically, multimedia and an associated synchronization index are communicated to a remote server. The remote server operates to re-format the synchronization index and communicate it to a mobile computing device. With the mobile computing device, its software, and the synchronization index, the user may then perform manipulations on the text and control the multimedia delivery to the mobile computing device, or to a separate receiving device. A user having performed manipulations to the synchronization index may then communicate those manipulations back to the remote server to allow subsequent users to retrieve the synchronization index for use with their own mobile computing devices, thereby realizing a collaborative working environment.

More recently, stenograph machines and computer software programs have been developed which translate the phonetic characters while the stenograph operator is typing. The output of this automated translation is a stream of ASCII characters or text data that is stored on a disk, data card (or other portable storage device), or in a personal computer attached directly to the stenograph machine by a serial communications link. These types of stenograph machines and the associated computer and software are referred to as Computer-Aided Transcription or CAT systems. The text data output of the CAT system is an ASCII text computer file of the testimony. The court reporter edits the ASCII file to create a completed version of the transcript, which can be viewed on a computer or can be printed. Typically, the court reporter then forwards the completed version of the transcript to a court reporting firm for quality review; standardization of formatting, to include page and line numbers, headers and/or footers, information to identify the court reporting agency and provide contact information, certification pages, and so on; and production and distribution to the attorneys and/or the court. The transcript is then a "final" transcript, and it may be formatted in a number of formats for litigation related software applications and printing.

Along with the development of CAT systems, video capture devices have advanced the art of making a record of testimony, most commonly employed as part of the deposition process. In major and/or complex litigation cases, testimony from depositions and/or a trial is video recorded in addition to having a transcript created. The person performing the video recording is called a videographer. The videographer uses a standard, commercially available video capture device. Video recording proceeds simultaneously with the creation of the written record of the testimony by the court reporter. After the testimony is complete, the lawyer will normally ask the court reporter for a copy of the text data or ASCII text file of the testimony and will ask the videographer for a copy of the video data of the testimony.

The video recording has historically been recorded to a tape media, which videotapes are commercially available in a number of sizes and formats. The videographer typically later encodes the content into an electronic format with commercially available playback and encoding equipment. A common encoding format for the legal industry is MPEG-1, as MPEG-1 functions with substantial stability with commercially available trial presentation software applications.

Transcript Management

A lawyer uses the ASCII file for many purposes including review and research of the deposition testimony, preparation for trial, and research prior to cross examination during trial. A variety of software tools have been developed which, among other things, allow a lawyer to electronically search testimony text for key words, to annotate, to insert page marks, to associate certain portions of testimony with issues and to create printouts of testimony for insertion in pleadings, submissions to the court, and trial presentations.

During the discovery and research phase of litigation, the attorney will search through testimony for key statements made by a witness. The attorney uses software tools for searching and annotating the ASCII testimony or text data.

A shortcoming of some transcript management utilities is that they operate on a full version of Microsoft Windows operating system, which places large demands on processor speed and RAM memory. As a result, the full Microsoft Windows operating system is unsuitable for mobile computing devices, and they cannot run transcript management utilities. The result is that there has been no transcript management utility for display of smoothly scrolling, synchronized text and multimedia for use on a mobile computing device, where the user may perform a gesture on the text to cause the multimedia to jump to a desired location and begin playback.

To understand some problems associated with transcript management, it is important to understand how a team of attorneys collaboratively works on a transcript. First, a team of attorneys reviews a transcript internally within the law firm or legal department. This internal review may be done by several attorneys, by a junior associate who has his work checked by a more senior attorney, by a paralegal, or in conjunction with the legal client or corporate representative who may have knowledge about the testimony or an interest in the litigation. The purpose of the internal review is to determine what questions and answers may be useful either in upcoming depositions, during settlement negotiations, for use in legal briefs, or at trial. Internal review is where "issue codes" are important. The term issue code refers generally to a range of words selected within a transcript and labeled to correspond to an issue within the litigation.

The circumstance may exist after a deposition where a paralegal, or other professional, may be asked to review the transcript and to annotate it for the law firm partner who is preparing to depose another witness, say, an expert witness. Accordingly, the partner would ask the paralegal to "issue code" all sections of the transcript relating to the partner's anticipated line of questioning of the new witness, for example, to explore inconsistencies from one witness to another. The paralegal does the review, and issue codes several parts of the transcript, say, in yellow. Before the deposition, the partner will come back to the transcript and read, as quickly and efficiently as possible, only those yellow sections. This process may occur for several issues, each of which may overlap and be a different color. The transcript itself can, if all issues are viewed simultaneously, become too busy to read, as overlapping colors bleed into one another, the number of colors become distracting as the numbers of issues increase, and so forth.

The goal of a legal team before trial is to piece together a coherent story using very discrete deposition designations, or video clips corresponding to deposition designations. These designations will support the credibility of legal briefs to the court, and such deponent testimony is frequently cited and footnoted accordingly.

In transitioning to trial, the "issue codes" as above become only secondarily useful. At that point, the primary purpose of the transcript management utility is to select only the best material to use in court. Assume a deponent has died and cannot, obviously, testify on the witness stand. The attorneys will be able to show his video recorded deposition in court, pursuant to the rules of evidence. The law firm will pare down the deponent's testimony to the best segments possible, for example as a highlight reel, leaving out the testimony that would tend to undermine the coherent story that they are trying to tell in court. This is typically a subset of the material already issue coded. Video run time is often a key consideration, 1) because the court can allocate a certain number of hours for one side to present its entire case, in an effort to get to the heart of the controversy and to respect the jury's time, and 2) because too much video can be boring for the jury to watch, causing them to cease paying attention or fail to appreciate the relevance of the testimony to the overall dispute.

Accordingly, the plaintiff's attorneys have a time before trial by which they need to identify to the defendants, and the court, which portions of testimony they intend to rely upon at trial. For this reason, plaintiff's attorneys will need to 1) shorten, modify, or eliminate testimony they have already issue coded, 2) "flatten" the issue codes into one common issue code, i.e. "Plaintiff's direct designations", and 3) transmit them to the defendant.

The defendant will then take "Plaintiff's direct designations" and add back all the material that would be helpful for defendant's case. Defendant's objectives are to 1) undermine the credibility of the witness, 2) lessen the impact of the testimony designated by the opposing party, 3) confuse the jury, or 4) add back so much material that it becomes difficult for a jury to understand the importance of the testimony as a whole or the reasons for which it is being proffered for the jury's consideration. These would be "issue coded" as, say, "Defendant's counter designations." This process may occur again with counter-counter designations by each party.

The trial consultant, generally an individual with information technology and trial presentation software expertise, is tasked with displaying with a computer in the courtroom only the proper video segments. Other than to provide an accurate accounting of what video run time is to be allocated against plaintiff's total allotted time and defendant's allotted time, the trial consultant is indifferent as to what clip "belongs" to whom. All of the designations, once finalized by the attorneys, should be "flattened", giving the consultant the fewest number of edit points to "fine tune." Accordingly, there is one merge of designations done after internal review when preparing for trial, and one merge done when a plaintiff and a defendant have absolutely finalized the designations and given them to the trial consultant.

Without the techniques described throughout this disclosure, transcript management and communication between parties and the court may be a process plagued with inefficiencies.

Timestamping a Transcript

In addition to having the written transcript organized and available to the attorney whilst eliciting testimony at trial, the need frequently arises to present to the court and jury a specific part of the testimony. When testimony has been video recorded, it is desirable to have the ability to use the video associated with key statements to impeach, to expose an inconsistency between a witness's in-court testimony and earlier testimony, to show a witness's demeanor, and so forth. As an examining attorney, having access to a witness's videotaped deposition, and having the witness know retrieval and display of prior testimony is a possibility, is also a strong psychological tool that can affect a witness's performance on the witness stand.

To view the video, the attorney historically had to have access to a VCR, a DVD player, a video player or DVR device and either a TV screen or monitor. With the advent of trial presentation software, along with advances in computing speed and storage capacity, attorneys and their trial consultants can link, or marry, the deposition transcript to the deposition video. This process is commonly referred to in the legal industry as "timestamping" a transcript.

The important job of synchronizing multimedia to a transcript or text data may be done by a human operator (either by a law firm or a third party vendor) using trial management software, or through a third party vendor who utilizes voice recognition software, or a combination of voice recognition software with a human quality review check. Other methods may be employed for creating closed captioned and/or subtitled outputs for use by the hearing impaired, and the multiplicity of methods to create synchronization indexes enhances the number of potential uses for the techniques described throughout this disclosure. Problems arise as the parties move through the litigation process and are tasked with synchronizing video data and text data, and they are further burdened with using disparate software applications to accomplish issue coding, annotating, editing, time stamping, video clip creation, video clip review, report creation to detail video clip duration, errata sheet tracking, and distribution of content to opposing parties, clients, and the court.

Regarding timestamping a transcript, one day of deposition testimony for one deponent is almost always comprised of more than one video segment. One video segment generally corresponds to one videotape the videographer fills during the deposition and later encodes to a single MPEG-1 file, the legal industry standard format for video encoding. Depending on videotape stock and format, one video tape will hold about an hour of content, and most often no more than two hours of content, while most depositions run longer than two hours. There is typically only one transcript for each deposition. An attorney needs to be able to associate the single transcript to the multiplicity of video files.

For example, it is common within the court reporting and legal videography industry for a 3-hour deposition of a deponent to be split between three videotapes, each an hour in duration, that would be encoded as x.mpg for time-code zero to hour 1, x1.mpg for hour 1 to hour 2, and x2.mpg for hour 2 to 3. Within some trial management utilities, x.mpg, x1.mpg, and x2.mpg are sequenced, for a 3 hour total duration, and associated with the single transcript. Using a trial management utility, the user reads the transcript while the video plays and presses a key when the last word on a line is spoken to have the software note the time at which the input was made and note it in a table adjacent to the line of testimony.

In some trial management utilities, the resultant timestamped file, or synchronization index, is a Microsoft Access formatted database file, in .mdb format, with a column of timecode run duration that runs sequentially from hour zero to hour three. Accordingly, a user of a trial management utility wishing to have the software call a line of testimony at time-code 02:30 would be pointed to 00:30 of x2.mpg. Calling testimony at time-code 01:45 would call x1.mpg at 00:45, and so on. In this fashion, the timestamped transcript, or synchro-

nization index, allows the attorney to use the transcript as a roadmap, while the software seeks first the correct video file, then seeks to the correct location within the video file, then displays each in congruent, synchronous fashion by refreshing the display of the transcript as the timecode associated with each new transcript line is reached.

FIG. **39** illustrates an exemplary data structure for the synchronization index. As shown, the synchronization index comprises entries for each line having a predetermined number of characters, such as 256 characters, and each page may have a predetermined number of lines. For each line, the synchronization index indicates a timestamp and coordinate for each character. The synchronization index assists in synchronizing multimedia content, such as audio and/or video clips, with transcripts of text.

In some cases, it has been very difficult for users to create video clips or audio clips in software, especially with known trial presentation software, that correspond to issue codes created within transcript management software. Users have been faced with a multiplicity of software applications, the combination of which are difficult to learn and use, expensive to purchase, and impossible to jointly manage, particularly on mobile computing devices.

Trial Preparation

Trial presentation software applications have become an indispensable tool to today's litigators. These applications allow organization, quick access to and broadcast of all types of material the litigator needs at trial, including trial exhibits, demonstrative exhibits, multimedia, animations, transcripts, video testimony, timelines, images and so on. Most trial presentation utilities are characterized by running only on a computer using a full version of the Microsoft Windows operating system (which itself requires a computer comprising at least a 233 MHz processor, 64 MB of RAM, and 1.5 GB of available hard drive space), by requiring extensive training and practice to achieve an acceptable level of competence, by costing hundreds of dollars to purchase or rent, by necessity of payment of yearly maintenance fees to maintain an active license and access to technical support, and by frequently requiring a paid litigation consultant to operate it competently in a courtroom environment. Each, and the combination, is replete with a number of shortcomings effecting the efficiency of litigation practice.

Transcript Errata Sheets

To illustrate just one of the problems associated with transcript management, one may look to the errata sheet used in litigation. The Federal Rules of Evidence (Rule 30), and other local rules patterned after them, allow a period of time after a deposition for the deponent to review the written transcript for errors before it is signed and returned as an accurate transcription of the testimony. Commonly, the witness will read through the transcript, note what he believes to be errors, and note them in what is referred to in the legal industry as an "errata sheet." A copy of this errata sheet is signed by the witness, returned to the court reporter or opposing counsel, and physically affixed to the hardcopy of the official transcript as an appendix. Thus, the witness's signature is an attestation to the accuracy and completeness of the court reporter's transcription which, if all errata denoted are remedied, would comprise the final, official transcript to be submitted to the court. Accordingly, there historically has been no notation in the original transcript at the point where a correction was made that would refer the reader to the correction in the errata sheet.

Moreover, and perhaps more problematically, content on an errata sheet is never added to or affixed to the electronic copy of a transcript, which is often in a .txt format. It is this .txt formatted transcript that is loaded into commercially available trial presentation software. For example, if a .txt transcript is loaded into a trial management utility, the trial management utility creates a Microsoft Access database table (.mdb format) formatted to take one line of text and places it in one of the database cells. This database, and the content of the cells, is called upon by the trial management utility when videotaped deposition testimony is played to give the appearance of synchronized, scrolling text beneath a video image. Since the corrections of the errata sheet never make their way into the .txt transcript, they never make their way into the trial presentation software, and they are never displayed, as they should be, as part of the synchronized, scrolling text beneath the video image.

The disparity between words clearly audible from the videotape and the written transcript is often noticed, if at all, on the eve of trial, by the trial consultant. Text that does not match the video recording is problematic because, according to procedural rules, it is the written transcript that is the official record and it is that record that is passed on to appellate courts and preserved in the record. It can be problematic and confusing if a jury is shown video testimony that does not exactly match the scrolling text that may be displayed with it. It can be further problematic and confusing, particularly to an appellate court, if a jury is shown video testimony without any scrolling transcript, where the written transcript may, in fact, contradict the words spoken on the video.

Prior to the techniques described throughout this disclosure, there has been no systemic way to ensure errata sheet corrections functioned in concert with trial presentation software.

Certain Closed Captioning, Subtitling and Historic Uses of Text

Closed captioning text and karaoke-type subtitles may present a number of shortcomings emblematic of the art before the techniques described throughout this disclosure. First, closed captioned text is configured to display over a part of the video screen, thereby obscuring at least a part of the video display itself. Second, closed captioned text often appears as text with a background graphic, for example an opaque or semi-opaque box layered between the video and the individual text characters. As a consequence, more of the video display area is covered than would be the case if the individual characters were alone displayed. Third, a user in general can only select to have closed captions "on" (or displayed), or "off" (not displayed.) Fourth, a user cannot generally select text display font, color, or size. Fifth, a user cannot perform a text search. Sixth, a user cannot view text that does not correspond to the portion of video being viewed, that is, they are inextricably linked and cannot be separated apart from turning the text display "off." Seventh, the text cannot be highlighted, annotated, bookmarked, associated with a note, nor can any of the above be used to navigate within the video. Eighth, a user cannot provide a link to the text to a second user, intending for the second user to begin video playback at a time certain based on the linked text. Ninth, closed captioning is not optimized for use with mobile computing devices, or display screens of relatively small size. Tenth, closed captioning text data is difficult to alter, as it is transmitted as an integral part of a video signal. In the case of "open subtitles" the subtitles are permanently placed into the video frame itself and cannot be removed.

Eleventh, another pitfall of closed captioning occurs as a result of a limited number of text words being able to be displayed at once, whereas in certain circumstances a more complete text transcript would be more preferable. For instance, song lyrics have the characteristics of poetry, or a

complete story. The context of the words within the overall composition may have meaning to the artists, or to the reader, when read as a whole, rather than one line at a time or a few words at a time. Twelfth, closed captions are most often employed by the hearing impaired or in environments where audio for video is not readably audible, for example in a restaurant or bar. Consequently, the vast majority of users who consume multimedia content do not seek to utilize closed captioned text even when it is made available, and many may not even be aware that it is available as an option.

Thirteenth, closed captioning text and subtitles are not "interactive," in that a user cannot do anything with the words other than watch them appear on screen when the video plays. The user cannot move ahead or backward in the transcription, and the user cannot read any words other than the limited number of lines than can fit on the video screen, obscuring part of the screen. Closed captioning and karaoke-type subtitles, and the information to display them in a synchronization index-type format, are characterized by passive non-interactivity, meaning there is no way for an operator to utilize the text in any way other than watching it appear and disappear, typically from the multimedia viewing area itself. The user has no opportunity to use the words in any fashion other than to read them.

By contrast, the synchronization index and software suited for use on a mobile computing device of the present disclosure is characterized by interactivity, meaning that the user is able to use the synchronous text display to accomplish another action, namely convenient navigation within the multimedia by using the text, or convenient navigation of the text by using the multimedia. Other actions may also be provided, as discussed further below, including annotation of text and provision of advertising to a mobile computing device. In the present disclosure, an enhanced overall user experience may be provided, where the text can be used as an interactive tool to facilitate navigation within corresponding media.

As is evident, transcript management for litigation is a daunting task because of continual updating, modifying, editing, issue coding, synchronization to video, video clip creation and editing, and need to communicate with the court and adversarial litigants, compounded by the multiplicity of complicated, expensive, computer-resource intensive software applications required to accomplish each task.

The techniques described throughout this disclosure may address and solve many of these shortcomings, for example by providing intuitive systems and methods to manage a synchronization index and associated multimedia with a mobile computing device.

Despite the numerous systems and methods known for manipulating transcripts, synchronizing text to video, and presenting multimedia in the courtroom, there is still a need for a system and methods to simplify the transcript management process by providing a synchronization index and associated multimedia to a mobile computing device, being in communication with a hosting server and multimedia server. In the present disclosure, a mobile computing device, with a user friendly interface, may be employed to simplify what has been a complex, problematic workflow, to synchronously display text and multimedia, to simplify navigation of multimedia, and to ease communication among disparate users.

There is also a need for systems, products, software and methods to facilitate use of mobile computing devices with synchronization indexes and corresponding multimedia for any type of multimedia that can be associated, and manipulated, by corresponding text, such as music and lyrics, video/audio books, movies and screenplays, and other multimedia recordings.



The techniques described throughout this disclosure may address one or more of these needs and may advantageously overcome one or more deficiencies of other options. Certain embodiments of the inventions will now be described. These embodiments are presented by way of example only, and are not intended to limit the scope of the inventions. Indeed, the novel methods and systems described herein may be embodied in a variety of other forms. Furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein may be made without departing from the spirit of the inventions. To illustrate some of the embodiments, reference will now be made to the figures.

FIG. **1** is a representation of the viewing screen layout of a mobile computing device, partitioned into several areas. In this example, computer source code (e.g., code written in Xcode or other suitable programming language) was compiled for mobile computing devices (e.g., a tablet computer, such as the iPad, a mobile phone, such as the iPhone, etc.) running a mobile device operating system (e.g., Apple's iOS4.0/iOS4.2). Some terms used within this application may be trademarks owned by their respective owners. In the case of a tablet computer, the display screen may be divided into several main areas: the multifunction area **1**, the header area **8**, the media area **9**, the text area **10**, and the scrub-bar area **11**.

The media area **9** may display output of a media file selected by a user. For example, the media area **9** may display image data in the form of a video or still image. In this example, the media area **9** may display a deposition video, a movie video, a music video, an illustration from an electronic book, or other types of media a user may desire to output. The tablet computer also may output, using a speaker, audio that corresponds to the displayed media, such as audio of a deposition video being displayed, audio of a movie being displayed, audio of a music video being displayed, audio of an electronic book for which an illustration is being displayed, etc.

The text area **10** may display a text transcript that corresponds to the media being displayed in the media area **9**. For example, the text area **10** may display a text transcript of a deposition video being displayed, a text transcript of dialogue from a movie being displayed, a text transcript of lyrics of a music video being displayed, a text transcript of an electronic book for which an illustration is being displayed, etc.

The text area **10** may control display of the text transcript in a synchronized manner with the media being displayed in the media area **9**. For instance, the tablet computer may identify a portion of the text transcript that corresponds to the portion of the media being displayed in the media area **9** and display the identified portion of the text transcript. The text area **10** also may include a highlight bar that serves as a position indicator, for example, by highlighting the current line of text being output as audio for the media displayed in the media area **9**. In some implementations, the tablet computer controls the highlight bar to remain static and causes the text displayed in the text area **10** to scroll up as each line of audio shown in the text transcript is output. In other implementations, the tablet computer controls the highlight bar to move down a line in the text transcript as each line of audio shown in the text transcript is output and controls the highlight bar to move back to the top of the text area **10** when it reaches the bottom of the text area **10** and a new portion (e.g., page) of the text transcript is displayed in the text area **10**. Other options for the highlight bar may be employed and highlighting of each word in the text transcript also may be used. The tablet computer may control display of the text transcript in a synchronized

manner with the media being displayed in the media area **9** by using a synchronization index as described throughout this disclosure.

The text area **10** also may be manipulated by a user to control display of the media being displayed in the media area **9**. For instance, the user may select a line in the text transcript being displayed in the text area **10** and the tablet computer may start display of the media at the point corresponding to the selected line in the text transcript. If the user selects multiple lines of the text transcript, the tablet computer may start display of the media at the first selected line in the text transcript and stop display of the media at the last selected line in the text transcript. The text transcript displayed in the text area **10** may be used to achieve other types of control of the media displayed in the media area **9**, as described throughout this disclosure.

In addition, in some implementations, the tablet computer may enable a user to independently review the text transcript displayed in the text area **10**. For instance, the tablet computer may enable a user to scroll through the text transcript with or without impacting the media displayed in the media area **9**. Also, the tablet computer may enable a user to search the text transcript to find portions of the text transcript and corresponding media that the user would like to perceive. Further, the tablet computer may enable a user to manipulate the text transcript by, for example, adding annotations to the text transcript and designating portions of the text transcript of interest, as described throughout this disclosure. The tablet computer may send the manipulations (e.g., annotations and designations) to a remote server for remote storage and to be synchronized with other systems the user may use for annotating a text transcript and designating portions of the text transcript.

The header area **8** may display information (e.g., metadata) about the media being displayed in the media area **9** and the text being displayed in the text area **10**. For instance, the header area **8** may display a title of the media, an author or director of the media, identity of actors or characters shown in the media, or any other information (e.g., metadata) that may be useful in providing additional information of the media and text being displayed.

The scrub-bar area **11** includes a scrub bar that may be used to control display of the media displayed in the media area **9** and the text displayed in the text area **10**. For example, as a user moves the scrub bar control back and forth, both the media displayed in the media area **9** and the text displayed in the text area **10** may scroll in a synchronized manner.

The multifunction area **1** may include a media select icon **2**, a search icon **3**, a title area **4**, an issue icon **5**, a text font display icon **6**, and an annotation icon **7**. The media select icon **2** may enable a user to select media to display in the media area **9** by, for example, causing display of a directory from which the user may select a desired media file or causing display of a list of available media files for user selection. The search icon **3** may enable a user to search the text transcript displayed in the text area **10**. The title area **4** may display a title of the media being output and the text font display icon **6** may enable control of font parameters of the text in the text area **10** is displayed. The issue icon **5** may enable a user to add an issue associated with any portion of the text transcript capable of being displayed in the text area **10** and the annotation icon **7** may enable a user to add an annotation to the text transcript displayed in the text area **10**.

FIG. **2** illustrates an example of a movie being output using the viewing screen layout of a mobile computing device shown in FIG. **1**. As shown in FIG. **2**, the header area **8** displays a title of the movie, the director of the movie, the writer of the movie, the scene name of the scene currently displayed, and the names of the characters (and/or actors) having speaking roles in the scene. The scene name and the names of the characters (and/or actors) may dynamically change as the movie plays. The header area **8** also includes a display of a concept for the scene currently being displayed and an image of a concept sketch of the scene currently being displayed. The concept and concept sketch may dynamically change as the movie plays. In addition, the media area **9** shows a display of the movie video and the text area **10** shows a portion of a text transcript of the dialogue of the movie video being displayed. As described throughout this disclosure, the mobile computing device may control display of the text transcript in the text area **10** in a synchronized manner with the video being displayed in the media area **9**.

FIG. **3** illustrates another example representation of the viewing screen layout of a mobile computing device, partitioned into several areas. As shown, the display screen may be divided into several main areas: the multifunction area **1**, the header area **13**, the media area **12**, the text area **14**, and the scrub-bar area **11**. The multifunction area **1** and the scrub-bar area **11** may have the same characteristics described above with respect to FIG. **1**. Despite different size and layout, the media area **12**, the header area **13**, and the text area **14** may operate similarly to the media area **9**, the header area **8**, and the text area **10** described above with respect to FIG. **1**.

FIG. **4** illustrates an example of a deposition video and transcript being output using the viewing screen layout of a mobile computing device shown in FIG. **3**. As shown in FIG. **4**, the header area **13** displays a court associated with the deposition, a civil action number associated with the deposition, a name of the deponent in the deposition, a location of the deposition, and the date/time of the deposition. In addition, the media area **12** shows a display of the video of the deposition and the text area **14** shows a portion of a text transcript of the dialogue of the deposition being displayed. As described throughout this disclosure, the mobile computing device may control display of the text transcript in the text area **14** in a synchronized manner with the video being displayed in the media area **12**.

FIG. **5** illustrates an example representation of the viewing screen layout of a mobile computing device, partitioned into several areas. As shown, the display screen may be used when the mobile computing device is oriented in a landscape orientation. The mobile computing device may switch between the layout shown in FIG. **5** and the layout shown in FIG. **1** or FIG. **3** depending on whether the mobile computing device detects that it is being held or viewed in a landscape or portrait orientation.

In FIG. **5**, the display screen may be divided into several main areas: the multifunction area **1**, a media list area **17**, the header area **19**, the media area **18**, the text area **20**, and the scrub-bar area **11**. The multifunction area **1** and the scrub-bar area **11** may have the same characteristics described above with respect to FIG. **1**, except that the media select icon **2** is displayed in the media list area **17**. Despite different size and layout, the media area **18**, the header area **19**, and the text area **20** may operate similarly to the media area **9**, the header area **8**, and the text area **10** described above with respect to FIG. **1**. The media list area **17** may display a directory or category name associated with the media files included in the media list area **17**. The media list area **17** may enable a user to quickly switch between different media files by selecting a media file (e.g., Media File 1, Media File 2, Media File 3, Media File 4, or Media File N) included in the list. The media list area **17** also includes an edit control **16** that enables a user to edit which media files are displayed in the list. For instance, the

edit control **16** may be used to select a different directory or category of media files to display in the list.

In one example, the display screen shown in FIG. **5** may be used to display music videos. In this example, the title area **4** may display a name of the song being output, the media area **18** may display a music video of the song being output, and the text area **20** may display lyrics of the song being output in a synchronized manner with the music video. In addition, the header area **19** may display a release date for the song, a time length of the song, a label for the song, a writer of the song, and a producer of the song. The media list area **17** may display a name of the artist singing the song being output and include a list of other songs for the artist that are available for selection.

In another example, the display screen shown in FIG. **5** may be used to display depositions. In this example, the title area **4** may display a deponent name, the media area **18** may display a video of the deposition, and the text area **20** may display a text transcript of the deposition in a synchronized manner with the deposition video. In addition, the header area **19** may display a court associated with the deposition, a civil action number associated with the deposition, a name of the deponent in the deposition, a location of the deposition, and the date/time of the deposition. The media list area **17** may display a deponents category (or a cases category) and include a list of other depositions (or other cases) available for selection.

FIG. **6** is a schematic of elements of an example system. The system comprises: a hosting server **6-1**; a multimedia server **6-2**; a web application **6-3**; text content **6-4**; multimedia content **6-5**; and at least one mobile computing device **6-6**. In most general terms, the web application is software (e.g., instructions executable by a processor and stored on a tangible, non-transitory computer-readable storage medium) that may comprise user permissioning logic **6-7**; file format and data parsing logic **6-8**; media delivery logic **6-9**; mobile computing device function logic **6-10**; search logic **6-11**; annotation and edit logic **6-12**; video, display, and playlist logic **6-13**; linked exhibit logic **6-14**; errata sheet logic **6-15**; output formatting logic **6-16**; scheduling and invoicing logic **6-17**; and variable content logic **6-18**. The web application, described in more detail below, may be software code intended to function as a "cloud computing" application, software running on a server remote from users who access it and its functionality by way of an internet connection, an internet or web browser, and a computer or, possibly, by a mobile computing device running software specifically for communication with the web application. The web application may be alternatively referred to as the WebApp.

The user permissioning logic **6-7** may control access to the web application and prevent users from accessing information stored by the web application that the users do not have permission to access. The user permissioning logic **6-7** may perform user tracking functions, change history tracking, and additional functions to allow users to access only the information they have permission to access.

The file format and data parsing logic **6-8** may be used to parse and interpret data (e.g., media files, transcripts, etc.) stored in various formats (e.g., TXT import, .MDB import, .PTF import, proprietary file formats, etc.). The file format and data parsing logic **6-8** may parse and interpret a synchronization index that controls text transcript display in synchronization with other media being displayed.

The media delivery logic **6-9** may perform functions related to media delivery. For instance, the media delivery logic **6-9** may provide media encoding, HTML5 browser support, HTTP Live Streaming, and media (e.g., iTunes) File Sharing.

The mobile computing device function logic **6-10** may perform functions related to using functions of the mobile computing device in conjunction with the web application. For example, the mobile computing device function logic **6-10** may allow the web application to leverage functionality of a smartphone (e.g., iPhone functionality) functionality of a tablet computer (e.g., iPad), functionality of an Internet television device (e.g., Apple TV functionality), and functionality of other operating system and mobile computing device technologies.

The search logic **6-11** may enable searching of text transcripts managed by the web application. For instance, the search logic **6-11** may enable searching of all text transcripts, searching of all text transcripts for a particular case, searching of a text transcript for a particular deposition, etc. The search logic **6-11** also may enable searching of corresponding options for alternative applications.

The annotation and edit logic **6-12** may enable adding and editing annotations of a text transcript. The annotation and edit logic **6-12** may enable a user to add notes to a text transcript, lock editing of a text transcript, link a counter designation to a direct designation, merge designations, bulk import designations, maintain confidentiality for edits to a text transcript, flatten designations, and add/edit evidentiary ruling designations.

The video, display, and playlist logic **6-13** may control synchronous text/video using a synchronization index. The video, display, and playlist logic **6-13** may perform video clip sequencing, jump to location features, runtime calculation, display of font/appearance, display and control of a scrub bar, timestamp editing, header/exhibits formatting, and variable speed playback control.

The linked exhibit logic **6-14** may enable display, linking, and control of exhibits that are linked (or are desired to be linked) to a transcript. The linked exhibit logic **6-14** may include a PDF viewer and an image viewer to enable display of linked exhibits or exhibits a user is considering linking to a transcript.

The errata sheet logic **6-15** may enable a user to display, edit, and control an electronic errata sheet for a text transcript. The errata sheet logic **6-15** may cause display of errata sheet entries with the original text in the transcript. The errata sheet logic **6-15** may have dual-view edit features and view toggle features.

The output formatting logic **6-16** may control output of media and/or text in terms of display on a display screen or in a printed format. The output formatting logic **6-16** may provide screen view control, 2-up view control, and print options (including PDF printing).

The scheduling and invoicing logic **6-17** performs scheduling and invoicing features and may leverage mobile computing device features. The scheduling and invoicing logic **6-17** may provide calendar functionality, invoicing functionality, recurring payments functionality, scheduling functionality, subscription model functionality, shipping functionality, and payment gateway functionality.

The variable content logic **6-18** may control variable content display. The variable content logic **6-18** may control display of advertisements (e.g., advertisements offered by the company hosting the web application, location-based advertisement, commercials and PSAs, etc.), new music, movie trailers, and branded applications (e.g., corporate news applications, educational applications, etc.).

Exemplary Synchronization Index

In some implementations, the function of a "synchronization index" is to link a word or range of words with certain media (e.g., multimedia). A "synchronization index" is an electronic file that may take any of several forms. For example, a synchronization index may be: 1) a spreadsheet with a time value corresponding to a word or range of words; 2) a table with a time value corresponding to a word or range of words; 3) a database, such as a Microsoft Access database, with a time value corresponding to a word or range of words; 4) an xml-type or html-type formatted listing that associates a time value corresponding to a word or range of words, for example as may be found in a Synchronized Multimedia Integration Language (SMIL) formatted file or similar; 5) any of the above, substituting the time value with a video frame count or any other marker or mechanism to mark a discrete portion of a media (e.g., multimedia) file a time $t_x$ into the media (e.g., multimedia) between t=0 to t=end; or 6) a file, such as a portable document format (i.e., "PDF").

The synchronization index itself may, then, include the transcript and the timing values, or positional values, for the associated media (e.g., multimedia). In this regard, for display of synchronous text and video, only the synchronization index and the associated media (e.g., multimedia) may be needed, along with a system (e.g., one or more hardware devices operating software with logic) configured to utilize each.

The synchronization index, optionally, may include information relating to the location and/or characteristics of the corresponding media (e.g., multimedia), so the system can retrieve the multimedia for synchronous playback. This may be a pathname/filename for retrieval of multimedia, a Uniform Resource Locator ("URL") specifying a location of the multimedia, a variant playlist, and so on.

The synchronization index also may include information relating to predetermined text display settings, for example defaults of text font, size, color formatting and so on selected to optimize an orderly display.

Mobile Computing Devices

Techniques described in the present disclosure, or a portion thereof, are intended to function on a computing device, such as a mobile computing device. In the embodiments, a mobile device may comprise a display, a battery, a user interface, such as a keyboard, touchscreen, etc., and a memory, such as a flash memory or hard drive. In addition, the mobile device may comprise a wireless networking capability, such as a wireless Wi-Fi communications device, or a wired networking connection. The mobile computing device may utilize a known mobile operating system, such as WebOS, Android, or IOS.

A mobile computing device generally comprises all or a subset of the following features: a viewing screen; a battery supply for extended periods of use or standby without needing to be plugged in to an electrical outlet; an operating system; an input mechanism, typically a keyboard rendered to a touch-sensitive viewing screen, or a keyboard/keypad that is integral to the device as opposed to a full size keyboard tethered or attached to the device by USB connection or other means; a networking mechanism that allows the device to communicate over a wireless network or telephone/data network to send and receive data (for example by Wi-Fi, 802.11a/b/g/n, Bluetooth, 3G, 4G, and so on); a quick start up time, relative to a longer start up times typically associated with booting a computer running a full version of a Microsoft Windows operating system; a utilization of solid state memory or flash memory in preference to hard-drive memory; a quiet sound when operating relative to use of noisy fans and heat sinks found in desktop computers; and a physical size, weight, or form factor that would favor portability.

Common examples of a mobile computing device include, but are not limited to, 1) a tablet computer, such as the device sold by Apple under the iPad trademark, or others including HP Slate, Dell Streak, Asus Eee Tablet, Compaq Tablet, Notion Ink Adam, MSI running Android, Quanta, ICD Vega, Google Tablet, HTC, Archos 5 Internet Tablet, Asus T91mt Eee PC, Panasonic Toughbook H1 Field, Toshiba Portege M780-S7220, Samsung Galaxy Tablet, and so on; 2) smartphones, including, but not limited to the Apple iPhone (3G, 3Gs, 4), phones running the Android operating system, phones sold by Research in Motion sold under the trademark BlackBerry, Samsung Galaxy Smartphones, Nokia N8; and other smartphones; 3) handheld devices, personal video recorders (PVRs), personal media players (PMPs), mobile gaming devices, personal digital assistants (PDAs), portable music devices (e.g., the Apple iPodTouch), and so on.

For simplicity throughout this disclosure, the term mobile computing device may be used interchangeably with the term tablet computer (e.g., iPad), but it is not intended that the term mobile computing device be limited to a tablet computer (e.g., the Apple iPad). Any examples or implementations utilizing a tablet computer (e.g., an Apple iPad) device specifically are illustrative only and are not intended to limit the scope of the disclosure. Certain illustrative examples may describe a tablet computer (e.g., the iPad) as implementing techniques described throughout the disclosure, but the disclosure is not limited to a tablet computer (e.g., the iPad). The terms "web application" and "mobile computing device software" are described in greater detail, below.

Errata Sheet Creation

In the present disclosure, a user loads an electronic transcript to a web-based software utility, referred to as the web application or the "WebApp." The WebApp is configured to accept most industry standard transcript formats. These may include: .txt, .ptx, .mdb, .html, .xml, and so on. Generally, these transcripts are numbered by page, and each page has an identical numbered series of lines that always correspond to the same text to ensure a page:line cite is always static. In a finalized transcript, the page and line numbers will always correspond to the same testimony text from one copy of a transcript to another. This ensures a page:line citation by an attorney, or the court, will always refer to the same location.

The web application re-formats the transcript into an xml-type format, generally described as associating a range of words with a specific page:line reference, as would be the case if each line of testimony was inserted into a series of database cells to comprise a column. A Graphical User Interface (GUI) allows a user to edit the text of any line of testimony. The purpose of this edit is to notate an error in transcription that would need to be included in an errata sheet. The system notes the original text of the line and compares it to the altered text. In commercial word processing software, this process is often referred to as "redlining." New or added text can, at the user's selection, be color coded to denote it as a change from the original text. Any combination of font characteristics can be selected by a user to denote that text that should be deleted, that text that should be altered, or that text that should be added. Font characteristics may include strikethrough, font color, font size, font, background highlighting, and similar characteristics.

The user can, by way of the GUI, instruct the system to run a report of the changes made and compile them in an errata sheet. The user can elect to view either the original content of the original line of text or the altered text of the revised line of text, or a markup with all changes.

A reviewer of the transcript can employ an additional step to confirm the accuracy of the court reporter's transcription. Optionally, the text of the transcript can be synchronized to the video. In concert with a synchronization index, the user can click or perform a gesture upon a line of testimony to cause the video to begin to play back at that portion of the video where those words were spoken. In this way, a deponent when reviewing the court reporter's written transcription of his testimony is not limited to his recollection of what was said, but rather has the exact video recording with which to compare the written transcription for accuracy. Moreover, attorneys can review the errata submission in conjunction with the actual video recording to ensure accuracy of the transcript. With the written transcript and the witness's recollection alone, without the video, there exists the temptation for the witness to change his testimony to what he wished he would have said at the deposition (for example, a "Yes" to a "No"), which is not the proper function of an errata submission, rather than to accurately reflect through errata that which was actually said or to correct minor spelling, punctuation or typographical errors. Accordingly, the system may facilitate more timely and trustworthy errata submissions, reduce the temptation for abuse because the video is available as a check, and ensure an accurate transcript displays electronically in the courtroom as synchronized, scrolling text with a video image, which may improve inefficiencies inherent in other systems.

Once the transcript has been reviewed by the witness in the system and changes for accuracy have been made, the user can 1) create a written hardcopy report that aggregates all changes into an errata sheet, as has historically been the practice, for signature and affixation to the official hardcopy of the original transcript, and 2) transmit to the opposing party or the court the resultant electronic file, which includes the witness's changes.

Any of the software operators, preferably including those using mobile computing devices, including opposing parties, can 1) quickly electronically jump to succeeding or preceding errata notations (or navigate via hyperlinks), 2) check the errata notations for accuracy against the video, 3) ensure the accuracy of the transcript as it will display with the trial presentation software, and 4) play video in the courtroom that contains information from the witness's errata sheet submission as though it was part of the court reporter's transcription.

Advantageously, an errata sheet prepared and communicated in this manner also may be electronically tracked, for example by affixing an unalterable, encrypted time and date stamp from a trusted, independent source, should the submitter ever need to verify that the errata corrections were completed within the time contemplated by the governing rules of procedure and communicated to opposing counsel or the court.

FIG. **7** illustrates an example interface that may be used in handling errata sheet operations. As shown, in FIG. **7**, a user may view a deposition video and a deposition transcript in a synchronized manner, and manipulate an errata display area to make a change to a deposition transcript to be added as a change in an errata sheet. In the example shown in FIG. **7**, a user "Deponent" selected line 15 of the deposition transcript and changed the testimony "Yes" to "Yes, I believe so." As shown, the errata display area shows the change made, the user who made the change, and the date on which the change was made. In addition, the deposition transcript has been updated to indicate the change made to the transcript at line 15 such that the original transcript and errata changes may be displayed together in synchronization with the deposition video. In some examples, the changes entered in the errata display area may be aggregated into an electronic errata sheet associated with the deposition transcript.

Merging and Flattening of Designations

Law firms are often tasked with transcript management on behalf of their clients. They commonly utilize a computer spreadsheet application, such as Microsoft Excel, to track changes, and they use a word processor, such as Microsoft Word, to type out their designations, sometimes in tabular format or longhand. Use of spreadsheets and word processors may be cumbersome and inefficient for transcript management.

A common way a deposition is cited is in the longhand, exemplified as "Page 10, line 2 to page 10, line 7." A shorthand for such a designation understood by trial presentation software would be, for example, "StartPage.StartLine+EndPage.EndLine." In the example, the shorthand would be 10.2+10.7.

Attorneys conduct review of transcripts in the context of internal review, and then in preparing for trial. In conducting internal review, or in transitioning from internal review to trial, it is often desirable or necessary to flatten certain designations. For example, one transcript may be reviewed by Plaintiff's counsel, and it may be issue coded to comprise a certain number of "page:line to page:line" designations that are associated to a particular issue. For example, one issue code may be titled "liability" and another "damages." Using the system described throughout this disclosure, a user may combine, or flatten, two or more issue codes into a common issue. In this example, the user may elect to flatten the "liability" coded designations with the "damages" coded designations into one common issue called, say, "Plaintiff's direct designations."

Similarly, one designation may be created and another one may be added at a later time but with a range that abuts the first designation. If these abutting designations have the same issue code, for example, they should be able to be merged into one designation. The disclosed system (e.g., the web application) comprises logic, such as executable program code, configured to automatically merge, at the user's choosing, abutting designations with the same issue code.

A list of top level, global, or roll-up issue codes may include Plaintiff's direct designations, Defendant's counter designations, Plaintiff's counter-counter designations, Defendant's direct designations, Plaintiff's counter designations, Defendant's counter-counter designations, Plaintiff's objections, and Defendant's objections, as well as Confidential, Restricted Confidential, and Attorneys' Eyes Only. As in the example above, a user may select the transcript sections issue coded "liability" and "damages" and specify that they be combined into another single issue code such as "Plaintiff's direct designations."

In reference to the desirability of flattening designations prior to display of video clips in court, it may be advantageous for an operator of trial presentation software to flatten designations before creating video clips, because this reduces the total number of video clips to create as well as the number of edit points, thereby facilitating more efficient workflow. For example, if a plaintiff designates for deponent "John Doe" testimony in the range 10.1+10.5 and 10.9+10.25, and if defendant counter-designates 10.6+10.8, the one video clip created may be for 10.1+10.25. More typically, and problematically, three designations would have likely resulted in three distinct video clips and they would be played as a multiclip, or series of individual clips:

| Page:line range | Clip title |
|---|---|
| 10.1 + 10.5 | JD01001 |
| 10.6 + 10.8 | JD01006-counter |
| 10.9 + 10.25 | JD01009 |

Using the system described throughout this disclosure, the logic of the software of the web application may recognize adjoining ranges of designated testimony. The logic may be employed to join, or flatten, these adjoining ranges. Further, rules may be employed to flatten only the desired issue codes, preserving the original range specification of "page:line to page:line" and issue tag should the user elect to undo a flattening operation, or should the user need to perform a calculation of video run duration, described below.

FIG. **8** illustrates an example of merging designations. As shown, a plaintiff has made initial designations to a deposition transcript and a defendant has made counter designations to the deposition transcript. In this example, the system recognizes that the plaintiff designations and the defendant designations represent adjoining ranges of designated testimony and, based on the recognition, merges the plaintiff designations and the defendant designations. The system displays a merged designations area that shows the designations that have been merged adjacent to the deposition transcript, which still shows the plaintiff designations and the defendant designations. Using the merged designations area, a user may verify whether or not the merging was proper and, if so, create a single video file that corresponds to the merged designations.

FIG. **9** illustrates example data structures that may be used in merging designations. As shown, a first user has designated page 117, line 13 to page 130, line 16 and a second user has designated page 121, line 0 to page 135, line 10. The system compares the position information (e.g., page and line numbers) of the designations made by the first user with the position information (e.g., page and line numbers) of the designations made by the second user and determines that the designations overlap based on the comparison. In response to the determination that the designations overlap, the system merges the designations into a single, merged data structure. The merged data structure includes all of the designations made by the first user and the second user, encompassing the earliest starting point for designations to the latest ending point for designations. For instance, as shown, the merged data structure has position information indicating designations from page 117, line 13 to page 135, line 10.

FIG. **10** illustrates an example interface for assigning issues to designations. As shown in FIG. **10**, a user may select one or more ranges of designations and assign one or more issues to each selected range of designations. The interface enables a user to add additional issues and apply all issues to a particular designation. The interface also allows a user to select a color with which the designations tagged with a particular issue will be displayed on a deposition transcript. The issues assigned to designations may be used for flattening and merging designations, as described above.

Locking Designations

In communicating designations between parties, the system prevents one party from designating testimony that has already been designated by the other. For example, if plaintiff designates 10.1+13.22, then the defendant should be prevented from counter-designating testimony in the same range. One way of understanding this function is with reference to FIGS. **11**A-C, where each party has its own work pane display of the transcript. In this manner, Plaintiff uses the left-most work pane to make annotations or to perform issue coding. The Plaintiff then communicates to Defendant that its designations are complete, and the Defendant begins to make counter-designations in the right-most work pane. Navigation of the transcript can operate on both work panes simultaneously, so it becomes easy for a Defendant to determine if counter-designations are needed in certain areas, without having to worry about overlapping annotation colors. The logic of the system prevents overlapping designations between parties. If an overlapping page:line is selected, the software snaps Defendant's selection to the available lines and/or provides an error message. As above where Plaintiff designated 10.1+13.22, if defendant inadvertently selects 13.15+14.10, the designation would automatically correct to 13.23+14.10, disregarding the overlapping section. The result may offer a clean, concise view of designations within the two work panes.

Where the parties make a simultaneous designation, for example by submitting direct designations to one another at a mutual time deadline set by a court, those page:line ranges can be merged into a distinct issue code, such as "both parties," or "agreed upon designations," and be locked to prevent objection by either party.

Linking Designations

The web application may comprise logic configured to link one designation with another designation. For example, in a deposition transcript a Plaintiff may proffer a set of direct designations for a witness. Thereafter, the Defendant may desire to add material for completeness in a Defendant's counter-designation should the Defendant believe Plaintiff's direct designations were not a complete or accurate representation of that portion of the testimony. In practice, however a Plaintiff may elect to drop its initial designation, making it a laborious process for the Defendant to eliminate corresponding Defendant counter-designations that should be removed as a result. Accordingly, the logic configured to link one designation with another designation provides functionality to automatically cause the deletion of a counter-designation if the designation to which it is linked is first deleted.

This logic may be further described with reference to FIG. **11**A-C, which illustrates a Plaintiff's work pane and a Defendant's work pane. As shown, a first designation is made by Plaintiff in Plaintiff's work pane. The Defendant's counter-designation is made in the Defendant's work pane, with logic to allow, or to compel, Defendant to identify that portion in Plaintiff's work pane that would correspond to Defendant's counter-designation. Defendant's counter-designation may be linked to more than one of Plaintiff's direct designations, with the linked designations being listed in Defendant's work pane. Should each of Plaintiff's designations within that list be removed, the logic causes removal of the corresponding counter-designation.

The Defendant may link each counter-designation to at least one Plaintiff designation using a graphical element, for example by selecting a range of text in Defendant's work pane and then dragging a "lasso" into Plaintiff's work pane to identify a page:line range to indicate the Plaintiff's selected testimony to which Defendant is tying his counter-designation. Again, one Defendant counter-designation may be tied to more than one of Plaintiff's designations. If all of those ties, or linkages, are severed by Plaintiff withdrawing his designations, then the logic may be configured such that Defendant's counter-designations are removed, or are identified as counter-designations that ought to be removed.

Alternatively, if Defendant has linked a counter designation to a Plaintiff's designation, and if the Plaintiff subsequently modifies the range of that designation, the Defendant

can be notified, by the logic of the system, that one designation to which a Defendant's counter-designation has been linked has been modified. The Defendant can make a determination as to whether his counter-designation should be deleted entirely, deleted in part, or left alone. With this logic to link designations, the parties are provided a new tool that may make efficient a work process that has historically been very laborious and fraught with potential for error. FIGS. **11**B and **11**C illustrate examples of linking designations according to one embodiment.

Batch Import of Designations

It may be advantageous to use the web application to import more than one transcript designation at a time. For example, when parties to litigation exchange their designations, each party needs to be able to import the designations of the other into his own working copy of the transcript. As another example, video clips may have been created within trial presentation software that need to be integrated into a transcript annotation utility. As part of the logic of the web application, a user may batch import more than one designation at a time. This can be accomplished by creating a loadfile with a predetermined format to communicate the batch of designations. For example, a loadfile using the StartPage.StartLine+EndPage.EndLine entries in series may be used. This format is the same as may be used to batch create video clips within trial presentation software applications. Upon ingest of the batch, the user may be presented a graphical user interface to assign an issue to each of the designations. FIG. **10** illustrates an exemplary interface that can be used to batch import more than one designation and assign an issue code to one or more designations.

Printing

Once parties to litigation have exchanged deposition designations, and objections thereto, with one another, it is often a requirement that a printed hardcopy be prepared for submission to the court. The printed hardcopy is also useful for the attorneys' own reference.

These submissions are typically color-coded copies of deposition transcripts for the convenience of the court and court staff. Historically, these color copies have been laboriously prepared by hand using a colored high-lighting marker on previously printed copies of the depositions. This method is extremely time consuming, it creates great potential for human error, and the work product is not easily revised or combined with the submission prepared by opposing legal counsel.

Moreover, during the deposition designation and counter-designation process, each party may also lodge objections to any number of designations or counter-designations for the purpose of asking the court to exclude the testimony from introduction into evidence under the rules of evidence. An objection is a written note to correspond to an annotation, that being a selected page:line range of the transcript that is commonly assigned an "issue code" meaningful to the user. The written note may comprise a reference to the evidentiary rule being relied upon by a party to warrant exclusion of the testimony by the judge as well as a short description or argument on the matter. It has been very difficult to view the objection and the testimony to which the objection was made, without using at least two separate documents or a table from a word processing application (e.g. Microsoft Word) That is time consuming to prepare and has a high probability of human error.

In the described system, the user is provided the facility to print hardcopies of the deposition transcript, including highlighting for each issue code in a different color, or a different font. For example, the user may be able to print objections on the same page as the transcript and in a location that is adjacent, or substantially adjacent, to the testimony itself. The logic in the software of the web application, preferably working in concert with software operating on a mobile computing device (including optionally utilizing the mobile computing device to communicate the print job to the printer), may be able to 1) print in a portrait orientation with two transcript pages comprising a column on the left half of the printed page, leaving the right half of the page for notes, such as an objection, to appear adjacent to the testimony to which a party has lodged an objection, and 2) print in a landscape orientation with a transcript pages comprising a column on the left half of the printed page, leaving the right half of the page for notes to appear adjacent to the testimony to which a party has lodged an objection. Printing in this manner allows one convenient document to be produced where a judge can evaluate an evidentiary objection while simultaneously accessing the testimony to which the objection applies. The reader also can examine the context of the overall transcript because the transcript contains highlighted designations as well as the non-designated portions, comprising the complete transcript.

A deposition designation has a color associated with it so the reader can immediately understand which party proffered the submission, including by reference to a color key that may be printed on the same page. Likewise, a graphic element, for example an elongated, colored bracket or a rectangle bounding the designated text, may be used to identify the party making an objection and the range of text to which the objection applies.

Printing may encompass communication with a printer to print on paper, creating a file in .pdf or .tif format, or other similar format, suitable for transmitting by email or printing at a location remote from the user, or rendering a file type for use with a mobile computing device, such as an electronic book format or similar (including .txt, .html, .ps, .pdf, .djvu, .epub, .fb2, .azw, .pdb, .lrf, .lrx, .wol, .tr2, .tr3, .aeh, .lit, .exe, and .rgo).

This printing method provides a new convenience to the reader, as at least two documents—a highlighted transcript and a table of objections and page:line cites to which objections are lodged—are consolidated into one. This printing method may solve a longstanding logistical problem for litigation professionals needing to submit deposition designations and objections to a court.

FIG. **12** illustrates an example printed page output in a portrait view. FIGS. **13**A-B illustrate an example printed page output showing only designated portions of a transcript. FIG. **14** illustrates an example printed page output in a landscape view. FIG. **15** illustrates an example of minuscript printing showing highlighted designations.

Electronic View of Printed Format

In addition to the printed copy, it may be advantageous to replicate on a computer screen the convenient layout of having objections adjacent to the testimony to which objections were lodged.

Additionally, the judge can be provided facility to make an evidentiary ruling within the system. With reference to FIG. **16**, the court is provided the facility to make evidentiary rulings on objections, here exemplified in the right-most column by an affirmed/overruled toggle in the form of a radio button. As a result, if the court elects to make a ruling, the date and time of the ruling is stored by the software, and such a ruling can be immediately communicated to the parties. The parties can access the electronic document to learn what testimony has been excluded and what has been permitted, and a report can be generated and printed or saved for offline study and evaluation.

Transcript Formatting

An example format for the synchronization index for use with the described system is an xml-type format, an example of which is shown in FIG. **17**. This xml-type format comprises tags to denote a transcript header, a transcript body, and a transcript footer. Metatags may also be present for display, including timed display, of graphics, images, advertising, secondary multimedia other than that primarily associated with the text of the synchronization index, logos and settings therefor, text, including foreign language translations, sounds, and so on.

Transcript annotations can be saved as an integral part of the xml-type formatted synchronization format. The example shown in FIG. **17** is intended to be illustrative of the xml-type format only and is not intended to represent an actual, working synchronization index with all information included in the synchronization index. Actual implementations may include more, perhaps much more, information.

Run Time Calculation

When video clips are created in trial presentation software, a report query can be executed to calculate and output the run time duration of each clip and the designated text. The report may be called a duration list, or "durlist." For the reasons mentioned above, litigants need this information, in part to determine whether they should add or remove testimony.

Historically video clips were created within the trial presentation software to generate a duration list. Because trial presentation software is often a tool not used by an attorney but rather a trial consultant with special expertise, typically employed only at a time very close to trial, it would be useful if the attorney could create a duration list apart from the trial presentation software and within an application used to annotate transcripts. In some examples, all of this can be accomplished on a mobile computing device.

As an example of cumbersome and inefficient workflow often experienced by litigators, the attorney creates designations using a highlighter on a printed transcript; support staff enters those designations into a transcript management utility, which carries the potential for error; the transcript management utility case is sent electronically to the trial consultant; the trial consultant runs a query from the transcript management utility to extract a .csv formatted file corresponding to the issues designated; the .csv is re-formatted to render a text file in StartPage.StartLine+EndPage.EndLine format to be used as a loadfile for video clip import to a trial presentation utility; the trial presentation utility is opened, and the .txt loadfile is used to import designations; the clips within the trial presentation utility are quality reviewed to ensure load errors have not occurred, for example as would exist if a designation began or ended on a line with no timestamp within the trial presentation utility .mdb; the video clips are fine-tuned at the beginning and end of each clip; the video clips are renamed to sort properly in page order within a duration list, for example by padding a "0" for pages 1-99 or by adding a prefix or suffix to identify the designator; the "durlist" command is executed, requiring the trial consultant to select the witness having video clips loaded and then manually parse out only the subset of video clips for which a duration list is sought from among the entirety of video clips present for a witness (e.g. clips within the trial presentation utility are identifiable only by clip name and do not carry any issue coded differentiation that may have been present in the transcript management utility); the duration list report is created from the clips identified by the trial consultant and printed, or saved electronically, for another quality review against the transcript management utility case; and then the duration list is forwarded back to the legal assistant or attorney.

With the described system, logic is employed in the software of the web application, and preferably within software executed on a mobile computing device, to calculate a duration list, without necessity of creating discrete video clips, by performing calculations from the synchronization index itself. For example, if a user annotates a page:line range within a transcript, the software examines the synchronization index to compute the time difference between video corresponding to EndPage.EndLine and StartPage.StartLine. In this manner, computations can be output for each annotation, for all annotations that comprise one issue, for merged issues, for more than one issue, and for the totality of all annotations.

In this manner, the attorney can very quickly determine the appropriateness of content being designated because he has immediate knowledge of the run duration of the annotations being made. The traditionally cumbersome and inefficient workflow is greatly improved. This provides the attorney a heretofore unavailable advantage, in that the strategy of determining what video to play in the courtroom has been a strategy historically left until the last moments of trial preparation, often as late as the day before video is to be played in the courtroom. This trial preparation strategy can now be deployed much earlier in the litigation process, leaving available more preparation time for the attorney in the moments immediately before trial, or in the evenings on trial days when preparation time is most scarce. Work that had consumed the attorney's time can be shifted to a trial consultant, as the actual play duration of video clips may vary slightly from the calculated duration list because the trial consultant can often fine tune the video to eliminate long pauses, false starts and stops, and correct inaccuracies or imperfections in timestamping of the synchronization index. With the described system, this fine-tuning, however, is no longer prerequisite to the attorney's evaluation of overall run durations historically generated once video clips had been created, historically a very time consuming task at trial.

FIGS. **7**, **11**, and **16** each show a displayed output of run time calculation. As shown, the system computes and displays a total run time for all designations, a total run time for plaintiff designations, and a total run time for defendant designations. The system may compute the totals in real-time as a user is viewing the transcript and video of the deposition, and editing designations for the transcript. The user may view the run time calculations and quickly perceive how changes being made to the designations impact run time of the corresponding video. In some implementations, the system may continuously monitor changes to the designations and, when a change is detected, the system may reference the synchronization index to extract timing data associated with the new designations and compute the run time totals for the new designations based on the extracted timing data.

Synchronized Exhibits

When an attorney reviews a videotaped deposition and its transcript after the deposition, it is often helpful to have access to deposition exhibits that may have been physically before the witness during a line of questioning. It is a feature of the present disclosure to provide within the synchronization index information that would provide for the display of a document at the correct time within the deposition. For example, when an attorney places a document before the witness, marks it as a deposition exhibit, and asks the witness to identify it, metadata within the synchronization index can be configured to display that first page of the exhibit at that

point within the deposition video. That point in time also corresponds to a page:line cite within the deposition transcript. If, in the attorney's next question he draws the witness's attention to the third page of the deposition exhibit, metadata within the synchronization index can be configured to display that third page, and so on.

Accordingly the synchronization index contains information for selecting the image to display, for the time at which the image is to appear, or an "in" time marker, and for the time at which the image is to be removed, or an "out" time marker. A series of such instructions within a synchronization index is generally referred to as "synchronized exhibits." It may be advantageous to allow data for synchronized exhibits to be independent of video clips and "in" and "out" edit points for video clips. Such independence allows video clips to be edited, merged and flattened without necessity to re-link the correct exhibit that should be simultaneously viewed with each video clip. Existing transcript management and trial presentation utilities lack this facility, making their use cumbersome and inefficient.

FIG. **18** illustrates an example of a linked exhibit. As shown, the interface in FIG. **18** includes a linked exhibit area where a user can view and add/delete/edit linked exhibits to the transcript displayed. In the example shown, an exhibit has been linked to the designations made to the displayed transcript. The exhibit is displayed adjacent to the transcript testimony to which the exhibit is linked. The linked exhibit may be displayed at a time when a portion of the deposition video corresponding to the designations is displayed. Users may be able to interact with the linked exhibit area to add additional linked exhibits, edit existing linked exhibits (e.g., move the linked exhibit to a different portion of the transcript), or remove linked exhibits.

The Web-Based Software Application

In some examples, the web-based software application may be an application coded within the Ruby on Rails ("Rails" or "RoR") open source web application framework for the Ruby programming language.

The web application is used as a case management system to facilitate management of users, user permissions, team collaboration, transcript manipulation, and distribution of synchronization indexes and multimedia retrieval instructions for a mobile computing device. Referring to FIG. **6**, the web application may comprise user permissioning logic **6-7**; file format and data parsing logic **6-8**; multimedia delivery logic **6-9**; mobile computing device function logic **6-10**; search logic **6-11**; annotation and edit logic **6-12**; video, display, and playlist logic **6-13**; linked exhibit logic **6-14**; errata sheet logic **6-15**; output formatting logic **6-16**; scheduling and invoicing logic **6-17**; and variable content logic **6-18**. The web application may include software code intended to function as a "cloud computing" application, software running on a server remote from users who access it and its functionality by way of an internet connection, an internet or web browser, and a computer or, possibly, by a mobile computing device. The software code may be stored in a non-transitory computer-readable storage medium and may be executed by one or more processors to perform operations described throughout this disclosure.

First, user permissioning logic **6-7** is present, generally to ensure each user has an account and that the account holder have access only to that content he has been authorized to receive. The user permissioning logic **6-7** may be understood with reference to a series of use cases. For example, consider a situation in which a plaintiff's attorney, a defendant's attorney, and a judge all are using the web application to review a deposition transcript. In this example, the plaintiff's attorney, the defendant's attorney, and the judge should be able to view some information that is public and common to all users, but should not be able to view information that is private or confidential to one of the other users. The user permissioning logic **6-7** ensures that the plaintiff's attorney, the defendant's attorney, and the judge see only the information that they are permitted to view. For instance, the user permissioning logic **6-7** controls display to the defendant's attorney and the judge, so that they can perceive designations shared by the plaintiff's attorney, but not confidential notes or annotations to the transcript made by the plaintiff's attorney. Similarly, the user permissioning logic **6-7** controls display to the plaintiff's attorney and the judge, so that they can perceive counter designations shared by the defendant's attorney, but not confidential notes or annotations to the transcript made by the defendant's attorney

Second, file format and data parsing logic **6-8** is required. This logic is used to ingest transcripts from a user. Within the legal industry, for example, there are a number of various electronic formats for transcripts, including .txt; .ptf, a file format most often associated with transcripts capable of being read by, or exported by, the commercially available transcript utility called LiveNote by ThompsonReuters; .ptx (or occasionally as an .exe), most often associated with transcripts capable of being read by, or exported by, the commercially available transcript utility called "eTran" by RealLegal; .mdb, the Microsoft Access formatted transcript type from Verdict Systems and its software called Sanction II; .cms (or .mdb, Microsoft Access) formatted transcript type from inData and its software called TrialDirector; and a number of other file formats used by common transcript management and/or trial presentation utilities.

The purpose of the file format and data parsing logic **6-8** is to ingest a transcript, to parse it according to its known formatting attributes for the purpose of extracting information including the text transcription, page and line numbers, headers and footers, multimedia associations, document exhibit listings and document exhibits, and timestamp data (or video frame data) and rendering all of said information into an intermediate, standardized format (herein referred to as the "xml-type" format) for use in the described system as a synchronization index that can be communicated to, and understood by, a mobile computing device.

Third, multimedia delivery logic **6-9** is provided. The multimedia delivery logic **3-9** functions to deliver multimedia content to a user. For instance, the media delivery logic **6-9** may provide media encoding, HTML5 browser support, HTTP Live Streaming, and media (e.g., iTunes) File Sharing.

Fourth, mobile computing device function logic **6-10** is explained. Mobile computing devices may be different from one another, so a separate mobile computing device function logic **6-10** is often needed to facilitate communication of data and multimedia to the device. Mobile computing device function logic **6-10** may include logic for the Apple iPhone (running the Apple operating system called iOS, including iOS 3.2 and iOS 4.0-4.2), the Apple iPad (running iOS, including iOS 3.2 and iOS 4.0-4.2), mobile computing devices running an Android operating system, and Research in Motion-type or Blackberry-type mobile computing devices (for example those utilizing Blackberry operating systems), and mobile computing devices utilizing the Symbian3 environment (to include devices manufactured by Nokia, such as the smartphone device sold with the tradename "N8").

By way of example, the mobile computing device function logic for the Apple iPad is written in Xcode for iOS4.2 and is compiled to communicate with the web application. A user, having the correct permissions, can access the web applica-

tion for retrieval of one or more synchronization indexes and corresponding multimedia. Fifth, search logic **6-11** is present to facilitate search of a synchronization index or a collection of multiple synchronization indexes. Once a user has used a mobile computing device to select a synchronization index, that synchronization index can be communicated to the device in whole and cached there, or it can be communicated to the device in part and subsequent portions of the synchronization index can be communicated to the mobile computing device as the user requires. Since many mobile computing devices have limited memory storage capacity and RAM, relative to laptop computers, desktop computers and servers, it may be advantageous to allocate certain tasks to that device best equipped to handle the task, while factoring in speed, efficiency, system resources and connectivity. A search for text is one such task, and that is one reason for search logic.

For example, if a user elects to retrieve the synchronization index for a single deposition having, say, a 300 page length if printed, the mobile computing device may be able to download the entire synchronization index and store it in memory. A text search of that deposition may reference the locally stored copy of the synchronization index and return a search result. This may be done with speed and efficiency on the mobile computing device.

If, however, the user expands the text search to include all depositions within that legal case of, say, 50 depositions rather than just searching one 300-page deposition, the search controller provides logic to efficiently perform the search and return search results to the mobile computing device. For instance, the search may first reference the locally stored content, then the logic comprising the search controller may ask the remote server to conduct the search on the remaining transcripts to be searched. Without necessarily communicating the entirety of all fifty synchronization indexes to the mobile computing device, the server can return to the mobile computing device only the search matches. When the user selects one of those search matches, only then would the server deliver a larger portion of that specific synchronization index, or the entire synchronization index, to the mobile computing device.

The search logic also facilitates search across vast libraries of synchronization indexes. It is contemplated that searches may involve, for example, searching lyrics of thousands of songs that may be hundreds or thousands of gigabytes in size. Such a search is best conducted on a server. As another example, a user of an Apple iPod with 32 Gb of memory may have a portion of that space allocated to, say, storage of 5000 songs, 2500 of which have lyrics that have been downloaded and stored to the device. A search query would first be executed upon the lyrics resident on the device and search results returned and displayed, and, at the user's option, the query would be extended to a server-side search to encompass lyrics not resident on the mobile computing device, to return and display search results.

Next, annotation and edit logic **6-12** is provided to allow manipulation of a transcript. In general, this is the logic employed to facilitate the transcript management and manipulation functions described above, including functions relating to creating annotations, notes, issue codes, merging designations, flattening designations, locking designations, and so on. Annotation and edit logic **6-12** communicates updates made on a mobile computing device to the remote server for storage and sharing with other users.

Seventh, video, display, and playlist logic **6-13** is employed. The video, display, and playlist logic **6-13** may perform video clip sequencing, jump to location features, runtime calculation, display of font/appearance, display and control of a scrub bar, timestamp editing, header/exhibits formatting, and variable speed playback control.

Eighth, linked exhibit logic **6-14** may be used. As described above with respect to synchronized exhibits, within a deposition, documents are often placed before the witness to elicit testimony. These are called deposition exhibits. When reviewing the transcript, it is often helpful for the reader to have convenient access to deposition exhibits, particularly accessible as a document linked to the deposition text where the exhibit was utilized. Linked exhibit logic **6-14** may assist in delivery of material other than the transcript, by using the synchronization index to retrieve that material. For example, the linked exhibit logic **6-14** may comprise a hyperlink within the text displayed in the transcript that a user may select for display of a particular deposition exhibit. If, for instance, an exhibit is referred to as "Smith Exhibit 1" in the transcript, the logic of the linked exhibit controller would link that text to the document comprising Smith Exhibit 1, perhaps a pdf image or a tiff image. A user following that hyperlink would be brought to the appropriate image.

Alternatively, for use with the Apple iPad, the linked exhibit logic may comprise logic to display material without input from the user. For example, if the synchronization index is constructed properly, a document can be linked for display at a time within the multimedia without prior user input. While the user watches the multimedia, and synchronous text display, a deposition exhibit may appear on the screen at the time it is relevant and would be useful for the user. The user can elect to play/pause the multimedia, navigate to selected pages from the deposition exhibit, or remove the deposition exhibit from the display and resume playback of the multimedia and text.

Ninth, errata sheet logic **6-15** may be used. The errata sheet logic comprises logic to display only an accurate transcription of the media. A more specific description of the function of errata sheet logic **6-15** is discussed, above, as is the way the logic operates to facilitate display of an accurate transcript.

Tenth, output formatting logic **6-16** is present. This is the logic required to provide the various printed outputs, described above, for the organized printing of a transcript with annotations and notes, including notes that can be printed substantially adjacent to the text to which it is associated.

Eleventh, scheduling and invoicing logic **6-17** is provided to facilitate the ability of a user to see a calendar (e.g. for depositions) and to pay for service. The web application may function as a subscription-based case management program with a recurring payment component, and this logic operates to facilitate processing of payments from a user account based on a subscription agreement.

Twelfth, variable content logic **6-18** is provided to make the system adaptable for uses in various alternative industries. This logic generally relates to the graphical user interface and graphical elements that may be suited for a particular use or industry. This includes the delivery of targeted advertising, branding elements, graphical "skins" to achieve a desired look-and-feel for a given application, commercials, and so on.

The web-based software application employs a number of controllers for various related devices, functions, and software associations.

In general, some function controllers for the web-based software application are used for operator manipulation of data via the mobile computing devices and have logic configured to perform a plurality of actions, specifically: to upload, manage and run file/format and video/text data; search engine functionality; annotation and editing capabil-

ity; calculation of video run time from designations without first creating a video clip; adding and merging or flattening of designations; cross-party communication to finalize designations; electronic errata sheet creation and updating; updating of issue coding and batch import of issue codes; a utility for printing with objections adjacent to designations; a utility for communication between parties; and a mechanism for a judge to participate by making evidentiary rulings in the transcript management utility.

As shown in FIG. **6**, a hosting server is used in conjunction with a multimedia server. A dual server system is shown for the present system due to the complex interactions between the web application, the multimedia server, and the plurality of mobile computing devices, as well as the substantial volume of information being uploaded, managed and served to users.

As an example, the hosting server is a cloud based computing platform, such as the hosting service provided by Heroku. The Heroku Server is preferably a platform as service/ruby on rails type cloud platform having open-source extensibility. The hosting server may deploy Amazon Simple Storage Service (Amazon S3) and Amazon Elastic Compute Cloud (Amazon EC2). This server stores a SSL-encrypted case management web-based software application, all user information, and case data information, to optionally include synchronization indexes. The hosting server is also the preferred location for the web application to be executed. A Heroku Server or other equivalent hosting server may control the cloud computing and data storage objectives described above without departing from the scope of the present disclosure.

An appropriate multimedia server is a server, or multiplicity of servers, configured to deliver multimedia, preferably multimedia that is appropriate for the receiving device and the bandwidth available to it. Exemplary multimedia servers and related services to deliver multimedia with a number of variant playlists include a Brightcove HTTP streaming server, or an Akamai HTTP streaming server, or a Wowza media server. A preferred HTTP streaming server has open-source extensibility and is adapted for streaming many multimedia formats, including in variant playlists, including audio, H.264, MPEG4, M4V type media files; HTTP Live Streaming (HTML5); MPEG-2 transport stream (H.264 video/AAC audio); and multimedia segmented for delivery on an Apple iPhone or iPad. Preferably, all multimedia data and text data is stored on the multimedia server.

The multimedia server may be configured to deliver streaming multimedia to a mobile computing device directly. It may also deliver streaming multimedia to a computing device directly, for example to a user of the web application using a web browser. The multimedia server may also be configured to deliver multimedia to an intermediate computing device that may then transfer multimedia to a mobile computing device. For example, a user that desires access to multimedia using a mobile computing device may elect to store the multimedia on the mobile computing device itself. Apple's iTunes, for instance, may be used to communicate multimedia from a computer to an iPad or iPhone temporarily tethered to the computer.

The hosting server and the multimedia server are in electronic data communication with one another and with a plurality of mobile computing devices operated by a plurality of users or operators, typically, attorneys and paralegals or commercial multimedia consumers. There are many suitable mobile computing devices, as listed above. The iPad with iOS 3.2-iOS 4.2, and the iPhone with iOS 4.0-iOS 4.2 may be used. The iPad tablet-type mobile computing device offers functionality, including the ability to multi-task in iOS4.2.

Specifically, the iPad is adapted to have a case/deposition reader with deposition viewer and supporting issue code identification; annotation functionality; case and deponent level search-ability; HTTP Live Streaming capability; annotation and time stamp editing; CoreText-type engine for text display ability; and exhibit linking and display via MPTimedMetadata with iOS 4.2. The iPhone is suitable for a subset of the above functionality, primarily due to the fact that its screen is smaller than the iPad, and is therefore a viable choice for a mobile computing device adaptable to the present system. Specifically the iPhone is capable of case/deposition reading with deposition viewer and supporting issue code identification; annotation functionality; and case and deponent level search-ability. Any combination of the above described mobile computing devices may make case management and performing the above manipulations now a nimble, in real time, task instead of the arduous and cumbersome modes of case management as are known.

In some implementations, a video display device may be associated with one or both servers. The mobile computing devices may be in electronic data communication with both the video display device and the servers. When a user performs a manipulation on a mobile computing device, such as scrubbing to a certain point in a video, the output or display may be shown on the video display device, either alone or along with being displayed on the mobile computing device. In this regard, the mobile computing device may be used to control display on a separate video device (e.g., a video display device in a courtroom, a video display device in a conference room with several participants, a video display device in a remote location, etc.).

In some examples, the data produced by the web-based software application is viewable on a plurality of mobile computing devices. A predetermined gesture on a hyperlinked line may initiate identification of desired video, may identify the elapsed time within that video, fetch and begin streaming the video at that time back to the mobile device, and finally begin scrolling the transcript in synchronization with remainder of the video as it plays. In these examples, a plurality of mobile computing devices may be used by multiple users, and playback may be provided via an independent display device associated with the remote server where data is stored. The web-based software application may have full search functionality for data accessible to the web-based software application. The web-based software application also may allow users to log identity (e.g., name, password, firm, mobile device serial number, phone number, etc.) and keeps record of multimedia files accessed, the portion of the transcript that would correspond to those segments viewed, and the individual who made/approved the designation.

Mobile Computing Device Software

A mobile computing device runs software for transcript management. First, the mobile computing device software has logic configured to communicate with the web application running on the hosting server. This communication allows transfer of a synchronization index to the mobile computing device. As described above, the web application ingests transcripts of a number of formats, then parses the data for re-formatting into an xml-type synchronization index. This xml-type synchronization index is then communicated to the mobile computing device, and the logic of the mobile computing device software operates to display the text of the synchronization index on the viewing screen.

The mobile computing device software includes logic to present the text of the synchronization index to the user in a

display of a multiplicity of text lines. When viewed in synchronicity with multimedia content, the text display is rendered in a smoothly scrolling teleprompter-type display. To denote the point within the multiplicity of text lines that corresponds to the multimedia, there is a position indicator. An appropriate placement of the position indicator is approximately five lines of text from the top of the text display. The position indicator may be a rectangular, semi-transparent graphical element of a predetermined color that is layered beneath the text. The purpose of the position indicator is to allow the reader to easily and quickly determine, when multimedia is playing, the line in the transcript that corresponds at a given point in time.

As one display option, the text scrolls, while the position indicator remains static. As the end of a line of text is reached within the multimedia, the multiplicity of text lines smoothly scrolls to re-position the next line of text into the area of the position indicator, while the position indicator remains static.

Alternatively, the display of a multiplicity of text lines may remain static while the position indicator descends through the text one line at a time. In this view, the position indicator begins at the top of the block of text lines and descends through the lines. When the position indicator reaches the bottom of the block of text lines, the block of text lines is refreshed, and the position indicator begins again at the top of the refreshed block of text lines.

With the scrolling text view, the text is synchronously displayed with the multimedia. The user may perform a gesture to scroll through the transcript. For example, on an iPad, a bottom-to-top drag (or swipe or flick) on the transcript will scroll to succeeding text lines or pages. This is similar to the way users may be accustomed to scrolling through text on a web page delivered within the Safari web browser present on iPad and iPhone mobile computing devices, either using the touch sensitive viewing screen or a multi-touch surface apparatus to accept gestures.

The user may select settings to determine the behavior of the video when bottom-to-top swipe is performed to read succeeding transcript pages. In the first setting, if multimedia is playing and a bottom-to-top swipe gesture is performed, the multimedia will pause, and the transcript's scroll to succeeding pages will be controlled by succeeding vertically oriented swipes or gestures. Because the user has now navigated away from the point at which the video was paused, the user may elect to begin playing the multimedia that corresponds to the text now residing within the position indicator, or, in the alternative, the user can elect to "re-sync" the transcript to where the multimedia was paused. This election is made in one or more graphical buttons, which may be placed on or near the rightmost portion of the position indicator. For example, when a user has navigated downward in the text, thereby pausing the video, one button may be labeled "play here" while another button may be labeled "re-sync/go back." The "play here" button causes the text to become most important, meaning that the text within the position indicator will cause the video to scrub to the correct location and begin playing. The "re-sync/go back" button will cause the video to become the navigational aid or bookmark, causing the video to resume play where it was paused, and the transcript will be refreshed to place the correct text back into the position indicator. With these two options, a user can use the text to navigate the video, or the video to navigate the text.

The user may also elect to begin multimedia playback from any line of text, even if that line is not congruous with the position indicator. To do so, a preselected gesture applied to a line of text is assigned to play multimedia. This gesture may be a swipe, a tap, a double-tap, a swipe and tap, a triple-tap, or any other gesture the user may select to associate with the playback function. This is helpful, for instance, when a user is playing multimedia and desires to view other text, but keep the multimedia playing in the meantime. The user may set a setting to, upon a gesture to view succeeding pages of text, keep the multimedia playing. While that media is playing, albeit now not in synchronous view with the transcript, a new play location can be found with the text, and the new multimedia playing location can be accessed with the selected gesture. While the video plays, the user can use the "re-sync/go back" button to instruct the text to re-coordinate with the playing position of the video.

Next, the mobile computing device software includes logic for facility to scrub through the text and multimedia via a navigational scrub bar. This navigational scrub bar is preferably visible at the bottom of the text display. It comprises a graphical representation of a time duration t=x to t=z, and a graphical element as a place marker to mark the position t=y between t=x and t=z. If the navigational scrub bar comprises the entirety of the video, x=0 and z=end. If the navigational scrub bar does not comprise the entirety of the video, but only a portion thereof as adjusted by the user to focus on less than all of the available video, t=x is earlier than t=z. The logic enables the user to scrub through the video and text by adjusting the location of the place marker. The place marker can be moved by corresponding input on a touch sensitive display screen, for example by using a finger to slide the place marker to a location on the navigational scrub bar.

Advantageously, when the place marker is moved, the logic achieves near simultaneous coordination between the multimedia being displayed and the corresponding text. To the user, the two appear to be inextricably linked, providing a seamless integration between scrubbing text and multimedia on a mobile computing device. Such near simultaneous coordination between the multimedia being displayed and the corresponding text is preferable in the circumstance where the multimedia content resides in memory on the mobile computing device, which the mobile computing device's processor can access with low latency, as opposed to the instance when multimedia is being streamed to the mobile computing device. For streamed multimedia, inferior data communication speeds may temporarily interrupt a seamless video display, in which case temporary reversion to an audio-only stream may still provide the near simultaneous coordination between media and text the user desires.

The term "near simultaneous coordination" should be understood to be as simultaneous as can be achieved given the computing constraints of a particular mobile computing device and, described above, the speed at which data can be transmitted to the mobile computing device. In some examples, the multimedia resides on the mobile computing device and the coordination between text and multimedia may be a fraction of a second, a delay length being virtually imperceptible to the user. The lower the latency able to be achieved, the better the user experience.

The function of the logic for the navigational scrub bar may provide a heretofore unavailable user convenience in simultaneously navigating synchronous text and multimedia on a mobile computing device.

Next, the mobile computing device software includes logic for facility to select a word or range of words, apply certain attributes to them, and save those attributes. For example, in a deposition transcript, as described above, the user may select a "page:line to page:line" range, assign a color to it, assign it an issue name, and attach a note to be associated with the selected text. This process is known in the legal industry as issue coding a transcript.

In some implementations, on the Apple iPad a double-tap gesture on a word will cause a pop-up with handles to refine the range of the text to be selected and with options for the user. Those options include ability to select a color, assign an issue name, create a new issue name, provide a note, copy, copy to an email, and so on. Generally, the user is provided facility, via a series of pop-ups, to perform a multiplicity of annotations or edits to the range of text selected.

These transcript manipulations can be saved to the memory of the mobile computing device, and they can also be communicated back to the web application on the hosting server. Later, succeeding users may access the revised synchronization index, thereby achieving a collaborative work environment.

Once an annotation has been made, for example a range of text being highlighted in the color yellow and assigned to the issue group "Plaintiff's direct designation," that yellow highlight will persist with that text any time the user has selected its display. In addition, since that text corresponds to a discrete portion of multimedia, the user may optionally be provided the facility to locate that yellow annotation by reference to the navigational scrub bar as well. With reference to FIG. **19**, another graphical element, for example a hatched rectangle, labeled **30**, may be provided either on the navigational scrub bar, or above it, or below it to indicate a corresponding annotation in the text. In this example, the user may look to the navigational scrub bar and would see a hatched rectangle that corresponds to the highlighted text. In this fashion, the user can quickly determine by looking at the navigational scrub bar to determine where highlighted portions of the text reside, without necessarily needing to view or scroll through the entirety of the text transcript. As shown in FIG. **19**, other graphical elements (e.g., graphical element **31**) may be displayed to indicate other highlighted/designated portions of the text transcript. The graph elements **30** and **31** may be displayed differently to indicate that the highlights/designations were made by different users, that the highlights/designations correspond to different issues, or that the highlights/designations were made at different times.

Further, the mobile computing device software includes logic for facility to sequence pre-selected "page:line to page:line" ranges of text and associated multimedia, to the exclusion of other text. For example, a user may have ten different issue codes (with each being assigned its own color), each having a multiplicity of page:line ranges associated with them. The user may elect to view only those page:line ranges that correspond to, say, issues 1, 3 and 7. In other words, any text not included within those issues would not be seen. The corresponding multimedia plays as well, skipping those portions of text not selected, and jumping as seamlessly as possible to the multimedia location corresponding to the succeeding selected text. As a consequence, all visible text would have an associated highlighting color, and the entirety of the refreshed navigational scrub bar would have at any discrete time at least one color. In this fashion, the user can very quickly determine from the navigational scrub bar the total run duration for the selected issues, the relative time duration expended by each discrete issue, concentrations of one issue relative to another along the time spectrum, and so on.

Sequencing of video clips also allows the attorney to very closely approximate the multimedia he intends to display to the judge or a jury, with the advantages being that no cumbersome trial presentation software is required, that no video editing expertise is required, that only a mobile computing device is required, that the multimedia can be shared with other users, say a legal client, because the multimedia is capable of being streamed to any validated mobile computing device by the streaming server, and so on.

In some examples, once the user has selected that sequence of video clips desired, the logic of the mobile computing device may be configured to output a load file intended to be used for creating video clips within trial presentation support software applications, such as SanctionII with a StartPage.StartLine+EndPage.EndLine format.

In some implementations, and as described above for the web application, the mobile computing device software also includes logic to calculate a duration list, without necessity of creating video clips, by performing calculations from the synchronization index itself. For example, if a user annotates a page:line range within a transcript, the software examines the synchronization index to compute the time difference between EndPage.EndLine and StartPage.StartLine. In this manner, computations can be output for each annotation, for all annotations that comprise one issue, for merged issues, for more than one issue, and for the totality of all annotations. This may be particularly useful when used in conjunction with the above described logic for facility to sequence pre-selected ranges of text and associated multimedia.

As described above for the web application, the mobile computing device software also includes logic to perform text searches. The user may elect to perform a text search on one synchronization index, on a multiplicity of synchronization indexes, or on an entire universe of synchronization indexes.

The mobile computing device software may also include logic to determine text font, size, color, and other attributes. In the context of a legal transcript, it may be particularly important that any such changes not affect the user's ability to determine the correct page:line reference should that portion of the transcript need to be cited in a legal paper or to the court. One way to ensure line breaks of the original transcript are ascertainable, even if font sizing causes a line wrap, is to insert a selected character, such as a relatively unobtrusive red-colored pipe character, at the end of each line which, when touched, reveals a page:line reference. In this manner, font size can be increased to cause line wraps but the user can still simply access a page:line reference.

Moreover, it may be advantageous to employ logic to ensure the transcript can be read in a comprehensible format. For example, in a legal transcript, hard returns between lines of text attributable to a certain speaker should be retained. A line tagged as a question by an attorney, often begun with the characters "Q:" should never be confused with the witness's answer, which lines may begin with the characters "A:" or with an indication of the witness's name. To the extent possible, the logic should parse questions from answers, and perhaps allow the user to apply certain attributes to only certain portions of the transcript. An example would be a deposition transcript, where the reader may more easily read and understand the content if all questions or attorney statements are in bold text, whereas all statements or answers by the witness remain in a non-bold type font. Other default font characteristics may be desirable and may be specified within the synchronization index, for example tagging all speech by one user as a pre-selected color.

The mobile computing device software may also include logic to receive only that content that a user is authorized to receive. A user of a mobile computing device may utilize a synchronization index to view the text of a deposition transcript. In some circumstances, attorneys may designate certain portions of the transcript as Confidential, Restricted Confidential, or Attorney's Eyes Only, categories typically defined by the court in a protective order that limits the individuals who may rightfully access certain testimony. In

these instances an administrator, via the web application, manages a set of permissions unique to each user within the administrator's workgroup. In this fashion, an administrator may utilize the synchronization index to issue code those transcript sections that might be, for example, Confidential, Restricted Confidential, or Attorney's Eyes Only. A subsequent user may not be assigned full administrative privileges, but may be granted access to the transcript including sections issue coded Confidential, but excluding sections coded Restricted Confidential or Attorney's Eyes Only. For this user, the logic of the mobile computing device software masks or otherwise redacts those portions of the text that correspond to transcript sections he is not authorized to see. In coordination, the logic also prevents that user from accessing multimedia that would correspond to transcript sections he is not authorized to see.

In circumstances where the video upon playback reaches a point for which access is limited by, say a Restricted Confidential designation, the video would seamlessly play while omitting the area of limited access. In other words, video playback stops at a section for which access is limited and immediately resumes at a point after that section of limited access. Optionally, an audio indicator of limited duration, for example a short ping, can be inserted to audibly indicate the omission of certain multimedia content and corresponding text.

Relatedly, the mobile computing device software may also include logic to ensure the delivery of multimedia and synchronization indexes only to authenticated users by an authentication routine, which may include encryption. That is, the mobile computing device, before receiving a synchronization index or multimedia from either the hosting server or the multimedia server, needs to be authenticated in an authentication protocol. Thereafter, the content may optionally be encrypted and communicated to the mobile computing device. Such security may be important in certain circumstances, such as legal proceedings where the parties need to ensure access is provided only to specific individuals, and that any access can be logged and verified as having occurred. Data encryption techniques may be employed to achieve high levels of security and accountability.

Next, the mobile computing device software may also contain logic to play multimedia at a speed that is greater than normal speed. It is possible for multimedia to be consumed and understood more easily, and with a higher level of retention of the material, if a user reads text at the same time audio is available. The logic that controls playback speed allows the user, via a GUI, to select a playback speed incrementally faster, or slower, than a regular playback speed (e.g. −2.0x, −1.9x, −1.8x, −1.7x, −1.6x, −1.5x, −1.4x, −1.3x, −1.2x, −1.1x, 1x, 1.1x, 1.2x, 1.3x, 1.4x, 1.5x, 1.6x, 1.7x, 1.8x, 1.9x, 2x, where x is the normal playback speed.) The user may also be provided the option to keep the pitch of the video equivalent to that of normal playback speed, which aids the user in comprehending human speech within a regular pitch range, but at increased speed. To accomplish faster than normal playback speeds, the multimedia may be played from memory resident on the mobile computing device, for example in flash memory or cached in RAM from multimedia that is streamed to the mobile computing device from a multimedia streaming server. With availability of sufficient data transfer speeds between a multimedia server and the mobile computing device, faster than normal playback speeds may also be accomplished.

The logic of the mobile computing device software may also be configured to negotiate among several multimedia variant playlists to select the most appropriate bitrate and/or video dimensions depending on the mobile computing device of the user, the wireless connectivity speed available, and the playback option selected. For example, if the user's mobile computing device has limited connectivity speed and the user has elected to play the multimedia at 2x speed, the multimedia server may not be able to deliver the multimedia at high bitrate and large video dimension without pauses, dropouts or the like, while the multimedia caches on the mobile computing device. Accordingly, logic of the mobile computing device software may negotiate down to a low-bitrate audio only stream available within the variant playlist, which facilitates the ability of more content to be cached to the mobile computing device more quickly thereby providing the user uninterrupted playback of audio at his selected 2x playback speed.

Next, the mobile computing device software may also include logic to cause the multimedia to play in full screen mode upon a gesture and, upon subsequent gesture, retreat back into a pre-configured location for use with synchronous text display. If, for example, the viewing screen is apportioned according to the layout of FIG. **3**, the multimedia display area resides in a fixed location at the upper left of the viewing area. To send the video to occupy the full viewing area, a gesture, for example a pinch out (a two finger reverse pinch), will expand the video to full screen. To return the video to its original location, a pinch gesture, or similar, may be used.

The mobile computing device software may also include logic configured to receive a realtime text feed (or other temporary or draft transcript without having been proofread and corrected for errors) from a court reporter or stenographer during the taking of testimony, for example during a deposition or a court proceeding. Common computer assisted translation (CAT) systems may be configured to broadcast a realtime text feed, including via a wireless LAN, and the logic of the mobile computing device software may be configured to wirelessly receive such broadcast. The realtime feed is then displayed on the viewing screen of the mobile computing device, and the annotation functionality, as described above for issue coding, may be applied to the draft transcript. It may be advantageous to utilize this logic within an overall system for transcript management, where the temporary transcript, and any user annotations on a mobile computing device, are communicated back to a web application. Later, the temporary transcript can be replaced by the final transcript in the manner that the annotations made on the draft will match the correct location within the final transcript. Thereafter, the final transcript can be delivered back to the user for use as a synchronization index, as has been described throughout.

The logic configured to receive a realtime text feed may allow a substantially wire-free deposition workspace, it allows a court reporter to conveniently carry and distribute mobile computing devices to deposition attendees to receive a realtime text feed, it allows an ease of use and ease of configurability not presently available in the court reporting industry, for example by use of an intuitive annotation functionality user interface, it makes consumption of realtime text transcription services more simple, thereby increasing the likelihood that such services will be utilized (and thereby providing additional revenue for court reporters with the professional ability to transcribe at realtime speeds), and it meets the further long felt but unmet need of providing an overall enhanced user experience for receipt of realtime text transcription services on a mobile computing device.

Each of the aforementioned elements of logic for operation on a mobile computing device may enhance the overall user experience, with the combination of such logic providing

heretofore unavailable functionality for use of text-synchronized multimedia on a mobile computing device. The user's workflow and efficiency in reviewing transcripts on a mobile computing device may be greatly improved.

While examples have been often described in the context of text synchronized multimedia delivery for legal testimony and corresponding video, the described techniques may be adapted for many other commercial uses and is not intended to be limited for use within the legal industry. By way of non-limiting examples, the following applications of the described technique are intended to be possible without departing from the spirit of the disclosure.

Other Applications of the Embodiments

Music

The sale or rental of music on mobile computing devices accounts for billions of dollars of revenue for those who have developed interfaces for distributing music and other multimedia. For example, Apple Inc.'s iTunes software has found considerable commercial success because it provides a positive user experience and provides convenient access to an extensive library of multimedia content for purchase or rental. In light of that commercial success, Apple and its competitors need features to set their multimedia distribution systems apart from others, making them more interesting or more functional for users.

For example, the overall user experience sways a consumer and his purchasing habits. It is frequently the case that a convenient system will find more users than an inconvenient one, and a system with many functional options for the user will find more users than one with limited user options. Each additional feature has an impact on overall commercial success. Apple's CoverFlow within iTunes (conceptually expanded upon within the Apple OS-X Snow Leopard operating system), for example, simply makes album art, the graphic image comprising the front of a record album or the cover of a CD's packaging, available to the consumer as a method to quickly shuffle from one album, or set of songs, to another album. This functionality is said to enhance the user's overall experience with using Apple's mobile computing devices—iPods, iPhones, iPads and the like—and thus has increased the likelihood that a consumer will purchase multimedia for use on those devices as well as the devices themselves.

Accordingly, an object of this aspect of the present disclosure is to enhance the overall user experience in using or consuming multimedia by providing a synchronization index to accompany multimedia, providing the user an ability to smoothly and substantially synchronously scrub through the multimedia using written words as a roadmap. It may be advantageous, for example, to offer a system for a mobile computing device that allows lyrics to be delivered with music in a fashion that a particular line in the lyrics can be used to advance the music to that specific point within the song. The described techniques contribute greatly to the functionality of a multimedia delivery system, such as iTunes or its competitors, and therefore has a very positive impact on the overall user experience, ultimately translating into increased commercial success by way of sales of multimedia and the mobile computing devices sold to play the multimedia.

By way of example for the music industry, an artist records a song and the song is encoded into a common electronic format, including .mp3, .wav, AAC or a number of others. A software application can be used as a synchronization index generator to synchronize the lyrics to the song and output a synchronization index. The synchronization index, or database structure, may be a formatted .mdb file, with each lyric line receiving a timestamp corresponding to the time at which a particular word is heard. Using the web application, the mdb format is parsed and reformatted into an xml-type format. The synchronization index and information about the song to which it is associated is communicated to a remote server, for example a server accessible by Apple's iTunes, or the web application of the present disclosure. A user then uses a mobile computing device to communicate with the remote server to access the synchronization index and retrieve the associated song.

Once the synchronization index has been communicated to the mobile computing device, a hierarchical seek order may be employed by the mobile computing device to retrieve multimedia. For example, when a synchronization index refers to a song, that song may reside on the mobile computing device already. The software on the mobile computing device first inspects the mobile computing device for the presence of the song. If the song is found, it is played with the synchronization index. If the song is not found resident on the mobile computing device, a subsequent step may be to seek for the song resident on a device within a network accessible by a WiFi connection (for example a local area network of computers within one's home), and if found, communicated from that device on the network to the mobile computing device for playback. Next, if the song still has not been found, the software may seek for the song in a remote location accessible by internet connection or accessible by 3G or telephone/data network, and so on until the correct song can be located and delivered for playback on the mobile computing device. A user may set preferences to choose the highest bandwidth connection for highest quality multimedia.

As the song plays on the mobile computing device, lyrics display in a synchronous, smoothly scrolling teleprompter-type fashion. Each line of lyrics is, preferably, linked to a specific time within the song. A predetermined gesture (e.g., a swipe, a double-tap, a triple-tap, or similar, or movement of the line of lyrics to a static position indicator to indicate a desired playback location) jumps the song to that time of elapsed duration.

Some implementations include a multiplicity of synchronization indexes that are aggregated for search to provide an extensive library or database of text-searchable song lyrics. One example is an album of songs and corresponding lyrics, as one may find printed upon a folded insert accompanying music distributed on a CD. Another example is a library of lyrics, comprising hundreds or thousands of songs, adapted for use and search from, say, Apple's iTunes. For example, a user may search for a particular phrase from a song. The library of lyrics would be searched for a match, and the matches, with the synchronization index or a portion thereof, would be returned to the user. Optionally, the search result may also include data such as an artist name, a song title, an album name or image, a recording date, and so on to allow the user to locate a particular song. Because a synchronization index is returned, the user may jump directly to the specific part of the song associated with the lyric in the synchronization index, and a song preview may begin to play from that point for a predetermined, short duration that is less than the duration of the entire song. Advantageously, the user may more easily determine if that is the song desired, and then complete a purchase, a download or a rental of the song. The user may also be exposed to multiple artists' renditions of the same song, allowing more song purchase options for the user.

In some examples, a search for text would access a complete text library (e.g., hosted by Apple, Google, Microsoft,

Amazon, or similar distributor of large libraries of multimedia content), return the hits, determine whether the identified song resides locally on the device, and, if not, provide a short stream of the song, with a solicitation to purchase the song or album. The same functionality applies to audio/visual books and movies, among other uses, without departing from the scope of the present disclosure.

Moreover, use of the described techniques for music may overcome the pitfall of karaoke-type closed captioning that occurs as a result of a limited number of text words being able to be displayed at once, whereas in certain circumstances a more complete text transcript would be preferable. For instance, song lyrics have the characteristics of poetry, or a complete story. The context of the words within the overall composition may have meaning to the artists, or to the reader, when read as a whole, rather than one line at a time or a few words at a time.

In addition, copyright holders for music may find it advantageous to distribute music with a synchronization index as opposed to just the music alone. Users are provided enhanced functionality with the ability to interact with and comprehend lyrics. Copyright holders are presented with a new opportunity for a revenue stream, wherein delivery of a synchronization index with music may command a monetary premium over the music alone, as well as a way to discourage uses of non-authorized works or content. If a user is certain the synchronization index purchased from the copyright holder of the music is guaranteed to be accurate in textual content and in the time links utilized to achieve synchronization between text and multimedia, the user may avoid alternate works that do not have such guarantees.

The described techniques may solve the problem of conveniently locating song lyrics from a mobile computing device, and then achieving synchronous playback of a song and its lyrics on a mobile computing device.

Movies and Motion Pictures

In another implementation, the multimedia may be a film, movie, motion picture, theatrical release, musical, music video, movie preview or trailer, or other video generally consumed for entertainment or used for documentary purposes. The synchronization index in this example comprises a screenplay, which may have spoken text, song lyrics, and other non-spoken words that the author may intend to be displayed, for example a screenwriter wishing to provide the audience the experience of reading his written direction cues for display with the video for study of how such cues were theatrically executed in the film itself. Screenplay authors can provide heretofore unavailable convenience for film industry professionals as well as new audiences. Screenplay authors generally do not have a broad consumer base for their written work product outside of industry-specific professionals, and the described techniques may allow a new consumer base to appreciate those written works of authorship, all with the additional benefit of being synchronously viewed with the resultant movie and theatric execution.

Moreover, another feature is provided by the present disclosure in that DVDs, Blu-ray discs and the like have typically been navigated by chaptering information included on the recording media that can be read by playback devices. These chapters have historically been used to navigate to preselected portions within the movie, such as may correspond to an Act or a Scene. For example, a movie may have contained ten or twenty discrete chapters, but typically not many more, and certainly not an order of magnitude more, which possibility is provided here for the first time.

With streaming media becoming more prevalent, however, consumers require something other than mere chaptering information for convenient access to the multimedia. With the described techniques, the synchronization index presents opportunity to apply timestamps to every word, creating hundreds, or thousands of "micro-chapters" that the user can use for nearly immediate, non-linear access to virtually any point within a movie. Legacy chaptering information can also be retained, as the synchronization index is not limited to spoken words, giving the producer a complete palette of navigation options to provide the consumer, including a table of contents and full-text search-ability.

Another advantage of the present disclosure is that the system allows the ability to text-search entire multimedia libraries. This allows a user to quickly access and watch selected scenes, with the result being that users rely more upon a cloud computing-type content distribution model wherein the entities providing those services, often on a subscription based business model, will retain paying members and the resultant revenue stream. The system also enhances the user experience of consuming multimedia, particularly on mobile computing devices, a factor that tends to increase market share for multimedia content service providers, such as Netflix or Apple sales through iTunes.

In addition, the system allows search criteria to be applied across multiple films with content from the synchronization index having the potential to be associated with other metadata for search purposes. For example, it is contemplated that a user may perform a search based on an actor's name, or a character's name, and a line spoken within a movie, without the user having to necessarily recall or search for the name of the movie itself. A search result, with appropriate metadata and tagging applied to the synchronization index, allows a user to access the exact scene desired.

In contrast, a common model for such searches is a search performed on the YouTube.com website for hosting video. With the YouTube model, millions of video clips are hosted which have been posted by thousands and thousands of disparate users, and the searcher finds the relevant scene only if the user posting the content happened to add the correct words to the title of the clip or as keywords associated with the uploaded video. The YouTube model for finding relevant and interesting video content, particularly for commercial films, is rife with copyright infringement and the potential therefor, with content owners needing to vigilantly police a multiplicity of hosting locations containing their own material and then follow procedures with those website operators to seek removal of the material due to copyright violations. Movie studios and other copyright owners are faced with the unpleasant prospect of having the content removed, thus potentially alienating a portion of their fan base who view content within those online communities and socially interact with other users, or leaving the content available but suffering economic loss due to 1) advertising losses, in that advertisers pay hosting services like YouTube based on the traffic generated, whereas that traffic often would not exist but for multimedia content users' desire to view interesting content, such as newly released films and so on; 2) the inability to control the user's experience; 3) the inability to display advertising of the copyright owner's choosing, be it for other movies it produces or distributes, for goods, for services, or for any other type of promotional, branding or goodwill enhancement; 4) lost licensing fees; 5) social networking interactions built upon common interest in movies, music, or other multimedia; and so on.

The described techniques provide a multimedia copyright owner the facility to make an entire film available as streaming media to a mobile computing device, and searchable via the synchronization index. Once a user performs a search, the

user's identity can be verified to determine if he ought to be granted full access to the multimedia, say by having a current paid subscription with the multimedia content provider. If the user has no subscription, and thus ought not be provided unlimited access to the multimedia, it may be advantageous to offer the user limited access, or preview access, to, say, a 30-240 second clip only, thereby reducing incentive for searchers to hunt "unauthorized" content on unauthorized distribution channels. The described techniques incentivize users to maintain paid subscriptions to content providers in return for convenient, searchable, "always on" full access to their content. The modern mobile computing device user desires such convenient access.

Moreover, for the system of the present disclosure it may be desirable to increase the amount of multimedia with synchronization indexes. One may leverage existing synchronization index-type information for use with the system of the present disclosure by de-multiplexing closed captioned data from multimedia, or by transcoding existing closed captioned data sets. In this fashion, the web application, by the file format and data parsing logic **6-8**, may re-purpose closed captioned data formats into an xml-type synchronization index. Closed caption file types suitable for this transformation include: SAMI (Synchronized Accessible Media Interchange), SMIL—(Synchronized Multimedia Integration Language), SubViewer (*.SUB), SubRip (*.SRT), .SBV, Adobe Encore DVD (*.txt), Advanced SubStation Alpha (*.ass), AQTitle (*.aqt), Captions 32 (*.txt), Captions DAT (*.dat), Captions DAT Text (*.dat), Captions Inc. (*.txt), Cheetah (*.asc), CPC-600 (*.txt), DKS Subtitle Format (*.dks), DVD Junior (*.txt), DVD Subtitle System (*.txt), DVDSubtitle (*.sub), FAB Subtitler (*.txt), IAuthor Script (*.txt), Inscriber CG (*.txt), JACOSub 2.7+(*.jss; *.js), Karaoke Lyrics LRC (*.lrc), Karaoke Lyrics VKT (*.vkt), KoalaPlayer (*.txt) (equal to one of the variations of TMPlayer), MAC DVD Studio Pro (*.txt), MacSUB (*.scr), MicroDVD (*.sub), MPlayer (*.mpl), MPlayer2, (*.mpl), MPSub (*.sub), OVR Script (*.ovr), Panimator (*.pan), Philips SVCD Designer (*.sub), Phoenix Japanimation Society (*.pjs), Pinnacle Impression (*.txt), PowerDivX (*.psb), PowerPixel (*.txt), QuickTime Text (*.txt), RealTime (*.rt), SAMI Captioning (*.smi), Sasami Script (*.s2k), SBT (*.sbt), Sofni (*.sub), Softitler RTF (*.rtf), SonicDVD Creator (*.sub), Sonic Scenarist (*.sst), Spruce DVDMaestro (*.son), Spruce Subtitle File (*.stl), Stream SubText Player (*.sst), Stream SubText Script (*.ssts), SubCreator 1.x (*.txt), SubRip (*.srt), SubSonic (*.sub), SubStation Alpha (*.ssa), SubViewer 1.0 (*.sub), SubViewer 2.0 (*.sub), TMPlayer (*.txt) (five different variations), Turbo Titler (*.txt), Ulead DVD Workshop 2.0 (*.txt), ViPlay Subtitle File (*.vsf), ZeroG (*.zeg).

Because existing closed captioned data sets may be old or inaccurate, users may modify the transcriptions as one would in making errata corrections to a deposition transcript. It may be advantageous to employ an open, wiki-style ability for a multiplicity of users to correct transcriptions. The result is that users are drawn in ever closer to the multimedia that attracts their interest, benefitting multimedia owners and creators as well as subsequent users and consumers.

As is evident, the present described techniques may contribute to an enhanced overall user experience, and may enhance commercial success and viability with respect to multimedia sales, content delivery subscriptions, and mobile computing device sales.

Educational Content and Regulatory Compliance

Yet another use for the described techniques is use for educational multimedia content and for access to multimedia created by or distributed by government, including multimedia whose distribution must meet rules and regulations for accessibility by disabled persons. There presently exists a large body of multimedia that is configured to meet rules and regulations for accessibility by disabled persons, however extensive use of closed captioning, with its many shortcomings set out above, for such compliance does not adequately address viewership of such multimedia on mobile computing devices. Mobile computing devices often have viewing screens that may be too small to accommodate legible text superimposed over video, they are often simply not configured to receive such closed captioned text, and the video files themselves when being transcoded or re-formatted for streaming media delivery unnecessarily strip or remove closed captioned text that may have originally provided regulatory compliance.

With the described techniques, multimedia content providers can provide a heretofore unavailable convenience for disabled users of mobile computing devices in a way that meets the requirements and intent of Section 508 Amendment to the Rehabilitation Act of 1973 (29 U.S.C. §794d), and others.

Educational content distributed by schools, universities, research institutions and the like can be consumed in multiple languages, as a synchronization index may allow the user to elect one of several language settings. Additionally, comprehension of content can be vastly improved as many studies indicate comprehension levels increase when users hear and read content at the same time. Moreover, the described techniques may facilitate learning, literacy initiatives, educational instruction, and they do so in a manner that mobile computing devices, with their increasing ubiquity, can be utilized for such worthwhile societal betterment objectives.

Voice-to-Text Voicemail and Telephony Recording

In another example, the multimedia may be a voicemail and the synchronization index may contain a transcription thereof. With the increasing use of mobile telephones/smartphones and voicemail services, many users find themselves deluged with lengthy voicemail messages that they do not want to take the time to listen through. New businesses have recently attempted to help solve the problem by applying voice-to-text transcription of voicemail and then sending, for example by email, the transcription of the voicemail to enable the recipient to more quickly understand what the speaker intended to convey. This transcription is often used in conjunction with a "visual voicemail" system.

With the described techniques, users are no longer required to choose to listen to the message or to read the transcription as an either/or proposition, but rather they now have for the first time a convenient way to navigate the voicemail multimedia with a synchronization index on a mobile computing device. For example, voice-to-text transcription software may be employed to create a transcription and in so doing it may apply a timestamp for each word, and in some instances one timestamp for what the software perceives to be the beginning of a word and one timestamp for what it perceives to be the end of the word. Because voice-to-text transcription software engines do not render perfect transcriptions, for a host of reasons, it may be important for the recipient to access the voicemail, but not necessarily from the beginning or with cumbersome fast-forward and rewind transport controls, to confirm the content of the message the sender intended. This is not unlike the use of an errata sheet in the legal context, wherein a user needs to check the transcription for accuracy; a task that is much easier to accomplish with convenient, non-linear access to the underlying multimedia itself, and preferably on a mobile computing device. Use of the described techniques for the aforementioned purpose may

overcome many shortcomings of existing voicemail and transcription systems and services. It is another example of an enhanced user experience and provision of a solution to a long felt but unmet need for the mobile computing device user.

Use of the Synchronization Index and a Mobile Computing Device to Control Multimedia Delivery to a Receiving Device

In some implementations, the synchronization index communicated to the mobile computing device may be used to seek video from a remote server, where the remote server is then asked to begin delivering video at time t1 to a device other than the mobile computing device itself. For example, a consumer of cable or satellite television services may desire to scrub video content that he can watch on a television within his home. In this embodiment, the user views the transcript, or a synchronization index, on the mobile computing device (e.g. Apple iPad), gestures on a transcript display on the iPad intending to scrub video to a certain location, then the request is communicated to the server to instruct it to deliver video at time t1 to destination d1, for example, a selected television within the home that has multimedia content communicated to it via a set-top DVR-type device, then the multimedia is delivered and, optionally, cached in whole or in part. In this manner, the iPad with the synchronization index functions as a sophisticated type of remote control for video content, using a transcript of the media to navigate precisely to a desired viewing location.

In common digital video recorder (DVR) devices, a user can elect to record broadcast television programming to a hard drive integral to the DVR. A user may navigate to a program guide and select content to record at a future time, or the user may elect to record the content being viewed live. Users then play back the multimedia at a later time. During playback, most DVR devices facilitate the ability to fast-forward through the recorded content, for example to avoid commercials, and the ability to rewind. Both fast-forward operations and rewind operations often include variable rate fast-forward and variable rate rewind, allowing the user to fast forward at differing speeds (e.g. 2x, 3x, 4x, −2x, −3x, −4x). These variable rates are intended to allow the user to scrub the video content to access the desired portion of multimedia content. They remain cumbersome in use, however, because they do not allow pinpoint scrubbing to a specific time location, nor is bookmarking, annotation, commenting, or social networking facilitated in most DVR-type devices. In further contrast, use of a synchronization index facilitates navigation in a multiplicity of ways, including navigating to a chapter, scene, or act, navigating by text, skipping discrete time blocks (30 seconds, 1 minute, 2 minutes, 5 minutes, 10 minutes, etc.), and so on.

In some examples, the synchronization index communicated to the mobile computing device may be used 1) to control multimedia resident on the mobile computing device itself, 2) to control multimedia resident on the mobile computing device itself, but then sent for display to a receiving device, 3) to control multimedia not resident on the mobile computing device itself, but stored on a receiving device (for example, if the receiving device was a commercially available home theater DVR-type device containing memory where multimedia has already been stored), or 4) to control multimedia not resident on the mobile computing device itself, and not stored on a receiving device, but communicated to the receiving device by a serving network or multimedia server (for example, if the receiving device had a network connection but little or no resident memory, or if a DVR-type receiving device had memory but had not yet had multimedia communicated to it and stored to memory).

As shown in FIG. **20**, the display screen of the mobile computing device can be partitioned to allow function buttons to be inserted at the bottom of the display. One such button may be configured to cause the mobile computing device to begin an instruction set that causes multimedia to be sent to or to be displayed upon the receiving device. In this manner, the synchronization index can be used to locate a desired viewing location, the desired viewing location can be viewed on the mobile computing device in video viewing area, and then the instruction set can be initiated to cause playback on the receiving device. One such example would be to use an Apple iPad, with a synchronization index and resident multimedia, that communicates using the Apple AirPlay protocol with an AppleTV appliance that, in turn, delivers multimedia to a home entertainment system.

Any number of hardware devices, or hardware/software combinations, may comprise the receiving device. By way of non-limiting example, a receiving device may be a digital video recorder, "DVR" (e.g., TiVo branded DVR appliance, Scientific Atlanta Explorer DVR device, Dish Network DVR, Hughes DirecTV DVR, Motorola DVR, Philips DVR, Polaroid DVR, and so on), a personal video recorder, "PVR", a hardware appliance for receiving cable television or satellite television services, a computer, a television, a smart television, an internet enabled TV (such as the Sony Internet TV), the AppleTV appliance by Apple, Inc., the GoogleTV appliance by Google, a gaming device with facility for receiving multimedia data (e.g., the Sony PlayStation3, Nintendo Wii console, Microsoft's Xbox360), streaming media players (e.g., Roku Streaming Player, Seagate FreeAgent Theater+ HD Media Player, Western Digital TV Live Plus HD Media Player), home theater appliances with facility to receive multimedia communication, and optionally to play Blu-Ray formatted media (e.g., as available from Insignia, LG, Panasonic, Philips, Pioneer, Samsung, Sony, Toshiba, Yamaha, VIZIO), a monitor, or another mobile computing device.

Multimedia may be delivered by any multimedia content distribution method, including by computer network, cable television or satellite television service, subscription multimedia delivery service (e.g., Netflix, Hulu, iTunes, Rhapsody, Spotify, MOG, Napster, Rdio, Grooveshark.com, Pandora.com, alluc.org, talk radio subscription content by radio personality, and so on), peer-to-peer network, Apple AirPlay, Universal Plug and Play ("UPnP", generally defined as a set of networking protocols for primarily residential networks without enterprise class devices that permits networked devices, such as personal computers, printers, Internet gateways, Wi-Fi access points and mobile devices to seamlessly discover each other's presence on the network and establish functional network services for data sharing, communications, and entertainment) and similar methods for delivering multimedia content.

While the term "video on demand" has historically been associated only with the user being able to select the time at which a video may have started to play, the described techniques allow a user to scrub video using a synchronization index, and vice versa, to a specific time within a multimedia file, thereby achieving a heretofore unavailable enhanced user experience.

In another implementation, one mobile computing device can be used to control multimedia delivery to a second mobile computing device. An intended example would be in-vehicle entertainment systems where one mobile computing device would be a master serving other slave mobile computing devices. In practice, a user may download multimedia to a mobile computing device, such as an Apple iPad. That first user, say a parent entering an automobile as a passenger with

children who have mobile computing devices of their own, may broadcast multimedia to the other receiving devices (e.g., for this example, another iPad, the entertainment system within the vehicle, a handheld gaming device, or similar mobile computing device) via an appropriate communication protocol and use the synchronization index to facilitate navigation through the multimedia.

As another example, the system can be used for audio books transmitted to a different receiving device, such as a vehicle's stereo system, or another type of in-vehicle entertainment system with capacity to distribute sound and/or video images. A user may use a mobile computing device, such as the Apple iPad, to read a book on the mobile computing device. Because the text of that book also functions as a synchronization index to the audio book, the reader may insert a bookmark, discontinue reading, move to a different location where reading is impracticable (such as in a car), access the bookmark as part of the synchronization index, and begin the playback of the audio book at the precise location where the reader had stopped reading.

Moreover, the synchronization index comprising the text of the book can reside on the mobile computing device, while the audio portion can be streamed, or streamed and cached, to the mobile computing device, or to the receiving device. In this fashion, the iPad user may take a synchronization index into a vehicle, and direct audio content to be delivered and optionally cached directly to the in-vehicle entertainment system. For example, the in-vehicle entertainment system may be equipped with capacity to communicate wirelessly with a computer network (for example by WiFi, 3G, 4G, Bluetooth, or other wireless connection, such as OnStar). This capacity may be combined with computer memory integral to the in-vehicle entertainment system, for example by a hard drive, flash memory or similar storage. As a result, the in-vehicle entertainment system is in communication with the mobile computing device. Once a synchronization index, or a specific portion thereof, is accessed, the in-vehicle entertainment system can begin automatically downloading and caching corresponding multimedia for use in the vehicle itself. Once the user has finished listening to the audio, the receiving device can communicate back to the mobile communicating device the point at which listening ceased. A bookmark is inserted into the synchronization index at that point, and the next time the user accesses the synchronization index, he can return to the correct point within the synchronization index to either begin reading or to begin a new listening session. In practice, the user utilizes the synchronization index on the mobile computing device to establish non-linear access to corresponding multimedia content in a new, novel way.

With this and other uses, new commercial opportunities are provided for those who control distribution of text-based authored works and for multimedia owners. As an example, consumers have typically purchased either an electronic book for reading on a mobile computing device, or, in the alternative, they have purchased an audiobook. Very few, if any, users have purchased both products, particularly with the full feature set of the described system for use on a mobile computing device. With the described techniques and systems, synchronization indexes and corresponding multimedia can be offered for sale as a functional, inter-related, interactive product with annotation capacity, rather than just text alone or just multimedia alone.

Advertising

Moreover, television broadcasters dislike the functionality of the DVR that allows commercial advertisements to be skipped during time-delayed program playback.

Digital video recorders have been changing the way television programs advertise products. Watching pre-recorded programs allows users to fast-forward through commercials, and some technology allows users to remove commercials entirely. Some features of this type have been controversial, with some major television networks and movie studios claiming they violate copyright and should be banned.

The described techniques may facilitate the exposure to advertising, including from companies whose advertisements would have accompanied the initial broadcast. By using a portion of the mobile computing device's screen, targeted advertisements can be unobtrusively displayed in a way that does not obscure the viewing screen of the multimedia, and in a way that subtly and unobtrusively invites the user's interaction.

As illustrated in FIG. **20**, the iPad display screen can be divided into multiple sections. For example, a section may be allocated for multimedia playback if the user desires to view content on the iPad itself, a section may be allocated for bibliographic data relating to the multimedia or programming content, a section may be allocated for transcript display and manipulation, and a section may be allocated for advertising or commercial content.

Targeted advertising may be delivered to the iPad. Criteria for targeted advertising may include: the user's profile and demographic data, geographic location, media being watched or accessed, media consumption history or previously viewed content, word search history, multimedia stored on the mobile computing device, and so on.

The portion of the iPad screen to display advertising can be periodically refreshed. Advertisements can be text, images, or multimedia. If the mobile computing device with synchronization index is being used in its capacity as a remote control for content on a receiving device, the multimedia can be received on a receiving device and played back without advertising displaying on the viewing monitor, while the advertising content remains on the mobile computing device. Additionally, advertisement on the mobile computing device concurrent with multimedia playback allows the user to interact with the advertisement, for example by clicking an ad or URL to be delivered to a website to receive more information about a company or a product.

For example, the synchronization index may be delivered as metadata to accompany the multimedia. The synchronization index may also provide instructions for the targeted, timed delivery of advertisement to the mobile computing device. These product placement-type advertisements can be very attractive to the user, yet subtle in the way they are delivered and displayed to the user. For example, a television program containing a car chase a given duration into the program may have timed metadata in the synchronization index for the delivery of an advertisement pertaining to the make and model of the car being used in the program. Product placement within multimedia can now be accompanied with a corresponding overt advertisement. With such an ad displaying unobtrusively on the mobile computing device, it increases the likelihood that the user will click through the advertisement to be brought to the website of the advertiser. In this way, the described techniques may make it easier for consumers to access information relevant to their interests or the multimedia content they access.

Another type of advertisement, used often for advertising TV shows on the same channel, places an ad overlay on the bottom of the TV screen, blocking out some of the picture, as was identified, above, as a shortcoming of closed captioning. Media companies refer to these "Banners," or "Logo Bugs," as Secondary Events (**2**E). Similar to the method by which

severe weather warnings have historically been delivered, sometimes these secondary events take up only 5-10% of the screen, but in the extreme, can take up as much as 25% of the viewing area. Some secondary events comprise sound or movement of a graphic across the viewing area, which may be undesirable for the user. Despite the increasing usage of Secondary Events, advertisers are seeking new methods, like advertising as described herein, to market their products in concert with television broadcasts and similar programming without substantially interfering with the users' viewing experience. Advertisers are losing the ability to invade the home, and consumer's minds, and are consequently increasingly forced to wait for an invitation from the consumer. Advertisers and content providers are learning that advertising content customers will be willing to seek out and receive is more likely to impact purchasing decisions. It is that type of advertising facilitated by the described techniques.

Social Networking

As yet another potential advantage, the described techniques may facilitate social networking around multimedia, and present new ways for mobile computing device users to share and recommend multimedia to their network of friends or colleagues.

One way users are provided the facility to interact is in the way that annotations can be created to a synchronization index and shared with others. For example, a user may find the chorus of a particular song to be emotionally moving, and he may wish to share not just that song, but that particular part within the song, with his social network. By creating an annotation to the synchronization index, and then by sharing that annotation, a subsequent user may obtain access to the first user's annotated synchronization index for immediate, non-linear access to the specific part of the song the first user desired to spotlight for discussion.

In practice, a user utilizes the synchronization index on a mobile computing device. An annotation is made, and information concerning the page:line range, issue code, color, attached note, and so on may be stored local to the mobile computing device. This information may also be transmitted back to the web application on the hosting server, along with identifying information about the user, such as the mobile computing device identification number (for example, if an Apple device then the identification can be found in a unique "UDID"), time, user location, and so on. A subsequent user may access the web application on the hosting server, examine annotations to which he has been allowed access, and elect to download those annotations to his own synchronization index. As described above, the user may merge or flatten these annotations with his own, or he may keep a subset and discard a subset, or a combination thereof.

In this manner, a user can select a group of users whose comments, notes and annotations he wishes to receive, to establish a social network. For instance, this functionality may be used by a movie's director, producer, its actors or others to provide notes and commentary, on an ongoing basis, to enhance one's interaction relating to the film. Whereas Blu-ray discs became an attractive media for content delivery due in part to the disc's ability to physically store more data pertaining to the film by way of director's commentaries and so forth, the new feature set described throughout this disclosure may make interaction with one's audience an organic, ongoing process. Movie fans can interact with one another, and filmmakers can interact with consumers.

Similarly, a user may bookmark a part of a synchronization index, and transmit that bookmark as a URL-type deep link to a specific time within multimedia to a subsequent user. Accessing the deep link delivers a subsequent user not only to the correct multimedia but also to the correct location within the multimedia. This is particularly useful in a cloud computing environment, where users are increasingly not interested in managing their own multimedia assets on devices they own so long as they can access the content in another convenient way, for example by streamed media over the internet or wireless connection. These streaming media services, such as Netflix, provide access to vast libraries of content at an affordable price, and, with the described system, become an even more attractive way for users to consume multimedia content and share it, and portions within it, with friends and colleagues.

It is easy to appreciate the multitude of interactions possible between users who enjoy discussing music, movies, television shows, lectures, politics, and all manner of content, and how, with benefit of a mobile computing device and synchronization index, those social interactions can be enhanced.

There has been limited capacity to allow a user of a mobile computing device access to multimedia at a precise location within the multimedia for the purpose of engaging in social networking. The described techniques may address and overcome many of those limitations.

Other uses for a synchronization index and associated multimedia operating on a mobile computing device are legion, and may include movies, music, music videos, news, news archives, audio books, television shows, documentaries, radio re-broadcasts and archives, podcasts, business and corporate events, product launches, corporate leadership speeches, CEO messaging, public disclosures, shareholder meetings, academic uses, educational uses, travelogues, politics and government, court proceedings, legislative sessions, executive speeches, political campaigns, local governments, school boards, regulatory compliance, uses for those with disabilities and compliance with the Section 508 Amendment to the Rehabilitation Act of 1973, medical records transcription, call centers, training, custom applications, foreign language education and learning, motivational speaking, religious instruction, sermons, worship, voice-to-text transcription, voicemail, historical preservation, sports broadcasts, infomercials, commercial advertising, material of children's interest, and many others.

For example, with commenting features of the present disclosure, crowd-sourced multimedia indexing may be achieved. Large groups of users may voluntarily contribute to create a knowledge base for use by others. This same "crowd-sourcing" can be applied to indexing multimedia. One use of crowd-sourcing has been described above in relation to users that text transcribe multimedia, modify the text of a transcription or to adjust timestamps used to synchronize text to multimedia within a synchronization index.

Another use of multimedia indexing is in advertising, where a product's producer seeks to enhance brand awareness. With crowd sourced tagging of multimedia, particularly with a synchronized transcript and commenting functionality, certain brands may be "tagged" by users.

Product placement in the multimedia content may be supported in the embodiments. A corporation may desire to have its goods used, or even highlighted, within a major motion picture and be noticed by the viewer. For example, a producer of goods or services may run an advertising promotion in association with a multimedia or movie producer, whereby the brand owner provides incentives for the consumer to 1) view the multimedia, including for the purpose of finding its products used within the multimedia, 2) "tag" those occurrences of product placement, for example by creating a text

comment or other marker (or "tag", "hit", "vote", "find", "like", "digg", "brand-emoticon", or similar) at the point in the multimedia when the product is used or shown, 3) share those "tags" or comments with one's social networking contacts, and 4) receive from the brand owner an incentive for having tagged its products.

Contests or promotions may be held for the users who tag and share a certain number of times, or who tag and share a certain number of films. It may be that a product is shown multiple times in a film, and if a user is able to tag a threshold number of them (within a pre-defined time range of the product being visible on screen), he may be eligible for sweepstakes contests, drawings or rewards, such as a coupon for free or discounted product, or loyalty points to be spent at a certain store for a certain product. More expensive items may also be used to entice users to tag films for product usage. For example, a car manufacturer may offer a promotion whereby a user who tags a certain number of films becomes eligible for a drawing to win a new vehicle.

This method of advertising in the embodiments has several benefits, including 1) it entices users to watch certain films, or to watch the film more than once, 2) it causes the user to "interact" with the film, and to pay attention to different aspects of it, including commercial aspects, more than would a passive observer viewing for entertainment only, 3) it spreads "tags" among social networks, 4) it encourages users to participate in an advertising methodology by offering rewards, 5) it can be low expense for the advertiser compared to more traditional advertising channels like print, television, or radio, 6) it allows co-branding, 7) it is fun for the user, 8) it is an opt-in, voluntary interaction in which the individual elects to participate (eliminating forced commercial advertising, for example as a bumper multimedia displayed before the multimedia a user desires to view, which is difficult or impossible to opt out of), 9) it leverages the efforts of a multiplicity of users to spread brand presence, and 10) it has the potential to drive consumer behavior by utilizing the psychological phenomenon of social proof.

Films and television programs are replete with product placement, and the disclosure of the present invention provides a convenient, fun way for consumers to "interact" with the multimedia by brand-tagging by using mobile computing devices. Brand-tagging also alleviates challenges to standard advertising, as more DVR users consciously skip overt advertisements forcibly inserted into a broadcast. With streaming media, users dislike a bumper ad being forced upon them before being able to view the content they elected to view, as might be found with increasing frequency in Youtube, Hulu, Justin.tv streams and many others.

By way of example, the following are ripe for brand tagging within multimedia: automobiles, consumer electronics and computers, beverages (colas/carbonated beverages, energy drinks, adult alcoholic beverages (beer, wine, liquor)), clothing and accessories/fashion, airlines, travel destinations, tobacco, restaurants and eateries, foods and snacks, hotels, firearms, radio/television/film/magazines, oil/energy, healthcare/drugs/hygiene, household items/soaps/detergents, and so on.

In practice, one way of implementing such a system includes: issuing a unique identifier, such as "BrandTagID," to the owner of a brand (for example, a randomized string of alphanumeric characters of predetermined length, akin to an encryption key used in the field of encryption); issuing a brand tag graphic or symbol or "BrandGraphic" (which itself may be a graphic, containing a hyperlink); having a user register to obtain a TaggingID (to allow secure registry of the identity of a unique user, for example by a randomized string of characters of predetermined length, akin to an encryption key used in the field of encryption); combining the BrandTagID with the TaggingID, to allow a user a UniqueID that links a specific user to a specific brand; providing facility for a user to leave or deposit a UniqueID at a time $t_x$, that being a discrete time within a multimedia file having a run duration of $t_0$ to $t_{end}$; providing facility for a computer system to receive a UniqueID from a user; and providing facility for a computer system to credit a discrete TaggingID (i.e. associated with a discrete human user) for having placed a UniqueID at a time $t_x$ within a specified multimedia file or associated synchronization index, for example to earn entry into contests or eligibility for prizes or giveaways. The system may also include ability to share a UniqueID with the social networking contacts of the individual associated with the corresponding TaggingID.

For example, User-1 may have a social network of 100 friends or contacts. User-1 applies for a TaggingID, and receives TaggingID=User-1-abcd1234. The "Brand, Inc." sporting goods company applies for a BrandTagID, and receives BrandTagID="Brand, Inc.-xyz789, BrandGraphic=www.brandwebsite.com/graphic.gif, VariableHyperlink=www.brandwebsite.com".

User-1 desires to brand tag for Brand, Inc., so he applies for and receives a UniqueID, which is a mathematical function performed utilizing the TaggingID and the BrandTagID, returning a UniqueID of, say, (encrypted, signed function of) UniqueID="abcd1234*xyz789".

User-1 watches a motion picture and places his UniqueID at a time that is 00:02:31.2 into the movie, when one of the main characters is seen wearing a pair of branded athletic shoes. The computer system places the BrandGraphic at that time within the synchronization index. Users in the social network of User-1 may elect to also view the same motion picture, opting to view the tags and comments left by User-1.

Once User-1 places a UniqueID, a report may be sent to the owner of the BrandTagID, letting the owner know the multimedia in which a tag was placed; the identity of the individual placing the tag, by the TaggingID; and the time/date when the tag was placed.

As a result, the owner of the BrandTagID has the ability to aggregate data about vast numbers of instances of brand occurrence across vast numbers of multimedia files, and it accomplishes this by leveraging the power great numbers of disaggregate users, using mobile devices, who volunteer their time to do it. As additional benefit, those tags are shared within the social networks of the large numbers of users.

In one embodiment, the user may use a mobile computing device to tag multimedia that is played in a location other than on the mobile computing device. For example, a user watches a movie at home that is streamed and received by an appliance, which then communicates the audio and video signals to a home theater and its components, such as an LCD television and speakers. Within this movie, suppose there are twelve companies that have products appearing in the film and that desire users to tag the times at which they appear. Assume each company has a BrandTagID and an associated brand graphic

The user may watch the film via his home theater system and tag brands using his mobile device, such as an iPad. For this example, the mobile device display may be partitioned into sections, wherein one brand graphic appears in one section. The user has a touch-sensitive palette of brands to apply to the multimedia. When that brand (or product, place, person, etc.) appears in the multimedia, performing a gesture on that section, for example tapping the graphic, tags that brand at that time within the multimedia. The user may have the

functionality to adjust the properties of the tag, such as the TimeIn and TimeOut to provide a duration D for the tag. The user may select a predetermined duration to set a tag, for example by associating the creation of a tag with a 0.5 second duration, or the duration of the tag may be set by how long the user performs the gesture. If the product appears on screen for 10 seconds, the user may press and hold the graphic for 10 seconds, and the software will record that action.

The user may be provided facility to tag more than one brand at once. For example, assume a film character uses an Apple iPhone for a phone call for 10 seconds, then walks to a Ford Mustang to continue the conversation for another 20 seconds. The user may press and hold the Apple brand graphic for 10 seconds and then simultaneously tap the Ford brand graphic (inserting the default tag with a duration of 0.5 seconds) and then release the Apple brand graphic after another 20 seconds, resulting in a tag for the Apple iPhone for a duration of 30 seconds. In another embodiment, the mobile computing device may be used to display the multimedia and to perform brand tagging. For example, FIG. **38** illustrates an exemplary layout of a display of a mobile device for brand tagging in multimedia content. The header area **13** displays information about the multimedia in which brand tagging is performed. In addition, the media area **12** shows a display of the video of the multimedia and the text area **14** shows a highlighted portion of a text currently being displayed. In addition, the display may include a section comprising various graphics of selected brands that the user may tag in the multimedia content. For example, when the user recognizes a particular brand on a product, the user may simply click or select the appropriate graphic in this section. In the spirit of this disclosure, this brand tagging functionality may be used alone, or it may be used with other functionality disclosed.

User viewing statistics may also be implemented in the embodiments. For example, the user may see graphing of a number of users viewing a scene for a given duration, offered to select from "most viewed"/"favorite" scenes, view scene recommendation or movie recommendation, for example, in the form of "viewers of this scene have also liked . . . "

## Exemplary Screen Shots of Embodiments

For purposes of illustration, FIGS. **21**-**37** are provided to show exemplary screen shots of potential multimedia content that may be provided by the embodiments. Of note, those skilled in the art will recognize that the embodiments allow for variance of the display sections and/or may allow the user to resize various sections as desired.

The screen shots may contain copyrighted material therein to teach and illustrate how multimedia content may be rendered or displayed on a mobile computing device. All rights in any such copyrighted material, however, remain reserved by the owner of the copyrighted work.

FIG. **21** illustrates an exemplary screen shot of a mobile device for a transcript synchronized to a multimedia audio file. For example, as shown, an audio file of an oral argument and transcript for a U.S. Supreme Court case related to Microsoft versus i4i Ltd. Partnership. In the screen shot, an image illustrating that the content is related to the U.S. Supreme Court is shown in the media area **12**. The header area **13** displays relevant identification of the case, e.g., Microsoft versus i4i Ltd. Partnership. In the example shown, a control bar providing control buttons and progress of the multimedia content may also be provided in the header area **13**. The text area **14** shows a portion of a text transcript of the dialogue of the deposition being displayed.

As described throughout this disclosure, the mobile computing device may control display of the text transcript in the text area **14** in a synchronized manner with the video being displayed in the media area **12**. For example, as shown, the text at line 09 is highlighted to indicate the current location in the transcript relative to playback of the audio file.

In addition, as shown, an advertisement may be provided at the bottom of the text area **14**. The advertisement may appear in the form of one or more banner advertisements. In addition, the advertisement may change based on time, the content of the transcript being shown, etc. Furthermore, a scrub-bar may also be provided at the bottom of the display on the mobile computing device.

FIG. **22** illustrates an exemplary screen shot of a mobile device playing multimedia content and a transcript for education material from an organization and a listing of other courses with multimedia content. For example, as shown, multimedia content for classes or lectures by the ABA may be offered to the user.

In the screen shot, an image indicating the "Patent Reform Act of 2009/2010: Effects on Small Businesses and Startups" from the ABA is shown in the media area **12**. The header area **13** displays relevant identification of the lecture, such as the product code, faculty, date, page count, running time, credit hours, ethics hours, sponsors, topic, and pricing. The text area **14** shows a portion of a text transcript of the dialogue currently being played. Finally, a scrub bar may be provided at the bottom of the display to indicate the progress of the playback and highlighting of text. Moreover, the screen shot may also offer links to other multimedia content files for other courses offered by the institution.

FIG. **23** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. The header area **13** displays a court associated with the deposition, a civil action number associated with the deposition, a name of the deponent in the deposition, a location of the deposition, and the date/time of the deposition. In addition, the media area **12** shows a display of the video of the deposition and the text area **14** shows a highlighted portion of a text transcript of the dialogue of the deposition being displayed. As also shown, the transcript may have an exhibit linked to one or more lines of text, as indicated by an icon, such as the paper clip icon adjacent to lines 02-06 shown in FIG. **23**.

As also shown, the transcript may have an exhibit linked to one or more lines of text, as indicated by an icon, such as the paper clip icon adjacent to lines 02-06 shown in FIG. **24**. Furthermore, a comments section may also be provided in a section of the display on the mobile computing device. The comments section, for example, allows a user or a group of users to record comments about the testimony.

FIG. **25** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript accompanied with a section of the display for showing errata and a thumbnail of an attachment to the transcript. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011.

As also shown, the transcript may have an exhibit linked to one or more lines of text, as indicated by an icon, such as the paper clip icon adjacent to lines 02-06 shown in FIG. **25**. Furthermore, an errata section may also be provided in a section of the display on the mobile computing device. The errata section, for example, allows a user or a group of users to record various errata of the transcript. In the example shown in FIG. **25**, Kevin Anderson on May 23, 2011 changed the word "something" to read—nothing—on line 12. Of note,

the word "something" has been changed to be shown as strikethrough text and the word—nothing—has been inserted in a distinctive manner. For example, as shown, the word—nothing—may be italicized, underlined, or may be displayed with a different font, color, or size.

FIG. **26** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a pop-up window showing a linked exhibit. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the transcript may have an exhibit linked to one or more lines of text, such as an issued U.S. patent. In the example shown, the user has selected or click on the linked exhibit's thumbnail, which has resulted in a pop-up window to display the linked exhibit, i.e., U.S. Pat. No. 6,714,091.

FIG. **27** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section for exhibits linked to the deposition. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the mobile device may provide a listing of available exhibits associated with the case or the deposition. Furthermore, in some embodiments, a cost may be associated with one or more the exhibits. For example, as shown in FIG. **26**, a user may buy or purchase the set of exhibits by selecting or clicking on the "Buy" control button displayed on the mobile device.

FIG. **28** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section showing objections to portions of the testimony by the deponent. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the transcript may have an exhibit linked to one or more lines of text, such as drawing from a U.S. patent. In addition, the mobile computing device may provide a section of the display for objections. For example, as shown, in FIG. **27**, the court overruled an objection by the defendant related to lines 7-13.

FIG. **29** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a summary section on the display. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the display may comprise a summary section. The summary section may indicate various items, such as the Plaintiff's designations, the Defendant's designations, runtime, locations, and locations of errata in the transcript.

FIG. **30** illustrates an exemplary screen shot of a mobile device for a filtered deposition video and transcript with a summary section on the display. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the transcript may be filtered to show only requested portions. In the example shown in FIG. **29**, a thick black line at line 12 indicates that text between lines 13-16 has been filtered from the display. As also shown, a video sequencing bar with a location indicator may be provided above the scrub bar to show relative locations of the requested portions of the deposition.

FIG. **31** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section listing witnesses. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the display may provide links to other witnesses of the case. In some instances, a cost may be associated with retrieving a witness testimony. For example, as shown in FIG. **30**, the testimony for Martha Campbell requires a purchase.

FIG. **32** illustrates an exemplary screen shot of a mobile device playing a news story having a video clip and corresponding text. For example, as shown, a news story from FoxNews regarding the royal wedding is shown.

In the screen shot, an image from the royal wedding is shown in the media area **12**. The header area **13** displays relevant identification of the story, such as the headline and tagline. The text area **14** shows a portion of a text transcript of the dialogue currently being played. In addition, the text area **14** may comprise a link to other content, such as a video of "William and Kate Exchanging Vows." Furthermore, certain portions of text may have a linked exhibit or attachment, as indicated by a paper clip icon shown adjacent to the relevant portion of the text. Finally, a scrub bar may be provided at the bottom of the display to indicate the progress of the playback and highlighting of text.

FIG. **33** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript and a section listing other files available to the user. For example, as shown, multimedia content for "The Glenn Beck Program" may be offered to the user.

In the screen shot, an image indicating the Glenn Beck Program is shown in the media area **12**. The header area **13** displays relevant identification of the story, such as the program's topic, date, and description. The text area **14** shows a portion of a text transcript of the dialogue currently being played. Finally, a scrub bar may be provided at the bottom of the display to indicate the progress of the playback and highlighting of text. Moreover, the screen shot may also offer links to other multimedia content files for the program, such as programs from different months.

FIG. **34** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript from an educational institution. For example, as shown, multimedia content from the Kellogg School Management may be provided to the user.

In the screen shot, an image indicating the speaker as Professor Michael Mazzeo is shown in the media area **12**. The header area **13** displays relevant identification of the speech or lecture, such as the title, speaker, and date. The text area **14** shows a portion of a text transcript of the dialogue currently being played. Finally, a scrub bar may be provided at the bottom of the display to indicate the progress of the playback and highlighting of text.

FIG. **35** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript from a musical group and section listing other available content from the musical group. For example, as shown, multimedia content, such as the song "Abbey Road" by the Beatles may be offered to the user.

In the screen shot, an image indicating the song is shown in the media area **12**. The header area **13** displays relevant identification of the song, such as the title, year, and background. The text area **14** shows a portion of a text transcript of the dialogue currently being played. Finally, a scrub bar may be provided at the bottom of the display to indicate the progress of the playback and highlighting of text. Moreover, the screen shot may also offer links to other multimedia content files for the program, such as different songs or albums also by the Beatles or other artists.

FIG. **36** illustrates an exemplary screen shot of a mobile device playing multimedia content and a transcript for an audio book. For example, as shown, an audio file for the book "Unbroken" by Laura Hillenbrand is shown. In the screen shot, an image illustrating that the content is related to the

book is shown in the media area **12**. The header area **13** displays relevant identification of book, such as the title, author, pages, publisher, and price. In the example shown, a control bar providing control buttons and progress of the multimedia content may also be provided in the header area **13**. The text area **14** shows a portion of a text transcript of the dialogue of the audio currently being played.

As described throughout this disclosure, the mobile computing device may control display of the text transcript in the text area **14** in a synchronized manner with the audio playback. Furthermore, a scrub-bar may also be provided at the bottom of the display on the mobile computing device.

FIG. **37** illustrates an exemplary screen shot of a mobile device playing a movie and a transcript with a section for navigating through the movie's content.

Titles, headers and section divisions within this disclosure are meant as navigational aids and are not meant to limit the scope of the disclosure. While multiple implementations have been illustrated and described in detail, it should be understood that various modifications in system and method design and details of construction are possible without departing from the spirit and scope of the disclosure.

Use of Barcode and a Mobile Computing Device to Retrieve Text Synchronized Multimedia

In yet another example of a printed transcript, a bar code, a 2D bar code or a Quick Response Code (or "OR Code") may be placed at the top of a page, in any margin on the page, or adjacent to a line or range of lines of a transcription of multimedia. A barcode may refer to any form of bar codes, QR codes, lines, dots, dashes, hieroglyphs, patterns, picture identifiers, color permutations, magnetic particle deposition, special character or numeric font usage, logos, faces, or combinations thereof, or any other similar reference that may be scanned or photographed for machine or electronic recognition. In one example shown, a QR Code may be scanned by a mobile computing device (or photographed with a camera integral to the mobile computing device and then deciphered by software on the mobile computing device, as is understood in the art). The software for scanning on the mobile device recognizes the QR Code as a URL-type link. The URL-type link causes software on the mobile computing device to retrieve an electronic copy of the transcript, including with synchronized multimedia. The link may be a deep link to the multimedia, directing the user to a point in the multimedia other than the beginning of the multimedia.

The QR code may comprise a series of alphanumeric characters, sometimes an encrypted or randomized string of alphanumeric characters. In one embodiment, the QR code may reference a client control number. The client control number can be associated with the purchaser of the transcript or other authorized recipient.

In the context of a deposition transcript, the client control number can be associated with at least one attorney, at least one law firm, or at least one litigant, or a preselected group of users. In this fashion, a hardcopy of the transcript can be utilized by an attorney or law firm as has been traditionally done, i.e. by making duplicate hardcopies for use and distribution, but providing the novel and added benefit that each recipient of the hardcopy can conveniently access the electronic transcript and associated multimedia by scanning the QR Code with a mobile computing device. In general, the client control number may function to help identify the users who may be authenticated, and to whom data may properly be delivered.

The QR code may also comprise reference to the synchronization index, or a portion thereof, and the corresponding multimedia, or portion thereof. In this fashion, a user may be directed directly to the desired portion of both the transcript and the associated multimedia.

The user with the hardcopy and mobile computing device may scan the bar code, and the application may communicate with a database to determine whether he is listed among the group of authorized users. If the user is not authenticated, electronic access to the transcript and multimedia can be denied.

User logs may be kept to determine the identity of users of the electronic assets, and usage and access can be monitored and conveniently reported.

As an additional benefit, it is not uncommon in the legal industry for parties to distribute hardcopies of a transcript without properly paying the court reporting firm for the correct number of copies. For example, in multi-party or class action litigation, a group of litigants may attempt to purchase one transcript copy from the court reporting firm, or a limited number of copies, but then share unauthorized photocopies for which the court reporting firm is not compensated.

In this instance, if the user scans the QR Code on the hardcopy of the transcript, and if the user is not already a member of a group that has paid for and can rightfully access the electronic transcript, then the software or software agreement may compel the user to pay for a copy of the transcript. Invoicing and payment can be achieved immediately and electronically. This is an efficient method to electronically distribute transcript copies and to provide electronic access on a mobile computing device to the transcription and associated multimedia.

The client control number may differ for each copy of a transcript sold. That is, each hardcopy of a transcript that is produced, for example by a court reporting firm, may be provided a unique code with a unique client control number. For example, "Code 1" may identify a purchase of a transcript copy by attorney John Doe, at Law Firm X, representing Company A. John Doe may, for instance, seek to utilize his mobile computing device to see deposition testimony beginning on Page 10, Line 1. With the application running on his iPad, he can scan, or photograph, the QR code adjacent that line on that page. When he does so, the application communicates the client control number embedded in the QR code. This communication is done by computer network, which computer network also comprises a computer that references a user database. The database is used to authenticate that the iPad belongs to John Doe. Once authenticated, John Doe is served data, i.e. the transcript and associated multimedia. If the user fails the authentication step, data delivery may be denied. In some circumstances, the authentication step may authenticate all data requesters.

John Doe may also set permissions allowing access to that transcript to other users in a group, for example other attorneys within his law firm, or certain designated individuals associated with his law firm's client, Company A. Permissions may also be limited by an administrator, for example the court-reporting firm responsible for distributing transcripts and allowed a reasonable fee therefor by the governing rules of procedure. In such a circumstance, the administrator may control or make alterations to the database that is used by the computer system in performing the authentication.

As an example, assume that John Doe provides the hardcopy of a deposition transcript to a co-litigant at Company B. Assume that Company B has not purchased a copy of the transcript from the court-reporting firm and that John Doe cannot set permissions to allow Company B access to the transcript electronically. If a user at Company B scans the QR code on the transcript to obtain electronic access to the transcript and associated multimedia on his own iPad, access may

be granted, in this example, if and only if the administrator has allowed it, i.e. the court reporting firm is legally able to furnish a copy, and if terms for the purchase and sale of the access have been agreed upon. The system administrator, or a court reporting firm utilizing the system, can include as part of the terms of use for the mobile device software an agreement that any asset delivery is subject to specified terms and fees, which may include a charge of a reasonable fee upon accessing a transcript or multimedia from having scanned a QR code on a hardcopy of a transcript. Such transaction can occur as an "in app purchase", or a purchase as is made from within the application. As one example, the Apple company supports "in app purchases", as opposed to delivering content through another mechanism, such as transfer of a pdf, book, text, music, or movies via iTunes.

In this example, the user at Company B scans with his iPad the QR code on John Doe's hardcopy transcript, Company B is immediately charged for a purchase, and access to the transcript and associated multimedia is furnished immediately electronically. From the electronic transcript, the software enables the user to print a hardcopy of the transcript from the mobile computing device, or it can be formatted as a pdf, or other suitable format, for printing or emailing. This hardcopy of Company B will be marked with a bar code comprising a client control number for Company B.

In this example, although John Doe provided a hardcopy of the transcript to a co-litigant improperly by not properly compensating the court reporting firm, the computer server and serving software may operate to ensure he doesn't inadvertently provide electronic access to what may be work product he has associated with his group's copy of the electronic assets. For example, John Doe and his law firm may have created issue codes and made comments upon the transcript, which they did not intend to share with Company B. Because Company B is not within the set of authorized users in John Doe's group, any work product of John Doe's group is not made available to Company B by virtue of the Company B user having scanned John Doe's QR code. That is, when Company B receives electronic access for the first time, a new, fresh user group is created, and the new user from Company B must indicate who is authorized to collaborate within his own group, subject to review by a system administrator.

In yet another example of the printed transcript, FIG. **40** illustrates how an issue coded transcript may be provided to a court. QR codes are placed in the margins to allow a user of a mobile computing device to scan the code to access an electronic copy of the transcript and multimedia at that exact position. Thus, paper filings can be made to a court, allowing simple access to the corresponding electronic assets (transcript and multimedia) on a separate mobile computing device.

In this manner, a judge, clerk, or courthouse staff can conveniently use a mobile computing device to retrieve multimedia assets, without having to take delivery of CDs, DVDs, or other storage media a litigant may intend to deliver to the court. Further, an overall computer system may be provided and managed, to ensure multimedia submitted to the court is available, convenient to access, able to be archived, and capable of having usage tracked, for example to ensure access is provided only to authorized users and to date the time of filing, as part of an electronic records filing and management system.

Such use of QR codes and mobile computing devices to allow simple and easy retrieval of specific portions of multimedia and corresponding transcription allows novel use of mobile computing devices. Such uses may be particularly useful in scholarly writing, news and news distribution, legal writing, magazines/periodicals, books, political discourse, and elsewhere.

While the examples above are presented in the context of a legal proceeding, i.e. a deposition transcript and associated multimedia, the examples are not intended to limit the scope of the invention. As discussed above, there exist many types and kinds of uses for a synchronization index with associated multimedia, being used on a mobile computing device.

Sharing a Transcript by Barcode

As another example, a court reporter at the conclusion of a deposition may distribute copies of the transcript by requiring that an attorney present at the deposition utilize a mobile computing device to scan a barcode to retrieve the transcript. As part of the court reporting software, for example, the court reporter may utilize a mobile computing device, such as an Apple iPad, to display a barcode to be scanned by an attorney who desires to purchase a copy of the transcript. The scan of the barcode evidences an offer and acceptance, forming a binding contract between the attorney and the court reporter to furnish a copy of a transcript. Prior to the invention, often times there existed disputes about whether an attorney agreed to pay for a copy of the transcript, as such orders were taken orally at the conclusion of a deposition.

After scanning the barcode, the URL-type link is opened on the attorney's mobile computing device, the transaction data is fed to a computer system for authentication, and the transaction is recorded as having been made. Certain of the information from the attorney's mobile computing device may be communicated to the computer system, for example identifying information from the mobile computing device itself, such as a UDID from an Apple iPhone or iPad and any user or owner information that may be retrieved. Also, the barcode may comprise information identifying the court reporter, for example the name of the court reporter, the date, the deponent, the caption of the case, and so on. The court reporter may refresh the barcode on his or her mobile computing device for each successive attorney wanting to make a purchase at the time of the deposition.

Sharing a Transcript by Close Proximity Communication Between Mobile Computing Devices

In yet another embodiment of sharing an electronic transcript utilizing a mobile computing device, once a user has properly accessed an electronic copy of a transcript, and associated multimedia, for example by having used his mobile computing device to scan a QR code printed on a photocopy of the transcript, discussed above, the authenticated user may transmit the identity of the electronic asset, or a specific location within the electronic asset, to another mobile computing device user by close or near-field proximity communication with another mobile computing device. In one example of close proximity communication, User1 may "bump" his mobile computing device with another mobile computing device, causing communication of a client identification number and/or a synchronization index reference. User2, with his mobile computing device, receives the communication of the client identification number and/or a synchronization index reference, and User2 then proceeds as though he has scanned User1's QR code, discussed above. One example of close proximity communication between mobile computing devices is utilizing Near Field Communication (NFC) technology. One mobile computing device utilizing NFC technology is the "Samsung Galaxy S III", which uses software referred to as "S Beam", to allow two devices to have their backs gently bumped together to initiate transfer of data.

Sharing a Deep Link by QR Code

In yet another embodiment, a user of a mobile computing device may highlight or otherwise select a range of text from a synchronization index, and then select an option to instruct the software to generate a QR code with information sufficient to allow a subsequent user to scan the QR code in order to be delivered directly to that portion within the multimedia.

In FIG. **41**, for example, QR Code was created, here by accessing the URL http://createqrcode.appspot.com/ for the sample string of text: www.sampleURL.com/ClientControl=AttorneySmith9876; Transcript=ABC123-Anderson; StartPage=14; StartLine=0.2; EndPage=14; EndLine=6. This string of text contains a hosting URL, here www.sampleURL.com; a client control number, here "ClientControl=AttorneySmith9876"; a transcript reference, here "Transcript=ABC123"; and a page and line range for the designated text (and corresponding video) at page 14, lines 2-6, here shown as "StartPage=14; StartLine=2; EndPage=14; EndLine=6".

Once that QR code is generated, it can be immediately scanned from the display screen by a second mobile computing device, posted online, for example, on one's social networking timeline as one may do using the Facebook website, emailed, printed, embedded in another document, or saved for later use.

FIG. **41** depicts an action sequence, beginning with an issue coded deposition transcript, for example as may be displayed on a mobile computing device. Here, the user intends to generate a QR code for the designation at page 14, lines 2-6 of the transcript. The user selects the function "Show QR code", and the corresponding QR code is displayed.

FIG. **42** depicts a software user interface for displaying QR codes. Here, the rightmost quarter of the display screen has been partitioned for display of QR codes. The tab "OR Code Reference" has been selected, and the mobile computing device software automatically generates a QR code for each designated portion of testimony. Here, a Defendant's designation page 14, lines 2-6 of the transcript is shown in the cross-hatched area 42-1 covering text at page 14, lines 2-6, and corresponding QR code is shown enlarged in the upper right corner of the display screen. As discussed above, another user of a mobile computing device may scan that QR code to access that transcript and corresponding multimedia at exactly that location.

Also shown in the rightmost margin is a thumbnail QR Code for the Plaintiff's designation of page 14, lines 7-12. Plaintiff's designation of page 14, lines 7-12 is depicted with a large-cross-hatched area 41-2. As the multimedia plays and the transcript scrolls, so too may the corresponding information in the rightmost pane. The QR code may be enlarged by a gesture on the viewing screen, such as a two finger reverse pinch, and once enlarged may be shrunken by another gesture on the viewing screen, such as a two finger pinch.

In this example, the use of the QR code facilitates the quick and easy sharing of a precise point within multimedia between one mobile computing device user and another. Moreover, a discrete "clip", or passage, or scene, or chapter, may be quickly and easily shared between users, here depicted as a deposition designation.

In yet another embodiment, an aggregation of various multimedia clips can be forwarded to a second user by use of a barcode. Suppose, for example, a first user has issue coded a deposition transcript with four issues, two of which are "Plaintiff's direct designations" and "Defendant's direct designations." Suppose, further, that the first user wants to direct a second user, e.g. the court, to view on a mobile computing device only those sections of the multimedia that correspond to those two issue codes, to the exclusion of the other portions of the deposition testimony. The first user creates the designations, then selects from a GUI the command to create a barcode for the set of designations. The first user's computer causes an edit decision list-type of file to be sent by computer network, to a server (or the edit decision list can be created by the server). This edit decision list, for example, may comprise a list of StartPage.StartLine+EndPage.EndLine entries, which correspond to multimedia times as may be found in a synchronization index. The barcode is then generated, with characters to direct the second user to the edit decision list generated by the first user. With a mobile computing device, the second user is then able to scan the barcode (i.e. if printed and placed within a legal brief filed with the court) and to retrieve the multimedia and associated synchronization index. In this manner, a first user can compile a set of discrete video segments that can be subsequently retrieved by a second user by using a barcode and a mobile computing device.

Use of Barcode and a Mobile Computing Device to Pick Up Location Data from Video Played on a Device Other than the Mobile Computing Device.

In yet another embodiment, a user of a DVR or set top appliance, such as an AppleTV by Apple, Inc., may pause playback of pre-recorded or streaming programming, and thereafter retrieve that exact location within the multimedia using a mobile computing device. As an example, suppose a DVR receives via cable television service certain broadcasting signals, which are recorded to a DVR, specifically the hard drive memory resident on the DVR. On pausing, the software on the DVR may function to display a barcode on the viewing screen, for example a flat screen monitor connected to the DVR by HDMI connection, whereupon a mobile computing device user, say using an Apple iPad, may scan the barcode, and then be delivered right to that place within the multimedia where the video was paused. The multimedia content, however, may be delivered to the iPad via Wifi or wireless data connection, and the user would be able to watch the content on his mobile device. Optimally, the user experience is a quick and seamless appearance of transference of multimedia. The mobile computing device acquires the barcode, having embedded therein a client control number, and other information, to allow the multimedia delivery system to perform an authentication step to determine whether the user or mobile computing device possesses necessary permissions to "share" the multimedia asset.

In this example, suppose the user, a subscriber to cable television services by Cox Communications in Northern Virginia, scheduled a recording of Program X on his DVR. The DVR records the program at the scheduled time. Assume the user then watches Program X, a one-hour long program, which was recorded on his home DVR. He stops at 37:00 into the program, and wishes to have his children watch the remainder of the program on an iPad while travelling in the car. On pausing, the user may elect a display of a barcode. The iPad user scans the barcode. The iPad then communicates, via data network, either wireless, 3G, 4G, LTE or similar, transmitting the content of the barcode to a multimedia delivery service. The multimedia delivery service then determines whether the user is allowed access to the multimedia, then commences delivery of the multimedia to the mobile computing device, either by streaming (via data network, either wireless, 3G, 4G, LTE or similar), or by streaming and caching for later playback on the mobile computing device.

In this example, the authentication step verifies that the mobile computing device user or the mobile computing device is eligible to receive multimedia content. This authentication does not necessarily require that the mobile comput-

ing device be registered to the same cable television service account, for example, which is supplying multimedia to the DVR.

Further, this placement of barcode for use with a mobile computing device may also be utilized when the multimedia is first delivered by other means as well, for example if the multimedia content resides on a Blu-ray disc and is first played therefrom. In that instance, a pause of multimedia played from the disc may still result in a display of a barcode, for retrieval of multimedia by a mobile computing device. The scan of the barcode may cause, on a computer network, the seek for the identical content for delivery at the time desired, through a delivery mechanism where the mobile computing device, or the user, is an authorized user. For example, a Blu-ray disc, when content is paused and a barcode is subsequently displayed, may contain as a client control number an indicator for the multimedia to be requested from a hierarchical list of delivery sources. For example, the system, using the client control number in the barcode displayed from the Blu-ray disc, may first seek to deliver the multimedia content from a multimedia delivery system controlled by the movie's production company (e.g. Disney/Pixar), then from a hierarchical number of others where the user would have authentication to receive the identical multimedia content, like Apple, Netflix, Amazon, Hulu, Google, Facebook, or any others.

While a Blu-ray-type media player is discussed above, the multimedia playback system is meant to include, but not to be limited to, any appliance for reading data from a disc using an optical reader, for example as used in reading content from CD, DVD, or Blu-ray formatted media; reading data from flash memory, no matter the physical form factor, including USB thumb drives, SD memory cards, compact flash, memory sticks, video game cartridges, and the like, and; streaming media appliances that receive, typically wirelessly or through wired data network, data transmissions from the internet.

Further, a video game console (for example as may be connected to a viewing monitor) may operate similarly, allowing a user to pause the game, whereupon a barcode is displayed allowing the user to utilize a mobile computing device to scan the barcode and be delivered to the same or similar game on a mobile computing device. In this instance, the information conveyed in the barcode may prompt a gaming software download onto the mobile computing device. The barcode may also contain information to replicate the position of the player who paused the game on the game console. For example, the mobile computing device user may inherit the status of the state of the gameplay, i.e. points, score, levels completed, character attributes, powers, weapons availability, lives remaining, etc. Exemplary video game consoles include Sony PS3, Nintendo Wii, desktop and laptop computers, Apple iPhone, Apple iPad, and so on.

FIG. **43** illustrates a children's movie being displayed on a television screen, a scrub bar element indicating a program duration of 60:00 minutes, with the program being paused at 37:00 minutes into the program, and a bar code (above which is shown a trademarking element, here captioned with the trademark "MobilePickup") which functions to be scanned by a mobile computing device.

FIG. **44** illustrates incorporation into a program guide screen a scrub bar element (here indicating a program duration of 60:00 minutes, with the program being paused at 37:00 minutes into the program), and a bar code. The program guide screen contains other elements of a summary program guide screen. Using the program guide screen, and the bar code, a user may retrieve multimedia content using a mobile computing device, which authentication step determines whether the multimedia may be broadcast to the mobile computing device as an "on-demand" multimedia delivery service. Authentication may be denied, or a barcode may not be displayed, for example, if an event listed in the program guide will be a live broadcast which has not been recorded or has not yet occurred, or if the event listed has been embargoed until a first broadcast date, for example as would be the case with a weekly scheduled drama or situation comedy.

The content programming guide can be used to retrieve a program from the guide. Retrieving a program using the barcode and the content programming guide may deliver the user to the beginning of the program. In a different embodiment, the barcode may deliver the mobile computing device to a point in the program other than to its beginning, as is shown in FIG. **44** where a scan of the barcode is intended to allow the user to "pick up" the multimedia at a point 37:00 into the program.

Once again, while some of the examples above are presented in the context of a legal proceeding, i.e. a deposition transcript and associated multimedia, the examples are not intended to limit the scope of the invention. As discussed above, there exist many types and kinds of uses for a synchronization index with associated multimedia, being used on a mobile computing device.

The features and attributes of the specific embodiments disclosed above may be combined in different ways to form additional embodiments, all of which fall within the scope of the present disclosure. Although the present disclosure provides certain embodiments and applications, other embodiments that are apparent to those of ordinary skill in the art, including embodiments, which do not provide all of the features and advantages set forth herein, are also within the scope of this disclosure. Accordingly, the scope of the present disclosure is intended to be defined only by reference to the appended claims.

What is claimed is:

**1**. A method for a multimedia seek sequence using a synchronization index and a mobile computing device comprising the steps:

providing, to a mobile computing device, information for displaying on the mobile computing device text from a synchronization index, wherein said synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia and respective times within multimedia corresponding to when a word or range of words is audible in the multimedia;

wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface;

displaying, after said providing step, at least a portion of said text from a synchronization index on said viewing screen, wherein said text is displayed other than as a web page;

receiving, from the mobile computing device, information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a displayed word, or a range of words, from said synchronization index, wherein said gesture is recognized by said touch-sensitive input interface on the mobile computing device;

performing a timecode lookup, using the synchronization index, and in response to the gesture performed to select a word or range of words, said timecode lookup functioning to associate a time, t1, within multimedia to the selected word or range of words; and

delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device to play said multimedia, wherein said multimedia corresponds to the word or range of words selected by the gesture.

**2**. The method of claim **1**, further comprising seeking on said mobile computing device a multimedia file corresponding to said synchronization index, and if found, accessing multimedia at time t1.

**3**. The method of claim **1**, wherein the receiving device is said mobile computing device, wherein delivered multimedia is able to be played with at least a portion of said text from a synchronization index on said viewing screen.

**4**. The method of claim **1**, wherein the receiving device is other than said mobile computing device and configured to receive multimedia input from a source selected from the group comprising satellite receiver, internet connection, WiFi, computer network, cable television system, fiber optic cable delivery network for data, cellular communication channel, bluetooth, UPnP, and local wireless connection.

**5**. The method of claim **1**, wherein the receiving device is selected from the group comprising a television, a computer monitor, an LCD display, a plasma display, an LED display, a multimedia projector, an in-vehicle entertainment system, a home entertainment system, a computer with monitor, a hardware appliance for receiving cable television or satellite television services, a gaming device with facility for receiving multimedia data, a streaming media player, a home theater appliance with facility to receive multimedia communication, a second mobile computing device, a digital video recorder, and a personal media player.

**6**. The method of claim **3**, further comprising caching within said mobile computing device at least a portion of the audio from said multimedia.

**7**. The method of claim **1**, wherein multimedia is delivered at t1 and cached thereafter to memory accessible to said receiving device to facilitate subsequent seek operations.

**8**. The method of claim **1**, wherein the mobile computing device comprises an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

**9**. A method for a multimedia seek sequence using a synchronization index and a mobile computing device comprising the steps:

displaying on a mobile computing device text from a synchronization index, wherein said synchronization index comprises respective times within multimedia corresponding to a word or range of words and wherein said text is displayed other than as a web page;

wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface;

receiving information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a word, or range of words, from said synchronization index, wherein said gesture is recognized by said touch-sensitive input interface;

performing a data lookup using said synchronization index, wherein said synchronization index is referenced to provide data for a time location t1 that corresponds to said word or range of words selected by the recognized gesture; and

seeking on said mobile computing device multimedia corresponding to said synchronization index, and if found, accessing multimedia at t1.

**10**. The method of claim **9**, further comprising:

requesting from a second computing device delivery of multimedia beginning at time t1;

delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device, wherein said multimedia comprises at least an audio element; and

caching within said mobile computing device at least a portion of said audio element.

**11**. The method of claim **9**, further comprising:

requesting from a second computing device delivery of multimedia beginning at time t1;

delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device; and

caching within said mobile computing device said multimedia or a portion thereof.

**12**. The method of claim **9**, further comprising:

requesting from a second computing device delivery of multimedia beginning at time t1;

delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device, wherein said receiving device is other than said mobile computing device; and

caching, within said receiving device, or memory accessible thereto, said multimedia or a portion thereof.

**13**. The method of claim **9**, wherein the mobile computing device comprises an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

**14**. A method for a multimedia seek sequence using a synchronization index and a mobile computing device, said method comprising the steps:

providing a mobile computing device comprising a viewing screen and a touch-sensitive input interface;

providing a synchronization index that comprises an electronic transcript that indicates text corresponding to audio from the multimedia and indicates respective times within multimedia corresponding to when a word or range of words is audible in the multimedia;

providing a receiving device;

displaying on said mobile computing device text from the synchronization index, wherein said text is displayed other than as a web page;

receiving, by the mobile computing device, information indicating a user's selected mobile computing device touch-sensitive input interface gesture performed on a portion of said viewing screen corresponding to a word, or range of words, from said synchronization index;

wherein said gesture is recognized by said touch-sensitive input interface;

performing a timecode lookup using the synchronization index, wherein said synchronization index is referenced to provide data for a time location t1 that corresponds to said word or range of words;

seeking on said receiving device multimedia corresponding to said synchronization index, and, if found, accessing multimedia at t1.

**15**. The method of claim **14**, further comprising:

providing a second computing device;

requesting from a second computing device delivery of multimedia beginning at time t1;

delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device, wherein said multimedia comprises at least an audio element; and

caching within said receiving device, or memory accessible thereto, at least a portion of said audio element.

**16**. The method of claim **14**, further comprising:

providing a second computing device;

requesting from a second computing device delivery of multimedia beginning at time t1;

delivering multimedia beginning at time t1, or providing instructions for the delivery of multimedia beginning at time t1, to a receiving device; and

caching, within said receiving device, or memory accessible thereto, said multimedia or a portion thereof.

**17**. The method of claim **14**, wherein the receiving device is said mobile computing device.

**18**. The method of claim **14**, wherein the receiving device is other than said mobile computing device and is configured to receive multimedia input from a source selected from the group comprising satellite receiver, internet connection, WiFi, computer network, cable television system, fiber optic cable delivery network for data, cellular communication channel, bluetooth, UPnP, and local wireless connection.

**19**. The method of claim **14**, wherein the receiving device is selected from the group comprising a television, a computer monitor, an LCD display, an LED display, a plasma display, a multimedia projector, an in-vehicle entertainment system, a home entertainment system, a computer with monitor, a hardware appliance for receiving cable television or satellite television services, a gaming device with facility for receiving multimedia data, a streaming media player, a home theater appliance with facility to receive multimedia communication, a second mobile computing device, a digital video recorder, and a personal media player.

**20**. The method of claim **14**, wherein the mobile computing device comprises an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

* * * * *

US008862978B2

(12) **United States Patent**
**Evans**

(10) **Patent No.: US 8,862,978 B2**
(45) **Date of Patent: Oct. 14, 2014**

(54) **METHODS AND SYSTEMS FOR FACILITATING AN ONLINE SOCIAL NETWORK**

(71) Applicant: **Curt Evans**, Springfield, VA (US)

(72) Inventor: **Curt Evans**, Springfield, VA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/099,231**

(22) Filed: **Dec. 6, 2013**

(65) **Prior Publication Data**

US 2014/0089413 A1 Mar. 27, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/851,813, filed on Mar. 27, 2013, which is a continuation-in-part of application No. 13/342,865, filed on Jan. 3, 2012.

(60) Provisional application No. 61/429,399, filed on Jan. 3, 2011.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 17/20*** | (2006.01) |
| ***H04N 9/82*** | (2006.01) |
| ***G06F 17/30*** | (2006.01) |
| ***H04N 21/414*** | (2011.01) |
| ***H04N 21/472*** | (2011.01) |
| ***A63F 13/30*** | (2014.01) |
| ***G06K 19/06*** | (2006.01) |
| ***G06F 3/0488*** | (2013.01) |
| ***G06F 3/0484*** | (2013.01) |
| ***H04N 21/482*** | (2011.01) |
| ***H04L 29/06*** | (2006.01) |
| ***H04N 21/433*** | (2011.01) |
| ***H04N 5/765*** | (2006.01) |
| ***H04N 21/4402*** | (2011.01) |

(52) **U.S. Cl.**

CPC .............. ***A63F 13/12*** (2013.01); ***H04N 9/8233*** (2013.01); ***G06F 17/30017*** (2013.01); ***H04N 21/41407*** (2013.01); ***H04N 21/47217*** (2013.01); ***G06K 19/06009*** (2013.01); ***G06F 3/0488*** (2013.01); ***G06F 3/0484*** (2013.01); ***H04N 21/4828*** (2013.01); ***H04L 65/403*** (2013.01); ***H04N 21/4334*** (2013.01); ***H04N 5/765*** (2013.01); ***H04N 21/440236*** (2013.01)

USPC .......................................................... **715/206**

(58) **Field of Classification Search**

USPC .......................................................... 715/206

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,018,768 | A | 1/2000 | Ullman et al. |
| 7,284,032 | B2 | 10/2007 | Weber |

(Continued)

OTHER PUBLICATIONS

Myers, Brad A., Juan P. Casares, Scott Stevens, Laura Dabbish, Dan Yocum, and Albert Corbett. "A multi-view intelligent editor for digital video libraries." In Proceedings of the 1st ACM/IEEE-CS joint conference on Digital libraries, pp. 106-115, ACM, 2001.*

(Continued)

*Primary Examiner* — Frank D Mills

(57) **ABSTRACT**

The invention relates to social networking with a mobile computing device. The mobile computing device is provided a synchronization index, wherein the synchronization index is associated to multimedia and indicates respective times within the multimedia corresponding to a word or range of words. The mobile computing device software comprises executable program code configured to facilitate annotation of the synchronization index responsive to user input received by the mobile computing device and communicates this annotation to a second computing device via a network.

**17 Claims, 47 Drawing Sheets**
**(39 of 47 Drawing Sheet(s) Filed in Color)**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,685,132 | B2 | 3/2010 | Hyman | |
| 7,962,948 | B1 * | 6/2011 | Girouard et al. | 725/115 |
| 8,046,411 | B2 | 10/2011 | Hayashi et al. | |
| 8,112,702 | B2 * | 2/2012 | Badoiu et al. | 715/230 |
| 8,438,602 | B2 * | 5/2013 | Rao | 725/89 |
| 2003/0078973 | A1 * | 4/2003 | Przekop et al. | 709/204 |
| 2006/0041632 | A1 | 2/2006 | Shah et al. | |
| 2006/0263037 | A1 * | 11/2006 | Gilley | 386/52 |
| 2006/0263038 | A1 * | 11/2006 | Gilley | 386/52 |
| 2006/0265657 | A1 * | 11/2006 | Gilley | 715/730 |
| 2007/0118794 | A1 | 5/2007 | Hollander et al. | |
| 2007/0245223 | A1 | 10/2007 | Siedzik et al. | |
| 2008/0092168 | A1 | 4/2008 | Logan et al. | |
| 2008/0119705 | A1 * | 5/2008 | Patel et al. | 600/347 |
| 2008/0134054 | A1 | 6/2008 | Clark et al. | |
| 2008/0184121 | A1 * | 7/2008 | Kulas | 715/723 |
| 2008/0319744 | A1 * | 12/2008 | Goldberg | 704/235 |
| 2009/0094520 | A1 * | 4/2009 | Kulas | 715/723 |
| 2009/0172150 | A1 * | 7/2009 | Alkov et al. | 709/224 |
| 2010/0005485 | A1 * | 1/2010 | Tian et al. | 725/32 |
| 2010/0169786 | A1 * | 7/2010 | O'Brien et al. | 715/738 |
| 2010/0225808 | A1 * | 9/2010 | Mears | 348/468 |
| 2010/0251120 | A1 * | 9/2010 | Chelba | 715/719 |
| 2011/0107369 | A1 * | 5/2011 | O'Brien et al. | 725/38 |
| 2011/0246502 | A1 | 10/2011 | Aguera Y Arcas et al. | |
| 2011/0258556 | A1 | 10/2011 | Kiciman et al. | |
| 2014/0067825 | A1 * | 3/2014 | Oztaskent et al. | 707/748 |

OTHER PUBLICATIONS

Myers, Brad A., Juan P. Casarea, Scott Stevens, Laura Dabbish, Dan Yocum, and Albert Corbett. "A multi-view intelligent editor for digital video libraries." In Proceedings of the 1st ACM/IEEE-CS joint conference on Digital libraries, pp. 106-115. ACM, 2001.*

Sack, et al., "Integrating Social Tagging and Document Annotation for Content-Based Search in Multimedia Data," In Semantic Authoring and Annotation Workshop (SAAW),Athens(GA), 2006, 4 pages.

Weng, "A Multimedia Social-Networking Community for Mobile Devices," Thesis: Interactive Telecommunications Program, New York Univerisity, 2007, 30 pages.

* cited by examiner




Fig. 1




FIG. 2




FIG. 3


8:19 AM
Cases
<Deponent Name>
Deposition Video
In the Circuit Court of Maryland
for Montgomery County
Civil Action No. XXXXX
Plaintiff v. Defendant et al.
Deponent Name
XXXXX
Plaintiff v. Defendant et al.
is in the Circuit Court of Maryland for Montgomery County. Our witness today is Deponent Name Our court
Name 1
Name 2
ATTY 1: I am Atty1 and I represent Defendant 1.
ATTY 2: I'm Atty2 and I'm President of Defendant 1.
ATTY 3: Atty3 representing Defendant 2.
THE WITNESS: Your turn, sir.
ATTY 4: Atty4. I'm one of the attorneys for Plaintiff.
ATTY 5: Atty5. Attorney for Plaintiff.
ATTY 6: Atty6. Attorney for Plaintiff.
ATTY 7: Atty7. Counsel for Plaintiff.
Deponent Name
EXAMINATION BY COUNSEL FOR PLAINTIFF | BY Atty4
Q. Would you state your full name and | address, please? |
Deponent Name and Address 1
Mr. Name?
Mr. Name
Q. Mr. Name , have you had your | deposition taken before? |
Q. Have you ever had your deposition | taken before? |
Q. In what case or what cases? |

FIG. 4


1
16
17
2
3
4
5
6
7
19
18
20
11
Media File 1
Media File 2
Media File 3
Media File 4
Media File N

FIG. 5


Host Server
Cloud Platform with Storage Service and Open-Source Extensibility
HTTP Streaming Server
Web App
Tablet App
Mobile Phone App
TXT, PTF & MDB import
(additional formats also)

FIG. 6


Errata
Change by user "Deponent Doe, John" on 10-10-2009: "Yes" changed to "Yes, I believe so."
Altered text displays differently. Give user option to determine color/font for additions (and possibly strikethrough for deletions, or just delete the deleted).
Transcript
Doe, John
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do. Is that your testimony
14 Sir?
15 A: (Pause) Yes , I believe so.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
Video runtime: Total 00:03:31
Plaintiff: 00:02:50
Defendant 00:00:41
Deposition Video
9:51:54AM
MAR 31 2003
on off
Plaintiff - Initial Designation
Defendant - Counter-Designation
= Objection by Defendant

Fig. 7


DESIGNATIONS MERGED
Page 13
Q: So the reason that you did not
wear the collar last time when you were in
court in front of the judge is because you had
some errands to do? Is that your testimony,
Sir?
A: (Pause) Yes.
Q: What were the errands?
A: I don't recall
Q: But didn't you say that you
normally wear the collar when you go out of
the house to do anything?
A: Not to do anything.
Q: Well, when you would go –
Page 14
A: When I am carrying out a function
of ministry of the Church, then I wear the
collar, Sir.
Q: Did you think you were carrying a
function of the Church when you came to court
to hear the argument on a motion to dismiss
this case?
A: I was a bystander. I wasn't
involved in active engagement with ministry
that day.
Transcript
Doe, John
Deposition
Video
9:51:54AM
MAR 31 2003

Fig. 8

If User 1 designated:

begin=anno
guid=b37b01c7483ca63129143bb88fabaf2f205ff62b
user=
datetime=2006 11 29 11 56 28
pos=117 13 130 16
issues=8
end=anno

And If User 2 designated:

begin=anno
guid=b37b01c7483ca63129143bb88fabaf2f205ff62b
user=
datetime=2006 11 29 11 56 28
pos=121 0 135 10
issues=8
end=anno

THE PROPER MERGE SHOULD BE:

begin=anno
guid=b37b01c7483ca63129143bb88fabaf2f205ff62b
user=
datetime=2006 11 29 11 56 28
pos=117 13 135 10
issues=8
end=anno

FIG. 9


You are adding these designations. Please assign one issue to each before the import begins.
79.3+80.18
88.1+89.5
98.1+99.2
101.1+109.5
1. damages
2. liability
3. Defendant counter
4
5
6
Current color
Add another issue.
Apply to all checked.

FIG. 10


User selects the work panes, e.g., if used for internal review, attorney may select "private" pane on left and "Master" for the middle pane. If utility is being used for "review for trial", the panes may be Plaintiff Master and Defendant Master (below), which become merged in "Case Master".
Transcript
Doe, John
Plaintiff's Work Pane (Locked and Final)
Defendant's Work Pane
Defendant's Objections
Sustain
Overrule
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your testimony,
14 Sir?
15 A: (Pause) Yes.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
Objection by Defendant.
FRE 403-Relevance.
Defendant makes specific reference to its Brief in Support of Summary Judgment at p. 9.
on off
Plaintiff - Initial Designation
Defendant - Counter-Designation
= Objection by Defendant
Video runtime: Total 00:03:31
Plaintiff: 00:02:50
Defendant 00:00:41
Each of Defendant's designations should, by law, correspond to one or more of Plaintiff's designations. The purpose of D's counter-designations are for "completeness".
If P elects to delete a designation, the corresponding D designation would be deleted as a consequence of their being linked. If any D designation retains a link, it stays.
Function: Require Defendant to link each designation to at least one Plaintiff designation, i.e. by dragging a "lasso". A D designation can correspond to more than one P designation.

Fig. 11A


Transcript
Doe, John
Arrows indicate linkages
Plaintiff's Work Pane (Locked and Final)
Defendant's Work Pane
Counter-designation Linkages
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your testimony,
14 Sir?
15 A: (Pause) Yes.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
Designation 13.18+13.21 is linked to:
13.15+13.17
13.22+14.3
To Add/remove linkages:
User can lasso/drag from left-most pane;
User can type page:line range to add to list;
User can pick from a page:line list of all of P's designations;
User can use a loadfile.
If this "Counter-designations Linkages" pane is active, user can
1) Select his own designation (here the grey 13.18+13.21)
2) drag (lasso) P's designation of 13.15+13.17 into the right-most pane, which results in the linkage and text "13.15+13.17" to appear in right-most pane

Fig. 11B


Arrows indicate linkages. Dashed indicates one link is now severed. Link is removed from list.
Transcript
Doe, John
Plaintiff's Work Pane (Locked and Final)
Defendant's Work Pane
Counter-designation Linkages
Designation 13.18+13.21 is linked to:
13.15+13.17
13.22+14.3
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your testimony
14 Sir?
15 A: (Pause) Yes.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
"Removal from Final" = crosshatch
On mouse-over, a status balloon like this appears.
On 1-1-11, Plaintiff identified this as Final, in yellow.
On 1-2-11, Defendant linked 13.18+13.21, the solid red arrow.
On 1-3-11, Plaintiff removed 13.15+13.17 from being Final, and it is crosshatched as a result.

Fig. 11C


Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have any description of the turbo confabulator?
A Smith?
Q You mean the one marked as Exhibit 7?
A Yes.
Q Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said, "Okay" I meant that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo confabulator anywhere. In fact, it describes the opposite of a turbo confabulator. Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something similar for well over $50 million. We also had offers at the time for licenses from Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Page 14
what he said. Fifty to seventy five, at least.
Q So these were conversations with Jobs and Zuckerberg?
A Yes. And then each of their lawyers made their written offers. It was clear they wanted to avoid the NTP v. Research in Motion situation down the road. Just get the license out of the way.
Q Do you have a Facebook account?
A I do now.
Q So do I. Think we should friend one another?
A Sir, there is nothing I'd like more. I bet you post something witty every day.
Q So you said $50 million. And then you said Zuckerberg told you as much as seventy-five. That's a big range, so what do you consider the value?
A Well, the high end of that range. My understanding is that the number would be something for the jury to decide. They'd determine the reasonable royalty and calculate the final number. I understand our damages expert will be supplementing his final report this week. The reasonable royalty is more than the $40 million conclusion of your expert, Mr. Anderson.
Page 15
Court: Overruled
Objection by Defendant to 14.7+14.13
FRE 403 - Relevance
Court: No ruling
Objection by Defendant to 14.17+15.1
FRE 801 – Hearsay. <Sentences of explanation can be placed here and still be displayed neatly and substantially adjacent to the designation at issue. This is sample text. This text can cite the location of a more complete briefing on the issue if needed.>
KEY
Plaintiff's designation On Off
Defendant 1 designation On Off
Defendant 2 designation On Off
Non-designated text = displayed

Fig. 12


2 Moving to the Smith article. Does the Smith article
3 have any description of the turbo confabulator?
4 A Smith? You mean the one marked as Exhibit 7?
5 Q Yes.
6 A Okay, yes.
7 Q So it does describe the turbo confabulator.
8 Does it also describe the flux capacitor?
9 A No, I think you misunderstood what I said. When I
10 said, "Okay" I meant that I had Exhibit 7 in front of me. Looking
11 at it now, it doesn't describe a turbo confabulator anywhere. In
12 fact, it describes the opposite of a turbo confabulator. Also, this
13 same article has nothing to do with a flux capacitor.
17 Q Moving to some of the numbers we discussed. How
18 did you value your invention at $50 million.
19 A Steve Jobs told me it was worth $50 million. Microsoft
20 negotiated something similar for well over $50 million. We also
21 had offers at the time for licenses from Google, Netflix, and
22 Facebook. I talked with Mark Zuckerberg himself, and that's
Page 14
1 what he said. Fifty to seventy five, at least.
Click to collapse non-designated text
13 Q So you said $50 million. And then you said
14 Zuckerberg told you as much as seventy-five. That's a big
15 range, so what do you consider the value?
16 A Well, the high end of that range. My understanding is
17 that the number would be something for the jury to decide.
18 They'd determine the reasonable royalty and calculate the final
19 number. I understand our damages expert will be
20 supplementing his final report this week. The reasonable
21 royalty is more than the $40 million conclusion of your expert,
22 Mr. Anderson.
Page 15
Court: Overruled
Objection by Defendant to 14.7+14.13
FRE 403 - Relevance
Court: No ruling
Objection by Defendant to 14.17+15.1
FRE 801 – Hearsay. <Sentences of explanation can be placed here and still be displayed neatly and substantially adjacent to the designation at issue. This is sample text. This text can cite the location of a more complete briefing on the issue if needed.>
In printed output (as an option), these long white gaps would be eliminated, leaving only testimony designated by a party. Electronically, chevrons may allow a user to expand/collapse these portions. This transcript copy can be provided to the Court or the Court's court reporter at trial.
Dark line, or other graphic, to indicate a range of lines has been omitted
KEY
Plaintiff's designation On Off
Defendant 1 designation On Off
Defendant 2 designation On Off
Non-designated text = NOT displayed

Fig. 13A


Dark line, or other graphic, to indicate a range of lines has been omitted
Moving to the Smith article. Does the Smith article have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator. Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said, "Okay" I meant that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo confabulator anywhere. In fact, it describes the opposite of a turbo confabulator. Also, this same article has nothing to do with a flux capacitor.
Q Moving to some of the numbers we discussed. How did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something similar for well over $50 million. We also had offers at the time for licenses from Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Page 14
what he said. Fifty to seventy five, at least.
Q So you said $50 million. And then you said Zuckerberg told you as much as seventy-five. That's a big range, so what do you consider the value?
A Well, the high end of that range. My understanding is that the number would be something for the jury to decide. They'd determine the reasonable royalty and calculate the final number. I understand our damages expert will be supplementing his final report this week. The reasonable royalty is more than the $40 million conclusion of your expert, Mr. Anderson.
Page 15
Court: Overruled
Objection by Defendant to 14.7+14.13
FRE 403 - Relevance
Court: No ruling
Objection by Defendant to 14.17+15.1
FRE 801 – Hearsay. <Sentences of explanation can be placed here and still be displayed neatly and substantially adjacent to the designation at issue. This is sample text. This text can cite the location of a more complete briefing on the issue if needed.>
KEY
Plaintiff's designation On Off
Defendant 1 designation On Off
Defendant 2 designation On Off
Non-designated text = NOT displayed

Fig. 13B


Printed Page Output – Landscape Option
KEY
Plaintiff's designation On Off
Defendant 1 designation On Off
Defendant 2 designation On Off
Non-designated text = displayed
Q Thank you for that last answer.
Q Moving to the Smith article. Does the Smith article have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator. Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said, "Okay" I meant that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo confabulator anywhere. In fact, it describes the opposite of a turbo confabulator. Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something similar for well over $50 million. We also had offers at the time for licenses from Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Page 14
Court: Overruled
Objection by Defendant to 14.7+14.13
FRE 403 - Relevance
Court: No ruling
Objection by Defendant to 14.17+15.1
FRE 801 – Hearsay. <Sentences of explanation can be placed here and still be displayed neatly and substantially adjacent to the designation at issue. This is sample text. This text can cite the location of a more complete briefing on the issue if needed.>

Fig. 14

Ability to print minuscript on 4 transcript pages per printed page, with issues highlighted, in 2 different configurations:




FIG. 15


Objections
Sustain
Overrule
Objection by Defendant Lusk. FRE 403-Relevance. Defendant makes specific reference to its Brief in Support of Summary Judgment at p. 9.
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your testimony,
14 Sir?
15 A (Pause) Yes
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
Transcript
Doe, John
Deposition Video
9:51:54AM
MAR 31
Video runtime: Total 00:03:31
Plaintiff: 00:02:50
Defendant 00:00:41
Show/hide certain issues
on off
Plaintiff Smith- Initial Designation
Defendant Lusk- Counter-Designation
= Objection by Defendant Lusk
Region to display objections. "Balloons" to expand/contract/accordion objections with a significantly long text description
Option: Allow Judge to rule upon objections within the application. "Sustain objection"=designation is prohibited from coming in to evidence.
"Overrule objection"=designation may still be offered into evidence.
For each, allow Judge a place to attach a comment, providing, if he wishes, a written description for reasons why the ruling was made. In this fashion, there is an opportunity to create a full, complete record for an appellate Court's review.
Calculates the would-be video run-time without creating the video clips.
Double click on any line of testimony causes video to begin playing at that location.
Chevrons to expand/collapse non-designated sections of testimony. Allows reader to read only those portions of the transcript that have been designated.

Fig. 16

```
<?xml version="1.0" encoding="UTF-8" ?>
- <DEPOSITION>
  - <PAGE pbk="T" T="0" n="1" a="1">
    - <LINE pbk="F" T="0" end_T="2816" n="1" p="1" a="1">
        <lnum>1</lnum>
        STATE OF MINNESOTA DISTRICT COURT
        </LINE>
    - <LINE pbk="F" T="0" end_T="2816" n="2" p="2" a="2">
        <lnum>2</lnum>
        COUNTY OF HENNEPIN THIRTY-EIGTH JUDICIAL DISTRICT
        </LINE>
    + <LINE pbk="F" T="0" end_T="2816" n="3" p="3" a="3">
    - <LINE pbk="F" T="244661" end_T="246826" n="15" p="15" a="190">
          <lnum>4</lnum>
        - <W pbk="F">
              <w>Word1</w>
              <t>244661</t>
              <end_t>245429</end_t>
          </W>
        - <W pbk="F">
              <w>And</w>
              <t>245429</t>
              <end_t>245748</end_t>
          </W>
        - <W pbk="F">
              <w>Word2</w>
              <t>246038</t>
              <end_t>246197</end_t>
          </W>
        </LINE>
    </PAGE>
  <MEDIA Name="demo4min.mpg" Duration="247838" TranStart="5:3" TranEnd="8:15" />
  <CONTINUING>0</CONTINUING>
  <DEPONENT_LAST>test</DEPONENT_LAST>
  <DEPONENT_FIRST>test</DEPONENT_FIRST>
  <DEPO_DATE>2005-12-14 00:00:00</DEPO_DATE>
  <CAPTION />
  <START_PAGE>1</START_PAGE>
  <PAGE_COUNT>8</PAGE_COUNT>
  <DIRECT_ATTORNEY>Attorney</DIRECT_ATTORNEY>
  <SHORT_CAPTION>test</SHORT_CAPTION>
  <LINES_PER_PAGE>25</LINES_PER_PAGE>
</DEPOSITION>
```


FIG. 17


Linked Exhibit
Exhibit
Transcript
Doe, John
Page 13
10 Q: So the reason that you did not
11 wear the collar last time when you were in
12 court in front of the judge is because you had
13 some errands to do? Is that your testimony,
14 Sir?
15 A: (Pause) Yes.
16 Q: What were the errands?
17 A: I don't recall
18 Q: But didn't you say that you
19 normally wear the collar when you go out of
20 the house to do anything?
21 A: Not to do anything.
22 Q: Well, when you would go –
Page 14
1 A: When I am carrying out a function
2 of ministry of the Church, then I wear the
3 collar, Sir.
4 Q: Did you think you were carrying a
5 function of the Church when you came to court
6 to hear the argument on a motion to dismiss
7 this case?
8 A: I was a bystander. I wasn't
9 involved in active engagement with ministry
10 that day.
Deposition Video
Video runtime: Total 00:03:31
Plaintiff: 00:02:50
Defendant 00:00:41
on
off
Plaintiff - Initial Designation
Defendant - Counter-Designation

Fig. 18




FIG. 19


Movie Title
Movie Video
Char 2: <line from movie script synchronized with movie video>
Char 1: <line from movie script synchronized with movie video>
Char 3: <line from movie script synchronized with movie video>
Char 2: <line from movie script synchronized with movie video>
Char 1: <line from movie script synchronized with movie video>
Char 3: <line from movie script synchronized with movie video>
Char 2: <line from movie script synchronized with movie video>
Char 1: <line from movie script synchronized with movie video>
Char 3: <line from movie script synchronized with movie video>
Send to TV
Ad

FIG. 20


iPad
8:19 AM
Oral Argument in The Supreme Court
Supreme Court of the United States
10-290. Microsoft Corp. v. i4i Ltd. Partnership
Date argued: 04-18-2011
THOMAS G. HUNGAR, ESQ., Washington, D.C.; on behalf of
Petitioner. SETH P. WAXMAN, ESQ., Washington, D.C.; on behalf of
SUPREME COURT
OF THE UNITED STATES
00:00:00
-00:01:26
003.03 JUSTICE SCALIA: We'll hear argument now in
04 Case No. 10-290, Microsoft Corporation v. i4i Limited
05 Partnership.
06 Mr. Hungar, you may proceed.
07 ORAL ARGUMENT OF THOMAS G. HUNGAR
08 ON BEHALF OF THE PETITIONER
09 MR. HUNGAR: Thank you, Justice Scalia, and
10 may it please the Court:
11 The Federal Circuit's clear and convincing
12 evidence standard ensures the enforcement of invalid
13 patents, even though this Court recognized in KSR that
14 invalid patents stifle rather than promote the progress
15 of liberal arts. Under this Court's decisions Grogan
16 and Huddleston, the default preponderance standard
17 should govern in all cases because section 282 does not
18 specify a heightened standard of proof.
19 And as this Court suggested in KSR, it makes
20 no sense to have a heightened standard of proof when the
21 relevant prior art evidence was never even considered by
22 PTO. Under any view, it was error to require clear and
23 convincing proof of invalidity in this case.
24 JUSTICE GINSBURG: It would be hard to
25 argue, Mr. Hungar, that it makes no sense, but it made
004.01 sense to Cardozo and Judge Rich
02 MR. HUNGAR: Your Honor, Justice Cardozo was
03 not addressing a case in which the evidence at issue had
04 not been considered by the Patent Office. To the
ABA Sections, Divisions and Forums
· Expand your knowledge · Network with colleagues
· Take control of your professional advancement
Your ABA.
Your Success.
Join Today

FIG. 21


iPad
8:34 AM
Edit
On-Demand CLE
American Bar Association
Assessing IP Risks and Managing Litigation in a Changing Legal Environment
Faculty: Peter Chen
Recording Date: February 10, 2010
Running Time: 90 minutes
Credit Hours: 1.5
Topics: Intellectual Property Law
Pricing: $129.00 (Regular)
Is Copyright's First Sale Doctrine Dying?
Faculty: Joseph C. Gratz
Recording Date: April 28, 2010
Running Time: 90 minutes
Credit Hours: 1.5
Topics: Intellectual Property Law
Pricing: $119.00 (Regular)
Intellectual Property Law Issues In Construction
Faculty: Edward G. Benes
Recording Date: May 9, 2010
Running Time: 90 minutes
Credit Hours: 1.5
Topics: Intellectual Property Law
Pricing: $150.00 (Regular)
The State of Patent Damages Law
Faculty: Brendan Gardiner
Recording Date: April 1, 2010
Running Time: 120 minutes
Credit Hours: 1.5
Topics: Intellectual Property Law
Pricing: $175.00 (Regular)
Audio CLE
Patent Reform Act of 2009 / 2010: Effects on Small Businesses and Startups
Product Code: CET10PRSPOD
Faculty: David Boundy, David Postolski
Recording Date: September 24, 2010
Page Count: 41
Running Time: 59 minutes (00:07:34 viewed)
Credit Hours: 1
Ethics Hours: 0
Sponsoring Entities: ABA Center for CLE, Section of Intellectual Property Law, Young Lawyers Division
Topics: Intellectual Property Law
Pricing: $129.00 (Regular)
Welcome to the American Bar Association's On-Demand CLE program.
My name is David Boundy and I will be speaking about the Patent Reform Act of 2009 and 2010 and the effect of the reforms on small businesses and startups.
Now, as you know, a party which manufactures, imports, uses, sells, or offers for sale patented technology, during the term of the patent and within the country that issued the patent, is considered to infringe the patent.
The test varies from country to country, but in general it requires that the infringing party's product (or method, service, and so on) falls within one or more of the claims of the patent. The process employed involves "reading" a claim onto the technology of interest. If all of the claim's elements are found in the technology, the claim is said to "read on" the technology; if a single element from the claim is missing from the technology, the claim does not literally read on the technology and the technology does not infringe the patent with respect to that claim.
Typically, an expert witness will testify that all of a claim's elements may be found in the device (or system or method) that the patentee alleges to be infringing.
In the United States, an infringement may occur where the defendant has made, used, sold, offered to sell, or imported an infringing invention or its equivalent. One also commits indirect infringement if he actively and knowingly induces another

FIG. 22


iPad
8:19 AM
Anderson, Kevin May 10, 2011
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said, "Okay" I meant that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo confabulator anywhere. In fact, it describes the opposite of a turbo confabulator. Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something similar for well over $50 million. We also had offers at the time for licenses from Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's what he said. Fifty to seventy five, at least.
Q So these were conversations with Jobs and Zuckerberg?
A Yes. And then each of their lawyers made their written offers. It was clear they wanted to avoid the NTP v. Research in Motion situation down the road. Just get the license out of the way.
Q Do you have a Facebook account?
A I do now.
Q So do I. Think we should friend one another?
A Sir, there is nothing I'd like more. I bet you post something witty every day.
Q So you said $50 million. And then you said Zuckerberg told you as much as seventy-five. That's a big range, so what do you consider the value?
A Well, the high end of that range. My understanding is that the number would be

FIG. 23


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Comments - Ping
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
014.01 Q Thank you for that last answer.
02 Moving to the Smith article. Does the Smith article have any description
03 of the turbo confabulator?
04 A Smith? You mean the one marked as Exhibit 7?
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulator.
08 Does it also describe the flux capacitor?
09 A No, I think you misunderstood what I said. When I said, "Okay" I meant
10 that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
11 confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
12 Also, this same article has nothing to do with a flux capacitor.
13 Q So neither is described?
14 A That's right. Neither is described in Smith. Here Exhibit 7.
15 Q Moving to some of the numbers we discussed. How did you value your
16 invention at $50 million.
17 A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
18 similar for well over $50 million. We also had offers at the time for licenses from
I can't believe Defendants would have designated this.
It is so clear from the answer when you watch it that he's not saying that "Smith describes a turbo confabulator."
Are there any other instances like this? Let's put them all together and put them in the section of the Summary Judgment brief dealing with Defendant's playing fast and loose with the Court. I would like . . . more
Who do you want to do that?
Mary, why don't you take the lead on that since you're also doing the arguments relating to willful infringement.
Okay, I'm on it. Thanks
BTW, these iPads are such a cool way to review transcripts. All of our trial teams need to use them. Saves so much time. I'm sending all transcripts to the client right now. He'll love it!

FIG. 24


iPad
8:34 AM
Anderson, Kevin May 10 2011
Errata
Confidential Deposition Transcript
In re Certain Electronic Devices, Including
Mobile Phones, Portable Music Players,
and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
JUN. 4 2008
014.01 Q Thank you for that last answer.
02 Moving to the Smith article. Does the Smith article have any description
03 of the turbo confabulator?
04 A Smith? You mean the one marked as Exhibit 7?
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulator.
08 Does it also describe the flux capacitor?
09 A No, I think you misunderstood what I said. When I said "Okay" I meant
10 that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
11 confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
12 Also, this same article has ~~something~~ *nothing* to do with a flux capacitor.
E
13 Q So neither is described?
14 A That's right. Neither is described in Smith. Here Exhibit 7.
15 Q Moving to some of the numbers we discussed. How did you value your
16 invention at $50 million.
17 A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
18 similar for well over $50 million. We also had offers at the time for licenses from
19 Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Page14, line 12.
"something" changed to
"nothing"
By Anderson, Kevin on
05-23-11.

FIG. 25


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Summary
JUN 14 2008
Exhibit 1 of 10
United States Patent
Page 1 of 13
Exit
014.01 Q Thank you for that last answer.
02 Moving to the Smith article. Does the Sı
03 of the turbo confabulator?
04 A Smith? You mean the one marked as E
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulat
08 Does it also describe the flux capacitor?
09 A No, I think you misunderstood what I sai
10 that I had Exhibit 7 in front of me. Looking at
11 confabulator anywhere. In fact, it describes t
12 Also, this same article has nothing to do with
13 Q So neither is described?
14 A That's right. Neither is described in Smi
15 Q Moving to some of the numbers we disc
16 invention at $50 million.
17 A Steve Jobs told me it was worth $50 mill
18 similar for well over $50 million. We also had
19 Google, Netflix, and Facebook. I talked with

FIG. 26


iPad
8:34 AM
List
Anderson, Kevin May 10, 2011
Exhibits
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
JUN 4 2008
014.01
Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have any description
of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said, "Okay" I meant
that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your
invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
similar for well over $50 million. We also had offers at the time for licenses from
Google, Netflix and Facebook. I talked with Mark Zuckerberg himself, and that's
Anderson, Kevin
05-10-2011
Deposition Exhibit Set
Anderson Exhibit 1
Notice of Deposition
Anderson Exhibit 2
Notice of Investigation
Anderson Exhibit 3
Expert Report - Tom Smith
Anderson Exhibit 4
Index of Patents at issue
6,714,091
6,834,181
6,895,256
6,518,957
6,073,036
6,262,735
6,924,789
Anderson Exhibit 5
Testimony of Anderson, Kevin in Acme Corp. v. Intel, 04-01-06
Anderson Exhibit 6

FIG. 27


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Objections
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No. I think you misunderstood what I said. When I said, "Okay" I meant that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo confabulator anywhere. In fact, it describes the opposite of a turbo confabulator. Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something similar for well over $50 million. We also had offers at the time for licenses from Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Court: Overruled
Objection by Defendant to 14.7+14.13
FRE 803 - Relevance

FIG. 28


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Summary
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
Plaintiff's Designations
5 clips 00:05.36
Defendant's Designations
17 clips 00:13.01
Total Clip Run Duration 00:18.37
Deposition length 06:42.10
Location - Page Line 014.15
Location - Time In 00:07.00
Location - Time Remaining 06:35.10
014.01 Q Thank you for that last answer.
02 Moving to the Smith article. Does the Smith article have any description
03 of the turbo confabulator?
04 A Smith? You mean the one marked as Exhibit 7?
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulator.
08 Does it also describe the flux capacitor?
09 A No, I think you misunderstood what I said. When I said, "Okay" I meant
10 that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
11 confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
12 Also, this same article has nothing to do with a flux capacitor.
13 Q So neither is described?
14 A That's right. Neither is described in Smith. Here Exhibit 7.
15 Q Moving to some of the numbers we discussed. How did you value your
16 invention at $50 million.
17 A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
18 similar for well over $50 million. We also had offers at the time for licenses from
19 Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Plaintiff's Designation
014.07-014.12
00:00.33
E
Plaintiff's Designation
014.17-015.02
00:01.05

FIG. 29


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Summary
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
Plaintiff's Designations
5 clips 00:05:36
Defendant's Designations
17 clips 00:13:01
Total Clip Run Duration 00:18:37
Deposition length 06:42:10
Location - Page:Line 014:09
Location - Time In 00:07:00
Location - Time Remaining 06:35:10
014.02 Moving to the Smith article. Does the Smith article have any description
03 of the turbo confabulator?
04 A Smith? You mean the one marked as Exhibit 7?
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulator.
08 Does it also describe the flux capacitor?
A No. I think you misunderstood what I said. When I said, 'Okay' I meant
10 that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
11 confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
12 Also, this same article has nothing to do with a flux capacitor.
17 A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
18 similar for well over $50 million. We also had offers at the time for licenses from
19 Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
20 what he said. Fifty to seventy five, at least.
21 Q So these were conversations with Jobs and Zuckerberg?
22 A Yes. And then each of their lawyers made their written offers. It was clear they
015.01 wanted to avoid the NTP v Research in Motion situation down the road. Just get
Plaintiff's Designation
014.07-014.12
00.00.33
E
Plaintiff's Designation
014.17-015.02
00:01:05

FIG. 30


iPad
8:34 AM
Anderson, Kevin May 10, 2011
Witnesses
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc.
JUN 4 2008 1:12:13 PM
014 01 Q Thank you for that last answer.
02 Moving to the Smith article. Does the Smith article have any description
03 of the turbo confabulator?
04 A Smith? You mean the one marked as Exhibit 7?
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulator.
08 Does it also describe the flux capacitor?
09 A No, I think you misunderstood what I said. When I said, "Okay" I meant
10 that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
11 confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
12 Also, this same article has nothing to do with a flux capacitor.
13 Q So neither is described?
14 A That's right. Neither is described in Smith. Here Exhibit 7.
15 Q Moving to some of the numbers we discussed. How did you value your
16 invention at $50 million.
17 A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
18 similar for well over $50 million. We also had offers at the time for licenses from
19 Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Anderson, Kevin
05-10-2011
Taken by Bill Smith
Baker, Paul
05-13-2011
Taken by Jeff Risher
Campbell, Martha
05-14-2011
30(b)(6) designee of
Defendant Nokia
Taken by Tom Smith
Mehra, Raj
03-01-2011
Taken by Jeff Risher
Singh, Sandeep
05-21-2011
Vol. 1 of 2
Taken by Tom Smith
Singh, Sandeep
05-22-2011
Vol. 2 of 2
Taken by Tom Smith
Waddams, Milton
02-10-2011

FIG. 31


iPad
8 19 AM
News
FoxNews - Fair & Balanced
FOX NEWS
Breaking Down
the Royal Wedding Vows
The first kiss - or two - delighted the throngs of crowds cheering the princess.
LONDON — Whether you're obsessed with all things Windsor or scoff at the idea of rising early to watch the pomp and circumstance of a fairytale wedding, you're probably aware that Britain's Prince William married his long-time love, Kate Middleton, on Friday. And while plenty of people are more interested in the gown, the over-the-top hats, and Kate's pouty junior bridesmaid, others are asking me for my professional opinion of the couple's first — and second — kiss as husband and wife.
VIDEO: William and Kate Exchanging Vows.
As a sex therapist and co-founder of Good in Bed, I often stress the importance of small gestures like kissing, which can go a long way to strengthening your relationship in — and outside — of the bedroom.
So what do Wills and Kate's smooches say about the future of their marriage? In case you missed it, the couple kissed as they greeted the public on the balcony of Buckingham Palace. To say it was short and sweet is an understatement: Observers described it as ceremonial, familial, and passionless — if you blinked, you missed it. Maybe that's why William, in response to the cheering crowd, suggested they try again. And while the second kiss was a little more romantic, it didn't exactly evoke fireworks. In fact, Kate even pulled away at the end.
Does this mean the royal couple is doomed? Not so fast. Not everyone indulges in a long, romantic kiss on their wedding day, and the Brits are no exception.
"Kate's apparent standoffishness is forgivable," explained my Good in Bed colleague Anna Potter. "She's the first 'commoner' in centuries to marry this close to the throne, and she must have been insanely nervous to smooch her new husband in front of thousands and thousands of fans."
In fact, there's a reason why the couple didn't immediately seal their nuptials with a kiss. Not only are premarital PDAs verboten, but the Church of England prohibits kissing both during and after the ceremony at Westminster Abbey. When you consider that pressure — never mind

FIG. 32


iPad
8:34 AM
Radio Archives
Fusion of Entertainment and Enlightenment
June 2011
May 2011
April 2011
March 2011
February 2011
January 2011
December 2001
November 2010
October 2010
September 2010
August 2010
July 2010
June 2010
May 2010
April 2010
March 2010
Glenn Beck Radio Interview of Bil Bennett
Air Date: Wednesday, Nov 21, 2007
Glenn interviewed Bill Bennett about his new book, titled A Book of Virtues to illustrate the catalog of virtues--self-discipline, compassion, work, responsibility, friendship courage perseverance honesty, loyalty, faith Glenn shared for the first time on air about how he had struggled as a recovering alcoholic
Other interviews of Bill Bennett:
Friday, Nov. 23, 2007
THE GLENN BECK PROGRAM
GLENN: Now, Bill Bennett is on the phone with me and, Bill, I just wanted to tell you something I don't think I've ever told you. You changed my life and I don't – I am not exaggerating by that. You actually changed my life.
BENNETT: Really?
GLENN: I read the Book of Virtues when my kids were little and I was so taken by it, I read it myself without the kids. And in there is a letter from Thomas Jefferson to Peter Carr. You know that one?
BENNETT: Yeah, sure.
GLENN: And I am a recovering alcoholic and I had just sobered up and I had just decided that I was – I didn't really believe in anything that I hadn't been told. I didn't discover anything. Here I am 30 something years old. I didn't know any – I didn't know what truth was because I had never really searched for it. And I'm reading this in your book, "Book of Virtues" and the line is one of the only things that I had ever tried to memorize, it just made such an impact on me is above all things, when it comes to religion, fix reason firmly in her seat for if there be a God he must surely rather honest questions over blindfolded fear.
BENNETT: Yeah.

FIG. 33


iPad
8:19 AM
Publications
Kellogg School of Management
Kellogg
"Information Strategies for Competitive Advantage"
Professor Michael Mazzeo
Thursday, March 31, 2011
Contemporary organizations face an environment with seemingly unlimited information and limitless tools available to process and analyze data. Successful companies will be those that are able to harness information more effectively than their competitors. Professor Mazzeo will discuss how companies can best use the latest insights from the economics of
The school, originally founded in 1908 as Northwestern University's School of Commerce, a part-time evening program, was one of 16 founding members of the Association to Advance Collegiate Schools of Business, the organization that sets accreditation standards for business schools. As one of the organization's original members, the school later played a major role in helping to establish the Graduate Management Admission Test. In addition, faculty associated with the school have made contributions to fields such as marketing and decisions sciences. For instance, Walter Dill Scott, a pioneer in applied psychology, helped establish some of the earliest advertising and marketing courses in the first decade of the twentieth century. He went on to serve as president of Northwestern University from 1920-1939. More recently, Philip Kotler and Sidney J. Levy's groundbreaking 1969 Journal of Marketing article, "Broadening the Conception of Marketing," laid the foundations for a greatly expanded understanding of marketing. Similarly, Kotler's Marketing Management text has played a key role in deepening the field's scholarship.
In 1919, Ralph E. Heilman, a Northwestern graduate with a doctorate from Harvard, was appointed dean of the school. And in the next year, the school launched a graduate program leading toward the Master of Business Administration degree, drawing nearly 400 students in its first two years.
In 1951, Kellogg began offering executive education courses. The Institute for Management, a four-week summer program based in Evanston, expanded the following year to two sections. The program's success eventually led to it being expanded in Europe in 1965 with a similar program offered in Bürgenstock, Switzerland. In 1976, the school expanded its executive education offerings in Evanston, introducing a degree-granting program known as the Executive Management Program (EMP, today known as the Executive MBA Program). A watershed event in the school's history was the opening of the James L. Allen Center, home of the Kellogg executive education programs. The vision of dean Donald P. Jacobs (deanship 1975-2001; on faculty in Finance Department since 1957), the Allen Center enlisted the help of significant business figures in the Chicago-area, most notably James L. Allen, a Kellogg alumnus and cofounder of consultancy Booz Allen Hamilton. The Allen Center's cornerstone was laid in 1978 while the facility officially opened Oct. 31, 1979.

FIG. 34


iPad
8:34 AM
The Beatles
Abbey Road - 1969
Abbey Road is the eleventh studio album by the English rock band The Beatles. Though Let It Be was the last album released before The Beatles' dissolution in 1970, work on Abbey Road began in April 1969, making it the final album recorded by the band. Abbey Road was released on 26 September 1969 in the United Kingdom, and 1 October 1969 in the United States. It was produced and orchestrated by George Martin for Apple Records. Geoff Emerick was engineer, Alan Parsons was assistant engineer, and Tony Banks was
Here come old flattop he come grooving up slowly
He got joo-joo eyeball he one holy roller
He got hair down to his knee
Got to be a joker he just do what he please
He wear no shoeshine he got toe-jam football
He got monkey finger he shoot coca-cola
He say "I know you, you know me"
One thing I can tell you is you got to be free
Come together right now over me
He bag production he got walrus gumboot
He got Ono sideboard he one spinal cracker
He got feet down below his knee
Hold you in his armchair you can feel his disease
Come together right now over me
He roller-coaster he got early warning
Let It Be
Rubber Soul
Beatles 65
Sgt. Pepper's Lonely Hearts Club Band
A Hard Day's Night

FIG. 35


iPad
8:19 AM
Unbroken NYT Bestsellers
LAURA HILLENBRAND
UNBROKEN
The New York Times
UNBROKEN
A World War II Story of Survival, Resilience and Redemption
By Laura Hillenbrand
496 pp. Random House. $13.99
00:00:00
-00:01:26
Eight years ago, an old man told me a story that took my breath away. His name was Louie Zamperini, and from the day I first spoke to him, his almost incomprehensibly dramatic life was my obsession.
It was a horse--the subject of my first book, Seabiscuit: An American Legend--who led me to Louie. As I researched the Depression-era racehorse, I kept coming across stories about Louie, a 1930s track star who endured an amazing odyssey in World War II. I knew only a little about him then, but I couldn't shake him from my mind. After I finished Seabiscuit, I tracked Louie down, called him and asked about his life. For the next hour, he had me transfixed.
Growing up in California in the 1920s, Louie was a hellraiser, stealing everything edible that he could carry, staging elaborate pranks, getting in fistfights, and bedeviling the local police. But as a teenager, he emerged as one of the greatest runners America had ever seen, competing at the 1936 Berlin Olympics, where he put on a sensational performance, crossed paths with Hitler, and stole a German flag right off the Reich Chancellery. He was preparing for the 1940 Olympics, and closing in on the fabled four-minute mile, when World War II began. Louie joined the Army Air Corps, becoming a bombardier. Stationed on Oahu, he survived harrowing combat, including an epic air battle that ended when his plane crash-landed, some six hundred holes in its fuselage and half the crew seriously wounded.
On a May afternoon in 1943, Louie took off on a search mission for a lost plane. Somewhere over the Pacific, the engines on his bomber failed. The plane plummeted into the sea, leaving Louie and two other men stranded on a tiny raft. Drifting for weeks and thousands of miles, they endured starvation and desperate thirst, sharks that leapt aboard the raft, trying to drag them off, a machine-gun attack from a Japanese bomber, and a typhoon with waves some forty feet high. At last, they spotted an island. As they rowed toward it, unbeknownst to them, a Japanese military boat was lurking nearby. Louie's journey had only just begun.
That first conversation with Louie was a pivot point in my life. Fascinated by his experiences, and the mystery of how a man could overcome so much, I began a seven-year journey through his story. I found it in diaries, letters and unpublished memoirs; in the memories of his family and friends, fellow Olympians, former American airmen and Japanese veterans; in forgotten papers in archives as far-flung as Oslo and Canberra. Along the way, there were staggering surprises, and Louie's unlikely, inspiring story came alive for me. It is a tale of daring, defiance

FIG. 36


iPad
8:34 AM
Disney's Pirates of the Carribean On Stranger Tides
PIRATES of the CARIBBEAN
ON STRANGER TIDES
ABOUT
VIDEOS
GALLERY
GAMES
ACTIVITIES
PARKS
PARTNERS
TICKETS
Past Voyages
Join Jack's Crew
We're doomed
Sharks!
Worse than sharks, boy. Mermaids.
Interesting
We can do this Jack, the Fountain of Youth.
Mermaid waters. That be our path.
Push on. You can sleep when you're dead.
We are at a disadvantage.
Speak for yourself.
Last I heard, you were hell bent to find the Fountain of Youth
I'm just as bent as ever. Hellishly so.
Arrrrrgh.

FIG. 37




FIG. 38

| Page, Line | Timestamp | 1 | 2 | 3 | 4 | 5 | 6 | 7 | …….. | X |
|---|---|---|---|---|---|---|---|---|---|---|
| $Page_0$, $Line_0$ | | | | | | | | | | |
| $Page_0$, $Line_1$ | | | | | | | | | | |
| $Page_0$, $Line_2$ | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| $Page_n$, $Line_n$ | | | | | | | | | | |

FIG. 39


Q Thank you for that last answer.
Moving to the Smith article. Does the Smith article have any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes.
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said When I said, "Okay" I meant that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo confabulator anywhere. In fact, it describes the opposite of a turbo confabulator. Also, this same article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7.
Q Moving to some of the numbers we discussed. How did you value your invention at $50 million.
A Steve Jobs told me it was worth $50 million. Microsoft negotiated something similar for well over $50 million. We also had offers at the time for licenses from Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Page 14
what he said. Fifty to seventy five, at least.
Q So these were conversations with Jobs and Zuckerberg?
A Yes. And then each of their lawyers made their written offers. It was clear they wanted to avoid the NTP v. Research in Motion situation down the road. Just get the license out of the way.
Q Do you have a Facebook account?
A I do now.
Q So do I. Think we should friend one another?
A Sir, there is nothing I'd like more. I bet you post something witty every day.
Q So you said $50 million. And then you said Zuckerberg told you as much as seventy-five. That's a big range, so what do you consider the value?
A Well, the high end of that range. My understanding is that the number would be something for the jury to decide. They'd determine the reasonable royalty and calculate the final number. I understand our damages expert will be supplementing his final report this week. The reasonable royalty is more than the $40 million conclusion of your expert, Mr. Anderson.
Page 15
KEY
Plaintiff's designation On Off
Defendant 1 designation On Off
Defendant 2 designation On Off
Non-designated text = displayed

Fig. 40


Q Thank you for that last answer
Moving to the Smith article. Does the Smith article have
any description of the turbo confabulator?
A Smith? You mean the one marked as Exhibit 7?
Q Yes.
A Okay, yes
Q So it does describe the turbo confabulator.
Does it also describe the flux capacitor?
A No, I think you misunderstood what I said. When I said,
"Okay" I meant that I had Exhibit 7 in front of me. Looking at it now,
it doesn't describe a turbo confabulator anywhere. In fact, it
describes the opposite of a turbo confabulator. Also, this same
article has nothing to do with a flux capacitor.
Q So neither is described?
A That's right. Neither is described in Smith. Here Exhibit 7
Q Moving to some of the numbers we discussed. How did
you value your invention at $50 million
A Steve Jobs told me it was worth $50 million. Microsoft
negotiated something similar for well over $50 million. We also had
offers at the time for licenses from Google, Netflix, and Facebook. I
talked with Mark Zuckerberg himself, and that's
Page 14
Show QR Code

FIG. 41


iPad
8:34 AM
Anderson, Kevin May 10, 2011
QR Code Reference
Confidential Deposition Transcript
In re Certain Electronic Devices, Including Mobile Phones, Portable Music Players, and Computers
U.S. Int'l Trade Commission
Inv. No. 337 T.A. 701
Administrative Law Judge E. James Gildea
Complainant: Nokia Corp. and Nokia, Inc
Defendant's Designation
014 02+014 06
www.sampleURL.com/ClientControl=AttorneySmith9876, Transcript=ABC123-Anderson, StartPage=14, StartLine=2; EndPage=14; EndLine=6
014 01 Q Thank you for that last answer.
02 Moving to the Smith article. Does the Smith article have any description
03 of the turbo confabulator?
04 A Smith? You mean the one marked as Exhibit 7?
05 Q Yes.
06 A Okay, yes.
07 Q So it does describe the turbo confabulator.
08 Does it also describe the flux capacitor?
09 A No, I think you misunderstood what I said. When I said, "Okay" I meant
10 that I had Exhibit 7 in front of me. Looking at it now, it doesn't describe a turbo
11 confabulator anywhere. In fact, it describes the opposite of a turbo confabulator.
12 Also, this same article has nothing to do with a flux capacitor.
13 Q So neither is described?
14 A That's right. Neither is described in Smith. Here Exhibit 7.
15 Q Moving to some of the numbers we discussed. How did you value your
16 invention at $50 million.
17 A Steve Jobs told me it was worth $50 million. Microsoft negotiated something
18 similar for well over $50 million. We also had offers at the time for licenses from
19 Google, Netflix, and Facebook. I talked with Mark Zuckerberg himself, and that's
Plaintiff's Designation
014.07+014.12
00:00:33

FIG. 42




FIG. 43


MobilePickup
KXDJ
KXDJ
58
Passport to Paradise
8:00 pm - 10:00 pm
Action and adventure await when a newly-wed couple escapes to an island paradise.
Paused
0:00
60:00
37:00
KCBC • 1000
12:30:03
Thu. 11/21
8:00 pm
8:30 pm
9:00 pm
KPQX 55
Mr. Front Man
College Foot...
KPDT 56
New Voyages
KXDJ 58
Passport to Paradise
KLSS 59
Eleven Elements of the World
Papa Papagopas
WKDS 61
Tracing the Past
Meeting...
REC
COX
A Time
B Theme
C Search

FIG. 44

# METHODS AND SYSTEMS FOR FACILITATING AN ONLINE SOCIAL NETWORK

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 13/851,813, entitled "Text-Synchronized Media Utilization and Manipulation Based on an Embedded Barcode," which is a continuation-in-part of U.S. patent application Ser. No. 13/342,865, entitled "Text-Synchronized Media Utilization and Manipulation," which claims priority to U.S. Provisional Patent Application Ser. No. 61/429,399, entitled "Text-Synchronized Media Utilization and Manipulation," which are all herein incorporated by reference in their entirety.

## BACKGROUND

Today, multimedia content can be recorded, displayed, and accessed on a wide variety of platforms including mobile computing devices, such as laptops, tablet computers, smart phones, etc. In general, multimedia may comprise a combination of text, audio, images, animation, video, or interactive content.

Unfortunately, it remains difficult to encode and synchronize text that is associated with a multimedia file. For example, the judicial system requires production and review of a substantial amount of information including audio and visual evidence, document production and review of written and electronically generated information, and testimony of various involved parties. Testimony is understood to be a process by which an attorney asks oral questions of a witness and the witness provides answers under oath. A word-for-word record of the questions asked and the answers given is called the testimony transcript. Testimony is normally taken and recorded during a deposition or a trial. During a trial or deposition, testimony is recorded by a court reporter using a special typewriter-like device normally referred to as a stenograph machine. The output of the stenograph machine is a long paper tape of printed phonetic characters capturing, in a form of short hand, the word-for-word record of the testimony. The court reporter uses the paper tape to create a text translation of the tape or text data. This text data is created using a typewriter or a word processor. The text data is referred to as a transcript of the testimony and is historically created "off-line" from the actual testimony.

During the discovery and research phase of litigation, the attorney will search through testimony for key statements made by a witness. The attorney uses software tools for searching and annotating the ASCII testimony or text data.

A shortcoming of some transcript management utilities is that they operate on a full version of Microsoft Windows operating system, which places large demands on processor speed and RAM memory. As a result, the full Microsoft Windows operating system is unsuitable for mobile computing devices, and they cannot run transcript management utilities. The result is that there has been no transcript management utility for display of smoothly scrolling, synchronized text and multimedia for use on a mobile computing device, where the user may perform a gesture on the text to cause the multimedia to jump to a desired location and begin playback.

## BRIEF DESCRIPTION OF THE DRAWINGS

The patent or application file contains at least one drawing executed in color. Copies of this patent or patent application publication with color drawing(s) will be provided by the Office upon request and payment of the necessary fee. Systems and methods which embody the various features of the invention will now be described with reference to the following drawings, in which:

FIG. **1** is a representation of the viewing screen layout of a mobile computing device, partitioned into several areas.

FIG. **2** illustrates an example of a movie being output using the viewing screen layout of a mobile computing device shown in FIG. **1**.

FIG. **3** illustrates another example representation of the viewing screen layout of a mobile computing device, partitioned into several areas.

FIG. **4** illustrates an example of a deposition video and transcript being output using the viewing screen layout of a mobile computing device shown in FIG. **3**.

FIG. **5** illustrates an example representation of the viewing screen layout of a mobile computing device, partitioned into several areas.

FIG. **6** is a schematic of elements of an example system.

FIG. **7** illustrates an example interface that may be used in handling errata sheet operations.

FIG. **8** illustrates an example of merging designations.

FIG. **9** illustrates example data structures that may be used in merging designations.

FIG. **10** illustrates an example interface for assigning issues to designations.

FIGS. **11**A-C illustrates an example interface where each party has its own work pane display of a transcript.

FIG. **12** illustrates an example printed page output in a portrait view.

FIGS. **13**A-B illustrates an example printed page output showing only designated portions of a transcript.

FIG. **14** illustrates an example printed page output in a landscape view.

FIG. **15** illustrates an example of a manuscript printing showing highlighted designations.

FIG. **16** illustrates an example interface for annotating evidentiary rulings on objections.

FIG. **17** illustrates an example format for a synchronization index.

FIG. **18** illustrates an example of a linked exhibit.

FIG. **19** illustrates exemplary graphical elements may be displayed to indicate other highlighted/designated portions of a text transcript.

FIG. **20** illustrates a display screen of a mobile device that can be divided into multiple sections.

FIG. **21** illustrates an exemplary screen shot of a mobile device for a transcript synchronized to a multimedia audio file.

FIG. **22** illustrates an exemplary screen shot of a mobile device playing multimedia content and a transcript for education material from an organization and a listing of other courses with multimedia content.

FIG. **23** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript.

FIG. **24** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript accompanied with a comments section on the display.

FIG. **25** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript accompanied with a section of the display for showing errata and a thumbnail of an attachment to the transcript.

FIG. **26** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a pop-up window showing a linked exhibit.

FIG. **27** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section for exhibits linked to the deposition.

FIG. **28** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section showing objections to portions of the testimony by the deponent.

FIG. **29** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a summary section on the display.

FIG. **30** illustrates an exemplary screen shot of a mobile device for a filtered deposition video and transcript with a summary section on the display.

FIG. **31** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section listing witnesses.

FIG. **32** illustrates an exemplary screen shot of a mobile device playing a news story having a video clip and corresponding text.

FIG. **33** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript and a section listing other files available to the user.

FIG. **34** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript from an educational institution.

FIG. **35** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript from a musical group and section listing other available content from the musical group.

FIG. **36** illustrates an exemplary screen shot of a mobile device playing multimedia content and a transcript for an audio book.

FIG. **37** illustrates an exemplary screen shot of a mobile device playing a movie and a transcript with a section for navigating through the movie's content.

FIG. **38** illustrates an exemplary layout of a display of a mobile device for brand tagging in multimedia content.

FIG. **39** illustrates an exemplary data structure for the synchronization index.

FIG. **40** illustrates an issue-coded transcript comprising barcode placed in the margin.

FIG. **41** illustrates a process flow chart for creating a barcode associated with a portion of a transcript and multimedia.

FIG. **42** illustrates a software user interface for displaying barcode associated with a portion of a transcript and multimedia.

FIG. **43** illustrates a multimedia display with barcode for retrieval of multimedia with a mobile computing device.

FIG. **44** illustrates a program guide with barcode for retrieval of multimedia with a mobile computing device.

## SUMMARY

In one embodiment, what is disclosed is a method for social networking with a mobile computing device. The method comprises providing for use on a mobile computing device a synchronization index, wherein said synchronization index is associated to multimedia, wherein the synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia, and wherein the synchronization index indicates respective times within the multimedia corresponding to when a word or range of words is audible in the multimedia. The method also involves providing mobile computing device software, wherein said mobile computing device software comprises executable program code configured to receive the synchronization index, wherein said mobile computing device software comprises executable program code configured to facilitate annotation of a portion of said synchronization index responsive to user input received by the mobile computing device; and communicating said annotation to a second computing device via a network.

In another embodiment, what is disclosed is method for social networking relating to multimedia. Multimedia is provided. A synchronization index is provided that comprises an electronic transcript of text corresponding to at least a portion of audio from said multimedia and indicates respective times within the multimedia corresponding to a word or range of words, wherein said synchronization index provides association between at least one portion of said electronic transcript and at least one portion of said multimedia, and wherein said synchronization index is provided to a first user and at least one additional user via a network. Executable program code is provided to deep link to a predetermined point within said multimedia by using said synchronization index. Executable program code is provided to share one or more said deep links, wherein said sharing of deep links facilitates interaction between the first user and at least one additional user via a network. In another embodiment, what is disclosed is a computer system for social networking relating to multimedia. The computer system comprises one or more processors for executing executable program code. The system also has executable program code configured to provide multimedia; executable program code configured to provide a synchronization index, wherein said synchronization index is associated to said multimedia, wherein the synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia, and wherein the synchronization index indicates respective times within the multimedia corresponding to a word or range of words, wherein said synchronization index is shared with a plurality of users; executable program code configured to provide facility for a user to deep link to a predetermined point within said multimedia by using said synchronization index; and executable program code configured to provide facility for a plurality of users to share said deep links, wherein said sharing of deep links facilitates interaction between a first user and at least one additional user via a network.

## DETAILED DESCRIPTION

Techniques are described for deploying a synchronization index and associated media (e.g., multimedia), for manipulations to the synchronization index, for navigation between the synchronization index and associated media (e.g., multimedia), and for synchronous playback of media (e.g., multimedia) and associated text, preferably using a mobile computing device. For example, a system may use multimedia with a synchronized text transcription thereof, or a synchronization index, on a mobile computing device for viewing and manipulating the multimedia, using the synchronized text transcription. In this example, the mobile computing device may be used to navigate the multimedia, annotate the text transcription, achieve synchronous play of the multimedia, and communicate to a computer other than the mobile computing device (e.g., a remote server) manipulations performed on the text or multimedia.

In one aspect, a system enables viewing and manipulating synchronized multimedia and text data stored on a remote server. The system may use multimedia with a synchronized text transcription thereof, or a synchronization index, on a mobile computing device for viewing and manipulating the multimedia, using the synchronized text transcription to navigate the multimedia and vice versa, optionally annotating the

text transcription, and communicating to a computer other than the mobile computing device manipulations performed on the text or multimedia.

More generally, in some implementations, a system enables viewing and manipulating multimedia and text data. Specifically, multimedia and an associated synchronization index are communicated to a remote server. The remote server operates to re-format the synchronization index and communicate it to a mobile computing device. With the mobile computing device, its software, and the synchronization index, the user may then perform manipulations on the text and control the multimedia delivery to the mobile computing device, or to a separate receiving device. A user having performed manipulations to the synchronization index may then communicate those manipulations back to the remote server to allow subsequent users to retrieve the synchronization index for use with their own mobile computing devices, thereby realizing a collaborative working environment.

More recently, stenograph machines and computer software programs have been developed which translate the phonetic characters while the stenograph operator is typing. The output of this automated translation is a stream of ASCII characters or text data that is stored on a disk, data card (or other portable storage device), or in a personal computer attached directly to the stenograph machine by a serial communications link. These types of stenograph machines and the associated computer and software are referred to as Computer-Aided Transcription or CAT systems. The text data output of the CAT system is an ASCII text computer file of the testimony. The court reporter edits the ASCII file to create a completed version of the transcript, which can be viewed on a computer or can be printed. Typically, the court reporter then forwards the completed version of the transcript to a court reporting firm for quality review; standardization of formatting, to include page and line numbers, headers and/or footers, information to identify the court reporting agency and provide contact information, certification pages, and so on; and production and distribution to the attorneys and/or the court. The transcript is then a "final" transcript, and it may be formatted in a number of formats for litigation related software applications and printing.

Along with the development of CAT systems, video capture devices have advanced the art of making a record of testimony, most commonly employed as part of the deposition process. In major and/or complex litigation cases, testimony from depositions and/or a trial is video recorded in addition to having a transcript created. The person performing the video recording is called a videographer. The videographer uses a standard, commercially available video capture device. Video recording proceeds simultaneously with the creation of the written record of the testimony by the court reporter. After the testimony is complete, the lawyer will normally ask the court reporter for a copy of the text data or ASCII text file of the testimony and will ask the videographer for a copy of the video data of the testimony.

The video recording has historically been recorded to a tape media, which videotapes are commercially available in a number of sizes and formats. The videographer typically later encodes the content into an electronic format with commercially available playback and encoding equipment. A common encoding format for the legal industry is MPEG-1, as MPEG-1 functions with substantial stability with commercially available trial presentation software applications.

Transcript Management

A lawyer uses the ASCII file for many purposes including review and research of the deposition testimony, preparation for trial, and research prior to cross examination during trial. A variety of software tools have been developed which, among other things, allow a lawyer to electronically search testimony text for key words, to annotate, to insert page marks, to associate certain portions of testimony with issues and to create printouts of testimony for insertion in pleadings, submissions to the court, and trial presentations.

During the discovery and research phase of litigation, the attorney will search through testimony for key statements made by a witness. The attorney uses software tools for searching and annotating the ASCII testimony or text data.

A shortcoming of some transcript management utilities is that they operate on a full version of Microsoft Windows operating system, which places large demands on processor speed and RAM memory. As a result, the full Microsoft Windows operating system is unsuitable for mobile computing devices, and they cannot run transcript management utilities. The result is that there has been no transcript management utility for display of smoothly scrolling, synchronized text and multimedia for use on a mobile computing device, where the user may perform a gesture on the text to cause the multimedia to jump to a desired location and begin playback.

To understand some problems associated with transcript management, it is important to understand how a team of attorneys collaboratively works on a transcript. First, a team of attorneys reviews a transcript internally within the law firm or legal department. This internal review may be done by several attorneys, by a junior associate who has his work checked by a more senior attorney, by a paralegal, or in conjunction with the legal client or corporate representative who may have knowledge about the testimony or an interest in the litigation. The purpose of the internal review is to determine what questions and answers may be useful either in upcoming depositions, during settlement negotiations, for use in legal briefs, or at trial. Internal review is where "issue codes" are important. The term issue code refers generally to a range of words selected within a transcript and labeled to correspond to an issue within the litigation.

The circumstance may exist after a deposition where a paralegal, or other professional, may be asked to review the transcript and to annotate it for the law firm partner who is preparing to depose another witness, say, an expert witness. Accordingly, the partner would ask the paralegal to "issue code" all sections of the transcript relating to the partner's anticipated line of questioning of the new witness, for example, to explore inconsistencies from one witness to another. The paralegal does the review, and issue codes several parts of the transcript, say, in yellow. Before the deposition, the partner will come back to the transcript and read, as quickly and efficiently as possible, only those yellow sections. This process may occur for several issues, each of which may overlap and be a different color. The transcript itself can, if all issues are viewed simultaneously, become too busy to read, as overlapping colors bleed into one another, the number of colors become distracting as the numbers of issues increase, and so forth.

The goal of a legal team before trial is to piece together a coherent story using very discrete deposition designations, or video clips corresponding to deposition designations. These designations will support the credibility of legal briefs to the court, and such deponent testimony is frequently cited and footnoted accordingly.

In transitioning to trial, the "issue codes" as above become only secondarily useful. At that point, the primary purpose of the transcript management utility is to select only the best material to use in court. Assume a deponent has died and cannot, obviously, testify on the witness stand. The attorneys will be able to show his video recorded deposition in court,

pursuant to the rules of evidence. The law firm will pare down the deponent's testimony to the best segments possible, for example as a highlight reel, leaving out the testimony that would tend to undermine the coherent story that they are trying to tell in court. This is typically a subset of the material already issue coded. Video run time is often a key consideration, 1) because the court can allocate a certain number of hours for one side to present its entire case, in an effort to get to the heart of the controversy and to respect the jury's time, and 2) because too much video can be boring for the jury to watch, causing them to cease paying attention or fail to appreciate the relevance of the testimony to the overall dispute.

Accordingly, the plaintiff's attorneys have a time before trial by which they need to identify to the defendants, and the court, which portions of testimony they intend to rely upon at trial. For this reason, plaintiff's attorneys will need to 1) shorten, modify, or eliminate testimony they have already issue coded, 2) "flatten" the issue codes into one common issue code, i.e. "Plaintiff's direct designations", and 3) transmit them to the defendant.

The defendant will then take "Plaintiff's direct designations" and add back all the material that would be helpful for defendant's case. Defendant's objectives are to 1) undermine the credibility of the witness, 2) lessen the impact of the testimony designated by the opposing party, 3) confuse the jury, or 4) add back so much material that it becomes difficult for a jury to understand the importance of the testimony as a whole or the reasons for which it is being proffered for the jury's consideration. These would be "issue coded" as, say, "Defendant's counter designations." This process may occur again with counter-counter designations by each party.

The trial consultant, generally an individual with information technology and trial presentation software expertise, is tasked with displaying with a computer in the courtroom only the proper video segments. Other than to provide an accurate accounting of what video run time is to be allocated against plaintiff's total allotted time and defendant's allotted time, the trial consultant is indifferent as to what clip "belongs" to whom. All of the designations, once finalized by the attorneys, should be "flattened", giving the consultant the fewest number of edit points to "fine tune." Accordingly, there is one merge of designations done after internal review when preparing for trial, and one merge done when a plaintiff and a defendant have absolutely finalized the designations and given them to the trial consultant.

Without the techniques described throughout this disclosure, transcript management and communication between parties and the court may be a process plagued with inefficiencies.

Timestamping a Transcript

In addition to having the written transcript organized and available to the attorney whilst eliciting testimony at trial, the need frequently arises to present to the court and jury a specific part of the testimony. When testimony has been video recorded, it is desirable to have the ability to use the video associated with key statements to impeach, to expose an inconsistency between a witness's in-court testimony and earlier testimony, to show a witness's demeanor, and so forth. As an examining attorney, having access to a witness's videotaped deposition, and having the witness know retrieval and display of prior testimony is a possibility, is also a strong psychological tool that can affect a witness's performance on the witness stand.

To view the video, the attorney historically had to have access to a VCR, a DVD player, a video player or DVR device and either a TV screen or monitor. With the advent of trial presentation software, along with advances in computing speed and storage capacity, attorneys and their trial consultants can link, or marry, the deposition transcript to the deposition video. This process is commonly referred to in the legal industry as "timestamping" a transcript.

The important job of synchronizing multimedia to a transcript or text data may be done by a human operator (either by a law firm or a third party vendor) using trial management software, or through a third party vendor who utilizes voice recognition software, or a combination of voice recognition software with a human quality review check. Other methods may be employed for creating closed captioned and/or subtitled outputs for use by the hearing impaired, and the multiplicity of methods to create synchronization indexes enhances the number of potential uses for the techniques described throughout this disclosure. Problems arise as the parties move through the litigation process and are tasked with synchronizing video data and text data, and they are further burdened with using disparate software applications to accomplish issue coding, annotating, editing, time stamping, video clip creation, video clip review, report creation to detail video clip duration, errata sheet tracking, and distribution of content to opposing parties, clients, and the court.

Regarding timestamping a transcript, one day of deposition testimony for one deponent is almost always comprised of more than one video segment. One video segment generally corresponds to one videotape the videographer fills during the deposition and later encodes to a single MPEG-1 file, the legal industry standard format for video encoding. Depending on videotape stock and format, one video tape will hold about an hour of content, and most often no more than two hours of content, while most depositions run longer than two hours. There is typically only one transcript for each deposition. An attorney needs to be able to associate the single transcript to the multiplicity of video files.

For example, it is common within the court reporting and legal videography industry for a 3-hour deposition of a deponent to be split between three videotapes, each an hour in duration, that would be encoded as x.mpg for time-code zero to hour 1, x1.mpg for hour 1 to hour 2, and x2.mpg for hour 2 to 3. Within some trial management utilities, x.mpg, x1.mpg, and x2.mpg are sequenced, for a 3 hour total duration, and associated with the single transcript. Using a trial management utility, the user reads the transcript while the video plays and presses a key when the last word on a line is spoken to have the software note the time at which the input was made and note it in a table adjacent to the line of testimony.

In some trial management utilities, the resultant timestamped file, or synchronization index, is a Microsoft Access formatted database file, in .mdb format, with a column of timecode run duration that runs sequentially from hour zero to hour three. Accordingly, a user of a trial management utility wishing to have the software call a line of testimony at timecode 02:30 would be pointed to 00:30 of x2.mpg. Calling testimony at time-code 01:45 would call x1.mpg at 00:45, and so on. In this fashion, the timestamped transcript, or synchronization index, allows the attorney to use the transcript as a roadmap, while the software seeks first the correct video file, then seeks to the correct location within the video file, then displays each in congruent, synchronous fashion by refreshing the display of the transcript as the timecode associated with each new transcript line is reached.

FIG. **39** illustrates an exemplary data structure for the synchronization index. As shown, the synchronization index comprises entries for each line having a predetermined number of characters, such as 256 characters, and each page may have a predetermined number of lines. For each line, the synchronization index indicates a timestamp and coordinate

for each character. The synchronization index assists in synchronizing multimedia content, such as audio and/or video clips, with transcripts of text.

In some cases, it has been very difficult for users to create video clips or audio clips in software, especially with known trial presentation software, that correspond to issue codes created within transcript management software. Users have been faced with a multiplicity of software applications, the combination of which are difficult to learn and use, expensive to purchase, and impossible to jointly manage, particularly on mobile computing devices.

Trial Preparation

Trial presentation software applications have become an indispensable tool to today's litigators. These applications allow organization, quick access to and broadcast of all types of material the litigator needs at trial, including trial exhibits, demonstrative exhibits, multimedia, animations, transcripts, video testimony, timelines, images and so on. Most trial presentation utilities are characterized by running only on a computer using a full version of the Microsoft Windows operating system (which itself requires a computer comprising at least a 233 MHz processor, 64 MB of RAM, and 1.5 GB of available hard drive space), by requiring extensive training and practice to achieve an acceptable level of competence, by costing hundreds of dollars to purchase or rent, by necessity of payment of yearly maintenance fees to maintain an active license and access to technical support, and by frequently requiring a paid litigation consultant to operate it competently in a courtroom environment. Each, and the combination, is replete with a number of shortcomings effecting the efficiency of litigation practice.

Transcript Errata Sheets

To illustrate just one of the problems associated with transcript management, one may look to the errata sheet used in litigation. The Federal Rules of Evidence (Rule 30), and other local rules patterned after them, allow a period of time after a deposition for the deponent to review the written transcript for errors before it is signed and returned as an accurate transcription of the testimony. Commonly, the witness will read through the transcript, note what he believes to be errors, and note them in what is referred to in the legal industry as an "errata sheet." A copy of this errata sheet is signed by the witness, returned to the court reporter or opposing counsel, and physically affixed to the hardcopy of the official transcript as an appendix. Thus, the witness's signature is an attestation to the accuracy and completeness of the court reporter's transcription which, if all errata denoted are remedied, would comprise the final, official transcript to be submitted to the court. Accordingly, there historically has been no notation in the original transcript at the point where a correction was made that would refer the reader to the correction in the errata sheet.

Moreover, and perhaps more problematically, content on an errata sheet is never added to or affixed to the electronic copy of a transcript, which is often in a .txt format. It is this .txt formatted transcript that is loaded into commercially available trial presentation software. For example, if a .txt transcript is loaded into a trial management utility, the trial management utility creates a Microsoft Access database table (.mdb format) formatted to take one line of text and places it in one of the database cells. This database, and the content of the cells, is called upon by the trial management utility when videotaped deposition testimony is played to give the appearance of synchronized, scrolling text beneath a video image. Since the corrections of the errata sheet never make their way into the .txt transcript, they never make their way into the trial presentation software, and they are never displayed, as they should be, as part of the synchronized, scrolling text beneath the video image.

The disparity between words clearly audible from the videotape and the written transcript is often noticed, if at all, on the eve of trial, by the trial consultant. Text that does not match the video recording is problematic because, according to procedural rules, it is the written transcript that is the official record and it is that record that is passed on to appellate courts and preserved in the record. It can be problematic and confusing if a jury is shown video testimony that does not exactly match the scrolling text that may be displayed with it. It can be further problematic and confusing, particularly to an appellate court, if a jury is shown video testimony without any scrolling transcript, where the written transcript may, in fact, contradict the words spoken on the video.

Prior to the techniques described throughout this disclosure, there has been no systemic way to ensure errata sheet corrections functioned in concert with trial presentation software.

Certain Closed Captioning, Subtitling and Historic Uses of Text

Closed captioning text and karaoke-type subtitles may present a number of shortcomings emblematic of the art before the techniques described throughout this disclosure. First, closed captioned text is configured to display over a part of the video screen, thereby obscuring at least a part of the video display itself. Second, closed captioned text often appears as text with a background graphic, for example an opaque or semi-opaque box layered between the video and the individual text characters. As a consequence, more of the video display area is covered than would be the case if the individual characters were alone displayed. Third, a user in general can only select to have closed captions "on" (or displayed), or "off" (not displayed.) Fourth, a user cannot generally select text display font, color, or size. Fifth, a user cannot perform a text search. Sixth, a user cannot view text that does not correspond to the portion of video being viewed, that is, they are inextricably linked and cannot be separated apart from turning the text display "off." Seventh, the text cannot be highlighted, annotated, bookmarked, associated with a note, nor can any of the above be used to navigate within the video. Eighth, a user cannot provide a link to the text to a second user, intending for the second user to begin video playback at a time certain based on the linked text. Ninth, closed captioning is not optimized for use with mobile computing devices, or display screens of relatively small size. Tenth, closed captioning text data is difficult to alter, as it is transmitted as an integral part of a video signal. In the case of "open subtitles" the subtitles are permanently placed into the video frame itself and cannot be removed.

Eleventh, another pitfall of closed captioning occurs as a result of a limited number of text words being able to be displayed at once, whereas in certain circumstances a more complete text transcript would be more preferable. For instance, song lyrics have the characteristics of poetry, or a complete story. The context of the words within the overall composition may have meaning to the artists, or to the reader, when read as a whole, rather than one line at a time or a few words at a time. Twelfth, closed captions are most often employed by the hearing impaired or in environments where audio for video is not readably audible, for example in a restaurant or bar. Consequently, the vast majority of users who consume multimedia content do not seek to utilize closed captioned text even when it is made available, and many may not even be aware that it is available as an option.

Thirteenth, closed captioning text and subtitles are not "interactive," in that a user cannot do anything with the words other than watch them appear on screen when the video plays. The user cannot move ahead or backward in the transcription, and the user cannot read any words other than the limited number of lines than can fit on the video screen, obscuring part of the screen. Closed captioning and karaoke-type subtitles, and the information to display them in a synchronization index-type format, are characterized by passive non-interactivity, meaning there is no way for an operator to utilize the text in any way other than watching it appear and disappear, typically from the multimedia viewing area itself. The user has no opportunity to use the words in any fashion other than to read them.

By contrast, the synchronization index and software suited for use on a mobile computing device of the present disclosure is characterized by interactivity, meaning that the user is able to use the synchronous text display to accomplish another action, namely convenient navigation within the multimedia by using the text, or convenient navigation of the text by using the multimedia. Other actions may also be provided, as discussed further below, including annotation of text and provision of advertising to a mobile computing device. In the present disclosure, an enhanced overall user experience may be provided, where the text can be used as an interactive tool to facilitate navigation within corresponding media.

As is evident, transcript management for litigation is a daunting task because of continual updating, modifying, editing, issue coding, synchronization to video, video clip creation and editing, and need to communicate with the court and adversarial litigants, compounded by the multiplicity of complicated, expensive, computer-resource intensive software applications required to accomplish each task.

The techniques described throughout this disclosure may address and solve many of these shortcomings, for example by providing intuitive systems and methods to manage a synchronization index and associated multimedia with a mobile computing device.

Despite the numerous systems and methods known for manipulating transcripts, synchronizing text to video, and presenting multimedia in the courtroom, there is still a need for a system and methods to simplify the transcript management process by providing a synchronization index and associated multimedia to a mobile computing device, being in communication with a hosting server and multimedia server. In the present disclosure, a mobile computing device, with a user friendly interface, may be employed to simplify what has been a complex, problematic workflow, to synchronously display text and multimedia, to simplify navigation of multimedia, and to ease communication among disparate users.

There is also a need for systems, products, software and methods to facilitate use of mobile computing devices with synchronization indexes and corresponding multimedia for any type of multimedia that can be associated, and manipulated, by corresponding text, such as music and lyrics, video/audio books, movies and screenplays, and other multimedia recordings.

The techniques described throughout this disclosure may address one or more of these needs and may advantageously overcome one or more deficiencies of other options. Certain embodiments of the inventions will now be described. These embodiments are presented by way of example only, and are not intended to limit the scope of the inventions. Indeed, the novel methods and systems described herein may be embodied in a variety of other forms. Furthermore, various omissions, substitutions and changes in the form of the methods and systems described herein may be made without departing from the spirit of the inventions. To illustrate some of the embodiments, reference will now be made to the figures.

FIG. **1** is a representation of the viewing screen layout of a mobile computing device, partitioned into several areas. In this example, computer source code (e.g., code written in Xcode or other suitable programming language) was compiled for mobile computing devices (e.g., a tablet computer, such as the iPad, a mobile phone, such as the iPhone, etc.) running a mobile device operating system (e.g., Apple's iOS4.0/iOS4.2). Some terms used within this application may be trademarks owned by their respective owners. In the case of a tablet computer, the display screen may be divided into several main areas: the multifunction area **1**, the header area **8**, the media area **9**, the text area **10**, and the scrub-bar area **11**.

The media area **9** may display output of a media file selected by a user. For example, the media area **9** may display image data in the form of a video or still image. In this example, the media area **9** may display a deposition video, a movie video, a music video, an illustration from an electronic book, or other types of media a user may desire to output. The tablet computer also may output, using a speaker, audio that corresponds to the displayed media, such as audio of a deposition video being displayed, audio of a movie being displayed, audio of a music video being displayed, audio of an electronic book for which an illustration is being displayed, etc.

The text area **10** may display a text transcript that corresponds to the media being displayed in the media area **9**. For example, the text area **10** may display a text transcript of a deposition video being displayed, a text transcript of dialogue from a movie being displayed, a text transcript of lyrics of a music video being displayed, a text transcript of an electronic book for which an illustration is being displayed, etc.

The text area **10** may control display of the text transcript in a synchronized manner with the media being displayed in the media area **9**. For instance, the tablet computer may identify a portion of the text transcript that corresponds to the portion of the media being displayed in the media area **9** and display the identified portion of the text transcript. The text area **10** also may include a highlight bar that serves as a position indicator, for example, by highlighting the current line of text being output as audio for the media displayed in the media area **9**. In some implementations, the tablet computer controls the highlight bar to remain static and causes the text displayed in the text area **10** to scroll up as each line of audio shown in the text transcript is output. In other implementations, the tablet computer controls the highlight bar to move down a line in the text transcript as each line of audio shown in the text transcript is output and controls the highlight bar to move back to the top of the text area **10** when it reaches the bottom of the text area **10** and a new portion (e.g., page) of the text transcript is displayed in the text area **10**. Other options for the highlight bar may be employed and highlighting of each word in the text transcript also may be used. The tablet computer may control display of the text transcript in a synchronized manner with the media being displayed in the media area **9** by using a synchronization index as described throughout this disclosure.

The text area **10** also may be manipulated by a user to control display of the media being displayed in the media area **9**. For instance, the user may select a line in the text transcript being displayed in the text area **10** and the tablet computer may start display of the media at the point corresponding to the selected line in the text transcript. If the user selects multiple lines of the text transcript, the tablet computer may start display of the media at the first selected line in the text

transcript and stop display of the media at the last selected line in the text transcript. The text transcript displayed in the text area **10** may be used to achieve other types of control of the media displayed in the media area **9**, as described throughout this disclosure.

In addition, in some implementations, the tablet computer may enable a user to independently review the text transcript displayed in the text area **10**. For instance, the tablet computer may enable a user to scroll through the text transcript with or without impacting the media displayed in the media area **9**. Also, the tablet computer may enable a user to search the text transcript to find portions of the text transcript and corresponding media that the user would like to perceive. Further, the tablet computer may enable a user to manipulate the text transcript by, for example, adding annotations to the text transcript and designating portions of the text transcript of interest, as described throughout this disclosure. The tablet computer may send the manipulations (e.g., annotations and designations) to a remote server for remote storage and to be synchronized with other systems the user may use for annotating a text transcript and designating portions of the text transcript.

The header area **8** may display information (e.g., metadata) about the media being displayed in the media area **9** and the text being displayed in the text area **10**. For instance, the header area **8** may display a title of the media, an author or director of the media, identity of actors or characters shown in the media, or any other information (e.g., metadata) that may be useful in providing additional information of the media and text being displayed.

The scrub-bar area **11** includes a scrub bar that may be used to control display of the media displayed in the media area **9** and the text displayed in the text area **10**. For example, as a user moves the scrub bar control back and forth, both the media displayed in the media area **9** and the text displayed in the text area **10** may scroll in a synchronized manner.

The multifunction area **1** may include a media select icon **2**, a search icon **3**, a title area **4**, an issue icon **5**, a text font display icon **6**, and an annotation icon **7**. The media select icon **2** may enable a user to select media to display in the media area **9** by, for example, causing display of a directory from which the user may select a desired media file or causing display of a list of available media files for user selection. The search icon **3** may enable a user to search the text transcript displayed in the text area **10**. The title area **4** may display a title of the media being output and the text font display icon **6** may enable control of font parameters of the text in the text area **10** is displayed. The issue icon **5** may enable a user to add an issue associated with any portion of the text transcript capable of being displayed in the text area **10** and the annotation icon **7** may enable a user to add an annotation to the text transcript displayed in the text area **10**.

FIG. **2** illustrates an example of a movie being output using the viewing screen layout of a mobile computing device shown in FIG. **1**. As shown in FIG. **2**, the header area **8** displays a title of the movie, the director of the movie, the writer of the movie, the scene name of the scene currently displayed, and the names of the characters (and/or actors) having speaking roles in the scene. The scene name and the names of the characters (and/or actors) may dynamically change as the movie plays. The header area **8** also includes a display of a concept for the scene currently being displayed and an image of a concept sketch of the scene currently being displayed. The concept and concept sketch may dynamically change as the movie plays. In addition, the media area **9** shows a display of the movie video and the text area **10** shows a portion of a text transcript of the dialogue of the movie video being displayed. As described throughout this disclosure, the mobile computing device may control display of the text transcript in the text area **10** in a synchronized manner with the video being displayed in the media area **9**.

FIG. **3** illustrates another example representation of the viewing screen layout of a mobile computing device, partitioned into several areas. As shown, the display screen may be divided into several main areas: the multifunction area **1**, the header area **13**, the media area **12**, the text area **14**, and the scrub-bar area **11**. The multifunction area **1** and the scrub-bar area **11** may have the same characteristics described above with respect to FIG. **1**. Despite different size and layout, the media area **12**, the header area **13**, and the text area **14** may operate similarly to the media area **9**, the header area **8**, and the text area **10** described above with respect to FIG. **1**.

FIG. **4** illustrates an example of a deposition video and transcript being output using the viewing screen layout of a mobile computing device shown in FIG. **3**. As shown in FIG. **4**, the header area **13** displays a court associated with the deposition, a civil action number associated with the deposition, a name of the deponent in the deposition, a location of the deposition, and the date/time of the deposition. In addition, the media area **12** shows a display of the video of the deposition and the text area **14** shows a portion of a text transcript of the dialogue of the deposition being displayed. As described throughout this disclosure, the mobile computing device may control display of the text transcript in the text area **14** in a synchronized manner with the video being displayed in the media area **12**.

FIG. **5** illustrates an example representation of the viewing screen layout of a mobile computing device, partitioned into several areas. As shown, the display screen may be used when the mobile computing device is oriented in a landscape orientation. The mobile computing device may switch between the layout shown in FIG. **5** and the layout shown in FIG. **1** or FIG. **3** depending on whether the mobile computing device detects that it is being held or viewed in a landscape or portrait orientation.

In FIG. **5**, the display screen may be divided into several main areas: the multifunction area **1**, a media list area **17**, the header area **19**, the media area **18**, the text area **20**, and the scrub-bar area **11**. The multifunction area **1** and the scrub-bar area **11** may have the same characteristics described above with respect to FIG. **1**, except that the media select icon **2** is displayed in the media list area **17**. Despite different size and layout, the media area **18**, the header area **19**, and the text area **20** may operate similarly to the media area **9**, the header area **8**, and the text area **10** described above with respect to FIG. **1**. The media list area **17** may display a directory or category name associated with the media files included in the media list area **17**. The media list area **17** may enable a user to quickly switch between different media files by selecting a media file (e.g., Media File 1, Media File 2, Media File 3, Media File 4, or Media File N) included in the list. The media list area **17** also includes an edit control **16** that enables a user to edit which media files are displayed in the list. For instance, the edit control **16** may be used to select a different directory or category of media files to display in the list.

In one example, the display screen shown in FIG. **5** may be used to display music videos. In this example, the title area **4** may display a name of the song being output, the media area **18** may display a music video of the song being output, and the text area **20** may display lyrics of the song being output in a synchronized manner with the music video. In addition, the header area **19** may display a release date for the song, a time length of the song, a label for the song, a writer of the song, and a producer of the song. The media list area **17** may display

a name of the artist singing the song being output and include a list of other songs for the artist that are available for selection.

In another example, the display screen shown in FIG. **5** may be used to display depositions. In this example, the title area **4** may display a deponent name, the media area **18** may display a video of the deposition, and the text area **20** may display a text transcript of the deposition in a synchronized manner with the deposition video. In addition, the header area **19** may display a court associated with the deposition, a civil action number associated with the deposition, a name of the deponent in the deposition, a location of the deposition, and the date/time of the deposition. The media list area **17** may display a deponents category (or a cases category) and include a list of other depositions (or other cases) available for selection.

FIG. **6** is a schematic of elements of an example system. The system comprises: a hosting server **6-1**; a multimedia server **6-2**; a web application **6-3**; text content **6-4**; multimedia content **6-5**; and at least one mobile computing device **6-6**. In most general terms, the web application is software (e.g., instructions executable by a processor and stored on a tangible, non-transitory computer-readable storage medium) that may comprise user permissioning logic **6-7**; file format and data parsing logic **6-8**; media delivery logic **6-9**; mobile computing device function logic **6-10**; search logic **6-11**; annotation and edit logic **6-12**; video, display, and playlist logic **6-13**; linked exhibit logic **6-14**; errata sheet logic **6-15**; output formatting logic **6-16**; scheduling and invoicing logic **6-17**; and variable content logic **6-18**. The web application, described in more detail below, may be software code intended to function as a "cloud computing" application, software running on a server remote from users who access it and its functionality by way of an internet connection, an internet or web browser, and a computer or, possibly, by a mobile computing device running software specifically for communication with the web application. The web application may be alternatively referred to as the WebApp.

The user permissioning logic **6-7** may control access to the web application and prevent users from accessing information stored by the web application that the users do not have permission to access. The user permissioning logic **6-7** may perform user tracking functions, change history tracking, and additional functions to allow users to access only the information they have permission to access.

The file format and data parsing logic **6-8** may be used to parse and interpret data (e.g., media files, transcripts, etc.) stored in various formats (e.g., TXT import, .MDB import, .PTF import, proprietary file formats, etc.). The file format and data parsing logic **6-8** may parse and interpret a synchronization index that controls text transcript display in synchronization with other media being displayed.

The media delivery logic **6-9** may perform functions related to media delivery. For instance, the media delivery logic **6-9** may provide media encoding, HTML5 browser support, HTTP Live Streaming, and media (e.g., iTunes) File Sharing.

The mobile computing device function logic **6-10** may perform functions related to using functions of the mobile computing device in conjunction with the web application. For example, the mobile computing device function logic **6-10** may allow the web application to leverage functionality of a smartphone (e.g., iPhone functionality) functionality of a tablet computer (e.g., iPad), functionality of an Internet television device (e.g., Apple TV functionality), and functionality of other operating system and mobile computing device technologies.

The search logic **6-11** may enable searching of text transcripts managed by the web application. For instance, the search logic **6-11** may enable searching of all text transcripts, searching of all text transcripts for a particular case, searching of a text transcript for a particular deposition, etc. The search logic **6-11** also may enable searching of corresponding options for alternative applications.

The annotation and edit logic **6-12** may enable adding and editing annotations of a text transcript. The annotation and edit logic **6-12** may enable a user to add notes to a text transcript, lock editing of a text transcript, link a counter designation to a direct designation, merge designations, bulk import designations, maintain confidentiality for edits to a text transcript, flatten designations, and add/edit evidentiary ruling designations.

The video, display, and playlist logic **6-13** may control synchronous text/video using a synchronization index. The video, display, and playlist logic **6-13** may perform video clip sequencing, jump to location features, runtime calculation, display of font/appearance, display and control of a scrub bar, timestamp editing, header/exhibits formatting, and variable speed playback control.

The linked exhibit logic **6-14** may enable display, linking, and control of exhibits that are linked (or are desired to be linked) to a transcript. The linked exhibit logic **6-14** may include a PDF viewer and an image viewer to enable display of linked exhibits or exhibits a user is considering linking to a transcript.

The errata sheet logic **6-15** may enable a user to display, edit, and control an electronic errata sheet for a text transcript. The errata sheet logic **6-15** may cause display of errata sheet entries with the original text in the transcript. The errata sheet logic **6-15** may have dual-view edit features and view toggle features.

The output formatting logic **6-16** may control output of media and/or text in terms of display on a display screen or in a printed format. The output formatting logic **6-16** may provide screen view control, 2-up view control, and print options (including PDF printing).

The scheduling and invoicing logic **6-17** performs scheduling and invoicing features and may leverage mobile computing device features. The scheduling and invoicing logic **6-17** may provide calendar functionality, invoicing functionality, recurring payments functionality, scheduling functionality, subscription model functionality, shipping functionality, and payment gateway functionality.

The variable content logic **6-18** may control variable content display. The variable content logic **6-18** may control display of advertisements (e.g., advertisements offered by the company hosting the web application, location-based advertisement, commercials and PSAs, etc.), new music, movie trailers, and branded applications (e.g., corporate news applications, educational applications, etc.).

Exemplary Synchronization Index

In some implementations, the function of a "synchronization index" is to link a word or range of words with certain media (e.g., multimedia). A "synchronization index" is an electronic file that may take any of several forms. For example, a synchronization index may be: 1) a spreadsheet with a time value corresponding to a word or range of words; 2) a table with a time value corresponding to a word or range of words; 3) a database, such as a Microsoft Access database, with a time value corresponding to a word or range of words; 4) an xml-type or html-type formatted listing that associates a time value corresponding to a word or range of words, for example as may be found in a Synchronized Multimedia Integration Language (SMIL) formatted file or similar; 5) any

of the above, substituting the time value with a video frame count or any other marker or mechanism to mark a discrete portion of a media (e.g., multimedia) file a time $t_x$ into the media (e.g., multimedia) between t=0 to t=end; or 6) a file, such as a portable document format (i.e., "PDF").

The synchronization index itself may, then, include the transcript and the timing values, or positional values, for the associated media (e.g., multimedia). In this regard, for display of synchronous text and video, only the synchronization index and the associated media (e.g., multimedia) may be needed, along with a system (e.g., one or more hardware devices operating software with logic) configured to utilize each.

The synchronization index, optionally, may include information relating to the location and/or characteristics of the corresponding media (e.g., multimedia), so the system can retrieve the multimedia for synchronous playback. This may be a pathname/filename for retrieval of multimedia, a Uniform Resource Locator ("URL") specifying a location of the multimedia, a variant playlist, and so on.

The synchronization index also may include information relating to predetermined text display settings, for example defaults of text font, size, color formatting and so on selected to optimize an orderly display.

Mobile Computing Devices

Techniques described in the present disclosure, or a portion thereof, are intended to function on a computing device, such as a mobile computing device. In the embodiments, a mobile device may comprise a display, a battery, a user interface, such as a keyboard, touchscreen, etc., and a memory, such as a flash memory or hard drive. In addition, the mobile device may comprise a wireless networking capability, such as a wireless Wi-Fi communications device, or a wired networking connection. The mobile computing device may utilize a known mobile operating system, such as WebOS, Android, or IOS.

A mobile computing device generally comprises all or a subset of the following features: a viewing screen; a battery supply for extended periods of use or standby without needing to be plugged in to an electrical outlet; an operating system;

an input mechanism, typically a keyboard rendered to a touch-sensitive viewing screen, or a keyboard/keypad that is integral to the device as opposed to a full size keyboard tethered or attached to the device by USB connection or other means; a networking mechanism that allows the device to communicate over a wireless network or telephone/data network to send and receive data (for example by Wi-Fi, 802.11a/b/g/n, Bluetooth, 3G, 4G, and so on); a quick start up time, relative to a longer start up times typically associated with booting a computer running a full version of a Microsoft Windows operating system; a utilization of solid state memory or flash memory in preference to hard-drive memory; a quiet sound when operating relative to use of noisy fans and heat sinks found in desktop computers; and a physical size, weight, or form factor that would favor portability.

Common examples of a mobile computing device include, but are not limited to, 1) a tablet computer, such as the device sold by Apple under the iPad trademark, or others including HP Slate, Dell Streak, Asus Eee Tablet, Compaq Tablet, Notion Ink Adam, MSI running Android, Quanta, ICD Vega, Google Tablet, HTC, Archos 5 Internet Tablet, Asus T91mt Eee PC, Panasonic Toughbook H1 Field, Toshiba Portege M780-S7220, Samsung Galaxy Tablet, and so on; 2) smartphones, including, but not limited to the Apple iPhone (3G, 3Gs, 4), phones running the Android operating system, phones sold by Research in Motion sold under the trademark BlackBerry, Samsung Galaxy Smartphones, Nokia N8; and other smartphones; 3) handheld devices, personal video recorders (PVRs), personal media players (PMPs), mobile gaming devices, personal digital assistants (PDAs), portable music devices (e.g., the Apple iPodTouch), and so on.

For simplicity throughout this disclosure, the term mobile computing device may be used interchangeably with the term tablet computer (e.g., iPad), but it is not intended that the term mobile computing device be limited to a tablet computer (e.g., the Apple iPad). Any examples or implementations utilizing a tablet computer (e.g., an Apple iPad) device specifically are illustrative only and are not intended to limit the scope of the disclosure. Certain illustrative examples may describe a tablet computer (e.g., the iPad) as implementing techniques described throughout the disclosure, but the disclosure is not limited to a tablet computer (e.g., the iPad). The terms "web application" and "mobile computing device software" are described in greater detail, below.

Errata Sheet Creation

In the present disclosure, a user loads an electronic transcript to a web-based software utility, referred to as the web application or the "WebApp." The WebApp is configured to accept most industry standard transcript formats. These may include: .txt, .ptx, .mdb, .html, .xml, and so on. Generally, these transcripts are numbered by page, and each page has an identical numbered series of lines that always correspond to the same text to ensure a page:line cite is always static. In a finalized transcript, the page and line numbers will always correspond to the same testimony text from one copy of a transcript to another. This ensures a page:line citation by an attorney, or the court, will always refer to the same location.

The web application re-formats the transcript into an xml-type format, generally described as associating a range of words with a specific page:line reference, as would be the case if each line of testimony was inserted into a series of database cells to comprise a column. A Graphical User Interface (GUI) allows a user to edit the text of any line of testimony. The purpose of this edit is to notate an error in transcription that would need to be included in an errata sheet. The system notes the original text of the line and compares it to the altered text. In commercial word processing software, this process is often referred to as "redlining." New or added text can, at the user's selection, be color coded to denote it as a change from the original text. Any combination of font characteristics can be selected by a user to denote that text that should be deleted, that text that should be altered, or that text that should be added. Font characteristics may include strikethrough, font color, font size, font, background highlighting, and similar characteristics.

The user can, by way of the GUI, instruct the system to run a report of the changes made and compile them in an errata sheet. The user can elect to view either the original content of the original line of text or the altered text of the revised line of text, or a markup with all changes.

A reviewer of the transcript can employ an additional step to confirm the accuracy of the court reporter's transcription. Optionally, the text of the transcript can be synchronized to the video. In concert with a synchronization index, the user can click or perform a gesture upon a line of testimony to cause the video to begin to play back at that portion of the video where those words were spoken. In this way, a deponent when reviewing the court reporter's written transcription of his testimony is not limited to his recollection of what was said, but rather has the exact video recording with which to compare the written transcription for accuracy. Moreover, attorneys can review the errata submission in conjunction with the actual video recording to ensure accuracy of the

transcript. With the written transcript and the witness's recollection alone, without the video, there exists the temptation for the witness to change his testimony to what he wished he would have said at the deposition (for example, a "Yes" to a "No"), which is not the proper function of an errata submission, rather than to accurately reflect through errata that which was actually said or to correct minor spelling, punctuation or typographical errors. Accordingly, the system may facilitate more timely and trustworthy errata submissions, reduce the temptation for abuse because the video is available as a check, and ensure an accurate transcript displays electronically in the courtroom as synchronized, scrolling text with a video image, which may improve inefficiencies inherent in other systems.

Once the transcript has been reviewed by the witness in the system and changes for accuracy have been made, the user can 1) create a written hardcopy report that aggregates all changes into an errata sheet, as has historically been the practice, for signature and affixation to the official hardcopy of the original transcript, and 2) transmit to the opposing party or the court the resultant electronic file, which includes the witness's changes.

Any of the software operators, preferably including those using mobile computing devices, including opposing parties, can 1) quickly electronically jump to succeeding or preceding errata notations (or navigate via hyperlinks), 2) check the errata notations for accuracy against the video, 3) ensure the accuracy of the transcript as it will display with the trial presentation software, and 4) play video in the courtroom that contains information from the witness's errata sheet submission as though it was part of the court reporter's transcription.

Advantageously, an errata sheet prepared and communicated in this manner also may be electronically tracked, for example by affixing an unalterable, encrypted time and date stamp from a trusted, independent source, should the submitter ever need to verify that the errata corrections were completed within the time contemplated by the governing rules of procedure and communicated to opposing counsel or the court.

FIG. **7** illustrates an example interface that may be used in handling errata sheet operations. As shown, in FIG. **7**, a user may view a deposition video and a deposition transcript in a synchronized manner, and manipulate an errata display area to make a change to a deposition transcript to be added as a change in an errata sheet. In the example shown in FIG. **7**, a user "Deponent" selected line 15 of the deposition transcript and changed the testimony "Yes" to "Yes, I believe so." As shown, the errata display area shows the change made, the user who made the change, and the date on which the change was made. In addition, the deposition transcript has been updated to indicate the change made to the transcript at line 15 such that the original transcript and errata changes may be displayed together in synchronization with the deposition video. In some examples, the changes entered in the errata display area may be aggregated into an electronic errata sheet associated with the deposition transcript.

Merging and Flattening of Designations

Law firms are often tasked with transcript management on behalf of their clients. They commonly utilize a computer spreadsheet application, such as Microsoft Excel, to track changes, and they use a word processor, such as Microsoft Word, to type out their designations, sometimes in tabular format or longhand. Use of spreadsheets and word processors may be cumbersome and inefficient for transcript management.

A common way a deposition is cited is in the longhand, exemplified as "Page 10, line 2 to page 10, line 7." A shorthand for such a designation understood by trial presentation software would be, for example, "StartPage.StartLine+EndPage.EndLine." In the example, the shorthand would be 10.2+10.7.

Attorneys conduct review of transcripts in the context of internal review, and then in preparing for trial. In conducting internal review, or in transitioning from internal review to trial, it is often desirable or necessary to flatten certain designations. For example, one transcript may be reviewed by Plaintiff's counsel, and it may be issue coded to comprise a certain number of "page:line to page:line" designations that are associated to a particular issue. For example, one issue code may be titled "liability" and another "damages." Using the system described throughout this disclosure, a user may combine, or flatten, two or more issue codes into a common issue. In this example, the user may elect to flatten the "liability" coded designations with the "damages" coded designations into one common issue called, say, "Plaintiff's direct designations."

Similarly, one designation may be created and another one may be added at a later time but with a range that abuts the first designation. If these abutting designations have the same issue code, for example, they should be able to be merged into one designation. The disclosed system (e.g., the web application) comprises logic, such as executable program code, configured to automatically merge, at the user's choosing, abutting designations with the same issue code.

A list of top level, global, or roll-up issue codes may include Plaintiff's direct designations, Defendant's counter designations, Plaintiff's counter-counter designations, Defendant's direct designations, Plaintiff's counter designations, Defendant's counter-counter designations, Plaintiff's objections, and Defendant's objections, as well as Confidential, Restricted Confidential, and Attorneys' Eyes Only. As in the example above, a user may select the transcript sections issue coded "liability" and "damages" and specify that they be combined into another single issue code such as "Plaintiff's direct designations."

In reference to the desirability of flattening designations prior to display of video clips in court, it may be advantageous for an operator of trial presentation software to flatten designations before creating video clips, because this reduces the total number of video clips to create as well as the number of edit points, thereby facilitating more efficient workflow. For example, if a plaintiff designates for deponent "John Doe" testimony in the range 10.1+10.5 and 10.9+10.25, and if defendant counter-designates 10.6+10.8, the one video clip created may be for 10.1+10.25. More typically, and problematically, three designations would have likely resulted in three distinct video clips and they would be played as a multiclip, or series of individual clips:

| Page:line range | Clip title |
|---|---|
| 10.1 + 10.5 | JD01001 |
| 10.6 + 10.8 | JD01006-counter |
| 10.9 + 10.25 | JD01009 |

Using the system described throughout this disclosure, the logic of the software of the web application may recognize adjoining ranges of designated testimony. The logic may be employed to join, or flatten, these adjoining ranges. Further, rules may be employed to flatten only the desired issue codes, preserving the original range specification of "page:line to page:line" and issue tag should the user elect to undo a flat-

tening operation, or should the user need to perform a calculation of video run duration, described below.

FIG. **8** illustrates an example of merging designations. As shown, a plaintiff has made initial designations to a deposition transcript and a defendant has made counter designations to the deposition transcript. In this example, the system recognizes that the plaintiff designations and the defendant designations represent adjoining ranges of designated testimony and, based on the recognition, merges the plaintiff designations and the defendant designations. The system displays a merged designations area that shows the designations that have been merged adjacent to the deposition transcript, which still shows the plaintiff designations and the defendant designations. Using the merged designations area, a user may verify whether or not the merging was proper and, if so, create a single video file that corresponds to the merged designations.

FIG. **9** illustrates example data structures that may be used in merging designations. As shown, a first user has designated page 117, line 13 to page 130, line 16 and a second user has designated page 121, line 0 to page 135, line 10. The system compares the position information (e.g., page and line numbers) of the designations made by the first user with the position information (e.g., page and line numbers) of the designations made by the second user and determines that the designations overlap based on the comparison. In response to the determination that the designations overlap, the system merges the designations into a single, merged data structure. The merged data structure includes all of the designations made by the first user and the second user, encompassing the earliest starting point for designations to the latest ending point for designations. For instance, as shown, the merged data structure has position information indicating designations from page 117, line 13 to page 135, line 10.

FIG. **10** illustrates an example interface for assigning issues to designations. As shown in FIG. **10**, a user may select one or more ranges of designations and assign one or more issues to each selected range of designations. The interface enables a user to add additional issues and apply all issues to a particular designation. The interface also allows a user to select a color with which the designations tagged with a particular issue will be displayed on a deposition transcript. The issues assigned to designations may be used for flattening and merging designations, as described above.

Locking Designations

In communicating designations between parties, the system prevents one party from designating testimony that has already been designated by the other. For example, if plaintiff designates 10.1+13.22, then the defendant should be prevented from counter-designating testimony in the same range. One way of understanding this function is with reference to FIGS. **11**A-C, where each party has its own work pane display of the transcript. In this manner, Plaintiff uses the left-most work pane to make annotations or to perform issue coding. The Plaintiff then communicates to Defendant that its designations are complete, and the Defendant begins to make counter-designations in the right-most work pane. Navigation of the transcript can operate on both work panes simultaneously, so it becomes easy for a Defendant to determine if counter-designations are needed in certain areas, without having to worry about overlapping annotation colors. The logic of the system prevents overlapping designations between parties. If an overlapping page:line is selected, the software snaps Defendant's selection to the available lines and/or provides an error message. As above where Plaintiff designated 10.1+13.22, if defendant inadvertently selects 13.15+14.10, the designation would automatically correct to 13.23+14.10, disregarding the overlapping section. The result may offer a clean, concise view of designations within the two work panes.

Where the parties make a simultaneous designation, for example by submitting direct designations to one another at a mutual time deadline set by a court, those page:line ranges can be merged into a distinct issue code, such as "both parties," or "agreed upon designations," and be locked to prevent objection by either party.

Linking Designations

The web application may comprise logic configured to link one designation with another designation. For example, in a deposition transcript a Plaintiff may proffer a set of direct designations for a witness. Thereafter, the Defendant may desire to add material for completeness in a Defendant's counter-designation should the Defendant believe Plaintiff's direct designations were not a complete or accurate representation of that portion of the testimony. In practice, however a Plaintiff may elect to drop its initial designation, making it a laborious process for the Defendant to eliminate corresponding Defendant counter-designations that should be removed as a result. Accordingly, the logic configured to link one designation with another designation provides functionality to automatically cause the deletion of a counter-designation if the designation to which it is linked is first deleted.

This logic may be further described with reference to FIG. **11**A-C, which illustrates a Plaintiff's work pane and a Defendant's work pane. As shown, a first designation is made by Plaintiff in Plaintiff's work pane. The Defendant's counter-designation is made in the Defendant's work pane, with logic to allow, or to compel, Defendant to identify that portion in Plaintiff's work pane that would correspond to Defendant's counter-designation. Defendant's counter-designation may be linked to more than one of Plaintiff's direct designations, with the linked designations being listed in Defendant's work pane. Should each of Plaintiff's designations within that list be removed, the logic causes removal of the corresponding counter-designation.

The Defendant may link each counter-designation to at least one Plaintiff designation using a graphical element, for example by selecting a range of text in Defendant's work pane and then dragging a "lasso" into Plaintiff's work pane to identify a page:line range to indicate the Plaintiff's selected testimony to which Defendant is tying his counter-designation. Again, one Defendant counter-designation may be tied to more than one of Plaintiff's designations. If all of those ties, or linkages, are severed by Plaintiff withdrawing his designations, then the logic may be configured such that Defendant's counter-designations are removed, or are identified as counter-designations that ought to be removed.

Alternatively, if Defendant has linked a counter designation to a Plaintiff's designation, and if the Plaintiff subsequently modifies the range of that designation, the Defendant can be notified, by the logic of the system, that one designation to which a Defendant's counter-designation has been linked has been modified. The Defendant can make a determination as to whether his counter-designation should be deleted entirely, deleted in part, or left alone. With this logic to link designations, the parties are provided a new tool that may make efficient a work process that has historically been very laborious and fraught with potential for error. FIGS. **11**B and **11**C illustrate examples of linking designations according to one embodiment.

Batch Import of Designations

It may be advantageous to use the web application to import more than one transcript designation at a time. For example, when parties to litigation exchange their designa-

tions, each party needs to be able to import the designations of the other into his own working copy of the transcript. As another example, video clips may have been created within trial presentation software that need to be integrated into a transcript annotation utility. As part of the logic of the web application, a user may batch import more than one designation at a time. This can be accomplished by creating a loadfile with a predetermined format to communicate the batch of designations. For example, a loadfile using the StartPage.StartLine+EndPage.EndLine entries in series may be used. This format is the same as may be used to batch create video clips within trial presentation software applications. Upon ingest of the batch, the user may be presented a graphical user interface to assign an issue to each of the designations. FIG. **10** illustrates an exemplary interface that can be used to batch import more than one designation and assign an issue code to one or more designations.

Printing

Once parties to litigation have exchanged deposition designations, and objections thereto, with one another, it is often a requirement that a printed hardcopy be prepared for submission to the court. The printed hardcopy is also useful for the attorneys' own reference.

These submissions are typically color-coded copies of deposition transcripts for the convenience of the court and court staff. Historically, these color copies have been laboriously prepared by hand using a colored high-lighting marker on previously printed copies of the depositions. This method is extremely time consuming, it creates great potential for human error, and the work product is not easily revised or combined with the submission prepared by opposing legal counsel.

Moreover, during the deposition designation and counter-designation process, each party may also lodge objections to any number of designations or counter-designations for the purpose of asking the court to exclude the testimony from introduction into evidence under the rules of evidence. An objection is a written note to correspond to an annotation, that being a selected page:line range of the transcript that is commonly assigned an "issue code" meaningful to the user. The written note may comprise a reference to the evidentiary rule being relied upon by a party to warrant exclusion of the testimony by the judge as well as a short description or argument on the matter. It has been very difficult to view the objection and the testimony to which the objection was made, without using at least two separate documents or a table from a word processing application (e.g. Microsoft Word) That is time consuming to prepare and has a high probability of human error.

In the described system, the user is provided the facility to print hardcopies of the deposition transcript, including highlighting for each issue code in a different color, or a different font. For example, the user may be able to print objections on the same page as the transcript and in a location that is adjacent, or substantially adjacent, to the testimony itself. The logic in the software of the web application, preferably working in concert with software operating on a mobile computing device (including optionally utilizing the mobile computing device to communicate the print job to the printer), may be able to 1) print in a portrait orientation with two transcript pages comprising a column on the left half of the printed page, leaving the right half of the page for notes, such as an objection, to appear adjacent to the testimony to which a party has lodged an objection, and 2) print in a landscape orientation with a transcript pages comprising a column on the left half of the printed page, leaving the right half of the page for notes to appear adjacent to the testimony to which a party has lodged



an objection. Printing in this manner allows one convenient document to be produced where a judge can evaluate an evidentiary objection while simultaneously accessing the testimony to which the objection applies. The reader also can examine the context of the overall transcript because the transcript contains highlighted designations as well as the non-designated portions, comprising the complete transcript.

A deposition designation has a color associated with it so the reader can immediately understand which party proffered the submission, including by reference to a color key that may be printed on the same page. Likewise, a graphic element, for example an elongated, colored bracket or a rectangle bounding the designated text, may be used to identify the party making an objection and the range of text to which the objection applies.

Printing may encompass communication with a printer to print on paper, creating a file in .pdf or .tif format, or other similar format, suitable for transmitting by email or printing at a location remote from the user, or rendering a file type for use with a mobile computing device, such as an electronic book format or similar (including .txt, .html, .ps, .pdf, .djvu, .epub, .fb2, .azw, .pdb, .lrf, .lrx, .wol, .tr2, .tr3, .aeh, .lit, .exe, and .rgo).

This printing method provides a new convenience to the reader, as at least two documents—a highlighted transcript and a table of objections and page:line cites to which objections are lodged—are consolidated into one. This printing method may solve a longstanding logistical problem for litigation professionals needing to submit deposition designations and objections to a court.

FIG. **12** illustrates an example printed page output in a portrait view. FIGS. **13**A-B illustrate an example printed page output showing only designated portions of a transcript. FIG. **14** illustrates an example printed page output in a landscape view. FIG. **15** illustrates an example of manuscript printing showing highlighted designations.

Electronic View of Printed Format

In addition to the printed copy, it may be advantageous to replicate on a computer screen the convenient layout of having objections adjacent to the testimony to which objections were lodged.

Additionally, the judge can be provided facility to make an evidentiary ruling within the system. With reference to FIG. **16**, the court is provided the facility to make evidentiary rulings on objections, here exemplified in the right-most column by an affirmed/overruled toggle in the form of a radio button. As a result, if the court elects to make a ruling, the date and time of the ruling is stored by the software, and such a ruling can be immediately communicated to the parties. The parties can access the electronic document to learn what testimony has been excluded and what has been permitted, and a report can be generated and printed or saved for offline study and evaluation.

Transcript Formatting

An example format for the synchronization index for use with the described system is an xml-type format, an example of which is shown in FIG. **17**. This xml-type format comprises tags to denote a transcript header, a transcript body, and a transcript footer. Metatags may also be present for display, including timed display, of graphics, images, advertising, secondary multimedia other than that primarily associated with the text of the synchronization index, logos and settings therefor, text, including foreign language translations, sounds, and so on.

Transcript annotations can be saved as an integral part of the xml-type formatted synchronization format. The example shown in FIG. **17** is intended to be illustrative of the xml-type

format only and is not intended to represent an actual, working synchronization index with all information included in the synchronization index. Actual implementations may include more, perhaps much more, information.

Run Time Calculation

When video clips are created in trial presentation software, a report query can be executed to calculate and output the run time duration of each clip and the designated text. The report may be called a duration list, or “durlist.” For the reasons mentioned above, litigants need this information, in part to determine whether they should add or remove testimony.

Historically video clips were created within the trial presentation software to generate a duration list. Because trial presentation software is often a tool not used by an attorney but rather a trial consultant with special expertise, typically employed only at a time very close to trial, it would be useful if the attorney could create a duration list apart from the trial presentation software and within an application used to annotate transcripts. In some examples, all of this can be accomplished on a mobile computing device.

As an example of cumbersome and inefficient workflow often experienced by litigators, the attorney creates designations using a highlighter on a printed transcript; support staff enters those designations into a transcript management utility, which carries the potential for error; the transcript management utility case is sent electronically to the trial consultant; the trial consultant runs a query from the transcript management utility to extract a .csv formatted file corresponding to the issues designated; the .csv is re-formatted to render a text file in StartPage.StartLine+EndPage.EndLine format to be used as a loadfile for video clip import to a trial presentation utility; the trial presentation utility is opened, and the .txt loadfile is used to import designations; the clips within the trial presentation utility are quality reviewed to ensure load errors have not occurred, for example as would exist if a designation began or ended on a line with no timestamp within the trial presentation utility .mdb; the video clips are fine-tuned at the beginning and end of each clip; the video clips are renamed to sort properly in page order within a duration list, for example by padding a “0” for pages 1-99 or by adding a prefix or suffix to identify the designator; the “durlist” command is executed, requiring the trial consultant to select the witness having video clips loaded and then manually parse out only the subset of video clips for which a duration list is sought from among the entirety of video clips present for a witness (e.g. clips within the trial presentation utility are identifiable only by clip name and do not carry any issue coded differentiation that may have been present in the transcript management utility); the duration list report is created from the clips identified by the trial consultant and printed, or saved electronically, for another quality review against the transcript management utility case; and then the duration list is forwarded back to the legal assistant or attorney.

With the described system, logic is employed in the software of the web application, and preferably within software executed on a mobile computing device, to calculate a duration list, without necessity of creating discrete video clips, by performing calculations from the synchronization index itself. For example, if a user annotates a page:line range within a transcript, the software examines the synchronization index to compute the time difference between video corresponding to EndPage.EndLine and StartPage.StartLine. In this manner, computations can be output for each annotation, for all annotations that comprise one issue, for merged issues, for more than one issue, and for the totality of all annotations.

In this manner, the attorney can very quickly determine the appropriateness of content being designated because he has immediate knowledge of the run duration of the annotations being made. The traditionally cumbersome and inefficient workflow is greatly improved. This provides the attorney a heretofore unavailable advantage, in that the strategy of determining what video to play in the courtroom has been a strategy historically left until the last moments of trial preparation, often as late as the day before video is to be played in the courtroom. This trial preparation strategy can now be deployed much earlier in the litigation process, leaving available more preparation time for the attorney in the moments immediately before trial, or in the evenings on trial days when preparation time is most scarce. Work that had consumed the attorney’s time can be shifted to a trial consultant, as the actual play duration of video clips may vary slightly from the calculated duration list because the trial consultant can often fine tune the video to eliminate long pauses, false starts and stops, and correct inaccuracies or imperfections in timestamping of the synchronization index. With the described system, this fine-tuning, however, is no longer prerequisite to the attorney’s evaluation of overall run durations historically generated once video clips had been created, historically a very time consuming task at trial.

FIGS. **7**, **11**, and **16** each show a displayed output of run time calculation. As shown, the system computes and displays a total run time for all designations, a total run time for plaintiff designations, and a total run time for defendant designations. The system may compute the totals in real-time as a user is viewing the transcript and video of the deposition, and editing designations for the transcript. The user may view the run time calculations and quickly perceive how changes being made to the designations impact run time of the corresponding video. In some implementations, the system may continuously monitor changes to the designations and, when a change is detected, the system may reference the synchronization index to extract timing data associated with the new designations and compute the run time totals for the new designations based on the extracted timing data.

Synchronized Exhibits

When an attorney reviews a videotaped deposition and its transcript after the deposition, it is often helpful to have access to deposition exhibits that may have been physically before the witness during a line of questioning. It is a feature of the present disclosure to provide within the synchronization index information that would provide for the display of a document at the correct time within the deposition. For example, when an attorney places a document before the witness, marks it as a deposition exhibit, and asks the witness to identify it, metadata within the synchronization index can be configured to display that first page of the exhibit at that point within the deposition video. That point in time also corresponds to a page:line cite within the deposition transcript. If, in the attorney’s next question he draws the witness’s attention to the third page of the deposition exhibit, metadata within the synchronization index can be configured to display that third page, and so on.

Accordingly the synchronization index contains information for selecting the image to display, for the time at which the image is to appear, or an “in” time marker, and for the time at which the image is to be removed, or an “out” time marker. A series of such instructions within a synchronization index is generally referred to as “synchronized exhibits.” It may be advantageous to allow data for synchronized exhibits to be independent of video clips and “in” and “out” edit points for video clips. Such independence allows video clips to be edited, merged and flattened without necessity to re-link the

correct exhibit that should be simultaneously viewed with each video clip. Existing transcript management and trial presentation utilities lack this facility, making their use cumbersome and inefficient.

FIG. **18** illustrates an example of a linked exhibit. As shown, the interface in FIG. **18** includes a linked exhibit area where a user can view and add/delete/edit linked exhibits to the transcript displayed. In the example shown, an exhibit has been linked to the designations made to the displayed transcript. The exhibit is displayed adjacent to the transcript testimony to which the exhibit is linked. The linked exhibit may be displayed at a time when a portion of the deposition video corresponding to the designations is displayed. Users may be able to interact with the linked exhibit area to add additional linked exhibits, edit existing linked exhibits (e.g., move the linked exhibit to a different portion of the transcript), or remove linked exhibits.

The Web-Based Software Application

In some examples, the web-based software application may be an application coded within the Ruby on Rails ("Rails" or "RoR") open source web application framework for the Ruby programming language.

The web application is used as a case management system to facilitate management of users, user permissions, team collaboration, transcript manipulation, and distribution of synchronization indexes and multimedia retrieval instructions for a mobile computing device. Referring to FIG. **6**, the web application may comprise user permissioning logic **6-7**; file format and data parsing logic **6-8**; multimedia delivery logic **6-9**; mobile computing device function logic **6-10**; search logic **6-11**; annotation and edit logic **6-12**; video, display, and playlist logic **6-13**; linked exhibit logic **6-14**; errata sheet logic **6-15**; output formatting logic **6-16**; scheduling and invoicing logic **6-17**; and variable content logic **6-18**. The web application may include software code intended to function as a "cloud computing" application, software running on a server remote from users who access it and its functionality by way of an internet connection, an internet or web browser, and a computer or, possibly, by a mobile computing device. The software code may be stored in a non-transitory computer-readable storage medium and may be executed by one or more processors to perform operations described throughout this disclosure.

First, user permissioning logic **6-7** is present, generally to ensure each user has an account and that the account holder have access only to that content he has been authorized to receive. The user permissioning logic **6-7** may be understood with reference to a series of use cases. For example, consider a situation in which a plaintiff's attorney, a defendant's attorney, and a judge all are using the web application to review a deposition transcript. In this example, the plaintiff's attorney, the defendant's attorney, and the judge should be able to view some information that is public and common to all users, but should not be able to view information that is private or confidential to one of the other users. The user permissioning logic **6-7** ensures that the plaintiff's attorney, the defendant's attorney, and the judge see only the information that they are permitted to view. For instance, the user permissioning logic **6-7** controls display to the defendant's attorney and the judge, so that they can perceive designations shared by the plaintiff's attorney, but not confidential notes or annotations to the transcript made by the plaintiff's attorney. Similarly, the user permissioning logic **6-7** controls display to the plaintiff's attorney and the judge, so that they can perceive counter designations shared by the defendant's attorney, but not confidential notes or annotations to the transcript made by the defendant's attorney

Second, file format and data parsing logic **6-8** is required. This logic is used to ingest transcripts from a user. Within the legal industry, for example, there are a number of various electronic formats for transcripts, including .txt; .ptf, a file format most often associated with transcripts capable of being read by, or exported by, the commercially available transcript utility called LiveNote by ThompsonReuters; .ptx (or occasionally as an .exe), most often associated with transcripts capable of being read by, or exported by, the commercially available transcript utility called "eTran" by RealLegal; .mdb, the Microsoft Access formatted transcript type from Verdict Systems and its software called Sanction II; .cms (or .mdb, Microsoft Access) formatted transcript type from in Data and its software called TrialDirector; and a number of other file formats used by common transcript management and/or trial presentation utilities.

The purpose of the file format and data parsing logic **6-8** is to ingest a transcript, to parse it according to its known formatting attributes for the purpose of extracting information including the text transcription, page and line numbers, headers and footers, multimedia associations, document exhibit listings and document exhibits, and timestamp data (or video frame data) and rendering all of said information into an intermediate, standardized format (herein referred to as the "xml-type" format) for use in the described system as a synchronization index that can be communicated to, and understood by, a mobile computing device.

Third, multimedia delivery logic **6-9** is provided. The multimedia delivery logic **3-9** functions to deliver multimedia content to a user. For instance, the media delivery logic **6-9** may provide media encoding, HTML5 browser support, HTTP Live Streaming, and media (e.g., iTunes) File Sharing.

Fourth, mobile computing device function logic **6-10** is explained. Mobile computing devices may be different from one another, so a separate mobile computing device function logic **6-10** is often needed to facilitate communication of data and multimedia to the device. Mobile computing device function logic **6-10** may include logic for the Apple iPhone (running the Apple operating system called iOS, including iOS 3.2 and iOS 4.0-4.2), the Apple iPad (running iOS, including iOS 3.2 and iOS 4.0-4.2), mobile computing devices running an Android operating system, and Research in Motion-type or Blackberry-type mobile computing devices (for example those utilizing Blackberry operating systems), and mobile computing devices utilizing the Symbian3 environment (to include devices manufactured by Nokia, such as the smartphone device sold with the tradename "N8").

By way of example, the mobile computing device function logic for the Apple iPad is written in Xcode for iOS4.2 and is compiled to communicate with the web application. A user, having the correct permissions, can access the web application for retrieval of one or more synchronization indexes and corresponding multimedia. Fifth, search logic **6-11** is present to facilitate search of a synchronization index or a collection of multiple synchronization indexes. Once a user has used a mobile computing device to select a synchronization index, that synchronization index can be communicated to the device in whole and cached there, or it can be communicated to the device in part and subsequent portions of the synchronization index can be communicated to the mobile computing device as the user requires. Since many mobile computing devices have limited memory storage capacity and RAM, relative to laptop computers, desktop computers and servers, it may be advantageous to allocate certain tasks to that device best equipped to handle the task, while factoring in speed, efficiency, system resources and connectivity. A search for text is one such task, and that is one reason for search logic.

For example, if a user elects to retrieve the synchronization index for a single deposition having, say, a 300 page length if printed, the mobile computing device may be able to download the entire synchronization index and store it in memory. A text search of that deposition may reference the locally stored copy of the synchronization index and return a search result. This may be done with speed and efficiency on the mobile computing device.

If, however, the user expands the text search to include all depositions within that legal case of, say, 50 depositions rather than just searching one 300-page deposition, the search controller provides logic to efficiently perform the search and return search results to the mobile computing device. For instance, the search may first reference the locally stored content, then the logic comprising the search controller may ask the remote server to conduct the search on the remaining transcripts to be searched. Without necessarily communicating the entirety of all fifty synchronization indexes to the mobile computing device, the server can return to the mobile computing device only the search matches. When the user selects one of those search matches, only then would the server deliver a larger portion of that specific synchronization index, or the entire synchronization index, to the mobile computing device.

The search logic also facilitates search across vast libraries of synchronization indexes. It is contemplated that searches may involve, for example, searching lyrics of thousands of songs that may be hundreds or thousands of gigabytes in size. Such a search is best conducted on a server. As another example, a user of an Apple iPod with 32 Gb of memory may have a portion of that space allocated to, say, storage of 5000 songs, 2500 of which have lyrics that have been downloaded and stored to the device. A search query would first be executed upon the lyrics resident on the device and search results returned and displayed, and, at the user's option, the query would be extended to a server-side search to encompass lyrics not resident on the mobile computing device, to return and display search results.

Next, annotation and edit logic **6-12** is provided to allow manipulation of a transcript. In general, this is the logic employed to facilitate the transcript management and manipulation functions described above, including functions relating to creating annotations, notes, issue codes, merging designations, flattening designations, locking designations, and so on. Annotation and edit logic **6-12** communicates updates made on a mobile computing device to the remote server for storage and sharing with other users.

Seventh, video, display, and playlist logic **6-13** is employed. The video, display, and playlist logic **6-13** may perform video clip sequencing, jump to location features, runtime calculation, display of font/appearance, display and control of a scrub bar, timestamp editing, header/exhibits formatting, and variable speed playback control.

Eighth, linked exhibit logic **6-14** may be used. As described above with respect to synchronized exhibits, within a deposition, documents are often placed before the witness to elicit testimony. These are called deposition exhibits. When reviewing the transcript, it is often helpful for the reader to have convenient access to deposition exhibits, particularly accessible as a document linked to the deposition text where the exhibit was utilized. Linked exhibit logic **6-14** may assist in delivery of material other than the transcript, by using the synchronization index to retrieve that material. For example, the linked exhibit logic **6-14** may comprise a hyperlink within the text displayed in the transcript that a user may select for display of a particular deposition exhibit. If, for instance, an exhibit is referred to as "Smith Exhibit 1" in the transcript, the logic of the linked exhibit controller would link that text to the document comprising Smith Exhibit 1, perhaps a pdf image or a tiff image. A user following that hyperlink would be brought to the appropriate image.

Alternatively, for use with the Apple iPad, the linked exhibit logic may comprise logic to display material without input from the user. For example, if the synchronization index is constructed properly, a document can be linked for display at a time within the multimedia without prior user input. While the user watches the multimedia, and synchronous text display, a deposition exhibit may appear on the screen at the time it is relevant and would be useful for the user. The user can elect to play/pause the multimedia, navigate to selected pages from the deposition exhibit, or remove the deposition exhibit from the display and resume playback of the multimedia and text.

Ninth, errata sheet logic **6-15** may be used. The errata sheet logic comprises logic to display only an accurate transcription of the media. A more specific description of the function of errata sheet logic **6-15** is discussed, above, as is the way the logic operates to facilitate display of an accurate transcript.

Tenth, output formatting logic **6-16** is present. This is the logic required to provide the various printed outputs, described above, for the organized printing of a transcript with annotations and notes, including notes that can be printed substantially adjacent to the text to which it is associated.

Eleventh, scheduling and invoicing logic **6-17** is provided to facilitate the ability of a user to see a calendar (e.g. for depositions) and to pay for service. The web application may function as a subscription-based case management program with a recurring payment component, and this logic operates to facilitate processing of payments from a user account based on a subscription agreement.

Twelfth, variable content logic **6-18** is provided to make the system adaptable for uses in various alternative industries. This logic generally relates to the graphical user interface and graphical elements that may be suited for a particular use or industry. This includes the delivery of targeted advertising, branding elements, graphical "skins" to achieve a desired look-and-feel for a given application, commercials, and so on.

The web-based software application employs a number of controllers for various related devices, functions, and software associations.

In general, some function controllers for the web-based software application are used for operator manipulation of data via the mobile computing devices and have logic configured to perform a plurality of actions, specifically: to upload, manage and run file/format and video/text data; search engine functionality; annotation and editing capability; calculation of video run time from designations without first creating a video clip; adding and merging or flattening of designations; cross-party communication to finalize designations; electronic errata sheet creation and updating; updating of issue coding and batch import of issue codes; a utility for printing with objections adjacent to designations; a utility for communication between parties; and a mechanism for a judge to participate by making evidentiary rulings in the transcript management utility.

As shown in FIG. **6**, a hosting server is used in conjunction with a multimedia server. A dual server system is shown for the present system due to the complex interactions between the web application, the multimedia server, and the plurality of mobile computing devices, as well as the substantial volume of information being uploaded, managed and served to users.

As an example, the hosting server is a cloud based computing platform, such as the hosting service provided by Heroku. The Heroku Server is preferably a platform as service/ruby on rails type cloud platform having open-source extensibility. The hosting server may deploy Amazon Simple Storage Service (Amazon S3) and Amazon Elastic Compute Cloud (Amazon EC2). This server stores a SSL-encrypted case management web-based software application, all user information, and case data information, to optionally include synchronization indexes. The hosting server is also the preferred location for the web application to be executed. A Heroku Server or other equivalent hosting server may control the cloud computing and data storage objectives described above without departing from the scope of the present disclosure.

An appropriate multimedia server is a server, or multiplicity of servers, configured to deliver multimedia, preferably multimedia that is appropriate for the receiving device and the bandwidth available to it. Exemplary multimedia servers and related services to deliver multimedia with a number of variant playlists include a Brightcove HTTP streaming server, or an Akamai HTTP streaming server, or a Wowza media server. A preferred HTTP streaming server has open-source extensibility and is adapted for streaming many multimedia formats, including in variant playlists, including audio, H.264, MPEG4, M4V type media files; HTTP Live Streaming (HTML5); MPEG-2 transport stream (H.264 video/AAC audio); and multimedia segmented for delivery on an Apple iPhone or iPad. Preferably, all multimedia data and text data is stored on the multimedia server.

The multimedia server may be configured to deliver streaming multimedia to a mobile computing device directly. It may also deliver streaming multimedia to a computing device directly, for example to a user of the web application using a web browser. The multimedia server may also be configured to deliver multimedia to an intermediate computing device that may then transfer multimedia to a mobile computing device. For example, a user that desires access to multimedia using a mobile computing device may elect to store the multimedia on the mobile computing device itself. Apple's iTunes, for instance, may be used to communicate multimedia from a computer to an iPad or iPhone temporarily tethered to the computer.

The hosting server and the multimedia server are in electronic data communication with one another and with a plurality of mobile computing devices operated by a plurality of users or operators, typically, attorneys and paralegals or commercial multimedia consumers. There are many suitable mobile computing devices, as listed above. The iPad with iOS 3.2-iOS 4.2, and the iPhone with iOS 4.0-iOS 4.2 may be used. The iPad tablet-type mobile computing device offers functionality, including the ability to multi-task in iOS4.2.

Specifically, the iPad is adapted to have a case/deposition reader with deposition viewer and supporting issue code identification; annotation functionality; case and deponent level search-ability; HTTP Live Streaming capability; annotation and time stamp editing; CoreText-type engine for text display ability; and exhibit linking and display via MPTimedMetadata with iOS 4.2. The iPhone is suitable for a subset of the above functionality, primarily due to the fact that its screen is smaller than the iPad, and is therefore a viable choice for a mobile computing device adaptable to the present system. Specifically the iPhone is capable of case/deposition reading with deposition viewer and supporting issue code identification; annotation functionality; and case and deponent level search-ability. Any combination of the above described mobile computing devices may make case management and performing the above manipulations now a nimble, in real time, task instead of the arduous and cumbersome modes of case management as are known.

In some implementations, a video display device may be associated with one or both servers. The mobile computing devices may be in electronic data communication with both the video display device and the servers. When a user performs a manipulation on a mobile computing device, such as scrubbing to a certain point in a video, the output or display may be shown on the video display device, either alone or along with being displayed on the mobile computing device. In this regard, the mobile computing device may be used to control display on a separate video device (e.g., a video display device in a courtroom, a video display device in a conference room with several participants, a video display device in a remote location, etc.).

In some examples, the data produced by the web-based software application is viewable on a plurality of mobile computing devices. A predetermined gesture on a hyperlinked line may initiate identification of desired video, may identify the elapsed time within that video, fetch and begin streaming the video at that time back to the mobile device, and finally begin scrolling the transcript in synchronization with remainder of the video as it plays. In these examples, a plurality of mobile computing devices may be used by multiple users, and playback may be provided via an independent display device associated with the remote server where data is stored. The web-based software application may have full search functionality for data accessible to the web-based software application. The web-based software application also may allow users to log identity (e.g., name, password, firm, mobile device serial number, phone number, etc.) and keeps record of multimedia files accessed, the portion of the transcript that would correspond to those segments viewed, and the individual who made/approved the designation.

Mobile Computing Device Software

A mobile computing device runs software for transcript management. First, the mobile computing device software has logic configured to communicate with the web application running on the hosting server. This communication allows transfer of a synchronization index to the mobile computing device. As described above, the web application ingests transcripts of a number of formats, then parses the data for re-formatting into an xml-type synchronization index. This xml-type synchronization index is then communicated to the mobile computing device, and the logic of the mobile computing device software operates to display the text of the synchronization index on the viewing screen.

The mobile computing device software includes logic to present the text of the synchronization index to the user in a display of a multiplicity of text lines. When viewed in synchronicity with multimedia content, the text display is rendered in a smoothly scrolling teleprompter-type display. To denote the point within the multiplicity of text lines that corresponds to the multimedia, there is a position indicator. An appropriate placement of the position indicator is approximately five lines of text from the top of the text display. The position indicator may be a rectangular, semi-transparent graphical element of a predetermined color that is layered beneath the text. The purpose of the position indicator is to allow the reader to easily and quickly determine, when multimedia is playing, the line in the transcript that corresponds at a given point in time.

As one display option, the text scrolls, while the position indicator remains static. As the end of a line of text is reached within the multimedia, the multiplicity of text lines smoothly

scrolls to re-position the next line of text into the area of the position indicator, while the position indicator remains static.

Alternatively, the display of a multiplicity of text lines may remain static while the position indicator descends through the text one line at a time. In this view, the position indicator begins at the top of the block of text lines and descends through the lines. When the position indicator reaches the bottom of the block of text lines, the block of text lines is refreshed, and the position indicator begins again at the top of the refreshed block of text lines.

With the scrolling text view, the text is synchronously displayed with the multimedia. The user may perform a gesture to scroll through the transcript. For example, on an iPad, a bottom-to-top drag (or swipe or flick) on the transcript will scroll to succeeding text lines or pages. This is similar to the way users may be accustomed to scrolling through text on a web page delivered within the Safari web browser present on iPad and iPhone mobile computing devices, either using the touch sensitive viewing screen or a multi-touch surface apparatus to accept gestures.

The user may select settings to determine the behavior of the video when bottom-to-top swipe is performed to read succeeding transcript pages. In the first setting, if multimedia is playing and a bottom-to-top swipe gesture is performed, the multimedia will pause, and the transcript's scroll to succeeding pages will be controlled by succeeding vertically oriented swipes or gestures. Because the user has now navigated away from the point at which the video was paused, the user may elect to begin playing the multimedia that corresponds to the text now residing within the position indicator, or, in the alternative, the user can elect to "re-sync" the transcript to where the multimedia was paused. This election is made in one or more graphical buttons, which may be placed on or near the rightmost portion of the position indicator. For example, when a user has navigated downward in the text, thereby pausing the video, one button may be labeled "play here" while another button may be labeled "re-sync/go back." The "play here" button causes the text to become most important, meaning that the text within the position indicator will cause the video to scrub to the correct location and begin playing. The "re-sync/go back" button will cause the video to become the navigational aid or bookmark, causing the video to resume play where it was paused, and the transcript will be refreshed to place the correct text back into the position indicator. With these two options, a user can use the text to navigate the video, or the video to navigate the text.

The user may also elect to begin multimedia playback from any line of text, even if that line is not congruous with the position indicator. To do so, a preselected gesture applied to a line of text is assigned to play multimedia. This gesture may be a swipe, a tap, a double-tap, a swipe and tap, a triple-tap, or any other gesture the user may select to associate with the playback function. This is helpful, for instance, when a user is playing multimedia and desires to view other text, but keep the multimedia playing in the meantime. The user may set a setting to, upon a gesture to view succeeding pages of text, keep the multimedia playing. While that media is playing, albeit now not in synchronous view with the transcript, a new play location can be found with the text, and the new multimedia playing location can be accessed with the selected gesture. While the video plays, the user can use the "re-sync/go back" button to instruct the text to re-coordinate with the playing position of the video.

Next, the mobile computing device software includes logic for facility to scrub through the text and multimedia via a navigational scrub bar. This navigational scrub bar is preferably visible at the bottom of the text display. It comprises a graphical representation of a time duration t=x to t=z, and a graphical element as a place marker to mark the position t=y between t=x and t=z. If the navigational scrub bar comprises the entirety of the video, x=0 and z=end. If the navigational scrub bar does not comprise the entirety of the video, but only a portion thereof as adjusted by the user to focus on less than all of the available video, t=x is earlier than t=z. The logic enables the user to scrub through the video and text by adjusting the location of the place marker. The place marker can be moved by corresponding input on a touch sensitive display screen, for example by using a finger to slide the place marker to a location on the navigational scrub bar.

Advantageously, when the place marker is moved, the logic achieves near simultaneous coordination between the multimedia being displayed and the corresponding text. To the user, the two appear to be inextricably linked, providing a seamless integration between scrubbing text and multimedia on a mobile computing device. Such near simultaneous coordination between the multimedia being displayed and the corresponding text is preferable in the circumstance where the multimedia content resides in memory on the mobile computing device, which the mobile computing device's processor can access with low latency, as opposed to the instance when multimedia is being streamed to the mobile computing device. For streamed multimedia, inferior data communication speeds may temporarily interrupt a seamless video display, in which case temporary reversion to an audio-only stream may still provide the near simultaneous coordination between media and text the user desires.

The term "near simultaneous coordination" should be understood to be as simultaneous as can be achieved given the computing constraints of a particular mobile computing device and, described above, the speed at which data can be transmitted to the mobile computing device. In some examples, the multimedia resides on the mobile computing device and the coordination between text and multimedia may be a fraction of a second, a delay length being virtually imperceptible to the user. The lower the latency able to be achieved, the better the user experience.

The function of the logic for the navigational scrub bar may provide a heretofore unavailable user convenience in simultaneously navigating synchronous text and multimedia on a mobile computing device.

Next, the mobile computing device software includes logic for facility to select a word or range of words, apply certain attributes to them, and save those attributes. For example, in a deposition transcript, as described above, the user may select a "page:line to page:line" range, assign a color to it, assign it an issue name, and attach a note to be associated with the selected text. This process is known in the legal industry as issue coding a transcript.

In some implementations, on the Apple iPad a double-tap gesture on a word will cause a pop-up with handles to refine the range of the text to be selected and with options for the user. Those options include ability to select a color, assign an issue name, create a new issue name, provide a note, copy, copy to an email, and so on. Generally, the user is provided facility, via a series of pop-ups, to perform a multiplicity of annotations or edits to the range of text selected.

These transcript manipulations can be saved to the memory of the mobile computing device, and they can also be communicated back to the web application on the hosting server. Later, succeeding users may access the revised synchronization index, thereby achieving a collaborative work environment.

Once an annotation has been made, for example a range of text being highlighted in the color yellow and assigned to the

issue group "Plaintiff's direct designation," that yellow highlight will persist with that text any time the user has selected its display. In addition, since that text corresponds to a discrete portion of multimedia, the user may optionally be provided the facility to locate that yellow annotation by reference to the navigational scrub bar as well. With reference to FIG. **19**, another graphical element, for example a hatched rectangle, labeled **30**, may be provided either on the navigational scrub bar, or above it, or below it to indicate a corresponding annotation in the text. In this example, the user may look to the navigational scrub bar and would see a hatched rectangle that corresponds to the highlighted text. In this fashion, the user can quickly determine by looking at the navigational scrub bar to determine where highlighted portions of the text reside, without necessarily needing to view or scroll through the entirety of the text transcript. As shown in FIG. **19**, other graphical elements (e.g., graphical element **31**) may be displayed to indicate other highlighted/designated portions of the text transcript. The graph elements **30** and **31** may be displayed differently to indicate that the highlights/designations were made by different users, that the highlights/designations correspond to different issues, or that the highlights/designations were made at different times.

Further, the mobile computing device software includes logic for facility to sequence pre-selected "page:line to page:line" ranges of text and associated multimedia, to the exclusion of other text. For example, a user may have ten different issue codes (with each being assigned its own color), each having a multiplicity of page:line ranges associated with them. The user may elect to view only those page:line ranges that correspond to, say, issues 1, 3 and 7. In other words, any text not included within those issues would not be seen. The corresponding multimedia plays as well, skipping those portions of text not selected, and jumping as seamlessly as possible to the multimedia location corresponding to the succeeding selected text. As a consequence, all visible text would have an associated highlighting color, and the entirety of the refreshed navigational scrub bar would have at any discrete time at least one color. In this fashion, the user can very quickly determine from the navigational scrub bar the total run duration for the selected issues, the relative time duration expended by each discrete issue, concentrations of one issue relative to another along the time spectrum, and so on.

Sequencing of video clips also allows the attorney to very closely approximate the multimedia he intends to display to the judge or a jury, with the advantages being that no cumbersome trial presentation software is required, that no video editing expertise is required, that only a mobile computing device is required, that the multimedia can be shared with other users, say a legal client, because the multimedia is capable of being streamed to any validated mobile computing device by the streaming server, and so on.

In some examples, once the user has selected that sequence of video clips desired, the logic of the mobile computing device may be configured to output a load file intended to be used for creating video clips within trial presentation support software applications, such as SanctionII with a StartPage.StartLine+EndPage.EndLine format.

In some implementations, and as described above for the web application, the mobile computing device software also includes logic to calculate a duration list, without necessity of creating video clips, by performing calculations from the synchronization index itself. For example, if a user annotates a page:line range within a transcript, the software examines the synchronization index to compute the time difference between EndPage.EndLine and StartPage.StartLine. In this manner, computations can be output for each annotation, for all annotations that comprise one issue, for merged issues, for more than one issue, and for the totality of all annotations. This may be particularly useful when used in conjunction with the above described logic for facility to sequence pre-selected ranges of text and associated multimedia.

As described above for the web application, the mobile computing device software also includes logic to perform text searches. The user may elect to perform a text search on one synchronization index, on a multiplicity of synchronization indexes, or on an entire universe of synchronization indexes.

The mobile computing device software may also include logic to determine text font, size, color, and other attributes. In the context of a legal transcript, it may be particularly important that any such changes not affect the user's ability to determine the correct page:line reference should that portion of the transcript need to be cited in a legal paper or to the court. One way to ensure line breaks of the original transcript are ascertainable, even if font sizing causes a line wrap, is to insert a selected character, such as a relatively unobtrusive red-colored pipe character, at the end of each line which, when touched, reveals a page:line reference. In this manner, font size can be increased to cause line wraps but the user can still simply access a page:line reference.

Moreover, it may be advantageous to employ logic to ensure the transcript can be read in a comprehensible format. For example, in a legal transcript, hard returns between lines of text attributable to a certain speaker should be retained. A line tagged as a question by an attorney, often begun with the characters "Q:" should never be confused with the witness's answer, which lines may begin with the characters "A:" or with an indication of the witness's name. To the extent possible, the logic should parse questions from answers, and perhaps allow the user to apply certain attributes to only certain portions of the transcript. An example would be a deposition transcript, where the reader may more easily read and understand the content if all questions or attorney statements are in bold text, whereas all statements or answers by the witness remain in a non-bold type font. Other default font characteristics may be desirable and may be specified within the synchronization index, for example tagging all speech by one user as a pre-selected color.

The mobile computing device software may also include logic to receive only that content that a user is authorized to receive. A user of a mobile computing device may utilize a synchronization index to view the text of a deposition transcript. In some circumstances, attorneys may designate certain portions of the transcript as Confidential, Restricted Confidential, or Attorney's Eyes Only, categories typically defined by the court in a protective order that limits the individuals who may rightfully access certain testimony. In these instances an administrator, via the web application, manages a set of permissions unique to each user within the administrator's workgroup. In this fashion, an administrator may utilize the synchronization index to issue code those transcript sections that might be, for example, Confidential, Restricted Confidential, or Attorney's Eyes Only. A subsequent user may not be assigned full administrative privileges, but may be granted access to the transcript including sections issue coded Confidential, but excluding sections coded Restricted Confidential or Attorney's Eyes Only. For this user, the logic of the mobile computing device software masks or otherwise redacts those portions of the text that correspond to transcript sections he is not authorized to see. In coordination, the logic also prevents that user from accessing multimedia that would correspond to transcript sections he is not authorized to see.

In circumstances where the video upon playback reaches a point for which access is limited by, say a Restricted Confidential designation, the video would seamlessly play while omitting the area of limited access. In other words, video playback stops at a section for which access is limited and immediately resumes at a point after that section of limited access. Optionally, an audio indicator of limited duration, for example a short ping, can be inserted to audibly indicate the omission of certain multimedia content and corresponding text.

Relatedly, the mobile computing device software may also include logic to ensure the delivery of multimedia and synchronization indexes only to authenticated users by an authentication routine, which may include encryption. That is, the mobile computing device, before receiving a synchronization index or multimedia from either the hosting server or the multimedia server, needs to be authenticated in an authentication protocol. Thereafter, the content may optionally be encrypted and communicated to the mobile computing device. Such security may be important in certain circumstances, such as legal proceedings where the parties need to ensure access is provided only to specific individuals, and that any access can be logged and verified as having occurred. Data encryption techniques may be employed to achieve high levels of security and accountability.

Next, the mobile computing device software may also contain logic to play multimedia at a speed that is greater than normal speed. It is possible for multimedia to be consumed and understood more easily, and with a higher level of retention of the material, if a user reads text at the same time audio is available. The logic that controls playback speed allows the user, via a GUI, to select a playback speed incrementally faster, or slower, than a regular playback speed (e.g. −2.0×, −1.9×, −1.8×, −1.7×, −1.6×, −1.5×, −1.4×, −1.3×, −1.2×, −1.1×, −1×, 1.1×, 1.2×, 1.3×, 1.4×, 1.5×, 1.6×, 1.7×, 1.8×, 1.9×, 2×, where x is the normal playback speed.) The user may also be provided the option to keep the pitch of the video equivalent to that of normal playback speed, which aids the user in comprehending human speech within a regular pitch range, but at increased speed. To accomplish faster than normal playback speeds, the multimedia may be played from memory resident on the mobile computing device, for example in flash memory or cached in RAM from multimedia that is streamed to the mobile computing device from a multimedia streaming server. With availability of sufficient data transfer speeds between a multimedia server and the mobile computing device, faster than normal playback speeds may also be accomplished.

The logic of the mobile computing device software may also be configured to negotiate among several multimedia variant playlists to select the most appropriate bitrate and/or video dimensions depending on the mobile computing device of the user, the wireless connectivity speed available, and the playback option selected. For example, if the user's mobile computing device has limited connectivity speed and the user has elected to play the multimedia at 2× speed, the multimedia server may not be able to deliver the multimedia at high bitrate and large video dimension without pauses, dropouts or the like, while the multimedia caches on the mobile computing device. Accordingly, logic of the mobile computing device software may negotiate down to a low-bitrate audio only stream available within the variant playlist, which facilitates the ability of more content to be cached to the mobile computing device more quickly thereby providing the user uninterrupted playback of audio at his selected 2× playback speed.



Next, the mobile computing device software may also include logic to cause the multimedia to play in full screen mode upon a gesture and, upon subsequent gesture, retreat back into a pre-configured location for use with synchronous text display. If, for example, the viewing screen is apportioned according to the layout of FIG. **3**, the multimedia display area resides in a fixed location at the upper left of the viewing area. To send the video to occupy the full viewing area, a gesture, for example a pinch out (a two finger reverse pinch), will expand the video to full screen. To return the video to its original location, a pinch gesture, or similar, may be used.

The mobile computing device software may also include logic configured to receive a realtime text feed (or other temporary or draft transcript without having been proofread and corrected for errors) from a court reporter or stenographer during the taking of testimony, for example during a deposition or a court proceeding. Common computer assisted translation (CAT) systems may be configured to broadcast a realtime text feed, including via a wireless LAN, and the logic of the mobile computing device software may be configured to wirelessly receive such broadcast. The realtime feed is then displayed on the viewing screen of the mobile computing device, and the annotation functionality, as described above for issue coding, may be applied to the draft transcript. It may be advantageous to utilize this logic within an overall system for transcript management, where the temporary transcript, and any user annotations on a mobile computing device, are communicated back to a web application. Later, the temporary transcript can be replaced by the final transcript in the manner that the annotations made on the draft will match the correct location within the final transcript. Thereafter, the final transcript can be delivered back to the user for use as a synchronization index, as has been described throughout.

The logic configured to receive a realtime text feed may allow a substantially wire-free deposition workspace, it allows a court reporter to conveniently carry and distribute mobile computing devices to deposition attendees to receive a realtime text feed, it allows an ease of use and ease of configurability not presently available in the court reporting industry, for example by use of an intuitive annotation functionality user interface, it makes consumption of realtime text transcription services more simple, thereby increasing the likelihood that such services will be utilized (and thereby providing additional revenue for court reporters with the professional ability to transcribe at realtime speeds), and it meets the further long felt but unmet need of providing an overall enhanced user experience for receipt of realtime text transcription services on a mobile computing device.

Each of the aforementioned elements of logic for operation on a mobile computing device may enhance the overall user experience, with the combination of such logic providing heretofore unavailable functionality for use of text-synchronized multimedia on a mobile computing device. The user's workflow and efficiency in reviewing transcripts on a mobile computing device may be greatly improved.

While examples have been often described in the context of text synchronized multimedia delivery for legal testimony and corresponding video, the described techniques may be adapted for many other commercial uses and is not intended to be limited for use within the legal industry. By way of non-limiting examples, the following applications of the described technique are intended to be possible without departing from the spirit of the disclosure.

Other Applications of the Embodiments

Music

The sale or rental of music on mobile computing devices accounts for billions of dollars of revenue for those who have developed interfaces for distributing music and other multimedia. For example, Apple Inc.'s iTunes software has found considerable commercial success because it provides a positive user experience and provides convenient access to an extensive library of multimedia content for purchase or rental. In light of that commercial success, Apple and its competitors need features to set their multimedia distribution systems apart from others, making them more interesting or more functional for users.

For example, the overall user experience sways a consumer and his purchasing habits. It is frequently the case that a convenient system will find more users than an inconvenient one, and a system with many functional options for the user will find more users than one with limited user options. Each additional feature has an impact on overall commercial success. Apple's CoverFlow within iTunes (conceptually expanded upon within the Apple OS-X Snow Leopard operating system), for example, simply makes album art, the graphic image comprising the front of a record album or the cover of a CD's packaging, available to the consumer as a method to quickly shuffle from one album, or set of songs, to another album. This functionality is said to enhance the user's overall experience with using Apple's mobile computing devices—iPods, iPhones, iPads and the like—and thus has increased the likelihood that a consumer will purchase multimedia for use on those devices as well as the devices themselves.

Accordingly, an object of this aspect of the present disclosure is to enhance the overall user experience in using or consuming multimedia by providing a synchronization index to accompany multimedia, providing the user an ability to smoothly and substantially synchronously scrub through the multimedia using written words as a roadmap. It may be advantageous, for example, to offer a system for a mobile computing device that allows lyrics to be delivered with music in a fashion that a particular line in the lyrics can be used to advance the music to that specific point within the song. The described techniques contribute greatly to the functionality of a multimedia delivery system, such as iTunes or its competitors, and therefore has a very positive impact on the overall user experience, ultimately translating into increased commercial success by way of sales of multimedia and the mobile computing devices sold to play the multimedia.

By way of example for the music industry, an artist records a song and the song is encoded into a common electronic format, including .mp3, .wav, AAC or a number of others. A software application can be used as a synchronization index generator to synchronize the lyrics to the song and output a synchronization index. The synchronization index, or database structure, may be a formatted .mdb file, with each lyric line receiving a timestamp corresponding to the time at which a particular word is heard. Using the web application, the mdb format is parsed and reformatted into an xml-type format. The synchronization index and information about the song to which it is associated is communicated to a remote server, for example a server accessible by Apple's iTunes, or the web application of the present disclosure. A user then uses a mobile computing device to communicate with the remote server to access the synchronization index and retrieve the associated song.

Once the synchronization index has been communicated to the mobile computing device, a hierarchical seek order may be employed by the mobile computing device to retrieve multimedia. For example, when a synchronization index refers to a song, that song may reside on the mobile computing device already. The software on the mobile computing device first inspects the mobile computing device for the presence of the song. If the song is found, it is played with the synchronization index. If the song is not found resident on the mobile computing device, a subsequent step may be to seek for the song resident on a device within a network accessible by a WiFi connection (for example a local area network of computers within one's home), and if found, communicated from that device on the network to the mobile computing device for playback. Next, if the song still has not been found, the software may seek for the song in a remote location accessible by internet connection or accessible by 3G or telephone/data network, and so on until the correct song can be located and delivered for playback on the mobile computing device. A user may set preferences to choose the highest bandwidth connection for highest quality multimedia.

As the song plays on the mobile computing device, lyrics display in a synchronous, smoothly scrolling teleprompter-type fashion. Each line of lyrics is, preferably, linked to a specific time within the song. A predetermined gesture (e.g., a swipe, a double-tap, a triple-tap, or similar, or movement of the line of lyrics to a static position indicator to indicate a desired playback location) jumps the song to that time of elapsed duration.

Some implementations include a multiplicity of synchronization indexes that are aggregated for search to provide an extensive library or database of text-searchable song lyrics. One example is an album of songs and corresponding lyrics, as one may find printed upon a folded insert accompanying music distributed on a CD. Another example is a library of lyrics, comprising hundreds or thousands of songs, adapted for use and search from, say, Apple's iTunes. For example, a user may search for a particular phrase from a song. The library of lyrics would be searched for a match, and the matches, with the synchronization index or a portion thereof, would be returned to the user. Optionally, the search result may also include data such as an artist name, a song title, an album name or image, a recording date, and so on to allow the user to locate a particular song. Because a synchronization index is returned, the user may jump directly to the specific part of the song associated with the lyric in the synchronization index, and a song preview may begin to play from that point for a predetermined, short duration that is less than the duration of the entire song. Advantageously, the user may more easily determine if that is the song desired, and then complete a purchase, a download or a rental of the song. The user may also be exposed to multiple artists' renditions of the same song, allowing more song purchase options for the user.

In some examples, a search for text would access a complete text library (e.g., hosted by Apple, Google, Microsoft, Amazon, or similar distributor of large libraries of multimedia content), return the hits, determine whether the identified song resides locally on the device, and, if not, provide a short stream of the song, with a solicitation to purchase the song or album. The same functionality applies to audio/visual books and movies, among other uses, without departing from the scope of the present disclosure.

Moreover, use of the described techniques for music may overcome the pitfall of karaoke-type closed captioning that occurs as a result of a limited number of text words being able to be displayed at once, whereas in certain circumstances a more complete text transcript would be preferable. For instance, song lyrics have the characteristics of poetry, or a complete story. The context of the words within the overall

composition may have meaning to the artists, or to the reader, when read as a whole, rather than one line at a time or a few words at a time.

In addition, copyright holders for music may find it advantageous to distribute music with a synchronization index as opposed to just the music alone. Users are provided enhanced functionality with the ability to interact with and comprehend lyrics. Copyright holders are presented with a new opportunity for a revenue stream, wherein delivery of a synchronization index with music may command a monetary premium over the music alone, as well as a way to discourage uses of non-authorized works or content. If a user is certain the synchronization index purchased from the copyright holder of the music is guaranteed to be accurate in textual content and in the time links utilized to achieve synchronization between text and multimedia, the user may avoid alternate works that do not have such guarantees.

The described techniques may solve the problem of conveniently locating song lyrics from a mobile computing device, and then achieving synchronous playback of a song and its lyrics on a mobile computing device.

Movies and Motion Pictures

In another implementation, the multimedia may be a film, movie, motion picture, theatrical release, musical, music video, movie preview or trailer, or other video generally consumed for entertainment or used for documentary purposes. The synchronization index in this example comprises a screenplay, which may have spoken text, song lyrics, and other non-spoken words that the author may intend to be displayed, for example a screenwriter wishing to provide the audience the experience of reading his written direction cues for display with the video for study of how such cues were theatrically executed in the film itself. Screenplay authors can provide heretofore unavailable convenience for film industry professionals as well as new audiences. Screenplay authors generally do not have a broad consumer base for their written work product outside of industry-specific professionals, and the described techniques may allow a new consumer base to appreciate those written works of authorship, all with the additional benefit of being synchronously viewed with the resultant movie and theatric execution.

Moreover, another feature is provided by the present disclosure in that DVDs, Blu-ray discs and the like have typically been navigated by chaptering information included on the recording media that can be read by playback devices. These chapters have historically been used to navigate to preselected portions within the movie, such as may correspond to an Act or a Scene. For example, a movie may have contained ten or twenty discrete chapters, but typically not many more, and certainly not an order of magnitude more, which possibility is provided here for the first time.

With streaming media becoming more prevalent, however, consumers require something other than mere chaptering information for convenient access to the multimedia. With the described techniques, the synchronization index presents opportunity to apply timestamps to every word, creating hundreds, or thousands of "micro-chapters" that the user can use for nearly immediate, non-linear access to virtually any point within a movie. Legacy chaptering information can also be retained, as the synchronization index is not limited to spoken words, giving the producer a complete palette of navigation options to provide the consumer, including a table of contents and full-text search-ability.

Another advantage of the present disclosure is that the system allows the ability to text-search entire multimedia libraries. This allows a user to quickly access and watch selected scenes, with the result being that users rely more upon a cloud computing-type content distribution model wherein the entities providing those services, often on a subscription based business model, will retain paying members and the resultant revenue stream. The system also enhances the user experience of consuming multimedia, particularly on mobile computing devices, a factor that tends to increase market share for multimedia content service providers, such as Netflix or Apple sales through iTunes.

In addition, the system allows search criteria to be applied across multiple films with content from the synchronization index having the potential to be associated with other metadata for search purposes. For example, it is contemplated that a user may perform a search based on an actor's name, or a character's name, and a line spoken within a movie, without the user having to necessarily recall or search for the name of the movie itself. A search result, with appropriate metadata and tagging applied to the synchronization index, allows a user to access the exact scene desired.

In contrast, a common model for such searches is a search performed on the YouTube.com website for hosting video. With the YouTube model, millions of video clips are hosted which have been posted by thousands and thousands of disparate users, and the searcher finds the relevant scene only if the user posting the content happened to add the correct words to the title of the clip or as keywords associated with the uploaded video. The YouTube model for finding relevant and interesting video content, particularly for commercial films, is rife with copyright infringement and the potential therefor, with content owners needing to vigilantly police a multiplicity of hosting locations containing their own material and then follow procedures with those website operators to seek removal of the material due to copyright violations. Movie studios and other copyright owners are faced with the unpleasant prospect of having the content removed, thus potentially alienating a portion of their fan base who view content within those online communities and socially interact with other users, or leaving the content available but suffering economic loss due to 1) advertising losses, in that advertisers pay hosting services like YouTube based on the traffic generated, whereas that traffic often would not exist but for multimedia content users' desire to view interesting content, such as newly released films and so on; 2) the inability to control the user's experience; 3) the inability to display advertising of the copyright owner's choosing, be it for other movies it produces or distributes, for goods, for services, or for any other type of promotional, branding or goodwill enhancement; 4) lost licensing fees; 5) social networking interactions built upon common interest in movies, music, or other multimedia; and so on.

The described techniques provide a multimedia copyright owner the facility to make an entire film available as streaming media to a mobile computing device, and searchable via the synchronization index. Once a user performs a search, the user's identity can be verified to determine if he ought to be granted full access to the multimedia, say by having a current paid subscription with the multimedia content provider. If the user has no subscription, and thus ought not be provided unlimited access to the multimedia, it may be advantageous to offer the user limited access, or preview access, to, say, a 30-240 second clip only, thereby reducing incentive for searchers to hunt "unauthorized" content on unauthorized distribution channels. The described techniques incentivize users to maintain paid subscriptions to content providers in return for convenient, searchable, "always on" full access to their content. The modern mobile computing device user desires such convenient access.

Moreover, for the system of the present disclosure it may be desirable to increase the amount of multimedia with synchronization indexes. One may leverage existing synchronization index-type information for use with the system of the present disclosure by de-multiplexing closed captioned data from multimedia, or by transcoding existing closed captioned data sets. In this fashion, the web application, by the file format and data parsing logic **6-8**, may re-purpose closed captioned data formats into an xml-type synchronization index. Closed caption file types suitable for this transformation include: SAMI (Synchronized Accessible Media Interchange), SMIL—(Synchronized Multimedia Integration Language), SubViewer (*.SUB), SubRip (*.SRT), .SBV, Adobe Encore DVD (*.txt), Advanced SubStation Alpha (*.ass), AQTitle (*.aqt), Captions 32 (*.txt), Captions DAT (*.dat), Captions DAT Text (*.dat), Captions Inc. (*.txt), Cheetah (*.asc), CPC-600 (*.txt), DKS Subtitle Format (*.dks), DVD Junior (*.txt), DVD Subtitle System (*.txt), DVDSubtitle (*.sub), FAB Subtitler (*.txt), IAuthor Script (*.txt), Inscriber CG (*.txt), JACOSub 2.7+(*.jss; *.js), Karaoke Lyrics LRC (*.lrc), Karaoke Lyrics VKT (*.vkt), KoalaPlayer (*.txt) (equal to one of the variations of TMPlayer), MAC DVD Studio Pro (*.txt), MacSUB (*.scr), MicroDVD (*.sub), MPlayer (*.mpl), MPlayer2, (*.mpl), MPSub (*.sub), OVR Script (*.ovr), Panimator (*.pan), Philips SVCD Designer (*.sub), Phoenix Japanimation Society (*.pjs), Pinnacle Impression (*.txt), PowerDivX (*.psb), PowerPixel (*.txt), QuickTime Text (*.txt), RealTime (*.rt), SAMI Captioning (*.smi), Sasami Script (*.s2k), SBT (*.sbt), Sofni (*.sub), Softitler RTF (*.rtf), SonicDVD Creator (*.sub), Sonic Scenarist (*.sst), Spruce DVDMaestro (*.son), Spruce Subtitle File (*.stl), Stream SubText Player (*.sst), Stream SubText Script (*.ssts), SubCreator 1.x (*.txt), SubRip (*.srt), SubSonic (*.sub), SubStation Alpha (*.ssa), SubViewer 1.0 (*.sub), SubViewer 2.0 (*.sub), TMPlayer (*.txt) (five different variations), Turbo Titler (*.txt), Ulead DVD Workshop 2.0 (*.txt), ViPlay Subtitle File (*.vsf), ZeroG (*.zeg).

Because existing closed captioned data sets may be old or inaccurate, users may modify the transcriptions as one would in making errata corrections to a deposition transcript. It may be advantageous to employ an open, wiki-style ability for a multiplicity of users to correct transcriptions. The result is that users are drawn in ever closer to the multimedia that attracts their interest, benefiting multimedia owners and creators as well as subsequent users and consumers.

As is evident, the present described techniques may contribute to an enhanced overall user experience, and may enhance commercial success and viability with respect to multimedia sales, content delivery subscriptions, and mobile computing device sales.

Educational Content and Regulatory Compliance

Yet another use for the described techniques is use for educational multimedia content and for access to multimedia created by or distributed by government, including multimedia whose distribution must meet rules and regulations for accessibility by disabled persons. There presently exists a large body of multimedia that is configured to meet rules and regulations for accessibility by disabled persons, however extensive use of closed captioning, with its many shortcomings set out above, for such compliance does not adequately address viewership of such multimedia on mobile computing devices. Mobile computing devices often have viewing screens that may be too small to accommodate legible text superimposed over video, they are often simply not configured to receive such closed captioned text, and the video files themselves when being transcoded or re-formatted for streaming media delivery unnecessarily strip or remove closed captioned text that may have originally provided regulatory compliance.

With the described techniques, multimedia content providers can provide a heretofore unavailable convenience for disabled users of mobile computing devices in a way that meets the requirements and intent of Section 508 Amendment to the Rehabilitation Act of 1973 (29 U.S.C. §794d), and others.

Educational content distributed by schools, universities, research institutions and the like can be consumed in multiple languages, as a synchronization index may allow the user to elect one of several language settings. Additionally, comprehension of content can be vastly improved as many studies indicate comprehension levels increase when users hear and read content at the same time. Moreover, the described techniques may facilitate learning, literacy initiatives, educational instruction, and they do so in a manner that mobile computing devices, with their increasing ubiquity, can be utilized for such worthwhile societal betterment objectives.

Voice-to-Text Voicemail and Telephony Recording

In another example, the multimedia may be a voicemail and the synchronization index may contain a transcription thereof. With the increasing use of mobile telephones/smartphones and voicemail services, many users find themselves deluged with lengthy voicemail messages that they do not want to take the time to listen through. New businesses have recently attempted to help solve the problem by applying voice-to-text transcription of voicemail and then sending, for example by email, the transcription of the voicemail to enable the recipient to more quickly understand what the speaker intended to convey. This transcription is often used in conjunction with a "visual voicemail" system.

With the described techniques, users are no longer required to choose to listen to the message or to read the transcription as an either/or proposition, but rather they now have for the first time a convenient way to navigate the voicemail multimedia with a synchronization index on a mobile computing device. For example, voice-to-text transcription software may be employed to create a transcription and in so doing it may apply a timestamp for each word, and in some instances one timestamp for what the software perceives to be the beginning of a word and one timestamp for what it perceives to be the end of the word. Because voice-to-text transcription software engines do not render perfect transcriptions, for a host of reasons, it may be important for the recipient to access the voicemail, but not necessarily from the beginning or with cumbersome fast-forward and rewind transport controls, to confirm the content of the message the sender intended. This is not unlike the use of an errata sheet in the legal context, wherein a user needs to check the transcription for accuracy; a task that is much easier to accomplish with convenient, non-linear access to the underlying multimedia itself, and preferably on a mobile computing device. Use of the described techniques for the aforementioned purpose may overcome many shortcomings of existing voicemail and transcription systems and services. It is another example of an enhanced user experience and provision of a solution to a long felt but unmet need for the mobile computing device user.

Use of the Synchronization Index and a Mobile Computing Device to Control Multimedia Delivery to a Receiving Device

In some implementations, the synchronization index communicated to the mobile computing device may be used to seek video from a remote server, where the remote server is then asked to begin delivering video at time t1 to a device other than the mobile computing device itself. For example, a consumer of cable or satellite television services may desire

to scrub video content that he can watch on a television within his home. In this embodiment, the user views the transcript, or a synchronization index, on the mobile computing device (e.g. Apple iPad), gestures on a transcript display on the iPad intending to scrub video to a certain location, then the request is communicated to the server to instruct it to deliver video at time t1 to destination d1, for example, a selected television within the home that has multimedia content communicated to it via a set-top DVR-type device, then the multimedia is delivered and, optionally, cached in whole or in part. In this manner, the iPad with the synchronization index functions as a sophisticated type of remote control for video content, using a transcript of the media to navigate precisely to a desired viewing location.

In common digital video recorder (DVR) devices, a user can elect to record broadcast television programming to a hard drive integral to the DVR. A user may navigate to a program guide and select content to record at a future time, or the user may elect to record the content being viewed live. Users then play back the multimedia at a later time. During playback, most DVR devices facilitate the ability to fast-forward through the recorded content, for example to avoid commercials, and the ability to rewind. Both fast-forward operations and rewind operations often include variable rate fast-forward and variable rate rewind, allowing the user to fast forward at differing speeds (e.g. 2×, 3×, 4×, −2×, −3×, −4×). These variable rates are intended to allow the user to scrub the video content to access the desired portion of multimedia content. They remain cumbersome in use, however, because they do not allow pinpoint scrubbing to a specific time location, nor is bookmarking, annotation, commenting, or social networking facilitated in most DVR-type devices. In further contrast, use of a synchronization index facilitates navigation in a multiplicity of ways, including navigating to a chapter, scene, or act, navigating by text, skipping discrete time blocks (30 seconds, 1 minute, 2 minutes, 5 minutes, 10 minutes, etc.), and so on.

In some examples, the synchronization index communicated to the mobile computing device may be used 1) to control multimedia resident on the mobile computing device itself, 2) to control multimedia resident on the mobile computing device itself, but then sent for display to a receiving device, 3) to control multimedia not resident on the mobile computing device itself, but stored on a receiving device (for example, if the receiving device was a commercially available home theater DVR-type device containing memory where multimedia has already been stored), or 4) to control multimedia not resident on the mobile computing device itself, and not stored on a receiving device, but communicated to the receiving device by a serving network or multimedia server (for example, if the receiving device had a network connection but little or no resident memory, or if a DVR-type receiving device had memory but had not yet had multimedia communicated to it and stored to memory).

As shown in FIG. **20**, the display screen of the mobile computing device can be partitioned to allow function buttons to be inserted at the bottom of the display. One such button may be configured to cause the mobile computing device to begin an instruction set that causes multimedia to be sent to or to be displayed upon the receiving device. In this manner, the synchronization index can be used to locate a desired viewing location, the desired viewing location can be viewed on the mobile computing device in video viewing area, and then the instruction set can be initiated to cause playback on the receiving device. One such example would be to use an Apple iPad, with a synchronization index and resident multimedia, that communicates using the Apple AirPlay protocol with an AppleTV appliance that, in turn, delivers multimedia to a home entertainment system.

Any number of hardware devices, or hardware/software combinations, may comprise the receiving device. By way of non-limiting example, a receiving device may be a digital video recorder, "DVR" (e.g., TiVo branded DVR appliance, Scientific Atlanta Explorer DVR device, Dish Network DVR, Hughes DirecTV DVR, Motorola DVR, Philips DVR, Polaroid DVR, and so on), a personal video recorder, "PVR", a hardware appliance for receiving cable television or satellite television services, a computer, a television, a smart television, an internet enabled TV (such as the Sony Internet TV), the AppleTV appliance by Apple, Inc., the GoogleTV appliance by Google, a gaming device with facility for receiving multimedia data (e.g., the Sony PlayStation3, Nintendo Wii console, Microsoft's Xbox360), streaming media players (e.g., Roku Streaming Player, Seagate FreeAgent Theater+ HD Media Player, Western Digital TV Live Plus HD Media Player), home theater appliances with facility to receive multimedia communication, and optionally to play Blu-Ray formatted media (e.g., as available from Insignia, LG, Panasonic, Philips, Pioneer, Samsung, Sony, Toshiba, Yamaha, VIZIO), a monitor, or another mobile computing device.

Multimedia may be delivered by any multimedia content distribution method, including by computer network, cable television or satellite television service, subscription multimedia delivery service (e.g., Netflix, Hulu, iTunes, Rhapsody, Spotify, MOG, Napster, Rdio, Grooveshark.com, Pandora.com, alluc.org, talk radio subscription content by radio personality, and so on), peer-to-peer network, Apple AirPlay, Universal Plug and Play ("UPnP", generally defined as a set of networking protocols for primarily residential networks without enterprise class devices that permits networked devices, such as personal computers, printers, Internet gateways, Wi-Fi access points and mobile devices to seamlessly discover each other's presence on the network and establish functional network services for data sharing, communications, and entertainment) and similar methods for delivering multimedia content.

While the term "video on demand" has historically been associated only with the user being able to select the time at which a video may have started to play, the described techniques allow a user to scrub video using a synchronization index, and vice versa, to a specific time within a multimedia file, thereby achieving a heretofore unavailable enhanced user experience.

In another implementation, one mobile computing device can be used to control multimedia delivery to a second mobile computing device. An intended example would be in-vehicle entertainment systems where one mobile computing device would be a master serving other slave mobile computing devices. In practice, a user may download multimedia to a mobile computing device, such as an Apple iPad. That first user, say a parent entering an automobile as a passenger with children who have mobile computing devices of their own, may broadcast multimedia to the other receiving devices (e.g., for this example, another iPad, the entertainment system within the vehicle, a handheld gaming device, or similar mobile computing device) via an appropriate communication protocol and use the synchronization index to facilitate navigation through the multimedia.

As another example, the system can be used for audio books transmitted to a different receiving device, such as a vehicle's stereo system, or another type of in-vehicle entertainment system with capacity to distribute sound and/or video images. A user may use a mobile computing device,

such as the Apple iPad, to read a book on the mobile computing device. Because the text of that book also functions as a synchronization index to the audio book, the reader may insert a bookmark, discontinue reading, move to a different location where reading is impracticable (such as in a car), access the bookmark as part of the synchronization index, and begin the playback of the audio book at the precise location where the reader had stopped reading.

Moreover, the synchronization index comprising the text of the book can reside on the mobile computing device, while the audio portion can be streamed, or streamed and cached, to the mobile computing device, or to the receiving device. In this fashion, the iPad user may take a synchronization index into a vehicle, and direct audio content to be delivered and optionally cached directly to the in-vehicle entertainment system. For example, the in-vehicle entertainment system may be equipped with capacity to communicate wirelessly with a computer network (for example by WiFi, 3G, 4G, Bluetooth, or other wireless connection, such as OnStar). This capacity may be combined with computer memory integral to the in-vehicle entertainment system, for example by a hard drive, flash memory or similar storage. As a result, the in-vehicle entertainment system is in communication with the mobile computing device. Once a synchronization index, or a specific portion thereof, is accessed, the in-vehicle entertainment system can begin automatically downloading and caching corresponding multimedia for use in the vehicle itself. Once the user has finished listening to the audio, the receiving device can communicate back to the mobile communicating device the point at which listening ceased. A bookmark is inserted into the synchronization index at that point, and the next time the user accesses the synchronization index, he can return to the correct point within the synchronization index to either begin reading or to begin a new listening session. In practice, the user utilizes the synchronization index on the mobile computing device to establish non-linear access to corresponding multimedia content in a new, novel way.

With this and other uses, new commercial opportunities are provided for those who control distribution of text-based authored works and for multimedia owners. As an example, consumers have typically purchased either an electronic book for reading on a mobile computing device, or, in the alternative, they have purchased an audiobook. Very few, if any, users have purchased both products, particularly with the full feature set of the described system for use on a mobile computing device. With the described techniques and systems, synchronization indexes and corresponding multimedia can be offered for sale as a functional, inter-related, interactive product with annotation capacity, rather than just text alone or just multimedia alone.

Advertising

Moreover, television broadcasters dislike the functionality of the DVR that allows commercial advertisements to be skipped during time-delayed program playback.

Digital video recorders have been changing the way television programs advertise products. Watching pre-recorded programs allows users to fast-forward through commercials, and some technology allows users to remove commercials entirely. Some features of this type have been controversial, with some major television networks and movie studios claiming they violate copyright and should be banned.

The described techniques may facilitate the exposure to advertising, including from companies whose advertisements would have accompanied the initial broadcast. By using a portion of the mobile computing device's screen, targeted advertisements can be unobtrusively displayed in a way that does not obscure the viewing screen of the multimedia, and in a way that subtly and unobtrusively invites the user's interaction.

As illustrated in FIG. **20**, the iPad display screen can be divided into multiple sections. For example, a section may be allocated for multimedia playback if the user desires to view content on the iPad itself, a section may be allocated for bibliographic data relating to the multimedia or programming content, a section may be allocated for transcript display and manipulation, and a section may be allocated for advertising or commercial content.

Targeted advertising may be delivered to the iPad. Criteria for targeted advertising may include: the user's profile and demographic data, geographic location, media being watched or accessed, media consumption history or previously viewed content, word search history, multimedia stored on the mobile computing device, and so on.

The portion of the iPad screen to display advertising can be periodically refreshed. Advertisements can be text, images, or multimedia. If the mobile computing device with synchronization index is being used in its capacity as a remote control for content on a receiving device, the multimedia can be received on a receiving device and played back without advertising displaying on the viewing monitor, while the advertising content remains on the mobile computing device. Additionally, advertisement on the mobile computing device concurrent with multimedia playback allows the user to interact with the advertisement, for example by clicking an ad or URL to be delivered to a website to receive more information about a company or a product.

For example, the synchronization index may be delivered as metadata to accompany the multimedia. The synchronization index may also provide instructions for the targeted, timed delivery of advertisement to the mobile computing device. These product placement-type advertisements can be very attractive to the user, yet subtle in the way they are delivered and displayed to the user. For example, a television program containing a car chase a given duration into the program may have timed metadata in the synchronization index for the delivery of an advertisement pertaining to the make and model of the car being used in the program. Product placement within multimedia can now be accompanied with a corresponding overt advertisement. With such an ad displaying unobtrusively on the mobile computing device, it increases the likelihood that the user will click through the advertisement to be brought to the website of the advertiser. In this way, the described techniques may make it easier for consumers to access information relevant to their interests or the multimedia content they access.

Another type of advertisement, used often for advertising TV shows on the same channel, places an ad overlay on the bottom of the TV screen, blocking out some of the picture, as was identified, above, as a shortcoming of closed captioning. Media companies refer to these "Banners," or "Logo Bugs," as Secondary Events (2E). Similar to the method by which severe weather warnings have historically been delivered, sometimes these secondary events take up only 5-10% of the screen, but in the extreme, can take up as much as 25% of the viewing area. Some secondary events comprise sound or movement of a graphic across the viewing area, which may be undesirable for the user. Despite the increasing usage of Secondary Events, advertisers are seeking new methods, like advertising as described herein, to market their products in concert with television broadcasts and similar programming without substantially interfering with the users' viewing experience. Advertisers are losing the ability to invade the home, and consumer's minds, and are consequently increas-

ingly forced to wait for an invitation from the consumer. Advertisers and content providers are learning that advertising content customers will be willing to seek out and receive is more likely to impact purchasing decisions. It is that type of advertising facilitated by the described techniques.

Social Networking

As yet another potential advantage, the described techniques may facilitate social networking around multimedia, and present new ways for mobile computing device users to share and recommend multimedia to their network of friends or colleagues.

One way users are provided the facility to interact is in the way that annotations can be created to a synchronization index and shared with others. For example, a user may find the chorus of a particular song to be emotionally moving, and he may wish to share not just that song, but that particular part within the song, with his social network. By creating an annotation to the synchronization index, and then by sharing that annotation, a subsequent user may obtain access to the first user's annotated synchronization index for immediate, non-linear access to the specific part of the song the first user desired to spotlight for discussion.

In practice, a user utilizes the synchronization index on a mobile computing device. An annotation is made, and information concerning the page:line range, issue code, color, attached note, and so on may be stored local to the mobile computing device. This information may also be transmitted back to the web application on the hosting server, along with identifying information about the user, such as the mobile computing device identification number (for example, if an Apple device then the identification can be found in a unique "UDID"), time, user location, and so on. A subsequent user may access the web application on the hosting server, examine annotations to which he has been allowed access, and elect to download those annotations to his own synchronization index. As described above, the user may merge or flatten these annotations with his own, or he may keep a subset and discard a subset, or a combination thereof.

In this manner, a user can select a group of users whose comments, notes and annotations he wishes to receive, to establish a social network. For instance, this functionality may be used by a movie's director, producer, its actors or others to provide notes and commentary, on an ongoing basis, to enhance one's interaction relating to the film. Whereas Blu-ray discs became an attractive media for content delivery due in part to the disc's ability to physically store more data pertaining to the film by way of director's commentaries and so forth, the new feature set described throughout this disclosure may make interaction with one's audience an organic, ongoing process. Movie fans can interact with one another, and filmmakers can interact with consumers.

Similarly, a user may bookmark a part of a synchronization index, and transmit that bookmark as a URL-type deep link to a specific time within multimedia to a subsequent user. Accessing the deep link delivers a subsequent user not only to the correct multimedia but also to the correct location within the multimedia. This is particularly useful in a cloud computing environment, where users are increasingly not interested in managing their own multimedia assets on devices they own so long as they can access the content in another convenient way, for example by streamed media over the internet or wireless connection. These streaming media services, such as Netflix, provide access to vast libraries of content at an affordable price, and, with the described system, become an even more attractive way for users to consume multimedia content and share it, and portions within it, with friends and colleagues.

It is easy to appreciate the multitude of interactions possible between users who enjoy discussing music, movies, television shows, lectures, politics, and all manner of content, and how, with benefit of a mobile computing device and synchronization index, those social interactions can be enhanced.

There has been limited capacity to allow a user of a mobile computing device access to multimedia at a precise location within the multimedia for the purpose of engaging in social networking. The described techniques may address and overcome many of those limitations.

Other uses for a synchronization index and associated multimedia operating on a mobile computing device are legion, and may include movies, music, music videos, news, news archives, audio books, television shows, documentaries, radio re-broadcasts and archives, podcasts, business and corporate events, product launches, corporate leadership speeches, CEO messaging, public disclosures, shareholder meetings, academic uses, educational uses, travelogues, politics and government, court proceedings, legislative sessions, executive speeches, political campaigns, local governments, school boards, regulatory compliance, uses for those with disabilities and compliance with the Section 508 Amendment to the Rehabilitation Act of 1973, medical records transcription, call centers, training, custom applications, foreign language education and learning, motivational speaking, religious instruction, sermons, worship, voice-to-text transcription, voicemail, historical preservation, sports broadcasts, infomercials, commercial advertising, material of children's interest, and many others.

For example, with commenting features of the present disclosure, crowd-sourced multimedia indexing may be achieved. Large groups of users may voluntarily contribute to create a knowledge base for use by others. This same "crowd-sourcing" can be applied to indexing multimedia. One use of crowd-sourcing has been described above in relation to users that text transcribe multimedia, modify the text of a transcription or to adjust timestamps used to synchronize text to multimedia within a synchronization index.

Another use of multimedia indexing is in advertising, where a product's producer seeks to enhance brand awareness. With crowd sourced tagging of multimedia, particularly with a synchronized transcript and commenting functionality, certain brands may be "tagged" by users.

Product placement in the multimedia content may be supported in the embodiments. A corporation may desire to have its goods used, or even highlighted, within a major motion picture and be noticed by the viewer. For example, a producer of goods or services may run an advertising promotion in association with a multimedia or movie producer, whereby the brand owner provides incentives for the consumer to 1) view the multimedia, including for the purpose of finding its products used within the multimedia, 2) "tag" those occurrences of product placement, for example by creating a text comment or other marker (or "tag", "hit", "vote", "find", "like", "digg", "brand-emoticon", or similar) at the point in the multimedia when the product is used or shown, 3) share those "tags" or comments with one's social networking contacts, and 4) receive from the brand owner an incentive for having tagged its products.

Contests or promotions may be held for the users who tag and share a certain number of times, or who tag and share a certain number of films. It may be that a product is shown multiple times in a film, and if a user is able to tag a threshold number of them (within a pre-defined time range of the product being visible on screen), he may be eligible for sweepstakes contests, drawings or rewards, such as a coupon for

free or discounted product, or loyalty points to be spent at a certain store for a certain product. More expensive items may also be used to entice users to tag films for product usage. For example, a car manufacturer may offer a promotion whereby a user who tags a certain number of films becomes eligible for a drawing to win a new vehicle.

This method of advertising in the embodiments has several benefits, including 1) it entices users to watch certain films, or to watch the film more than once, 2) it causes the user to "interact" with the film, and to pay attention to different aspects of it, including commercial aspects, more than would a passive observer viewing for entertainment only, 3) it spreads "tags" among social networks, 4) it encourages users to participate in an advertising methodology by offering rewards, 5) it can be low expense for the advertiser compared to more traditional advertising channels like print, television, or radio, 6) it allows co-branding, 7) it is fun for the user, 8) it is an opt-in, voluntary interaction in which the individual elects to participate (eliminating forced commercial advertising, for example as a bumper multimedia displayed before the multimedia a user desires to view, which is difficult or impossible to opt out of), 9) it leverages the efforts of a multiplicity of users to spread brand presence, and 10) it has the potential to drive consumer behavior by utilizing the psychological phenomenon of social proof.

Films and television programs are replete with product placement, and the disclosure of the present invention provides a convenient, fun way for consumers to "interact" with the multimedia by brand-tagging by using mobile computing devices. Brand-tagging also alleviates challenges to standard advertising, as more DVR users consciously skip overt advertisements forcibly inserted into a broadcast. With streaming media, users dislike a bumper ad being forced upon them before being able to view the content they elected to view, as might be found with increasing frequency in Youtube, Hulu, Justin.tv streams and many others.

By way of example, the following are ripe for brand tagging within multimedia: automobiles, consumer electronics and computers, beverages (colas/carbonated beverages, energy drinks, adult alcoholic beverages (beer, wine, liquor)), clothing and accessories/fashion, airlines, travel destinations, tobacco, restaurants and eateries, foods and snacks, hotels, firearms, radio/television/film/magazines, oil/energy, healthcare/drugs/hygiene, household items/soaps/detergents, and so on.

In practice, one way of implementing such a system includes: issuing a unique identifier, such as "BrandTagID," to the owner of a brand (for example, a randomized string of alphanumeric characters of predetermined length, akin to an encryption key used in the field of encryption); issuing a brand tag graphic or symbol or "BrandGraphic" (which itself may be a graphic, containing a hyperlink); having a user register to obtain a TaggingID (to allow secure registry of the identity of a unique user, for example by a randomized string of characters of predetermined length, akin to an encryption key used in the field of encryption); combining the BrandTagID with the TaggingID, to allow a user a UniqueID that links a specific user to a specific brand; providing facility for a user to leave or deposit a UniqueID at a time $t_x$, that being a discrete time within a multimedia file having a run duration of $t_0$ to $t_{end}$; providing facility for a computer system to receive a UniqueID from a user; and providing facility for a computer system to credit a discrete TaggingID (i.e. associated with a discrete human user) for having placed a UniqueID at a time $t_x$ within a specified multimedia file or associated synchronization index, for example to earn entry into contests or eligibility for prizes or giveaways. The system may also include ability to share a UniqueID with the social networking contacts of the individual associated with the corresponding TaggingID.

For example, User-1 may have a social network of 100 friends or contacts. User-1 applies for a TaggingID, and receives TaggingID=User-1-abcd1234. The "Brand, Inc." sporting goods company applies for a BrandTagID, and receives BrandTagID="Brand, Inc.-xyz789, BrandGraphic=www.brandwebsite.com/graphic.gif, VariableHyperlink=www.brandwebsite.com".

User-1 desires to brand tag for Brand, Inc., so he applies for and receives a UniqueID, which is a mathematical function performed utilizing the TaggingID and the BrandTagID, returning a UniqueID of, say, (encrypted, signed function of) UniqueID="abcd1234*xyz789".

User-1 watches a motion picture and places his UniqueID at a time that is 00:02:31.2 into the movie, when one of the main characters is seen wearing a pair of branded athletic shoes. The computer system places the BrandGraphic at that time within the synchronization index. Users in the social network of User-1 may elect to also view the same motion picture, opting to view the tags and comments left by User-1.

Once User-1 places a UniqueID, a report may be sent to the owner of the BrandTagID, letting the owner know the multimedia in which a tag was placed; the identity of the individual placing the tag, by the TaggingID; and the time/date when the tag was placed.

As a result, the owner of the BrandTagID has the ability to aggregate data about vast numbers of instances of brand occurrence across vast numbers of multimedia files, and it accomplishes this by leveraging the power great numbers of desegregate users, using mobile devices, who volunteer their time to do it. As additional benefit, those tags are shared within the social networks of the large numbers of users.

In one embodiment, the user may use a mobile computing device to tag multimedia that is played in a location other than on the mobile computing device. For example, a user watches a movie at home that is streamed and received by an appliance, which then communicates the audio and video signals to a home theater and its components, such as an LCD television and speakers. Within this movie, suppose there are twelve companies that have products appearing in the film and that desire users to tag the times at which they appear. Assume each company has a BrandTagID and an associated brand graphic

The user may watch the film via his home theater system and tag brands using his mobile device, such as an iPad. For this example, the mobile device display may be partitioned into sections, wherein one brand graphic appears in one section. The user has a touch-sensitive palette of brands to apply to the multimedia. When that brand (or product, place, person, etc.) appears in the multimedia, performing a gesture on that section, for example tapping the graphic, tags that brand at that time within the multimedia. The user may have the functionality to adjust the properties of the tag, such as the TimeIn and TimeOut to provide a duration D for the tag. The user may select a predetermined duration to set a tag, for example by associating the creation of a tag with a 0.5 second duration, or the duration of the tag may be set by how long the user performs the gesture. If the product appears on screen for 10 seconds, the user may press and hold the graphic for 10 seconds, and the software will record that action.

The user may be provided facility to tag more than one brand at once. For example, assume a film character uses an Apple iPhone for a phone call for 10 seconds, then walks to a Ford Mustang to continue the conversation for another 20 seconds. The user may press and hold the Apple brand graphic

for 10 seconds and then simultaneously tap the Ford brand graphic (inserting the default tag with a duration of 0.5 seconds) and then release the Apple brand graphic after another 20 seconds, resulting in a tag for the Apple iPhone for a duration of 30 seconds. In another embodiment, the mobile computing device may be used to display the multimedia and to perform brand tagging. For example, FIG. **38** illustrates an exemplary layout of a display of a mobile device for brand tagging in multimedia content. The header area **13** displays information about the multimedia in which brand tagging is performed. In addition, the media area **12** shows a display of the video of the multimedia and the text area **14** shows a highlighted portion of a text currently being displayed. In addition, the display may include a section comprising various graphics of selected brands that the user may tag in the multimedia content. For example, when the user recognizes a particular brand on a product, the user may simply click or select the appropriate graphic in this section. In the spirit of this disclosure, this brand tagging functionality may be used alone, or it may be used with other functionality disclosed.

User viewing statistics may also be implemented in the embodiments. For example, the user may see graphing of a number of users viewing a scene for a given duration, offered to select from "most viewed"/"favorite" scenes, view scene recommendation or movie recommendation, for example, in the form of "viewers of this scene have also liked . . . "

Exemplary Screen Shots of Embodiments

For purposes of illustration, FIGS. **21-37** are provided to show exemplary screen shots of potential multimedia content that may be provided by the embodiments. Of note, those skilled in the art will recognize that the embodiments allow for variance of the display sections and/or may allow the user to resize various sections as desired.

The screen shots may contain copyrighted material therein to teach and illustrate how multimedia content may be rendered or displayed on a mobile computing device. All rights in any such copyrighted material, however, remain reserved by the owner of the copyrighted work.

FIG. **21** illustrates an exemplary screen shot of a mobile device for a transcript synchronized to a multimedia audio file. For example, as shown, an audio file of an oral argument and transcript for a U.S. Supreme Court case related to Microsoft versus i4i Ltd. Partnership. In the screen shot, an image illustrating that the content is related to the U.S. Supreme Court is shown in the media area **12**. The header area **13** displays relevant identification of the case, e.g., Microsoft versus i4i Ltd. Partnership. In the example shown, a control bar providing control buttons and progress of the multimedia content may also be provided in the header area **13**. The text area **14** shows a portion of a text transcript of the dialogue of the deposition being displayed.

As described throughout this disclosure, the mobile computing device may control display of the text transcript in the text area **14** in a synchronized manner with the video being displayed in the media area **12**. For example, as shown, the text at line 09 is highlighted to indicate the current location in the transcript relative to playback of the audio file.

In addition, as shown, an advertisement may be provided at the bottom of the text area **14**. The advertisement may appear in the form of one or more banner advertisements. In addition, the advertisement may change based on time, the content of the transcript being shown, etc. Furthermore, a scrub-bar may also be provided at the bottom of the display on the mobile computing device.

FIG. **22** illustrates an exemplary screen shot of a mobile device playing multimedia content and a transcript for education material from an organization and a listing of other courses with multimedia content. For example, as shown, multimedia content for classes or lectures by the ABA may be offered to the user.

In the screen shot, an image indicating the "Patent Reform Act of 2009/2010: Effects on Small Businesses and Startups" from the ABA is shown in the media area **12**. The header area **13** displays relevant identification of the lecture, such as the product code, faculty, date, page count, running time, credit hours, ethics hours, sponsors, topic, and pricing. The text area **14** shows a portion of a text transcript of the dialogue currently being played. Finally, a scrub bar may be provided at the bottom of the display to indicate the progress of the playback and highlighting of text. Moreover, the screen shot may also offer links to other multimedia content files for other courses offered by the institution.

FIG. **23** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. The header area **13** displays a court associated with the deposition, a civil action number associated with the deposition, a name of the deponent in the deposition, a location of the deposition, and the date/time of the deposition. In addition, the media area **12** shows a display of the video of the deposition and the text area **14** shows a highlighted portion of a text transcript of the dialogue of the deposition being displayed. As also shown, the transcript may have an exhibit linked to one or more lines of text, as indicated by an icon, such as the paper clip icon adjacent to lines 02-06 shown in FIG. **23**.

As also shown, the transcript may have an exhibit linked to one or more lines of text, as indicated by an icon, such as the paper clip icon adjacent to lines 02-06 shown in FIG. **24**. Furthermore, a comments section may also be provided in a section of the display on the mobile computing device. The comments section, for example, allows a user or a group of users to record comments about the testimony.

FIG. **25** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript accompanied with a section of the display for showing errata and a thumbnail of an attachment to the transcript. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011.

As also shown, the transcript may have an exhibit linked to one or more lines of text, as indicated by an icon, such as the paper clip icon adjacent to lines 02-06 shown in FIG. **25**. Furthermore, an errata section may also be provided in a section of the display on the mobile computing device. The errata section, for example, allows a user or a group of users to record various errata of the transcript. In the example shown in FIG. **25**, Kevin Anderson on May 23, 2011 changed the word "something" to read—nothing—on line 12. Of note, the word "something" has been changed to be shown as strikethrough text and the word—nothing—has been inserted in a distinctive manner. For example, as shown, the word—nothing—may be italicized, underlined, or may be displayed with a different font, color, or size.

FIG. **26** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a pop-up window showing a linked exhibit. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the transcript may have an exhibit linked to one or more lines of text, such as an issued U.S. patent. In the example shown, the user has selected or click on the linked exhibit's thumbnail, which has resulted in a pop-up window to display the linked exhibit, i.e., U.S. Pat. No. 6,714,091.

FIG. **27** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section for exhibits linked to the deposition. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the mobile device may provide a listing of available exhibits associated with the case or the deposition. Furthermore, in some embodiments, a cost may be associated with one or more the exhibits. For example, as shown in FIG. **26**, a user may buy or purchase the set of exhibits by selecting or clicking on the "Buy" control button displayed on the mobile device.

FIG. **28** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section showing objections to portions of the testimony by the deponent. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the transcript may have an exhibit linked to one or more lines of text, such as drawing from a U.S. patent. In addition, the mobile computing device may provide a section of the display for objections. For example, as shown, in FIG. **27**, the court overruled an objection by the defendant related to lines 7-13.

FIG. **29** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a summary section on the display. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the display may comprise a summary section. The summary section may indicate various items, such as the Plaintiff's designations, the Defendant's designations, runtime, locations, and locations of errata in the transcript.

FIG. **30** illustrates an exemplary screen shot of a mobile device for a filtered deposition video and transcript with a summary section on the display. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the transcript may be filtered to show only requested portions. In the example shown in FIG. **29**, a thick black line at line 12 indicates that text between lines 13-16 has been filtered from the display. As also shown, a video sequencing bar with a location indicator may be provided above the scrub bar to show relative locations of the requested portions of the deposition.

FIG. **31** illustrates an exemplary screen shot of a mobile device for a deposition video and transcript with a section listing witnesses. In particular, the mobile device is showing a deposition video and transcript of a deposition of Kevin Anderson on May 10, 2011. As also shown, the display may provide links to other witnesses of the case. In some instances, a cost may be associated with retrieving a witness testimony. For example, as shown in FIG. **30**, the testimony for Martha Campbell requires a purchase.

FIG. **32** illustrates an exemplary screen shot of a mobile device playing a news story having a video clip and corresponding text. For example, as shown, a news story from FoxNews regarding the royal wedding is shown.

In the screen shot, an image from the royal wedding is shown in the media area **12**. The header area **13** displays relevant identification of the story, such as the headline and tagline. The text area **14** shows a portion of a text transcript of the dialogue currently being played. In addition, the text area **14** may comprise a link to other content, such as a video of "William and Kate Exchanging Vows." Furthermore, certain portions of text may have a linked exhibit or attachment, as indicated by a paper clip icon shown adjacent to the relevant portion of the text. Finally, a scrub bar may be provided at the bottom of the display to indicate the progress of the playback and highlighting of text.

FIG. **33** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript and a section listing other files available to the user. For example, as shown, multimedia content for "The Glenn Beck Program" may be offered to the user.

In the screen shot, an image indicating the Glenn Beck Program is shown in the media area **12**. The header area **13** displays relevant identification of the story, such as the program's topic, date, and description. The text area **14** shows a portion of a text transcript of the dialogue currently being played. Finally, a scrub bar may be provided at the bottom of the display to indicate the progress of the playback and highlighting of text. Moreover, the screen shot may also offer links to other multimedia content files for the program, such as programs from different months.

FIG. **34** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript from an educational institution. For example, as shown, multimedia content from the Kellogg School Management may be provided to the user.

In the screen shot, an image indicating the speaker as Professor Michael Mazzeo is shown in the media area **12**. The header area **13** displays relevant identification of the speech or lecture, such as the title, speaker, and date. The text area **14** shows a portion of a text transcript of the dialogue currently being played. Finally, a scrub bar may be provided at the bottom of the display to indicate the progress of the playback and highlighting of text.

FIG. **35** illustrates an exemplary screen shot of a mobile device playing multimedia content with a transcript from a musical group and section listing other available content from the musical group. For example, as shown, multimedia content, such as the song "Abbey Road" by the Beatles may be offered to the user.

In the screen shot, an image indicating the song is shown in the media area **12**. The header area **13** displays relevant identification of the song, such as the title, year, and background. The text area **14** shows a portion of a text transcript of the dialogue currently being played. Finally, a scrub bar may be provided at the bottom of the display to indicate the progress of the playback and highlighting of text. Moreover, the screen shot may also offer links to other multimedia content files for the program, such as different songs or albums also by the Beatles or other artists.

FIG. **36** illustrates an exemplary screen shot of a mobile device playing multimedia content and a transcript for an audio book. For example, as shown, an audio file for the book "Unbroken" by Laura Hillenbrand is shown. In the screen shot, an image illustrating that the content is related to the book is shown in the media area **12**. The header area **13** displays relevant identification of book, such as the title, author, pages, publisher, and price. In the example shown, a control bar providing control buttons and progress of the multimedia content may also be provided in the header area **13**. The text area **14** shows a portion of a text transcript of the dialogue of the audio currently being played.

As described throughout this disclosure, the mobile computing device may control display of the text transcript in the text area **14** in a synchronized manner with the audio playback. Furthermore, a scrub-bar may also be provided at the bottom of the display on the mobile computing device.

FIG. **37** illustrates an exemplary screen shot of a mobile device playing a movie and a transcript with a section for navigating through the movie's content.

Titles, headers and section divisions within this disclosure are meant as navigational aids and are not meant to limit the scope of the disclosure. While multiple implementations have been illustrated and described in detail, it should be understood that various modifications in system and method design and details of construction are possible without departing from the spirit and scope of the disclosure.

Use of Barcode and a Mobile Computing Device to Retrieve Text Synchronized Multimedia

In yet another example of a printed transcript, a bar code, a 2D bar code or a Quick Response Code (or "OR Code") may be placed at the top of a page, in any margin on the page, or adjacent to a line or range of lines of a transcription of multimedia. A barcode may refer to any form of bar codes, QR codes, lines, dots, dashes, hieroglyphs, patterns, picture identifiers, color permutations, magnetic particle deposition, special character or numeric font usage, logos, faces, or combinations thereof, or any other similar reference that may be scanned or photographed for machine or electronic recognition. In one example shown, a QR Code may be scanned by a mobile computing device (or photographed with a camera integral to the mobile computing device and then deciphered by software on the mobile computing device, as is understood in the art). The software for scanning on the mobile device recognizes the QR Code as a URL-type link. The URL-type link causes software on the mobile computing device to retrieve an electronic copy of the transcript, including with synchronized multimedia. The link may be a deep link to the multimedia, directing the user to a point in the multimedia other than the beginning of the multimedia.

The QR code may comprise a series of alphanumeric characters, sometimes an encrypted or randomized string of alphanumeric characters. In one embodiment, the QR code may reference a client control number. The client control number can be associated with the purchaser of the transcript or other authorized recipient.

In the context of a deposition transcript, the client control number can be associated with at least one attorney, at least one law firm, or at least one litigant, or a preselected group of users. In this fashion, a hardcopy of the transcript can be utilized by an attorney or law firm as has been traditionally done, i.e. by making duplicate hardcopies for use and distribution, but providing the novel and added benefit that each recipient of the hardcopy can conveniently access the electronic transcript and associated multimedia by scanning the QR Code with a mobile computing device. In general, the client control number may function to help identify the users who may be authenticated, and to whom data may properly be delivered.

The QR code may also comprise reference to the synchronization index, or a portion thereof, and the corresponding multimedia, or portion thereof. In this fashion, a user may be directed directly to the desired portion of both the transcript and the associated multimedia.

The user with the hardcopy and mobile computing device may scan the bar code, and the application may communicate with a database to determine whether he is listed among the group of authorized users. If the user is not authenticated, electronic access to the transcript and multimedia can be denied.

User logs may be kept to determine the identity of users of the electronic assets, and usage and access can be monitored and conveniently reported.

As an additional benefit, it is not uncommon in the legal industry for parties to distribute hardcopies of a transcript without properly paying the court reporting firm for the correct number of copies. For example, in multi-party or class action litigation, a group of litigants may attempt to purchase one transcript copy from the court reporting firm, or a limited number of copies, but then share unauthorized photocopies for which the court reporting firm is not compensated.

In this instance, if the user scans the QR Code on the hardcopy of the transcript, and if the user is not already a member of a group that has paid for and can rightfully access the electronic transcript, then the software or software agreement may compel the user to pay for a copy of the transcript. Invoicing and payment can be achieved immediately and electronically. This is an efficient method to electronically distribute transcript copies and to provide electronic access on a mobile computing device to the transcription and associated multimedia.

The client control number may differ for each copy of a transcript sold. That is, each hardcopy of a transcript that is produced, for example by a court reporting firm, may be provided a unique code with a unique client control number. For example, "Code 1" may identify a purchase of a transcript copy by attorney John Doe, at Law Firm X, representing Company A. John Doe may, for instance, seek to utilize his mobile computing device to see deposition testimony beginning on Page 10, Line 1. With the application running on his iPad, he can scan, or photograph, the QR code adjacent that line on that page. When he does so, the application communicates the client control number embedded in the QR code. This communication is done by computer network, which computer network also comprises a computer that references a user database. The database is used to authenticate that the iPad belongs to John Doe. Once authenticated, John Doe is served data, i.e. the transcript and associated multimedia. If the user fails the authentication step, data delivery may be denied. In some circumstances, the authentication step may authenticate all data requesters.

John Doe may also set permissions allowing access to that transcript to other users in a group, for example other attorneys within his law firm, or certain designated individuals associated with his law firm's client, Company A. Permissions may also be limited by an administrator, for example the court-reporting firm responsible for distributing transcripts and allowed a reasonable fee therefor by the governing rules of procedure. In such a circumstance, the administrator may control or make alterations to the database that is used by the computer system in performing the authentication.

As an example, assume that John Doe provides the hardcopy of a deposition transcript to a co-litigant at Company B. Assume that Company B has not purchased a copy of the transcript from the court-reporting firm and that John Doe cannot set permissions to allow Company B access to the transcript electronically. If a user at Company B scans the QR code on the transcript to obtain electronic access to the transcript and associated multimedia on his own iPad, access may be granted, in this example, if and only if the administrator has allowed it, i.e. the court reporting firm is legally able to furnish a copy, and if terms for the purchase and sale of the access have been agreed upon. The system administrator, or a court reporting firm utilizing the system, can include as part of the terms of use for the mobile device software an agreement that any asset delivery is subject to specified terms and fees, which may include a charge of a reasonable fee upon accessing a transcript or multimedia from having scanned a QR code on a hardcopy of a transcript. Such transaction can occur as an "in app purchase", or a purchase as is made from within the application. As one example, the Apple company supports "in app purchases", as opposed to delivering content through another mechanism, such as transfer of a pdf, book, text, music, or movies via iTunes.

In this example, the user at Company B scans with his iPad the QR code on John Doe's hardcopy transcript, Company B is immediately charged for a purchase, and access to the transcript and associated multimedia is furnished immediately electronically. From the electronic transcript, the software enables the user to print a hardcopy of the transcript from the mobile computing device, or it can be formatted as a pdf, or other suitable format, for printing or emailing. This hardcopy of Company B will be marked with a bar code comprising a client control number for Company B.

In this example, although John Doe provided a hardcopy of the transcript to a co-litigant improperly by not properly compensating the court reporting firm, the computer server and serving software may operate to ensure he doesn't inadvertently provide electronic access to what may be work product he has associated with his group's copy of the electronic assets. For example, John Doe and his law firm may have created issue codes and made comments upon the transcript, which they did not intend to share with Company B. Because Company B is not within the set of authorized users in John Doe's group, any work product of John Doe's group is not made available to Company B by virtue of the Company B user having scanned John Doe's QR code. That is, when Company B receives electronic access for the first time, a new, fresh user group is created, and the new user from Company B must indicate who is authorized to collaborate within his own group, subject to review by a system administrator.

In yet another example of the printed transcript, FIG. **40** illustrates how an issue coded transcript may be provided to a court. QR codes are placed in the margins to allow a user of a mobile computing device to scan the code to access an electronic copy of the transcript and multimedia at that exact position. Thus, paper filings can be made to a court, allowing simple access to the corresponding electronic assets (transcript and multimedia) on a separate mobile computing device.

In this manner, a judge, clerk, or courthouse staff can conveniently use a mobile computing device to retrieve multimedia assets, without having to take delivery of CDs, DVDs, or other storage media a litigant may intend to deliver to the court. Further, an overall computer system may be provided and managed, to ensure multimedia submitted to the court is available, convenient to access, able to be archived, and capable of having usage tracked, for example to ensure access is provided only to authorized users and to date the time of filing, as part of an electronic records filing and management system.

Such use of QR codes and mobile computing devices to allow simple and easy retrieval of specific portions of multimedia and corresponding transcription allows novel use of mobile computing devices. Such uses may be particularly useful in scholarly writing, news and news distribution, legal writing, magazines/periodicals, books, political discourse, and elsewhere.

While the examples above are presented in the context of a legal proceeding, i.e. a deposition transcript and associated multimedia, the examples are not intended to limit the scope of the invention. As discussed above, there exist many types and kinds of uses for a synchronization index with associated multimedia, being used on a mobile computing device.

Sharing a Transcript by Barcode

As another example, a court reporter at the conclusion of a deposition may distribute copies of the transcript by requiring that an attorney present at the deposition utilize a mobile computing device to scan a barcode to retrieve the transcript. As part of the court reporting software, for example, the court reporter may utilize a mobile computing device, such as an Apple iPad, to display a barcode to be scanned by an attorney who desires to purchase a copy of the transcript. The scan of the barcode evidences an offer and acceptance, forming a binding contract between the attorney and the court reporter to furnish a copy of a transcript. Prior to the invention, often times there existed disputes about whether an attorney agreed to pay for a copy of the transcript, as such orders were taken orally at the conclusion of a deposition.

After scanning the barcode, the URL-type link is opened on the attorney's mobile computing device, the transaction data is fed to a computer system for authentication, and the transaction is recorded as having been made. Certain of the information from the attorney's mobile computing device may be communicated to the computer system, for example identifying information from the mobile computing device itself, such as a UDID from an Apple iPhone or iPad and any user or owner information that may be retrieved. Also, the barcode may comprise information identifying the court reporter, for example the name of the court reporter, the date, the deponent, the caption of the case, and so on. The court reporter may refresh the barcode on his or her mobile computing device for each successive attorney wanting to make a purchase at the time of the deposition.

Sharing a Transcript by Close Proximity Communication Between Mobile Computing Devices

In yet another embodiment of sharing an electronic transcript utilizing a mobile computing device, once a user has properly accessed an electronic copy of a transcript, and associated multimedia, for example by having used his mobile computing device to scan a QR code printed on a photocopy of the transcript, discussed above, the authenticated user may transmit the identity of the electronic asset, or a specific location within the electronic asset, to another mobile computing device user by close or near-field proximity communication with another mobile computing device. In one example of close proximity communication, User1 may "bump" his mobile computing device with another mobile computing device, causing communication of a client identification number and/or a synchronization index reference. User2, with his mobile computing device, receives the communication of the client identification number and/or a synchronization index reference, and User2 then proceeds as though he has scanned User1's QR code, discussed above. One example of close proximity communication between mobile computing devices is utilizing Near Field Communication (NFC) technology. One mobile computing device utilizing NFC technology is the "Samsung Galaxy S III", which uses software referred to as "S Beam", to allow two devices to have their backs gently bumped together to initiate transfer of data.

Sharing a Deep Link by QR Code

In yet another embodiment, a user of a mobile computing device may highlight or otherwise select a range of text from a synchronization index, and then select an option to instruct the software to generate a QR code with information sufficient to allow a subsequent user to scan the QR code in order to be delivered directly to that portion within the multimedia.

In FIG. **41**, for example, QR Code was created, here by accessing the URL http://createqrcode.appspot.com/ for the sample string of text: www.sampleURL.com/ClientControl=AttorneySmith9876. Transcript=ABC123-Anderson; StartPage=14; StartLine=2; EndPage=14; EndLine=6. This string of text contains a hosting URL, here www.sampleURL.com; a client control number, here "ClientControl=AttorneySmith9876"; a transcript reference, here "Transcript=ABC123"; and a page and line range for the

designated text (and corresponding video) at page 14, lines 2-6, here shown as "StartPage=14; StartLine=2; EndPage=14; EndLine=6".

Once that QR code is generated, it can be immediately scanned from the display screen by a second mobile computing device, posted online, for example, on one's social networking timeline as one may do using the Facebook website, emailed, printed, embedded in another document, or saved for later use.

FIG. **41** depicts an action sequence, beginning with an issue coded deposition transcript, for example as may be displayed on a mobile computing device. Here, the user intends to generate a QR code for the designation at page 14, lines 2-6 of the transcript. The user selects the function "Show QR code", and the corresponding QR code is displayed.

FIG. **42** depicts a software user interface for displaying QR codes. Here, the rightmost quarter of the display screen has been partitioned for display of QR codes. The tab "OR Code Reference" has been selected, and the mobile computing device software automatically generates a QR code for each designated portion of testimony. Here, a Defendant's designation page 14, lines 2-6 of the transcript is shown in the cross-hatched area **42-1** covering text at page 14, lines 2-6, and corresponding QR code is shown enlarged in the upper right corner of the display screen. As discussed above, another user of a mobile computing device may scan that QR code to access that transcript and corresponding multimedia at exactly that location.

Also shown in the rightmost margin is a thumbnail QR Code for the Plaintiff's designation of page 14, lines 7-12. Plaintiff's designation of page 14, lines 7-12 is depicted with a large-cross-hatched area **41-2**. As the multimedia plays and the transcript scrolls, so too may the corresponding information in the rightmost pane. The QR code may be enlarged by a gesture on the viewing screen, such as a two finger reverse pinch, and once enlarged may be shrunken by another gesture on the viewing screen, such as a two finger pinch.

In this example, the use of the QR code facilitates the quick and easy sharing of a precise point within multimedia between one mobile computing device user and another. Moreover, a discrete "clip", or passage, or scene, or chapter, may be quickly and easily shared between users, here depicted as a deposition designation.

In yet another embodiment, an aggregation of various multimedia clips can be forwarded to a second user by use of a barcode. Suppose, for example, a first user has issue coded a deposition transcript with four issues, two of which are "Plaintiff's direct designations" and "Defendant's direct designations." Suppose, further, that the first user wants to direct a second user, e.g. the court, to view on a mobile computing device only those sections of the multimedia that correspond to those two issue codes, to the exclusion of the other portions of the deposition testimony. The first user creates the designations, then selects from a GUI the command to create a barcode for the set of designations. The first user's computer causes an edit decision list-type of file to be sent by computer network, to a server (or the edit decision list can be created by the server). This edit decision list, for example, may comprise a list of StartPage.StartLine+EndPage.EndLine entries, which correspond to multimedia times as may be found in a synchronization index. The barcode is then generated, with characters to direct the second user to the edit decision list generated by the first user. With a mobile computing device, the second user is then able to scan the barcode (i.e. if printed and placed within a legal brief filed with the court) and to retrieve the multimedia and associated synchronization index. In this manner, a first user can compile a set of discrete video segments that can be subsequently retrieved by a second user by using a barcode and a mobile computing device.

Use of Barcode and a Mobile Computing Device to Pick Up Location Data from Video Played on a Device Other than the Mobile Computing Device.

In yet another embodiment, a user of a DVR or set top appliance, such as an AppleTV by Apple, Inc., may pause playback of pre-recorded or streaming programming, and thereafter retrieve that exact location within the multimedia using a mobile computing device. As an example, suppose a DVR receives via cable television service certain broadcasting signals, which are recorded to a DVR, specifically the hard drive memory resident on the DVR. On pausing, the software on the DVR may function to display a barcode on the viewing screen, for example a flat screen monitor connected to the DVR by HDMI connection, whereupon a mobile computing device user, say using an Apple iPad, may scan the barcode, and then be delivered right to that place within the multimedia where the video was paused. The multimedia content, however, may be delivered to the iPad via Wifi or wireless data connection, and the user would be able to watch the content on his mobile device. Optimally, the user experience is a quick and seamless appearance of transference of multimedia. The mobile computing device acquires the barcode, having embedded therein a client control number, and other information, to allow the multimedia delivery system to perform an authentication step to determine whether the user or mobile computing device possesses necessary permissions to "share" the multimedia asset.

In this example, suppose the user, a subscriber to cable television services by Cox Communications in Northern Virginia, scheduled a recording of Program X on his DVR. The DVR records the program at the scheduled time. Assume the user then watches Program X, a one-hour long program, which was recorded on his home DVR. He stops at 37:00 into the program, and wishes to have his children watch the remainder of the program on an iPad while travelling in the car. On pausing, the user may elect a display of a barcode. The iPad user scans the barcode. The iPad then communicates, via data network, either wireless, 3G, 4G, LTE or similar, transmitting the content of the barcode to a multimedia delivery service. The multimedia delivery service then determines whether the user is allowed access to the multimedia, then commences delivery of the multimedia to the mobile computing device, either by streaming (via data network, either wireless, 3G, 4G, LTE or similar), or by streaming and caching for later playback on the mobile computing device.

In this example, the authentication step verifies that the mobile computing device user or the mobile computing device is eligible to receive multimedia content. This authentication does not necessarily require that the mobile computing device be registered to the same cable television service account, for example, which is supplying multimedia to the DVR.

Further, this placement of barcode for use with a mobile computing device may also be utilized when the multimedia is first delivered by other means as well, for example if the multimedia content resides on a Blu-ray disc and is first played therefrom. In that instance, a pause of multimedia played from the disc may still result in a display of a barcode, for retrieval of multimedia by a mobile computing device. The scan of the barcode may cause, on a computer network, the seek for the identical content for delivery at the time desired, through a delivery mechanism where the mobile computing device, or the user, is an authorized user. For example, a Blu-ray disc, when content is paused and a barcode is subsequently displayed, may contain as a client con-

trol number an indicator for the multimedia to be requested from a hierarchical list of delivery sources. For example, the system, using the client control number in the barcode displayed from the Blu-ray disc, may first seek to deliver the multimedia content from a multimedia delivery system controlled by the movie's production company (e.g. Disney/Pixar), then from a hierarchical number of others where the user would have authentication to receive the identical multimedia content, like Apple, Netflix, Amazon, Hulu, Google, Facebook, or any others.

While a Blu-ray-type media player is discussed above, the multimedia playback system is meant to include, but not to be limited to, any appliance for reading data from a disc using an optical reader, for example as used in reading content from CD, DVD, or Blu-ray formatted media; reading data from flash memory, no matter the physical form factor, including USB thumb drives, SD memory cards, compact flash, memory sticks, video game cartridges, and the like, and; streaming media appliances that receive, typically wirelessly or through wired data network, data transmissions from the internet.

Further, a video game console (for example as may be connected to a viewing monitor) may operate similarly, allowing a user to pause the game, whereupon a barcode is displayed allowing the user to utilize a mobile computing device to scan the barcode and be delivered to the same or similar game on a mobile computing device. In this instance, the information conveyed in the barcode may prompt a gaming software download onto the mobile computing device. The barcode may also contain information to replicate the position of the player who paused the game on the game console. For example, the mobile computing device user may inherit the status of the state of the gameplay, i.e. points, score, levels completed, character attributes, powers, weapons availability, lives remaining, etc. Exemplary video game consoles include Sony PS3, Nintendo Wii, desktop and laptop computers, Apple iPhone, Apple iPad, and so on.

FIG. **43** illustrates a children's movie being displayed on a television screen, a scrub bar element indicating a program duration of 60:00 minutes, with the program being paused at 37:00 minutes into the program, and a bar code (above which is shown a trademarking element, here captioned with the trademark "MobilePickup") which functions to be scanned by a mobile computing device.

FIG. **44** illustrates incorporation into a program guide screen a scrub bar element (here indicating a program duration of 60:00 minutes, with the program being paused at 37:00 minutes into the program), and a bar code. The program guide screen contains other elements of a summary program guide screen. Using the program guide screen, and the bar code, a user may retrieve multimedia content using a mobile computing device, which authentication step determines whether the multimedia may be broadcast to the mobile computing device as an "on-demand" multimedia delivery service. Authentication may be denied, or a barcode may not be displayed, for example, if an event listed in the program guide will be a live broadcast which has not been recorded or has not yet occurred, or if the event listed has been embargoed until a first broadcast date, for example as would be the case with a weekly scheduled drama or situation comedy.

The content programming guide can be used to retrieve a program from the guide. Retrieving a program using the barcode and the content programming guide may deliver the user to the beginning of the program. In a different embodiment, the barcode may deliver the mobile computing device to a point in the program other than to its beginning, as is shown in FIG. **44** where a scan of the barcode is intended to allow the user to "pick up" the multimedia at a point 37:00 into the program.

Once again, while some of the examples above are presented in the context of a legal proceeding, i.e. a deposition transcript and associated multimedia, the examples are not intended to limit the scope of the invention. As discussed above, there exist many types and kinds of uses for a synchronization index with associated multimedia, being used on a mobile computing device.

The features and attributes of the specific embodiments disclosed above may be combined in different ways to form additional embodiments, all of which fall within the scope of the present disclosure. Although the present disclosure provides certain embodiments and applications, other embodiments that are apparent to those of ordinary skill in the art, including embodiments, which do not provide all of the features and advantages set forth herein, are also within the scope of this disclosure. Accordingly, the scope of the present disclosure is intended to be defined only by reference to the appended claims.

What is claimed is:

**1**. A method for social networking with a mobile computing device comprising:

providing for use on a mobile computing device a synchronization index, wherein said synchronization index is associated to multimedia, wherein the synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia, and wherein the synchronization index indicates respective times within the multimedia corresponding to when a word or range of words is audible in the multimedia;

providing mobile computing device software, wherein said mobile computing device software comprises executable program code configured to receive the synchronization index, and wherein said text is able to be displayed other than as a web page,

wherein said mobile computing device comprises a viewing screen and a touch-sensitive input interface,

wherein said viewing screen is able to display multimedia and text from said synchronization index,

wherein performing a user's selected gesture on a portion of said viewing screen corresponding to a portion of said text is recognized by said touch-sensitive input interface to facilitate annotation of a portion of said synchronization index, and

wherein said mobile computing device software comprises executable program code configured to facilitate annotation of a portion of said synchronization index responsive to user input received by the mobile computing device; and

communicating said annotation for subsequent retrieval on a second computing device via a network.

**2**. The method of claim **1**, wherein said mobile computing device software comprises executable program code configured to synchronously play said associated multimedia with said synchronization index other than as part of a web page.

**3**. The method of claim **1**, wherein said annotation is a link to a portion of said multimedia.

**4**. The method of claim **1**, wherein said annotation is text, said text being associated to a portion of said multimedia.

**5**. The method of claim **1**, wherein said annotation is text, said text being associated to a portion of said multimedia, and

wherein said text is able to be displayed when playback of said portion of said multimedia occurs.

**6**. The method of claim **1**, wherein said annotation is associated to a portion of said multimedia, and

wherein said annotation is selected from the group comprising a threaded text discussion, a selected range of text from said synchronization index to which a highlighting color or font characteristic is applied, an audio file, a multimedia file, a picture, a photograph, a graphic, a drawn annotation, a brand element, an alteration to the text of said synchronization index, a hyperlink, and a hyperlink to predetermined portion of multimedia.

**7**. The method of claim **1**, wherein said annotation is associated to a portion of said multimedia;

wherein said annotation is selected from the group comprising a threaded text discussion, a selected range of text from said synchronization index to which a highlighting color or font characteristic is applied, an audio file, a multimedia file, a picture, a photograph, a graphic, a drawn annotation, a brand element, an alteration to the text of said synchronization index, a hyperlink, and a hyperlink to predetermined portion of multimedia; and

wherein said second computing device selectively receives annotations as part of a social network.

**8**. The method of claim **1**, wherein said second computing device comprises computer hardware and software to operate a social networking service, wherein a user of said service is provided facility to share annotations.

**9**. The method of claim **1**, wherein said second computing device comprises a second mobile computing device.

**10**. The method of claim **1**, wherein said mobile computing device runs an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

**11**. A method for social networking relating to multimedia comprising:

providing multimedia;

providing a synchronization index that comprises an electronic transcript of text corresponding to at least a portion of audio from said multimedia and indicates respective times within the multimedia corresponding to a word or range of words, wherein said synchronization index provides association between at least one portion of said electronic transcript and at least one portion of said multimedia, and wherein said synchronization index is provided to a first user and at least one additional user via a network;

providing executable program code to deep link to a predetermined point within said multimedia by using said synchronization index; and

providing executable program code to share one or more said deep links, wherein said sharing of deep links facilitates interaction between the first user and at least one additional user via a network,

wherein mobile computing device software comprises executable program code to view said multimedia and said synchronization index other than as a web page,

wherein mobile computing device software comprises said executable program code to deep link, and

wherein mobile computing device software comprises executable program code to communicate deep links to a second computing device,

wherein said mobile computing device software operates on a mobile computing device comprising a viewing screen and a touch-sensitive input interface,

wherein said viewing screen is able to display multimedia and text from said synchronization index,

wherein performing a user's selected gesture on a portion of said viewing screen corresponding to a portion of said text is recognized by said touch-sensitive input interface to facilitate said deep linking.

**12**. The method of claim **11**, wherein said deep link is a hyperlink to a predetermined portion of multimedia,

wherein said hyperlink is associated to an element selected from the group comprising text, a note, a selected range of text from said synchronization index to which a highlighting color or font characteristic is applied, a picture, a photograph, a graphic, a drawn annotation, and a brand element, and

wherein said element is able to be viewed on a mobile computing device.

**13**. The method of claim **11**, wherein said mobile computing device software functions on a mobile computing device that runs an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

**14**. A computer system for social networking relating to multimedia comprising:

one or more processors for executing executable program code;

executable program code configured to provide multimedia;

executable program code configured to provide a synchronization index, wherein said synchronization index is associated to said multimedia, wherein the synchronization index comprises an electronic transcript that indicates text corresponding to audio from the multimedia, and wherein the synchronization index indicates respective times within the multimedia corresponding to a word or range of words, wherein said synchronization index is shared with a plurality of users, and wherein said text is able to be displayed other than as a web page;

executable program code configured to provide facility for a user to deep link to a predetermined point within said multimedia by using said synchronization index; and

executable program code configured to provide facility for a plurality of users to share said deep links, wherein said sharing of deep links facilitates interaction between a first user and at least one additional user via a network,

wherein said computing system comprises a hosting server and one or more mobile computing devices,

wherein at least one mobile computing device comprises a viewing screen and a touch-sensitive input interface,

wherein said viewing screen is able to display multimedia and text from said synchronization index, and

wherein performing a user's selected gesture on a portion of said viewing screen corresponding to a portion of said text is recognized by said touch-sensitive input interface to deep link to a predetermined point within said multimedia.

**15**. The system of claim **14**,

wherein at least one mobile computing device executes said executable program code configured to provide facility for a user to deep link to a predetermined point within said multimedia by using said synchronization index.

**16**. The system of claim **14**,

wherein at least one mobile computing device executes said executable program code configured to provide facility for a user to deep link to a predetermined point within said multimedia by using said synchronization index, and

wherein at least one mobile computing device plays multimedia synchronously with text from a synchronization index other than as a web page.

**17**. The system of claim **14**,

wherein at least one of said one or more mobile computing devices runs an operating system selected from the group comprising iOS, Android, Windows Phone, BlackBerry OS, and Linux.

* * * * *

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1102

**Short Case Caption:** TrackTime, LLC v. Amazon.com Services LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 13,502 words.
- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.
- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 12/09/2024

Signature: /s/ Robert Greenspoon

Name: Robert Greenspoon

Save for Filing